## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

COALITION FOR INDEPENDENT
TECHNOLOGY RESEARCH
P.O. Box 880264
San Francisco, CA 94188,

        Plaintiff,[1]

    v.

MARCO RUBIO, in his official capacity as
Secretary of State,
2201 C Street NW
Washington, DC 20520,

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security,
245 Murray Lane SW
Washington, DC 20528, and

PAMELA BONDI, in her official capacity as
Attorney General of the United States,
950 Pennsylvania Avenue NW
Washington, DC 20530,

        Defendants.

Civil Action No. _____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.    The Trump administration is engaged in a brazen and far-reaching campaign of censorship while cynically and falsely claiming that censorship is what it is fighting. Defendants have adopted a new policy of excluding and deporting noncitizens whose work involves combatting misinformation and disinformation, fact-checking, content moderation, trust and

---

[1] Plaintiff's motion for leave to provide a Post Office Box in the caption is forthcoming.

safety, or compliance (the "Censorship Policy" or "Policy"). Defendants are actively enforcing this Policy with the goal of punishing independent researchers, advocates, and others who research and report on the major internet platforms. Defendants have described the Policy as a response to what they call "censorship" of Americans, but it is a flagrant violation of the First Amendment.

2.    Despite Defendants' characterization, the work by the private individuals and organizations targeted by the Censorship Policy is not "censorship." To the contrary, when independent researchers and advocates study the internet platforms or express their views about the content moderation policies of those platforms, and when the platforms' employees work to develop or enforce those policies, they are engaged in private expressive activity that the First Amendment protects. It is Defendants' campaign to suppress that expressive activity that violates the Constitution.

3.    The Censorship Policy punishes expressive activity based on viewpoint. As memorialized in internal memoranda and described publicly by Defendants and their agents, the Policy targets noncitizens for their work "combatting" misinformation and disinformation, and for their advocacy in favor of certain content moderation policies. The content moderation policies of the major internet platforms reflect editorial judgments and have shaped each platform into a distinctive expressive environment. These policies are the subject of a great deal of public debate—debate that stems in part from disagreement about whether the platforms have caused societal harms and, if so, how those harms should be addressed. Through the Policy, Defendants explicitly seek to sanction and silence one set of participants in that debate: those whose research, advocacy, content moderation, or other work supports greater moderation of content on the platforms. And, as discussed further below, Defendants have in fact singled out for punishment researchers and

advocates who have criticized the more permissive content moderation policies of one platform in particular—X.

4.      The Censorship Policy punishes expressive activity for no legitimate governmental purpose. Defendants claim that the Policy serves the government's interest in protecting the right of Americans to speak on social media platforms, but, as the Supreme Court made clear just two years ago, the government has no compelling or even legitimate interest in dictating what speech private companies should publish. As the Court wrote: "On the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *Moody v. NetChoice*, 603 U.S. 707, 741–42 (2024). It follows that the government has no legitimate interest in punishing private actors who advocate for one set of content moderation policies or another, or who develop and implement those policies on behalf of the platforms.

5.      The Censorship Policy also violates the First Amendment because Defendants are using the "threat of invoking legal sanctions and other means of coercion" to indirectly "achieve the suppression" of protected speech that they could not achieve directly. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). The First Amendment forecloses Defendants from directly silencing speakers who favor certain content moderation policies over others. It likewise prohibits Defendants from silencing those speakers indirectly through the threat of punitive immigration enforcement action.

6.      The Censorship Policy is also unconstitutionally vague. Defendants have declared that they will target those who are "complicit in censoring Americans," but that phrase provides no fair warning of what speech or conduct the Policy prohibits. Indeed, given that the First Amendment forbids only censorship of speech *by the government*, the term "censoring Americans"

is inherently vague—and even incoherent—as applied to the speech or conduct of private actors. Meanwhile, Defendants have reportedly, but not publicly, identified a broad range of work subject to scrutiny under the Policy, leaving its scope indeterminate.

7.      The Censorship Policy has succeeded in chilling the expressive and associational activities of those whose work it targets, including noncitizen members of Plaintiff Coalition for Independent Technology Research ("CITR"). CITR is a non-profit organization whose members are research institutions, academics, journalists, and advocates who study and report on the impacts of technology on society, including questions relating to misinformation, disinformation, content moderation, and trust and safety. Defendants have already targeted CITR's membership under the Policy. On December 23, 2025, Defendant Rubio announced that the State Department would exclude or deport five specific individuals pursuant to the Policy—including the leaders of two organizations that are members of CITR. He also warned that the "State Department stands ready and willing to expand" the list of targets if others "do not reverse course." CITR's other noncitizen members quite reasonably fear they will be next on the list if they continue their research and advocacy focused on the major internet platforms.

8.      Defendants' related immigration enforcement practices have exacerbated the Censorship Policy's chilling effects. As CITR members and the broader public are well aware, Defendants have targeted other individuals for detention and deportation based on speech that Defendants disfavor. The enforcement efforts in those cases involved arrests by masked agents in unmarked vehicles; midnight flights to detention centers more than a thousand miles away; and prolonged detentions in harrowing conditions. As another U.S. district court recently concluded, these actions were intended to terrify noncitizens into silence, and to a significant extent they have succeeded in doing so. *See Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 173 (D.

Mass. 2025). Some of CITR's noncitizen members who currently live in the United States fear that they and their families, too, will be arrested with no notice and transferred to far-flung detention centers.

9.    Because of the fear that they will be targeted for detention and deportation under the Censorship Policy, some of CITR's noncitizen members who currently live and work in the United States have turned away from research projects in their primary areas of expertise; restricted public speaking about their work; declined invitations to conferences and other events relevant to their work; and limited or discontinued their public engagement with CITR and its advocacy efforts. Some have even made plans to leave the United States so that they can continue their work without fear of detention and deportation. These chilling effects have, in turn, significantly harmed the expressive, associational, and professional interests of CITR's U.S. organizational and U.S. citizen members as well.

10.    The Censorship Policy's chilling effects on CITR's members have harmed CITR, too. Because of the Policy, CITR has had to expend considerable time and resources mitigating the risks that other noncitizen members will be targeted under the Policy and, more broadly, responding to noncitizen members' concerns about the Policy's implications for their work and their involvement in CITR.

11.    As described further below, the Censorship Policy violates the First and Fifth Amendments to the U.S. Constitution. It also violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), because it is arbitrary, capricious, an abuse of discretion, and contrary to constitutional right, and because it exceeds Defendants' authority under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq*. CITR respectfully requests that the Court declare that the Censorship Policy is unlawful, set it aside, and enjoin Defendants from enforcing it.

## JURISDICTION AND VENUE

12. The Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331, 5 U.S.C. § 702, and the U.S. Constitution.

13. The Court has authority to issue the requested relief pursuant to 5 U.S.C. § 706(2), 28 U.S.C. §§ 2201–2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the Court's inherent equitable powers. The Court has authority to award costs and attorneys' fees pursuant to 28 U.S.C. § 2412.

14. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1).

## PARTIES

### *Plaintiff*

15. Plaintiff Coalition for Independent Technology Research ("CITR") is a U.S.-based, non-partisan, non-profit membership organization established to advance, defend, and sustain the right to ethically study the impact of technology on society. CITR's members are research institutions, academics, journalists, and advocates who study and report on emerging digital technologies, including social media, and their social and political impacts. As part of its mission, CITR works to defend technology research from efforts at obstruction, interference, and cooption by both the government and the technology companies that are often the subject of that research. CITR believes that technology is changing society in ways that are essential for the public, the government, and the internet platforms themselves to understand, and that independent research is critical to that understanding. CITR is a fiscally sponsored project of Aspiration, a non-profit organization based in San Francisco, CA.

### *Defendants*

16. Defendant Marco Rubio is the Secretary of State. The State Department is an agency of the federal government of the United States located in Washington, DC. Defendant

Rubio is sued in his official capacity. In that capacity and through his agents, Defendant Rubio exercises authority over all State Department policies and practices, including the Censorship Policy challenged here.

17.    Defendant Kristi Noem is the Secretary of Homeland Security. The Department of Homeland Security ("DHS") is an agency of the federal government of the United States located in Washington, DC. Defendant Noem is sued in her official capacity. In that capacity and through her agents, she directs each of the component agencies within DHS, including U.S. Immigration and Customs Enforcement ("ICE"), U.S. Citizenship and Immigration Services ("USCIS"), and U.S. Customs and Border Protection ("CBP"), and she exercises broad authority over the enforcement of the immigration laws, including in connection with the Censorship Policy challenged here.

18.    Defendant Pamela Bondi is the Attorney General of the United States and leads the Department of Justice ("DOJ"). DOJ is an agency of the federal government of the United States located in Washington, DC. Defendant Bondi is sued in her official capacity. In that capacity and through her agents, she directs each of the component agencies within DOJ, including the Executive Office for Immigration Review ("EOIR"), and she exercises broad authority over the administration of the immigration laws, including in connection with the Censorship Policy challenged here.

## FACTUAL BACKGROUND

### *Independent Research, Fact-Checking, and Trust and Safety Work*

19.    Much of today's public and political discourse takes place on social media and other internet platforms owned and operated by private companies. Four related fields of work shape how internet platforms operate and how the public understands and interacts with them. Laws and regulations impose legal obligations as to how internet platforms respond to certain types of

7

content posted by their users. Platforms' trust and safety work carries out platforms' editorial decisions about the content they wish to host, giving each platform a distinctive feel and serving the interests of users and advertisers. Independent fact-checking empowers the public to assess the accuracy of information published on the platforms. And independent research underpins all of the above, informing the public's as well as the platforms' own understanding of how the platforms operate and how they impact society, providing transparency and enabling accountability.

20.    Independent research is critical to the public's understanding of the ways in which powerful technology companies observe our online interactions and shape our society. CITR's members—including researchers, research institutions, journalists, and advocates—conduct rigorous, independent research to identify ways to ensure user safety and promote free expression and positive social impact on the internet platforms. CITR's membership encompasses a broad range of perspectives on what platform policies are preferable from a societal standpoint: some members support tighter moderation of content on social media platforms, for example, while others support looser moderation of content on the platforms. Regardless of their positions, by operating independently from the technology industry, CITR members provide essential transparency and enable accountability for the platforms' decisions. Their research informs public understanding, shapes policy debates, and helps ensure that platforms' policies and practices serve the public interest. CITR advocates for researcher access to platform data and systems necessary to conduct this research and fosters a community to enable its members to share resources, collaborate on best practices, create standards, and advocate for funding.

21.    Independent fact-checking is critical to the public's ability to assess the accuracy of information published on internet platforms. Fact-checkers investigate the factual accuracy of statements by public figures or institutions, or statements in news stories or other widely circulated

posts, through journalistic processes such as consulting different sources, verifying claims with experts, and considering supporting evidence. Some platforms choose to employ third-party fact-checkers to help identify news stories that have been disputed or debunked, or to flag or limit distribution of stories that are false, misleading, or spammy. Fact-checkers may also operate entirely independently from platforms, sharing fact-checking assessments directly with the public via their own websites or hotlines.

22.    Trust and safety operations encompass the comprehensive set of policies, technologies, and dedicated personnel that internet platforms employ to protect user well-being; safeguard platform reputation; ensure compliance with community standards; and exercise editorial judgment over the content shared on their platforms. Trust and safety work generally focuses on safety (protecting users from harm), integrity (maintaining platform reliability and authenticity), user control (empowering users with tools such as blocking, muting, and reporting functions), and transparency (providing clear information about enforcement actions and community standards). Each platform's trust and safety operations are structured differently, depending on the platform's purpose or service; its resources, structure, and development; and how the platform defines the kind of content and community it wishes to cultivate. Trust and safety work may include identifying and removing illegal or harmful material—such as harassment, hate speech, terrorist material, or content depicting child sexual abuse—and detecting and preventing fraudulent activities, misinformation, human trafficking, and other forms of malicious behavior that undermine platform integrity. Content moderation is a key component of trust and safety work, encompassing the policies and practices through which the platforms exercise their editorial discretion to curate the extraordinary volume of content posted online each day. Platforms' curatorial decisions can take many forms. Some platforms choose to remove certain kinds of

content, such as pornography or spam, entirely. Others may deprioritize certain types of content compared to other types on users' feeds, or they may add notes or warnings to certain posts.

23.    Alongside or as part of their trust and safety teams, internet platforms employ compliance teams dedicated to ensuring the platform meets legal and regulatory obligations across the jurisdictions in which they operate. These obligations may include removing content that is illegal in particular jurisdictions, adhering to age verification or parental consent requirements, and fulfilling mandatory reporting obligations, such as by reporting child sexual abuse material.

### Defendants' Conflation of Private Actors' Expressive Activities with "Censorship"

24.    Since his first administration, President Trump and his political allies have characterized the expressive activities of private actors described above as a form of "censorship," paying particular attention to the treatment of conservative speech on social media platforms. Through private lawsuits, congressional investigations, and administrative actions targeting internet researchers and advocates as well as internet platforms themselves, President Trump and his allies have waged a broader campaign against what they call the "censorship-industrial complex." The development and enforcement of the Censorship Policy are best understood in the context of this broader campaign.

25.    This campaign began in earnest in May 2020. On May 26, 2020, President Trump shared false information about U.S. voting processes on Twitter, stating that mail-in ballots would be "substantially fraudulent." Twitter responded by adding a fact-check label describing President Trump's tweet as "potentially misleading" and providing readers with a link to additional context about mail-in ballots. That same day, President Trump wrote on Twitter, "Twitter is completely stifling FREE SPEECH, and I, as President, will not allow it to happen!" The following day, President Trump wrote on Twitter, "Republicans feel that Social Media Platforms totally silence

conservatives [sic] voices. We will strongly regulate, or close them down, before we can ever allow this to happen."

26.    Two days later, President Trump issued Executive Order 13,925, titled "Preventing Online Censorship," which stated: "Twitter now selectively decides to place a warning label on certain tweets in a manner that clearly reflects political bias." Among other things, the order directed the Commerce Department to work with the DOJ and the Federal Communications Commission to propose regulations to "clarify" section 230 of the Communications Decency Act, which generally shields internet platforms from liability arising from the publication of user-generated content. The order also directed government agencies to review their advertising expenditures on platforms that engage in "viewpoint-based speech restrictions."

27.    President Trump and his allies' campaign against internet platforms' content moderation practices escalated in response to the suspension of President Trump's accounts following his actions on January 6, 2021. On that day, Twitter and Facebook both removed posts by President Trump praising rioters who had attacked the U.S. Capitol, and they temporarily suspended his accounts on their respective platforms. On January 8, 2021, Twitter announced that it had permanently suspended President Trump's account because of "the risk of further incitement of violence." In June 2021, Facebook announced that its suspension of President Trump's account would last at least through January 2023, after which point it would decide "whether the risk to public safety has receded." Other internet platforms, including YouTube and Instagram, similarly suspended President Trump's accounts.

28.    President Trump sued Facebook, Twitter, and YouTube in July 2021, claiming that the suspensions of his accounts constituted "illegal, shameful censorship of the American people."

A federal judge dismissed President Trump's lawsuit against Twitter in May 2022, ruling that the complaint failed to plausibly allege a First Amendment claim against Twitter, a private company.[2]

29.     Between his two presidential terms, President Trump and his political allies turned their attention toward researchers and advocates who study and report on internet platforms' content moderation practices, characterizing their work as "censorship" and seeking to impede it.

30.     By 2022, Elon Musk—who later occupied a senior role in the second Trump administration—had adopted President Trump's claims of anti-conservative censorship on social media platforms. Almost immediately after purchasing Twitter in October 2022, Musk reinstated President Trump's suspended account. He subsequently renamed the platform X. Then, in July 2023, X filed a lawsuit against CITR member the Center for Countering Digital Hate ("CCDH"), a non-profit organization that works to stop the spread of online hate and disinformation through research, public campaigns, and policy advocacy. In June 2023, CCDH had published research about the prevalence of hate speech on X. In its lawsuit, X accused CCDH of collecting information in violation of contractual provisions as part of a "campaign" to "censor a wide range of viewpoints on social media with which it disagrees." A federal district court dismissed the lawsuit in March 2024, writing: "This case is about punishing the Defendants for their speech." *X Corp. v. Ctr. for Countering Digital Hate, Inc.*, 724 F. Supp. 3d 948, 955 (N.D. Cal. 2024).

31.     By 2023, President Trump's allies in Congress had also taken up his charge against alleged anti-conservative censorship on social media platforms and turned their attention to internet researchers. They first singled out the Stanford Internet Observatory ("SIO"), an academic program at Stanford University that researched abuse on internet platforms. Through its Election

---

[2] President Trump appealed the ruling. After President Trump's second inauguration, X (formerly Twitter) settled the lawsuit. Meta (the parent company of Facebook) and Alphabet (the parent company of YouTube) similarly agreed to settle the lawsuits against them after President Trump's second inauguration. Facebook, Instagram, and YouTube had reinstated President Trump's suspended accounts in 2023.

Integrity Partnership, the SIO partnered with the University of Washington to track falsehoods about the 2020 and 2022 elections. On April 12, 2023, the House Judiciary Committee's Weaponization of the Federal Government Subcommittee, led by Representative Jim Jordan, subpoenaed SIO for documents related to the committee's investigation of alleged censorship. On June 1, 2023, Chairman Jordan issued a letter to SIO asserting that SIO's research activities constituted "the censorship of disfavored speech." On November 6, 2023, a Committee Report accused SIO's Election Integrity Partnership of colluding with federal agencies to "censor Americans' online speech" in advance of the 2020 presidential election.

32.    Meanwhile, SIO leadership defended against a private lawsuit brought by America First Legal, an organization co-founded by Stephen Miller and Gene Hamilton, who have served as senior officials in each of President Trump's terms. That lawsuit, filed in May 2023, characterized the Election Integrity Partnership's research as "the largest mass-surveillance and mass-censorship program in American history." In response to mounting political pressure, the Election Integrity Partnership announced that it would cease work on future elections altogether, and SIO ultimately shut down.

33.    The House Judiciary Committee subsequently targeted other internet researchers and advocacy organizations, including CITR members, as well as European regulators. On August 3, 2023, the Committee sent a letter to Imran Ahmed, the CEO of CCDH, requesting information on what the Committee characterized as an "unconstitutional pressure campaign against social media platforms to censor" individuals like Robert F. Kennedy, Jr., now the Secretary of Health and Human Services. On August 30, 2023, the Committee subpoenaed CCDH for additional documents. On September 10, 2024, the Committee also sent a letter to EU Commissioner for

Internal Markets Thierry Breton regarding its "concerns that the EU may be attempting to censor or suppress lawful speech in the United States," specifically referencing Elon Musk and X.

34.    Immediately following his return to office, President Trump ordered federal agencies to support his attack on purported "censorship" of speech on social media. On January 20, 2025, President Trump signed Executive Order 14,149, denouncing the Biden administration's purported efforts to "combat[] 'misinformation,' 'disinformation,' and 'malinformation'" by "exerting substantial coercive pressure on third parties, such as social media companies, to moderate, deplatform, or otherwise suppress speech." The same day, President Trump also signed Executive Order 14,150, declaring that "the foreign policy of the United States shall champion core American interests and always put America and American citizens first," and Executive Order 14,161, directing the Secretary of State and other Cabinet officials to "[r]ecommend any actions necessary to protect the American people from the actions of foreign nationals who have undermined or seek to undermine the fundamental constitutional rights of the American people including, but not limited to, our Citizens' right to freedom of speech."

35.    Several agencies then took action. On February 19, 2025, the Federal Trade Commission ("FTC") launched an inquiry into how it might impose liability on internet platforms for their trust and safety efforts, requesting public comments on "technology platform censorship." FTC Chairman Andrew N. Ferguson stated in a press release that the inquiry was intended to "help the FTC better understand how these firms may have violated the law by silencing and intimidating Americans for speaking their minds."

36.    In April 2025, the U.S. Attorney for the District of Columbia threatened Wikipedia's tax-exempt non-profit status, accusing Wikipedia of "allowing foreign actors to manipulate information and spread propaganda to the American public . . . including the rewriting

of key, historical events and biographical information of current and previous American leaders, as well as other matters implicating the national security and the interests of the United States." Based on this accusation, the U.S. Attorney demanded documents and information, including about the "employees and contractors, budget, day to day oversight, and enforcement mechanisms" on Wikipedia's trust and safety team.

37.    On July 11, 2025, the Antitrust Division of DOJ filed a statement of interest in *Children's Health Defense v. WP Company, LLC D/B/A The Washington Post et al.*, No. 23-CV-2735 (D.D.C.), a lawsuit filed in 2023 by plaintiffs including now-Secretary Robert F. Kennedy, Jr., and the Children's Defense Fund, a group founded by Kennedy that advocates against vaccine mandates. The lawsuit accused news organizations of forming a "censorship partnership" with internet platforms to censor claims about COVID-19. In its statement of interest, DOJ criticized the news organizations' efforts to flag misinformation for the platforms and claimed that the defendants engaged in "viewpoint collusion."

38.    Meanwhile, chaired by Representative Jordan, the House Judiciary Committee has held multiple hearings and issued multiple reports focused on the so-called "censorship-industrial complex," in which it has targeted other independent advocacy organizations, including CITR members. On July 25, 2025, the Committee published a report titled, "The Foreign Censorship Threat," which stated that organizations like HateAid, led by Josephine Ballon and Anna-Lena von Hodenberg, may be incentivized "to flag content in hopes that platforms censor the content." On February 3, 2026, the Committee published another report titled, "The Foreign Censorship Threat: Part II," which called out the Global Disinformation Index ("GDI"), a CITR member led by Clare Melford, as an allegedly "biased, left-wing" organization that seeks to censor conservative speech.

***The Censorship Policy***

39.     Defendants Rubio and the State Department are also now targeting the independent researchers and advocates, fact-checkers, and trust and safety workers whose work the Trump administration and its political allies have characterized as "censorship." Specifically, Defendants are subjecting noncitizens who work in those fields to visa denials, visa revocations, and even detention and deportation based on their expressive activities.

40.     On May 28, 2025, Secretary of State Marco Rubio announced on X "a new visa restriction policy that will apply to foreign officials and persons who are complicit in censoring Americans":



In a follow-up post, he added, "[f]oreigners who work to undermine the rights of Americans should not enjoy the privilege of traveling to our country," whether they come from "Latin America, Europe, or elsewhere . . . ."

41.     Defendants soon began to enforce this policy. Defendant Rubio initially targeted Justice Alexandre de Moraes of Brazil's Supreme Federal Court, who was supervising the case against former Brazilian President Jair Bolsonaro for attempting a coup after losing the 2022

election. Justice Moraes had ordered X to shut down operations in Brazil in 2024, following the platforms' reluctance to remove certain accounts accused of undermining Brazilian democracy. On July 18, 2025, Defendant Rubio announced visa revocations for Justice Moraes and seven other members of the Court, as well as their immediate family members, claiming they were "responsible for censorship of protected expression in the United States." Defendant Rubio denounced what he called Justice Moraes's "political witch hunt against Jair Bolsonaro," an ally of President Trump, which he said had "created a persecution and censorship complex so sweeping that it not only violates basic rights of Brazilians, but also extends beyond Brazil's shores to target Americans." On July 30, 2025, Defendant Rubio announced that he was also imposing sanctions on Justice Moraes pursuant to Executive Order 13,818 and the Global Magnitsky Human Rights Accountability Act. Defendant Rubio claimed that Moraes had "abused his authority by engaging in a targeted and politically motivated effort designed to silence political critics through the issuance of secret orders compelling online platforms, including U.S. social media companies, to ban the accounts of individuals for posting protected speech." On September 22, 2025, Defendant Rubio announced the extension of these sanctions to "enablers" of Justice Moraes, including his wife and their holding company.

42.    Defendants then expanded enforcement of the policy. On December 2, 2025, the State Department reportedly sent a cable ordering U.S. consular officers to scrutinize visa applicants' resumes, LinkedIn profiles, and media appearances to determine whether they have engaged in activities including "combatting misinformation, disinformation or false narratives, fact-checking, content moderation, compliance, and trust and safety" (the "Cable"). According to news reports, the Cable instructs consular officers to pursue a finding of ineligibility if they determine an applicant "was responsible for, or complicit in, censorship or attempted censorship

of protected expression in the United States," consistent with the visa restriction policy announced by Defendant Rubio on May 28, 2025. The Cable reportedly subjects H-1B visa applicants to heightened review under this policy because "many [H-1B applicants] work in or have worked in the tech sector, including in social media or financial services companies involved in the suppression of protected expression."

43.    Commenting on the Cable, a State Department spokesperson said: "We do not support aliens coming to the United States to work as censors muzzling Americans," adding, "[i]n the past, the President himself was the victim of this kind of abuse when social media companies locked his accounts. He does not want other Americans to suffer this way. Allowing foreigners to lead this type of censorship would both insult and injure the American people." To date, Defendants have not made the Cable public, leaving unknown many details about how and against whom the visa restriction policy is being enforced.

44.    On December 3, 2025, the State Department announced that H-1B visa applicants and their dependents will now be required to adjust the privacy settings on their social media profiles to "public" in order to facilitate the Department's "online presence review."

45.    Subsequent developments make clear that the new "visa restriction policy" extends beyond visa applicants to visa-waiver travelers, visa holders, and even lawful permanent residents in the United States.

46.    On December 5, 2025, the European Commission imposed a $140 million fine on X for breaching transparency obligations under the European Union's Digital Services Act ("DSA"), including by failing to provide data access to researchers and by misleading users with its "blue check" identity verification system. In response to the fine, Defendant Rubio posted on X:



47.     On December 16, 2025, Under Secretary of State for Public Diplomacy and Public Affairs Sarah B. Rogers sent an "Action Memo" to Defendant Rubio titled, "Response Options to the European Commission's Fine of X Corp. Under the Digital Services Act (DSA)." The Action Memo frames the European Commission's fine on X as part of a "broader political struggle over information control and the influence of U.S. technology platforms in Europe." "Consistent with those foreign policy objectives articulated in the May 2025 3C policy," Under Secretary Rogers recommended that Defendant Rubio respond to the fine imposed on X by laying the foundation for the deportation of two U.S. lawful permanent residents, including Mr. Ahmed.

48.     Specifically, Under Secretary Rogers recommended that Defendant Rubio exercise his authority under section 237(a)(4)(C) of the INA (8 U.S.C. § 1227(a)(4)(C)) (the "deportability provision"). This provision states that a noncitizen is deportable if "the Secretary of State has reasonable ground to believe" that their "presence or activities in the United States . . . would have potentially serious adverse foreign policy consequences for the United States," and it incorporates by reference exceptions contained in a provision regarding inadmissibility of noncitizens on similar foreign policy grounds, INA section 212(a)(3)(C) (8 U.S.C. § 1182(a)(3)(C)) (the "inadmissibility provision" and, together with INA section 237(a)(4)(C), the "foreign policy provisions"). These exceptions expressly prohibit the Secretary of State from making

inadmissibility determinations based on a noncitizen's "past, current, or expected beliefs, statements, or associations [that] would be lawful within the United States," unless "the Secretary of State personally determines that the [noncitizen]'s admission would compromise a *compelling* United States foreign policy interest." 8 U.S.C. § 1182(a)(3)(C)(iii) (emphasis added). In that case, the Secretary "must notify on a timely basis the chairmen of the Committees on the Judiciary and Foreign Affairs of the House of Representatives and of the Committees on the Judiciary and Foreign Relations of the Senate of the identity of the [noncitizen] and the reasons for the determination." *Id.* § 1182(a)(3)(C)(iv).

49.    The legislative history of the foreign policy provisions confirms Congress's intent to *restrict* the Executive's authority to exclude noncitizens from the country based on their speech, beliefs, or associations. As explained in a Senate Committee report, Congress adopted the foreign policy provisions to replace McCarthy Era provisions of the INA and, in doing so, "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States." A House Conference report underscored this point, stating that the provisions should be used "sparingly and not merely because there is a likelihood that [a noncitizen] will make critical remarks about the United States or its policies," and that the "'compelling foreign policy interest' standard [must] be interpreted as a significantly higher standard than the general 'potentially serious adverse foreign policy consequences standard.'" The "compelling foreign policy interest" standard might be met, for example, "when [a noncitizen's] mere entry into the United States could result in imminent harm to the lives or property of United States persons abroad or to property of the United States government abroad (as occurred with the former Shah of Iran), or when [a noncitizen's] entry would violate a treaty or international agreement to which the United States is party."

50.    In the Action Memo, Under Secretary Rogers cited Mr. Ahmed's expressive activities as the basis for her deportability recommendation. These activities included his advocacy "for foreign regulatory action," his leadership of "efforts to lobby Google to remove ads" from two websites, his reporting on vaccine-related disinformation online, and his endorsement of "HateAid's petition calling on the European Commission to take action to ensure access of platform data to researchers under the DSA."

51.    As a final note in her deportability recommendation, Under Secretary Rogers stated that, if Defendant Rubio determined that Ahmed was deportable, "DHS/ICE may elect to pursue removal proceedings, including possibly detaining . . . Ahmed in the process."

52.    On December 19, 2025, Defendant Rubio adopted Under Secretary Rogers' recommendation regarding Mr. Ahmed. That day, Rubio sent a memo to Defendant Noem titled, "Determination of Deportability under Section 237(a)(4)(C) of the INA" (the "Rubio–Noem Memo"). Defendant Rubio shared his determination that Mr. Ahmed was deportable under the foreign policy provisions, along with his understanding that "DHS may now initiate removal charges against him." Defendant Rubio cited the same expressive activities that Under Secretary Rogers had cited in her recommendation. He further explained that his determination regarding Mr. Ahmed was "based on the same foreign policy objectives articulated in [his] May announcement of a policy to restrict visa issuance under INA section 212(a)(3)(C)" (the inadmissibility provision).

53.    On December 23, 2025, Defendant Rubio issued a press release announcing that the State Department was "taking decisive action against five individuals who have led organized efforts to coerce American platforms to censor, demonetize, and suppress American viewpoints they oppose." The press release stated that Defendant Rubio had made determinations under the

foreign policy provisions that the individuals' "entry, presence, or activities in the United States have potentially serious adverse foreign policy consequences for the United States." The press release announced "visa restrictions" on all five individuals, so that they are "generally barred from entering the United States." The press release further stated that, based on Defendant Rubio's determinations, DHS "can initiate removal proceedings against certain individuals pursuant to INA section 237(a)(4)(C), which renders such individuals deportable." The press release proclaimed that the "State Department stands ready and willing to expand today's list."

54.    The same day, Defendant Rubio posted on X: "Today, [the State Department] will take steps to bar leading figures of the global censorship-industrial complex from entering the United States. We stand ready and willing to expand this list if others do not reverse course."



55.    Also on December 23, 2025, Under Secretary Rogers posted on X the names of the five "sanctioned" individuals referenced in Defendant Rubio's press release and stated that these sanctions "target the censorship-NGO ecosystem." The five individuals identified by Under

Secretary Rogers are Thierry Breton, Imran Ahmed, Clare Melford, Josephine Ballon, and Anna-Lena von Hodenberg.

56.    Thierry Breton is a French citizen and former European Commissioner for Internal Markets and Digital Services. In 2022, while Mr. Breton was serving as Commissioner, the European Union enacted the DSA, establishing regulations for digital services including social media platforms. On August 12, 2024, before Mr. Musk hosted a live interview with then-candidate Donald Trump on X, Mr. Breton sent him a letter reminding him of the platform's obligations under the DSA. In her December 23, 2025 post on X identifying Mr. Breton as one of the "sanctioned" individuals, Under Secretary Rogers cited, among other things, this letter to Mr. Musk:



57.    Imran Ahmed is a lawful permanent resident of the United States and founder and CEO of CITR member CCDH. CCDH is a non-profit organization that works to stop the spread of online hate and disinformation through research, public campaigns, and policy advocacy. It has published reports on investigations into different internet platforms, including Meta, TikTok, YouTube, and ChatGPT. For example, CCDH has conducted research that showed an increase in

hate speech on X after Mr. Musk took over Twitter. It also published a report on the so-called "Disinformation Dozen," concluding that twelve individuals alone, including now-Secretary Robert F. Kennedy, Jr., were responsible for almost two-thirds of anti-vaccine content on social media platforms. In her December 23, 2025 post on X identifying Mr. Ahmed as one of the "sanctioned" individuals, Under Secretary Rogers cited, among other things, CCDH's "Disinformation Dozen" report and its support for the DSA:



Mr. Ahmed received no direct notice of Defendant Rubio's deportability determination. On December 24, 2025, Mr. Ahmed filed a lawsuit in the Southern District of New York challenging the determination on several grounds. Complaint, *Ahmed v. Rubio*, No. 1:25-cv-10705-LAP (S.D.N.Y. Dec. 24, 2025), ECF No. 1. On December 25, 2025, a district court granted Mr. Ahmed's request for a temporary restraining order, enjoining the government from arresting or detaining Mr. Ahmed. Order, *Ahmed v. Rubio*, No. 1:25-cv-10705-LAP (S.D.N.Y. Dec. 24, 2025), ECF No. 14. The temporary restraining order remains in place pending further litigation.

Stipulation and Order, *Ahmed v. Rubio*, No. 1:25-cv-10705-LAP (S.D.N.Y. Feb. 2, 2026), ECF No. 40.

58.     Clare Melford is a citizen and resident of the United Kingdom and co-founder and executive director of CITR member GDI. GDI is a non-profit organization that aims to reduce disinformation on the internet. It provides disinformation risk ratings for news sites in media markets globally, and it publishes research reports on hate speech and disinformation in certain topics or regions. In her December 23, 2025 post on X identifying Ms. Melford as one of the "sanctioned" individuals, Under Secretary Rogers included a screenshot of a report on hate speech and claimed, among other things, that GDI had "joined the deleterious EU Code of Practice on Disinformation:"



On December 23, 2025, Ms. Melford received an email from CBP informing her that her Electronic System for Travel Authorization ("ESTA") application had changed status from "approved" to "pending." On December 24, 2025, she received another email informing her that she was not authorized to travel to the United States. Ms. Melford had planned to travel to the United States in January 2026 but, because of Defendants' actions, was unable to do so.

59.    Josephine Ballon is a citizen and resident of Germany and a co-founder and managing director of HateAid, a non-profit organization that provides individuals facing online abuse and violent threats with direct counseling and legal support services. HateAid is a "trusted flagger" under the DSA, designated to identify and report online content that may be illegal under European law, such as hate speech or terrorist content. Ms. Ballon also serves on Germany's Advisory Council of the Digital Services Coordinator, which leads national enforcement of the DSA. In her December 23, 2025 post on X identifying Ms. Ballon as one of the "sanctioned" individuals, Under Secretary Rogers cited, among other things, an interview Ms. Ballon gave on the news program 60 Minutes:



On December 23, 2025, Ms. Ballon received an email from CBP informing her that her previously approved ESTA application had changed status from "approved" to "pending." On December 24, 2025, she received another email informing her that she was not authorized to travel to the United States.

60.     Anna-Lena von Hodenberg is a citizen and resident of Germany and a co-founder and managing director of HateAid. In her December 23, 2025 post on X identifying Ms. von Hodenberg as one of the "sanctioned" individuals, Under Secretary Rogers again cited, among other things, HateAid's petition to expand data access for researchers under the DSA:



← **Post**

**Under Secretary of State Sarah B. Rogers** ✓
@UnderSecPD

WE'VE SANCTIONED: Anna-Lena von Hodenberg, the leader and founder of HateAid, a German organization founded after the 2017 German federal elections to counter conservative groups. HateAid is an official "trusted flagger" (a censor) under the EU's anti-speech Digital Services Act (DSA) and routinely demands access to propriety social media platform data to help it censor more. Hodenberg cited threat of "disinformation" from "right-wing extremists" online in upcoming U.S. and EU elections when circulating a petition for the DSA to become more strongly enforced to allow data access for "researchers".

3:48 PM · Dec 23, 2025 · **1.2M** Views

💬 883        ⟲ 2.7K        ♡ 17K        🔖 852        ⬆️

💬 Read 883 replies

Ms. von Hodenberg received no direct notice of Defendants' decision to bar her from the United States.

61.     Under Secretary Rogers concluded her series of posts on X identifying the five "sanctioned" individuals by stating that this list was "illustrative[,] not exhaustive," and that she and Defendant Rubio stood "'ready and willing to expand' it":



In a follow-up post, she added, "if you spend your career fomenting censorship of American speech, you're unwelcome on American soil."

62.     On information and belief, Defendant Rubio did not timely notify the chairs of the Committees on the Judiciary and Foreign Affairs of the House of Representatives and of the Committees on the Judiciary and Foreign Relations of the Senate of the identity of the five "sanctioned" noncitizens, or of the reasons for his inadmissibility and deportability determinations under the foreign policy provisions.

63.     In mid-January 2026, the State Department released its "Agency Strategic Plan" for fiscal years 2026–2030, in which it elaborated on the Censorship Policy under "Objective 1.2":

> For their own domestic political purposes, foreign governments have imposed restrictions on speech that would be unacceptable in the United States, including by enforcing conditions to operate or levying fines on technology and media companies that operate in those countries. Meanwhile, globalist bureaucrats and activists direct campaigns in multilateral bodies and through NGOs which seek to

restrict the right of free speech in the name of combatting "hate speech," promoting "trust and safety," or countering "disinformation."

The Department will oppose efforts by foreign countries, international organizations and NGOs, and activist groups that seek to censor Americans in their own country. We will counter these efforts through all appropriate means including visa and financial sanctions.

64.     Appearing before the House Committee on Foreign Affairs on March 5, 2026, Under Secretary Rogers discussed the work of GDI in response to a question about the "censorship-industrial complex," and she noted the targeting of Mr. Ahmed under the State Department's "3C sanctions" policy.

### *The Censorship Policy's Harms to CITR's Members*

65.     The Censorship Policy has caused pervasive fear among CITR's noncitizen members, including members lawfully residing in the United States. This fear has deterred them from pursuing research projects in their primary areas of expertise; speaking publicly about their work; engaging in public advocacy campaigns; and attending conferences and other events relevant to their work. These chilling effects have, in turn, significantly harmed the expressive, associational, and professional interests of CITR's U.S. organizational and U.S. citizen members as well.

66.     The Censorship Policy's chilling effects on CITR's noncitizen members flow directly from the fact that the Policy explicitly targets their work. CITR's membership is open to academics, journalists, civil society researchers, and community scientists, as well as organizations, who work independently from the technology industry to inform the public about technology's impacts on society. Approximately 30 to 40 of CITR's members are noncitizens based in the United States. Some of these members are lawful permanent residents, while others hold H-1B visas, other visas, or lawful status and will need to renew their visas or status in the near future. Many of CITR's noncitizen members in the United States research and write about

misinformation, disinformation, content moderation, and trust and safety issues—work identified as grounds for targeting under the Policy.

67.    The Censorship Policy's chilling effects on CITR's noncitizen members are especially acute because Defendants have already enforced the Policy against some of them. Two of the five individuals whom Defendants identified on December 23, 2025 as subject to exclusion or deportation under the Policy—Mr. Ahmed and Ms. Melford—lead organizations that are CITR members. And the work that Under Secretary Rogers cited in explaining Defendants' decisions to exclude or deport four of those five individuals is substantially similar to the work of many other CITR members. Moreover, as revealed in the Action Memo, noncitizen U.S. residents may be subject to detention as well as deportation under the Policy. CITR's noncitizen members thus face a credible threat that they, too, will face visa denial, visa revocation, detention, or deportation under the Policy.

68.    CITR's noncitizen members, particularly those who live and work in the United Sates, therefore reasonably fear that they will be targeted under the Censorship Policy based on their research, writing, or advocacy, and as a result, they have felt compelled to curtail their exercise of expressive and associational rights. Some of these members are described below. These individuals have been anonymized in this Complaint because they fear that even their connection to this lawsuit could lead to the denial or revocation of their visas or status, or even detention and deportation, under the Policy. Some noncitizen members interviewed by undersigned counsel were too fearful of these consequences, for themselves and their families, to have their experiences described even anonymously in this Complaint.[3]

---

[3] CITR plans to move for a protective order explicitly prohibiting Defendants from retaliating against CITR or its members based on their involvement in this lawsuit.

69.    **CITR Member A.** CITR Member A is a lawful permanent resident of the United States and a research director at a university in the Northeast. They obtained their lawful permanent resident status through the EB-1A category for those with "extraordinary ability," based on their expertise in content moderation, among other topics.

70.    The Censorship Policy has deterred CITR Member A from pursuing research projects in their primary areas of expertise. Before Defendants adopted the Policy, CITR Member A researched and published scholarship on content moderation, among other topics. Through their work, they advocated for the adoption of alternative approaches to content moderation to better address harm on social media platforms. They intended to continue this work. Because of the fear that they will be targeted for detention and deportation under the Policy based on this work, however, CITR Member A has shifted the focus of their research and writing to topics they believe may be considered more politically neutral.

71.    The Censorship Policy has also deterred CITR Member A from speaking publicly about their work. CITR Member A has previously published op-eds and presented their research at international conferences, and they still wish to do so. They no longer participate in these activities, however, because of the fear that they will be targeted for detention and deportation under the Policy as a result. CITR Member A also previously posted on social media about their research and about other topics, but now, because of the Policy, they feel compelled to weigh the risks and benefits of every public post, which causes them significant emotional distress. Moreover, concerned that they would be denied reentry to the United States under the Policy, CITR Member A now refrains from traveling internationally, including to conferences they would have otherwise attended, such as CITR's Independent Technology Researchers' Summit held in Berlin, Germany in September 2025, and another conference held in Europe in October 2025 that

focused on CITR Member A's core areas of expertise and for which they served as a workshop organizer.

72.    The Censorship Policy has also deterred CITR Member A from engaging in public advocacy with CITR and publicly associating with other CITR members. Before Defendants adopted the Policy, CITR Member A participated in multiple public CITR events and discussions, and they worked with CITR members on public advocacy campaigns relating to online safety and researchers' data access. They still wish to participate in these activities. Because of the fear that they will be targeted for detention and deportation under the Policy based on these activities, however, they have limited their involvement with CITR and its public advocacy to a behind-the-scenes role.

73.    If the Policy were no longer in place, CITR Member A would resume their research and writing in their primary areas of expertise; resume speaking freely and publicly about their work, including by publishing op-eds and social media posts and by presenting their research at international conferences; and also resume their public advocacy with CITR and their public association with other CITR members.

74.    **CITR Member B.** CITR Member B is a lawful permanent resident of the United States who works as a data scientist and developer focused on developing tools to enable journalists, fact-checkers, and researchers to identify coordinated inauthentic behavior online.

75.    The Censorship Policy has deterred CITR Member B from pursuing projects in their areas of expertise. Before Defendants adopted the Policy, CITR Member B worked on developing tools for journalists, fact-checkers, and researchers to analyze social media datasets to detect coordinated inauthentic behavior online, including misinformation campaigns. They intended to continue this work. Because of the fear that they will be targeted for detention and

deportation under the Policy based on this work, however, CITR Member B has reframed their work to avoid focusing on identifying misinformation online.

76.    The Censorship Policy has deterred CITR Member B from speaking publicly about their work. Before Defendants adopted the Policy, CITR Member B regularly presented their research at conferences and posted on social media about their work, and they still wish to do so. Because of the fear that they will be targeted for detention and deportation under the Policy based on these activities, however, CITR Member B feels compelled to self-censor in their presentations and social media posts to avoid discussing possible applications of their work to the identification of misinformation online. Moreover, concerned that they would be denied reentry to the United States under the Policy, CITR Member B also refrains from traveling internationally to conferences they would have otherwise attended to present their research, such as a conference on disinformation that is scheduled to be held in Europe in 2026.

77.    The Censorship Policy has also deterred CITR Member B from engaging in public advocacy with CITR and speaking about certain topics at public CITR events. Before Defendants adopted the Policy, CITR Member B planned to present their work at a future CITR event, and they were interested in engaging in CITR's public advocacy work. Because of the fear that they will be targeted for detention and deportation under the Policy based on these activities, however, they feel compelled to decline public participation in CITR's public advocacy and to self-censor in future presentations about their work at public CITR events, avoiding discussion of possible applications of their work to the identification of misinformation online.

78.    If the Policy were no longer in place, CITR Member B would be substantially more likely to resume projects in their primary areas of expertise and to resume speaking freely and publicly about their work, including by presenting their research at international conferences and

by posting about their work on social media without feeling compelled to self-censor. If the Policy were no longer in place, CITR Member B would also be substantially more likely to participate in CITR's public advocacy and to present their work at public CITR events without feeling compelled to self-censor.

79.     **CITR Member C.** CITR Member C is a lawful permanent resident of the United States and the head of a U.S.-based non-profit organization dedicated to advancing research and policies to address extremism, radicalism, and online harms.

80.     The Censorship Policy has deterred CITR Member C from pursuing work in their areas of expertise in the United States. Before Defendants adopted the Policy, CITR Member C's research, writing, and advocacy focused on combatting online extremism and other online harms, including in the United States. Because of the fear that they will be targeted for detention and deportation under the Policy based on this work, however, CITR Member C has reduced their focus on issues relating to the United States and online harms.

81.     The Censorship Policy has also deterred CITR Member C from speaking publicly about their work. Before Defendants adopted the Policy, CITR Member C regularly spoke at U.S. and international conferences and events about their work, and they still wish to do so. Concerned that that they will be denied reentry to the United States or targeted for detention and deportation under the Policy based on their work, however, CITR Member C has reduced the frequency and visibility of their public speaking, and they feel compelled to self-censor when speaking publicly about their work.

82.     The Censorship Policy has also deterred CITR Member C from publicly associating with CITR. Before Defendants adopted the Policy, CITR Member C attended CITR events and meetings, and they still wish to do so. Because of the fear that they will be targeted for detention

and deportation under the Policy based on these activities, however, they no longer attend CITR meetings and events, and they have halted any public association with CITR, including by asking for their name to be removed from CITR's website.

83.     If the Policy were no longer in place, CITR Member C would no longer be deterred from pursuing work in their areas of expertise in the United States, and they would be substantially more likely to resume speaking freely and publicly about their work without feeling compelled to self-censor. If the Policy were no longer in place, they would also be substantially more likely to resume attending CITR events and meetings and otherwise associating with the organization.

84.     **CITR Member D.** CITR Member D currently resides in the United States and works as a professor at a university in the South. Their research focuses on the role of media in United States politics and the spread of disinformation and misinformation online. CITR Member D holds H-1B status and intends to apply for lawful permanent residency in the United States in the near future.

85.     The Censorship Policy has deterred CITR Member D from pursuing research projects in their primary areas of expertise. Before Defendants adopted the Policy, CITR Member D researched and published scholarship on the role of media in U.S. politics and the spread of disinformation and misinformation online. Through their work, they have proposed approaches for holding media organizations accountable for spreading disinformation online. They intended to continue this work. Because of the fear that they will be targeted for status revocation, detention, and deportation under the Policy based on this work, however, CITR Member D has shifted the focus of their research and writing to topics they believe may be considered more politically neutral.

86.     The Censorship Policy has deterred CITR Member D from speaking publicly about their work. They recently authored a book based on their research on disinformation in the United States, and they intended to participate in public events to promote their book, as U.S. citizen colleagues who have published books on similar topics have done, and as is common practice. Because of the fear that they will be targeted for status revocation, detention, and deportation under the Policy based on their work, however, CITR Member D did not hold any public promotional events for their book, and they feel compelled to self-censor and limit discussion of their work to academic circles. Before Defendants adopted the Policy, CITR Member D published op-eds based on their research on disinformation, and they wished to continue doing so. They no longer participate in this activity, however, because of the fear that they will be targeted under the Policy as a result. Moreover, concerned that they would be denied reentry to the United States under the Policy, CITR Member D also refrains from traveling internationally, including to conferences they would have otherwise attended, such as a conference in their area of expertise that is scheduled to be held in Africa in 2026.

87.     If the Policy were no longer in place, CITR Member D would be substantially more likely to resume their research and writing in their primary areas of expertise and resume speaking freely and publicly about their work, including by holding public promotional events for their book, publishing op-eds, and presenting their research at international conferences.

88.     **CITR Member E.** CITR Member E is an O-1A visa holder in the United States, a member of CITR, and a scholar, researcher, writer, advocate, and professor at a university in the Midwest, with expertise in propaganda and disinformation, among other topics.

89.     The Censorship Policy has burdened CITR Member E's ability to pursue research and writing projects in their primary area of expertise. Before the administration adopted the

Policy, CITR Member E researched and published books, articles, and op-eds on topics relating to their work, and they traveled internationally to present their research at conferences and participate in policy discussions relating to propaganda and disinformation, among other topics. They intend to continue this work. Because of the fear that they will be targeted for visa revocation, detention, and deportation under the Policy based on this work, however, CITR Member E feels compelled to carefully consider the consequences of every word they write, the details or arguments they include in their writing, and whether they can write on certain topics at all. They also feel compelled to weigh the risks and benefits of putting some thoughts into writing to friends, family, colleagues, and other contacts, and they often self-censor, fearing that even their notes may later be seized, which could put others at risk of being targeted under the Policy.

90.    The Censorship Policy has hampered CITR Member E's ability to continue their research, writing, and advocacy work in the United States. CITR Member E conducts research, writes, and engages in advocacy about propaganda and disinformation, among other topics. They intend to continue this work in the United States. Because of the fear that they will be targeted for visa revocation, detention, and deportation under the Policy based on this work, however, CITR Member E feels compelled to expend substantial time and resources developing alternative plans to continue their life and work outside the United States, despite the fact that leaving the United States would seriously disrupt their personal and professional life and their ongoing research projects.

91.    The Censorship Policy has also deterred CITR Member E from speaking publicly about their work. Before the administration adopted the Policy, CITR Member E regularly posted about their work on social media, spoke with reporters about their work, and presented their work at domestic and international events conferences, and they still wish to do so. Because of the fear

that they will be targeted for visa revocation, detention, and deportation under the Policy based on these activities, however, they feel compelled to self-censor when posting about their work on social media and when speaking with reporters about certain areas of their work. Moreover, concerned that they would be denied reentry to the United States under the Policy, CITR Member E now hesitates to travel internationally, including to conferences they would have otherwise attended without question. If they do travel internationally, they feel compelled to expend substantial time planning how to mitigate their risks of being targeted under the Policy, and they feel significant emotional distress when engaging in that risk mitigation planning. For example, they have decided that if they do travel outside the United States, they will delay the publication of forthcoming work until they are safely back in the United States. CITR Member E also now hesitates to accept invitations to present their work at domestic conferences and events, carefully evaluating the risk that they might be detained or deported under the Policy and, as a result, ultimately be unable to attend.

92.     The Censorship Policy has also deterred CITR Member E from publicly associating with other CITR members. Before Defendants adopted the Policy, CITR Member E participated in multiple public CITR events and discussions, and they still wish to do so. Because of the fear that they will be targeted for visa revocation, detention, and deportation under the Policy based on these activities, however, they feel compelled to limit their participation in public CITR events and advocacy, and they are considering forgoing attendance at future international CITR events.

93.     If the Policy were no longer in place, CITR Member E would no longer spend significant time and energy considering the need to self-censor when conducting research and writing in their primary areas of expertise, would no longer feel compelled to self-censor when

speaking publicly about their work, and would no longer feel compelled to limit their engagement in CITR's public advocacy and their public associations with other CITR members.

94.     **CITR Member F.** CITR Member F is a researcher, writer, and advocate. They have applied for a visa through the EB-1A category for those with "extraordinary ability," based on their expertise in trust and safety and online harms, among other issues.

95.     The Censorship Policy deterred CITR Member F from pursuing research, writing, and advocacy in their primary area of expertise. Before Defendants adopted the Policy, CITR Member F conducted research; published books, articles, and op-eds; and engaged in other advocacy on issues relating to trust and safety and online harms. Through this work, they have advocated for creating safer online spaces, particularly for children. They intended to continue this work. Because of the fear that they will be targeted for visa denial, detention, and deportation under the Policy based on this work, however, CITR Member F shifted the focus of their work and advocacy to topics they believed might be considered more politically neutral.

96.     The Censorship Policy has deterred CITR Member F from pursuing their research and teaching in the United States. Until very recently, CITR Member F resided in the United States. Appointed as an adjunct professor at a university in the East, CITR Member F engaged with colleagues about their own research and developed a new course relating to the impact of online harms on children. They intended to continue their research and to teach the course they developed in the United States. Because of the fear that they will be targeted for visa denial, detention, and deportation under the Policy based on this work, however, CITR Member F felt compelled to leave the United States and will now spend at least the next several months outside the United States, despite the fact that doing so substantially disrupts their personal life, teaching career, research and advocacy work, and ability to engage with colleagues in the United States.

97. The Censorship Policy also burdens CITR Member F's ability to publicly associate and develop professional ties with U.S.-based CITR members. Before Defendants adopted the Policy, CITR Member F participated in CITR events and discussions and developed strong professional ties with CITR members through informal meetings in the United States. They still wish to do so. Because of the fear that they will be targeted for visa denial, detention, and deportation under the Policy based on their work, however, they have now left the United States and so will no longer be able to attend in-person CITR events and meetings and associating with other CITR members in the United States.

98. If the Policy were no longer in place, CITR Member F would resume their research and writing in their primary area of expertise, and they would no longer be deterred from pursuing their research, teaching, and advocacy in the United States.

99. **CITR Member G.** CITR Member G is an F-1 visa holder in the United States, a member of CITR, and a doctoral student at a university in the Northeast, where their research and writing focuses on social media, politics, technology, and content moderation.

100. The Censorship Policy has deterred CITR Member G from speaking publicly about their work. CITR Member G's research and writing focuses on technology, content moderation, the impacts of social media platforms' design decisions, and how algorithmic feeds change how users engage with information online. They present their research at conferences and other events. Because of the fear that they will be targeted for visa revocation, detention, and deportation under the Policy based on this work, however, CITR Member G feels compelled to self-censor and reframe their public discussion about their work to focus on topics they believe may be considered more politically neutral. If the Policy were no longer in place, CITR Member G would resume speaking freely and publicly about their work.

101.    The Censorship Policy has also harmed CITR's U.S.-based organizational members and CITR's U.S. citizen members. The leaders of two of CITR's U.S.-based organizational members have been directly and publicly targeted under the Policy. While one of them, Mr. Ahmed, has forestalled Defendants' deportation efforts through emergency litigation and remained in the United States, the other, Ms. Melford, has been barred from entering the United States, which substantially impairs her organization's ability to conduct its research and to raise funds for that work. Individual U.S.-citizen members of CITR have also suffered significant harms because of the Policy, which has deterred noncitizen members, as well as noncitizen colleagues and students, from contributing to U.S. citizen members' research and advocacy projects and engaging with them on topics of shared interest.

102.    **Global Disinformation Index.** GDI is a U.S.-based non-profit organization and an organizational member of CITR. GDI is dedicated to informing industry and the public about disinformation and its harms. Ms. Melford, one of the individuals publicly targeted under the Censorship Policy, is the co-founder and CEO of GDI.

103.    Before the December 23, 2025 announcement of Defendant Rubio's foreign policy determination against Ms. Melford, she had planned to travel to the United States in January 2026 to meet with GDI colleagues, collaborators, and funders, as well as students interested in GDI's work. As a direct result of Defendants' actions pursuant to the Censorship Policy, however, Ms. Melford had to cancel her trip and postpone travel to the United States indefinitely. Her inability to travel to the United States substantially impairs GDI's ability to continue with its research relating to disinformation in the following ways.

104.    First, the Censorship Policy has substantially impaired GDI's ability to hear from and engage with its director. During her January 2026 trip to the United States, Ms. Melford had

planned to meet with her GDI colleagues and discuss her vision for GDI's future. Because of the Policy, however, she was unable to meet with her GDI colleagues in January, and she will be unable to meet with them in person in the United States indefinitely, depriving her U.S.-based GDI colleagues of opportunities to receive and discuss their CEO's insights going forward.

105.    Second, the Censorship Policy has substantially impaired GDI's ability to collaborate with researchers, research organizations, and other partners in the United States. During her January 2026 trip to the United States, Ms. Melford had planned to meet with researchers, research organizations, and other partners who might benefit from GDI's research and publications. Sharing the results of GDI's research with these potential collaborators in-person would have made it significantly more likely that they would use GDI's research in their own work and share GDI's research through their networks. Because of the Policy, however, she was unable to meet with these potential collaborators in January, and she will be unable to meet with potential collaborators in the United States indefinitely, significantly impairing GDI's ability to share its work with U.S.-based collaborators going forward.

106.    Third, the Censorship Policy has prevented Ms. Melford from speaking publicly about GDI's work. Before the December 23, 2025 announcement of Defendant Rubio's foreign policy determination against her, Ms. Melford had planned to present on GDI's work as a guest speaker at a New York University class on disinformation during her January 2026 trip to the United States. Because of the Policy, however, Ms. Melford was unable to attend the class and speak with students in January, and she will be unable to speak with students and others in the United States indefinitely, significantly impairing GDI's ability to share its research with U.S. audiences going forward.

107. Finally, the Censorship Policy has substantially impaired GDI's ability to secure funding to continue its work in the United States. GDI has relied significantly on funding from U.S.-based foundations, and in-person introductions between Ms. Melford and new potential funders has proven essential to GDI's financial security. Ms. Melford's previous trip to the United States was critical to securing a multi-year grant for GDI to study disinformation globally. Ms. Melford had planned to meet with funders during her January 2026 trip to the United States. Because of the Policy, however, she was unable to meet with those funders in person in January, and she will be unable to meet with funders in person in the United States indefinitely, significantly impairing GDI's ability to engage with and secure funding from U.S.-based funders going forward. In addition, the Policy has deterred some U.S. funders from publicly associating with GDI. GDI had previously received permission from its funders to place the funders' logos on GDI's website. Shortly after the December 23, 2025 announcement of Defendant Rubio's foreign policy determination against Ms. Melford, however, one funder requested that its logo no longer appear on GDI's website.

108. **Dr. J. Nathan Matias.** Dr. Matias is a U.S. citizen and a member of CITR's Board of Directors. He is a computer scientist and behavioral scientist who currently serves as an assistant professor in the Cornell University Department of Communication and a field member in Information Science. At Cornell, he founded the Citizens and Technology Lab, which works with communities to study the effects of technology on society and test ideas for changing digital spaces to better serve the public interest. Dr. Matias's research focuses on, among other things, freedom of expression, content moderation, and online safety. The through line of his work has been a search for ways to expand and protect freedom of expression while improving online safety. Over the years, he has audited technology platforms for their use of content moderation, studied ways

that the public can manage conflicts and safety independent of the technology industry, studied the effect of content removal on freedom of expression, and tested alternatives to content removal.

109.    The Censorship Policy has significantly impaired Dr. Matias's collaborations with noncitizens in the United States and abroad and, as a result, harmed his own expressive, associational, and professional interests. As the leader of a large lab, his output as a professor depends on the work of his collaborators, many of whom are noncitizens, and some of whom are noncitizen CITR members. The work they publish together bears Dr. Matias's name. In addition to contributing to science and society, these publications are incorporated into Dr. Matias's job evaluation file for tenure consideration. The Policy's chilling effect on noncitizen collaborators has directly impacted their work with Dr. Matias in the following ways, reducing his output and impairing his ability to earn tenure.

110.    First, the Censorship Policy has deprived Dr. Matias of significant opportunities to collaborate with noncitizen researchers from abroad. In one case, a rising star in Dr. Matias's field who had received external research funding asked to join Dr. Matias's lab to collaborate on projects related to youth mental health, artificial intelligence, and social media. Although this scholar would have contributed their talent and other valuable resources to the lab and Dr. Matias otherwise would have accepted them, Dr. Matias felt compelled to decline their request because of the fear that they would be targeted for visa denial or subsequent visa revocation, detention, and deportation under the Policy based on their work. The Policy has also hampered Dr. Matias's collaborations with other noncitizen researchers from abroad, including researchers in the United Kingdom focused on child online safety who are now unwilling or unable to travel to the United States.

111.    Second, the Censorship Policy has deprived Dr. Matias of significant contributions from his noncitizen collaborators in the United States. Because of the fear that they will be denied reentry to the United States under the Policy, some of Dr. Matias's U.S.-based noncitizen collaborators have decided not to travel abroad, including to attend meetings with new community partners who have important experiences related to online safety and freedom of expression. As a result, Dr. Matias has been unable to pursue collaborations with those partners, who would have added significant value to his research. Because of the same fear, one of Dr. Matias's noncitizen collaborators felt compelled to make extensive contingency plans in connection with international travel, requiring more flexibility in their work and less visibility on their projects, which has significantly delayed progress on those projects. Additionally, because of the fear that they will be targeted for detention or deportation under the Policy based on their work, at least one of Dr. Matias's noncitizen collaborators has decided not to speak to journalists or answer questions from policymakers on topics related to their work. As a result of these chilling effects, Dr. Matias has lost important opportunities to develop new research, obtain expert feedback on research, and bring visibility to his work and the work of his lab.

112.    If the Censorship Policy were no longer in place, Dr. Matias's lab would regain its previous levels of output and impact because his noncitizen collaborators would no longer require reductions of responsibilities to avoid targeting under the Policy; they would no longer refrain from speaking to journalists and policymakers about their work; and they would resume traveling internationally to meetings with partners and other events. If the Policy were no longer in place, Dr. Matias would also welcome new talent from abroad to work in his lab, and he would invite his UK collaborators to the United States to deepen their work together.

113.    **Dr. Rebekah Tromble.** Dr. Rebekah Tromble is a U.S. citizen, a co-founder of CITR, and a member of CITR's Executive Committee. She is a political communications scholar and researcher currently serving as a professor in the Khoury College of Computer Sciences and the College of Social Sciences and Humanities at Northeastern University. At Northeastern, she co-leads the Institute for Information, the Internet and Democracy, which aims to advance public-interest research that examines how the internet and emerging information technologies impact democratic societies. She is also the co-founder of Expert Voices Together and the Researcher Support Consortium, both of which support researchers and others facing coordinated campaigns of intimidation and harassment in response to their public-facing work.

114.    Though Dr. Tromble is a U.S. citizen, the Censorship Policy has significantly chilled her work. Dr. Tromble has met all five of the individuals whom Defendants announced on December 23, 2025 would be excluded or deported under the Policy, she is well-acquainted with four of those individuals, and she has worked closely with one of them as a member of the same advisory council. She is thus acutely aware of how her research and advocacy efforts could expose the noncitizen students and collaborators with whom she works to the risks of visa denial, visa revocation, and detention and deportation under the Policy. As explained below, the Policy has deterred her from engaging in certain research and advocacy projects, from accepting several speaking engagements, and from publicly associating with noncitizen CITR members and colleagues; it has diminished the quality and quantity of research conducted by others in her field; and it has caused her to expend significant additional time and energy in connection with Expert Voices Together and the Researcher Support Consortium.

115.    The Censorship Policy has deterred Dr. Tromble from pursuing certain research projects in her primary areas of expertise. Dr. Tromble's research focuses on, among other things,

how misinformation and disinformation spread in online spaces and how different communities understand what misinformation and disinformation are. Her research also focuses on hate speech and forms of online harassment. She frequently works with undergraduate and graduate students, and she anticipates that a number of noncitizen students will join a new research lab that she is currently setting up. Since the Policy was announced, Dr. Tromble has become concerned that her work would expose her noncitizen students to risk of visa denial, visa revocation, and detention and deportation under the Policy. Because of this concern, she has made the difficult decision to discontinue much of her work on the topics subject to scrutiny under the Policy, even though they fall within her primary areas of expertise. Moreover, because of this concern, she feels compelled not to assign noncitizens to any projects that she does pursue on these topics, and as a result, she will have to take on more of the work herself, significantly reducing her research productivity.

116.    The Censorship Policy has also diminished the quality and quantity of research conducted by others in Dr. Tromble's field, on which she relies in her own work. Several noncitizen colleagues and collaborators have informed her that they have halted their research on certain topics of shared interest because they fear it will expose them to repercussions under the Policy. Additionally, several international scholars with whom Dr. Tromble has previously co-authored research publications have told her that they are unwilling to travel to the United States while the Policy remains in place, decreasing opportunities for in-person discussion and collaboration. These chilling effects on noncitizen scholars harm the overall production of knowledge in the field, including by Dr. Tromble.

117.    The Censorship Policy has also deterred Dr. Tromble from speaking publicly about her research and engaging in public advocacy. Before Defendants adopted the Policy, Dr. Tromble regularly spoke publicly about misinformation, disinformation, online harassment, and

researchers' data access, and she still wishes to do so. Because of the fear that engaging in public speaking or advocacy related to these topics will expose her noncitizen students and collaborators to greater risk of being targeted under the Policy, however, she has recently turned down at least half a dozen public speaking opportunities. If the Policy were no longer in place, she would resume speaking freely and publicly about these topics.

118.   The Censorship Policy has also caused Dr. Tromble to expend significantly more time and energy than she otherwise would have in connection with Expert Voices Together and the Researcher Support Consortium. Since news outlets reported the contents of the Cable in early December 2025, she has consulted with several dozen individuals, including CITR members, about the threats posed by the Policy. These individuals include noncitizen researchers as well as U.S. citizen principal investigators and research leads who are concerned about the risks their noncitizen students and supervisees face under the Policy. At the same time, Dr. Tromble has felt compelled to exclude noncitizen students and collaborators from these efforts because of the risks they might face in connection with it under the Policy. The Policy has thus simultaneously caused a significant increase in consultation requests and a decrease in student and collaborator support, greatly increasing the burden on Dr. Tromble and decreasing the amount of work she can conduct on other projects.

119.   Finally, the Censorship Policy has impeded Dr. Tromble's association with noncitizen CITR members and colleagues. As a co-founder of CITR and a member of CITR's Executive Committee, Dr. Tromble has been deeply engaged with the organization and its membership since its creation. Because of the Policy, she now has fewer opportunities to engage with CITR members at events in the United States: as discussed below, some noncitizen CITR members who reside abroad fear that they will be targeted under the Policy if they travel to the

United States, and given the resulting safety concerns, CITR has temporarily stopped holding in-person events in the United States. Dr. Tromble has thus lost meaningful opportunities to engage with noncitizen CITR members and other colleagues in person.

120.    If the Policy were no longer in place, Dr. Tromble would resume engaging in certain research and advocacy projects, resume freely engaging in public speaking and public advocacy about her work, and resume publicly associating with noncitizen CITR members and colleagues. If the Policy were no longer in place, she would also invite noncitizen students to support her work with Expert Voices Together and the Researcher Support Consortium.

### *The Censorship Policy's Harms to CITR*

121.    The Censorship Policy has caused significant harm to CITR as an organization. This harm comes as no surprise: The Policy is a direct attack on the very same community that CITR was founded to build, protect, and empower. CITR has thrived as an organization because of its active members, who plan and attend events, contribute ideas, create opportunities for collaboration, and engage in advocacy efforts. Some of these members now find themselves in the crosshairs of the Policy, targeted for the work that has brought them together. Fearing that they will be targeted under the Policy based on their work and their expressive and associational activities, some of these members have stopped attending CITR events and limited participation in its advocacy efforts—efforts that depend on member engagement for their success. Their fear is not speculative: as described above, the leaders of two CITR member organizations, Mr. Ahmed and Ms. Melford, have already been targeted under the Policy based on their research and reporting.

122.    CITR is a U.S.-based non-partisan membership organization whose mission is to advance, sustain, and defend the right to ethically study the impact of technology on society. As

part of this mission, CITR works to protect technology research from efforts at obstruction, interference, and cooption by both the government and the technology companies themselves. CITR was formed in 2022 after Facebook sent a letter to two researchers at New York University demanding that they cease their research into the spread of disinformation on Facebook's platform. Since then, the organization has served as a mutual aid network that defends the right of independent researchers to carry out their work without fear of reprisal; an advocate for public-interest research to educate the public about the impacts of technology on society; and a community hub for independent researchers to develop their careers, learn new skills, sharpen their analyses, and build the field of industry-independent researchers.

123.    Today, CITR has nearly 500 individual and institutional members, including academics, journalists, civil society researchers, community scientists, and organizations working across forty-seven countries. These members include both U.S. citizens and noncitizens. Roughly half of CITR's members are located in the United States, and roughly half are located outside the United States. As noted above, approximately 30 to 40 of the members who reside in the United States are noncitizens. These members research and write about a wide range of issues related to the societal impacts of technology, including, for example, misinformation and disinformation on social media platforms; how online scams, child sexual abuse material, and other harmful content spread across the internet; how large technology companies treat individual privacy online; and how to improve user literacy and mitigate user harms through platform policies. Their work informs the decisions of users and advertisers, of policymakers, and of the platforms themselves.

124.    CITR members participate in the organization's two core programmatic pillars, each designed to support independent researchers in their work to inform public understanding of technology's impacts on society. The first pillar is "Community": CITR works to create a trusted,

neutral space for members to build professional networks and develop skills. In support of this pillar, CITR creates opportunities for members to connect, collaborate, and share best practices. For example, CITR regularly hosts events for its members to discuss urgent issues facing independent technology researchers. One such event is its annual Independent Technology Researchers' Summit, last held in Berlin, Germany in September 2025. CITR also hosts regular member meet-ups, as well as virtual and in-person workshops on different topics. CITR typically holds one or two events each month. CITR members are the primary audience for these events, though independent researchers, journalists, and lawyers who are not CITR members often join these events as well.

125.    The second pillar is "Advocacy": CITR advocates for systemic changes through legislative initiatives, legal actions, and changes to corporate policies. Together with its members, CITR engages in advocacy efforts to strengthen rights for independent, public-interest technology researchers and to support their exercise of those rights through, for example, sufficient funding, access to data and information, and legal protections. CITR also engages in public awareness campaigns to draw attention to the important role that independent researchers play in informing the public about technology's impacts on society, and to build support for their work among key stakeholders.

126.    The Censorship Policy has significantly harmed CITR's ability to advance both of its programmatic pillars.

127.    The Censorship Policy has harmed CITR's ability to advance its first programmatic pillar, "Community," by hampering its ability to host effective, inclusive in-person events. In-person events provide unparalleled opportunities for CITR members to develop deep connections across borders, identify opportunities for collaboration, and collectively address the threats facing

the independent technology researcher community by sharing their different experiences and perspectives. Because of the Policy, however, noncitizens residing in the United States fear that they will be detained at the U.S. border and deported under the Policy following attendance at CITR events abroad, and noncitizen members residing outside the United States fear that they will be detained at the U.S. border and denied entry to attend events in the United States.

128.    CITR previously held events open to its entire membership in both the United States and Europe. Before Defendants adopted the Censorship Policy, CITR typically held multiple events in the United States each year. Since the summer of 2025, however, CITR has temporarily stopped holding in-person events in the United States, because of the fear expressed by noncitizen members residing abroad that they would be denied entry or otherwise targeted under the Policy if they attempted to travel to the United States. Because roughly half of CITR members are based in the United States, the decision not to host events here has deceased CITR's ability to engage with its membership. If the Policy were no longer in place, CITR would resume regularly hosting events in the United States.

129.    Though CITR has continued to hold in-person events in Europe, the Censorship Policy has deterred U.S.-based noncitizens from participating in those events. For example, some U.S.-based noncitizen members declined to participate in CITR's most recent annual Independent Technology Researcher's Summit, hosted Berlin, Germany in September 2025, because of the Policy. The purpose of the event was to empower independent technology researchers from around the world to develop collaborations, discuss common obstacles they face in their work, and chart new paths to advance the field of independent technology research. Several U.S.-based, noncitizen CITR members who otherwise would have attended the Summit, including CITR member A, chose not to attend, because of the fear that they would be denied reentry to the United States or otherwise

targeted under the Policy as a result. As a result, the Summit suffered from decreased participation from CITR's U.S.-based members, which hampered CITR's ability to coordinate work across its membership on key topics. If the Policy were no longer in place, these members would attend future CITR events outside the United States.

130.    Because the Censorship Policy has made some U.S.-based, noncitizen CITR members unwilling to travel internationally, and it has made other noncitizen members based abroad unwilling or unable to travel to the United States, CITR has been unable to host inclusive, cohesive events. CITR plans to expend a significant amount of time and money in an effort to mitigate this harm. CITR is in the process of planning its annual Summit for 2026 and, because of the Policy, is currently planning to hold two separate Summits: one in the United States and one outside the United States. CITR has thus had to include two separate cost structures for its annual Summit in its 2026 budget, and CITR estimates that it will cost the organization tens of thousands of dollars more to host two events than it would have cost to host one.

131.    Even with this effort, the Censorship Policy will likely decrease member participation in CITR events going forward. For example, CITR Member B had planned to present their work at a future CITR event. Because of the fear that they will be targeted for detention and deportation under the Policy based on their work, however, they now feel compelled to self-censor in future presentations about their work at public CITR events. If the Policy were no longer in place, they would be substantially more likely to participate in public CITR events without feeling compelled to self-censor. CITR Member E, who has previously participated in public CITR events and discussions, now feels compelled to limit their public participation in CITR events because of the fear that they will be targeted for detention and deportation under the Policy based on these activities. If the Policy were no longer in place, they would no longer feel compelled to limit their

public associations with other CITR members. And CITR Member A now refrains from traveling internationally, including to CITR and other conferences they otherwise would have attended, because they fear that they will be denied reentry under the Policy based on their work. They would resume attending those events if the Policy were no longer in place.

132.    Moreover, at least one noncitizen member has not only stopped attending CITR events, but also significantly curtailed or even halted their association with CITR because of the Censorship Policy. Before Defendants adopted the Policy, CITR Member C attended CITR events and meetings. Because of the fear that they will be targeted for detention and deportation under the Policy based on these activities, however, they no longer attend CITR meetings and events, and they have halted *any* public association with CITR, including by asking for their name to be removed from CITR's website. If the Policy were no longer in place, they would be substantially more likely to resume attending CITR events and meetings and otherwise associating with the organization.

133.    The Censorship Policy has thus bifurcated CITR's international community and decreased CITR's ability to engage with its membership overall, harming its effectiveness as an organization. The Policy has also hampered its ability to achieve its mission of facilitating collaboration among independent technology researchers, which harms its U.S. citizen members as well. When noncitizens decline to participate in CITR events and activities, U.S. members lose opportunities to hear from and engage with them, along with opportunities to collaborate with them on funding proposals and other projects.

134.    The Censorship Policy has also harmed CITR's ability to advance its second programmatic pillar, "Advocacy." First, some noncitizen members have reduced their participation in CITR's public advocacy efforts because of the fear that they will be targeted under the Policy

as a result. For example, CITR Member A, who had previously worked with CITR on public advocacy campaigns relating to online safety and researchers' access to data, has limited their involvement with CITR and its public advocacy to a behind-the-scenes role, because of the fear that they will be targeted for detention and deportation under the Policy based on this activity. If the Policy were no longer in place, they would resume their public involvement in CITR's advocacy efforts.

135.    Second, the Censorship Policy has harmed CITR's ability to advance its advocacy goals by deterring noncitizen members from sharing their names and experiences for CITR's own reporting. For example, because of the fear that they will be targeted for detention or deportation under the Policy based on their work and their association with CITR, some noncitizen members were reluctant to share their names and experiences in CITR's 2025 State of Independent Tech Research report. Similarly, when journalists have approached CITR seeking comment from its members about the impacts of the Policy on their work and the field more broadly, some noncitizen members have been reluctant to speak on the record because of the same fear. The chill caused by the Policy has thus made it much more difficult for CITR to effectively advocate on behalf of independent technology researchers.

136.    Instead of responding to other pressing challenges facing the organization and pursing long-term goals, such as advocating for increased data access for researchers, CITR has spent significant staff time hosting events and consulting with members regarding the risks they face under the Censorship Policy. For example, CITR has planned three separate convenings of European researchers in large part to address member concerns regarding the Policy and its impact on the CITR community. The first event was held on June 26, 2025, in response to member concerns following Defendant Rubio's May 28, 2025 announcement of the Policy (see *supra* ¶ 40).

The second event was held on July 30, 2025, as a follow-up event to discuss the Policy in light of the House Judiciary Committee's July 25, 2025 publication of "The Foreign Censorship Threat" report (see *supra* ¶ 38). The third event was held on December 17, 2025, in response to member concerns stemming from reporting regarding the Cable (see *supra* ¶ 42) and the European Commission's fine against X for violations under the DSA (see *supra* ¶ 46). CITR organized all three events to identify ways it could support its members as they evaluated their risks under the Policy. Separate from these events, CITR has also spent significant time counseling individual citizen and noncitizen members on the Policy's implications for their work and their involvement in CITR. CITR leadership has consulted with dozens of U.S. citizen and noncitizen members about the Policy since December 2025. Organizing and hosting member events focused on the Policy and separately addressing individual member concerns about the Policy diverted time and resources from other activities in which CITR leadership would have engaged.

137.    CITR has also worked to raise awareness of the Censorship Policy and its effect on the public-interest research community by engaging in advocacy, speaking to the media, and conducting outreach to other organizations. For example, CITR coordinated an open letter joined by over a hundred researchers and allies to oppose the State Department's December 23, 2025 announcement of Defendant Rubio's foreign policy determinations against five individuals under the Policy. Because of the Policy, CITR leaders have also felt compelled to take extra measures and create ad hoc processes to ensure the safety of CITR members before engaging in CITR's advocacy work, making its advocacy efforts more difficult and time-consuming.

138.    The considerable time and resources CITR has spent planning events to address member concerns regarding the Censorship Policy, counseling members on the implications of the Policy for their work and their involvement in CITR, and otherwise raising awareness of the threats

the Policy poses to the independent technology researcher community has left the organization with less time and resources to pursue other priorities. For example, though public-interest technology research has faced significant reductions in federal funding, CITR has not had time to focus on advocacy addressing that issue. CITR had also intended to organize capacity-building work for researchers around data access over the past year, but it has not been able to launch that initiative because of the time and effort spent responding to the Policy. If the Policy were no longer in place, CITR would redirect its resources to focus on these other pressing issues.

## CAUSES OF ACTION

### COUNT I
### The Censorship Policy
### Violates the First Amendment

139.    The Censorship Policy violates the First Amendment because it subjects noncitizens to visa denial, visa revocation, detention, and deportation on the basis of and in retaliation for their First Amendment–protected speech and association, including on the basis of their actual or perceived viewpoints or the content of their speech; because it burdens the rights of CITR and its U.S. citizen members to hear from, and associate with, its noncitizen members; and because the Policy is not sufficiently tailored to any compelling, or even legitimate, governmental interest.

140.    The Censorship Policy violates the First Amendment for the additional reason that Defendants are using coercive threats to subject CITR members to visa denial, visa revocation, detention, and deportation to unconstitutionally suppress their speech based on its content and viewpoint.

141.    To the extent Defendants rely on the foreign policy provisions as the basis for carrying out the Censorship Policy, those provisions violate the First Amendment as applied, for the same reasons.

## COUNT II
### The Censorship Policy
### Violates the Fifth Amendment

142.    The Censorship Policy violates the Fifth Amendment because it is vague, inviting arbitrary and discriminatory enforcement.

143.    Defendants have failed to make key components of the Censorship Policy public, including the Cable, which reportedly conveys the scope of activities subject to scrutiny under the Policy.

144.    Because the Censorship Policy is vague with respect to what conduct it punishes, including what conduct it considers "complicit in censoring Americans," CITR and its members could not with any reasonable certainty conform their conduct to its requirements, even if they wished to.

145.    To the extent Defendants rely on the foreign policy provisions as the basis for carrying out the Censorship Policy, those provisions violate the Fifth Amendment as applied, for the same reasons, and because they fail to give CITR and its noncitizen members fair warning as to the scope of activities Defendants consider grounds for exclusion and deportation.

## COUNT III
### The Censorship Policy
### Violates the APA

146.    The "visa restriction policy" announced by Defendant Rubio on May 28, 2025, the Cable reportedly sent on December 2, 2025, the Rubio–Noem Memo dated December 19, 2025, and the foreign policy determinations announced on December 23, 2025 each represent final

agency action and, together with the additional actions of Defendants described above (see *supra* ¶¶ 39–64), constitute the Censorship Policy challenged here.

147.    The Censorship Policy violates the APA because it is arbitrary, capricious, an abuse of discretion, and contrary to constitutional right. 5 U.S.C. § 706(2)(A), (B).

148.    The Censorship Policy also violates the APA because it exceeds Defendants' statutory authority under the INA, including the authority granted under the foreign policy provisions. 5 U.S.C. § 706(2)(C).

## REQUEST FOR RELIEF

CITR respectfully requests that this Court:

A.    Declare that the Censorship Policy violates the First and Fifth Amendments.

B.    Declare that the Censorship Policy violates the APA, set aside the Policy, and set aside any foreign policy determinations concerning CITR's members.

C.    Declare that Defendants' use of threats to subject CITR members to visa denial, visa revocation, detention, and deportation to unconstitutionally suppress their speech based on its content and viewpoint violates the First Amendment, and enjoin Defendants from continuing to make those threats.

D.    Enjoin Defendants from enforcing the Censorship Policy.

E.    To the extent Defendants rely on the foreign policy provisions as the basis for carrying out the Censorship Policy, declare that the provisions violate the First and Fifth Amendments as applied, and enjoin Defendants from applying them.

F.    Award CITR reasonable costs and attorneys' fees incurred in this action.

G.    Grant such other and further relief as the Court may deem just and proper.

March 9, 2026                                    Respectfully submitted,

/s/ *Naomi Gilens*                              /s/ *Carrie DeCell*
_____          _____
Naomi Gilens (D.C. Bar No. 90037831)*        Carrie DeCell (D.C. Bar No. 1015491)
Nicole Schneidman**                              Raya Koreh*
Protect Democracy Project                      Kiran Wattamwar**
2020 Pennsylvania Avenue NW, Suite 163      Anna Diakun**
Washington, DC 20006                           Katie Fallow**
(202) 579-4582                                 Alex Abdo**
naomi.gilens@protectdemocracy.org            Jameel Jaffer (D.C. Bar No. MI0067)
                                              Knight First Amendment Institute
                                              at Columbia University
                                              475 Riverside Drive, Suite 302
                                              New York, NY 10115
                                              (646) 745-8500
                                              carrie.decell@knightcolumbia.org

                                              *Counsel for Plaintiff*

                                              * Application for admission to
                                              D.D.C. pending.

                                              ** Motion for admission *pro hac
                                              vice* forthcoming.