**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| COALITION FOR INDEPENDENT TECHNOLOGY RESEARCH,<br><br>Plaintiff,<br><br>v.<br><br>MARCO RUBIO, in his official capacity as Secretary of State; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; and PAMELA BONDI, in her official capacity as Attorney General of the United States,<br><br>Defendants. | Civil Action No. 1:26-cv-00815 (JEB)<br><br><br>**HEARING REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SECTION 705 STAY AND PRELIMINARY INJUNCTION**

**Table of Contents**

Table of Authorities ................................................................................................ iii

Introduction.......................................................................................................... 1

Statutory Background ...........................................................................................2

Factual Background ..............................................................................................3

Argument ............................................................................................................13

    I.        CITR has standing.................................................................................13

        A.      CITR has associational standing. ..................................................... 13

            1.       CITR member GDI has standing. ........................................ 14

            2.       Individual CITR members have standing. .......................... 15

                    a.       CITR's noncitizen members have standing. .......................... 16

                    b.       CITR's U.S. citizen members have standing. ......................... 18

            3.       The interests CITR seeks to protect are germane to its purpose, and this suit does not require participation of individual members. ......................................................................... 20

        B.      CITR has organizational standing................................................... 21

    II.      CITR is likely to succeed on the merits. ................................................27

        A.      The Censorship Policy violates the First Amendment.................................. 27

            1.       The Censorship Policy burdens expressive and associational activities protected by the First Amendment. ..................................... 27

            2.       The Censorship Policy imposes a viewpoint-based burden on speech and association that fails First Amendment scrutiny. ............. 30

                    a.       The Censorship Policy discriminates on the basis of viewpoint and is therefore presumptively unconstitutional. ..................................................................... 30

                    b.       The Censorship Policy furthers no legitimate government interest that would justify its burdens on speech. ..................................................................................... 32

i

3.      Defendants' coercive threats independently violate the First
        Amendment.................................................................................... 34

B.      The Censorship Policy violates the Fifth Amendment. ................................... 35

C.      The Censorship Policy violates the APA......................................................... 36

        1.      The Censorship Policy is subject to review under the APA. .............. 36

        2.      The Censorship Policy is arbitrary and capricious and an abuse
                of discretion. .................................................................................... 38

        3.      The Censorship Policy exceeds Defendants' statutory
                authority. ........................................................................................... 40

III.    The other preliminary injunction factors support relief...............................................44

Conclusion ........................................................................................................................45

**Table of Authorities**

**Cases**

*Abourezk v. Reagan*, 592 F. Supp. 880 (D.D.C. 1984).................................................................. 33

*\*Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1986).............................................. 38, 42, 43, 44

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th
586 (D.C. Cir. 2022) ........................................................................................................ 17

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* 570 U.S. 205 (2013) .............................. 39

*Allende v. Shultz*, 605 F. Supp. 1220 (D. Mass. 1985) .......................................................... 33, 42

*Am. Acad. of Religion v. Chertoff*, 463 F. Supp. 2d 400, 415–16 (S.D.N.Y. 2006) ..................... 34

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615 (D.C. Cir. 2020) .................... 25

*Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120 (D. Mass. 2025)............... 18, 29, 33

*Am. Freedom Def. Initiative v. Lynch*, 217 F. Supp. 3d 100 (D.D.C. 2016) ................................ 32

*Am. Freedom Def. Initiative v. Sessions*, 697 F. App'x 7 (D.C. Cir. 2017) ................................. 32

*Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045 (9th Cir. 1995) ..................... 29, 33

*Ams. for Safe Access v. Drug Enf't Admin.*, 706 F.3d 438 (D.C. Cir. 2013) ............................... 26

*Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602 (D.C. Cir. 2017)..................................... 40

*Atlas Brew Works, LLC v. Barr*, 820 F. App'x 4 (D.C. Cir. 2020) ............................................. 16

*\*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)...................................................... 27, 34, 35

*Bennett v. Spear*, 520 U.S. 154 (1997) ...................................................................................... 36

*Biden v. Texas*, 597 U.S. 785 (2022) .......................................................................................... 37

*Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281 (D.D.C. 2011) ...................................... 29

*\*Bridges v. Wixon*, 326 U.S. 135 (1945) ..................................................................................... 29

*Carpenters Indus. Council v. Zinke*, 854 F.3d 1 (D.C. Cir. 2017)............................... 18, 20, 25, 27

*Citizens for Resp. & Ethics in Wash. v. U.S. Off. of Special Couns*, 480 F. Supp.
3d 118 (D.D.C. 2020) ................................................................................................. 23, 24

*Competitive Enter. Inst. v. FCC, 970 F.3d 372, 384 (D.C. Cir. 2020)*....................................... 27

*CSL Plasma Inc. v. CBP*, 33 F.4th 584 (D.C. Cir. 2022)........................................................ 36, 38

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144 (D.C. Cir. 2025) .......................................................................................................... 14, 21

*Ctr. for Biological Diversity v. Env't Prot. Agency*, 861 F.3d 174 (D.C. Cir. 2017) ............. 18, 20

*Dep't of Com. v. New York*, 588 U.S. 752 (2019)......................................................................... 20

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1 (2020) ...................... 37

*District of Columbia v. Trump*, 810 F. Supp. 3d 19 (D.D.C. 2025) ............................................. 13

*Elec. Priv. Info. Ctr. v. Fed. Aviation Admin.*, 892 F.3d 1249 (D.C. Cir. 2018) .......................... 23

*Elrod v. Burns*, 427 U.S. 347 (1976) ........................................................................................... 44

*Ercelik v. Hyde*, No. 25-CV-11007, 2025 WL 1361543 (D. Mass. May 8, 2025) ....................... 29

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)......................................................... 35

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021).............................................................. 39

*Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024)................................... 24

*Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905 (D.C. Cir. 2015)................................... 22, 23

*Frederick Douglass Found., Inc. v. Dist. of Columbia.*, 82 F.4th 1122 (D.C. Cir. 2023) ............................................................................................................................. 31

*Gooding v. Wilson*, 405 U.S. 518 (1972) ....................................................................................... 2

*Harvard Law Sch. Forum v. Shultz*, 633 F. Supp. 525 (D. Mass. 1986) ..................................... 33

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ............................................................ 33

*Hotel & Rest. Emps. Union, Loc. 25 v. Smith*, 846 F.2d 1499 (D.C. Cir. 1988) ......................... 17

*Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76 (D.D.C. 2025).......................... 17

*Kahbasi v. Blinken*, No. CV 23-1667, 2024 WL 3202222 (D.D.C. June 27, 2024)..................... 14

*Khalil v. Trump*, 784 F. Supp. 3d 705 (D.N.J. 2025).................................................................... 42

*Kleindienst v. Mandel*, 408 U.S. 753 (1972)................................................................. 14, 19, 30, 33

*Kwong Hai Chew v. Colding*, 344 U.S. 590 (1953)....................................................................... 29

*Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965) ................................................................. 19, 30

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ................................... 45

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ............................. 38

*Lincoln v. Vigil*, 508 U.S. 182 (1993) ................................................................................. 37

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ........................................................ 40, 43

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ................................................................. 15, 20, 26

*Mahdawi v. Trump*, 781 F. Supp. 3d 214 (D. Vt. Apr. 30, 2025) ................................................. 29

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S.
209 (2012) ................................................................................................................ 37

\*Media Matters for Am. v. Paxton*, 138 F.4th 563 (D.C. Cir. 2025) ........................................... 28

*Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1 (D.D.C. 2024) ......................................... 44

*Mohammed H. v. Trump*, 786 F. Supp. 3d 1149 (D. Minn. 2025) .............................................. 29

\*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) .............................................................. 3, 32, 39

*Motion Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796 (D.C. Cir. 2002) .................................. 43

*N.Y. Republican State Comm. v. S.E.C.*, 799 F.3d 1126, (D.C. Cir. 2015) .................................. 16

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964) ............................................................... 28

*Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 983 F.3d 498 (D.C. Cir. 2020) ......................... 21

*Nat'l Lime Ass'n v. E.P.A.*, 233 F.3d 625 (D.C. Cir. 2000) .................................................... 20

\*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) ..................................................... 27, 34, 35

*NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77 (D.C. Cir. 2012) ................................. 17

*Nken v. Holder*, 556 U.S. 418 (2009) ............................................................................. 13, 45

*Öztürk v. Trump*, 779 F. Supp. 3d 462 (D. Vt. 2025) ......................................................... 29

*Packingham v. North Carolina*, 582 U.S. 98 (2017) ............................................................. 3

*Parcham v. INS*, 769 F.2d 1001 (4th Cir. 1985) ................................................................. 29

*Paul v. FAA,* No. 24-1348, 2026 WL 547264 (D.C. Cir. Feb. 27, 2026) ................................... 40, 43

\*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d
1087 (D.C. Cir. 2015) ......................................................................................... 21, 22, 24, 26

*Pietersen v. U.S. Dep't of State*, 138 F.4th 552 (D.C. Cir. 2025) ........................................ 15, 18

*Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518 (9th Cir. 1989) ........................... 23

*Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500 (D.C. Cir. 2016) ....................................... 44, 45

*Ragbir v. Homan*, 923 F.3d 53 (2d Cir. 2019) ................................................................. 29

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ............................................................. 19, 30

*Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ........................... 31, 32

*Roth v. United States*, 354 U.S. 476 (1957) ................................................................... 28

*Sandvig v. Sessions*, 315 F. Supp. 3d 1 (D.D.C. 2018) ..................................................... 15

*Snyder v. Phelps*, 562 U.S. 443 (2011) ...................................................................... 28, 32

*Solar Energy Indus. Ass'n v. Fed. Energy Reg. Comm'n*, 154 F.4th 863 (D.C. Cir.
    2025) ...................................................................................................................... 40

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159
    (2001) ..................................................................................................................... 43

*Stanford Daily Publ'g Corp. v. Rubio*, No. 25-CV-06618-NW, 2026 WL 125241
    (N.D. Cal. Jan. 16, 2026) ...................................................................................... 18, 22

*Stanley v. Georgia*, 394 U.S. 557 (1969) ....................................................................... 30

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) .................................................. 15

*TOMAC v. Norton*, 193 F. Supp. 2d 182 (D.D.C. 2002) ................................................... 21

*Trump v. Twitter Inc.*, 602 F. Supp. 3d 1213 (N.D. Cal. 2022) ....................................... 4, 39

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ...................................................... 31

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) ......................................... 37

*\*U.S. Telecom Ass'n v. Fed. Commc'ns Comm'n*, 825 F.3d 674 (D.C. Cir. 2016) ................ 15, 19

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544
    (1996) ..................................................................................................................... 21

*United States v. Witkovich*, 353 U.S. 194 (1957) ............................................................. 44

*Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988) ............................................. 18

*Weaver v. U.S. Info. Agency*, 87 F.3d 1429 (D.C. Cir. 1996) ............................................... 44

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9 (2018)............................................. 37

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1 (D.D.C. 2020) .............................................................................................. 21, 26

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ............................................................. 13

*World Shipping Council v. Fed. Mar. Comm'n*, 152 F.4th 215 (D.C. Cir. 2025) ........................ 38

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ...................................................................................... 44

**Statutes**

5 U.S.C. § 701 .......................................................................................................................... 36, 37

5 U.S.C. § 704 .............................................................................................................................. 36

5 U.S.C. § 705 ........................................................................................................................... 2, 36

5 U.S.C. § 706 .......................................................................................................................... 36, 40

8 U.S.C. § 1101 ............................................................................................................................. 38

8 U.S.C. § 1182 ......................................................................................................... 2, 3, 37, 41, 42

8 U.S.C. § 1227 ............................................................................................................................... 2

**Other Authorities**

Black's Law Dictionary (11th ed. 2019)...................................................................................... 41

H.R. Rep. 101-955 ....................................................................................................................... 41

Press Release, Fed. Trade Comm'n, *Federal Trade Commission Launches Inquiry on Tech Censorship* (Feb. 20, 2025), https://perma.cc/M7QS-9XDA .................................... 5

S. Rep. No. 100-75......................................................................................................................... 41

Staff of H. Comm. on the Judiciary, 119th Cong., *The Foreign Censorship Threat: How the European Union's Digital Services Act Compels Global Censorship and Infringes on American Free Speech* (Interim Staff Rep. 2025), https://perma.cc/W5Y6-BV32 ......................................................................................... 4

**Introduction**

This case challenges a policy of censorship masquerading as a policy to stop censorship. Claiming the mantle of free speech, Defendants have adopted and are now enforcing a new exclusion and deportation policy targeting noncitizens based on their viewpoints, in direct contravention of the First Amendment, the Fifth Amendment, and the Administrative Procedure Act ("APA"). Specifically, Defendants are seeking to exclude and deport noncitizens based on their First Amendment–protected work involving research and reporting on misinformation and disinformation, as well as fact-checking, content moderation, trust and safety, and compliance (the "Censorship Policy" or "Policy"). Pursuant to the Policy, Defendants have announced visa restrictions on noncitizens they deem "complicit in censoring Americans," and they have taken steps to detain and deport U.S. lawful permanent residents on the same grounds. In announcing the enforcement of the Policy against five individuals on December 23, 2025, Defendant Rubio warned that the "State Department stands ready and willing to expand" the target list.

Plaintiff, the Coalition for Independent Technology Research ("CITR"), represents independent technology research institutions and researchers around the world, including many researchers who live and work in the United States. Defendants have already targeted the leaders of two CITR member organizations under the Censorship Policy, including a U.S. lawful permanent resident. Other noncitizen members of CITR have significantly curtailed their research and writing, their participation in conferences and other public events, and their public advocacy because they reasonably fear that they, too, will be targeted for adverse visa determinations or even detention and deportation under the Policy based on those activities. These chilling effects have, in turn, significantly harmed the expressive, associational, and professional interests of CITR's U.S. organizational and U.S. citizen members, as well as the organizational interests of CITR.

CITR now moves this Court for preliminary relief. It is likely to succeed on the merits of its claims: The Censorship Policy violates the First Amendment because it punishes individuals on the basis of viewpoint in the furtherance of no legitimate, let alone compelling, government interest, and it violates the Fifth Amendment because it is impermissibly vague. The Policy violates the APA because it is contrary to constitutional right and arbitrary and capricious, and because it exceeds Defendants' statutory authority. Absent preliminary relief, CITR and its members will continue to be chilled in the exercise of their First Amendment rights, in addition to suffering other irreparable injuries. The public interest and balance of equities also favor preliminary relief because the government's interest merges with the public interest, which lies in halting unlawful action that deters CITR's members from engaging in constitutionally protected expression of "transcendent value to all of society." *Gooding v. Wilson*, 405 U.S. 518, 521 (1972).

For these reasons, CITR moves the Court for an order staying the policy under the APA, 5 U.S.C. § 705, and preliminarily enjoining Defendants from enforcing it.

## Statutory Background

Defendants have claimed authority to adopt and enforce the Censorship Policy under 8 U.S.C. §§ 1182(a)(3)(C), 1227(a)(4)(C) (the "foreign policy provisions"). The foreign policy provisions state that a noncitizen is inadmissible or deportable if the Secretary of State has "reasonable ground to believe" that the noncitizen's entry, presence, or activities in the country "would have potentially serious adverse foreign policy consequences for the United States." *Id.* § 1182(a)(3)(C)(i) (inadmissibility); *id.* § 1227(a)(4)(C)(i) (deportability). Both provisions, however, are subject to exceptions that expressly prohibit the exclusion of noncitizens based on their "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States, unless the Secretary of State personally

2

determines that the [noncitizen's] admission would compromise a compelling United States foreign policy interest." *Id.* § 1182(a)(3)(C)(iii). If the Secretary makes such a personal determination, he "must notify on a timely basis" the chairs of the House Committees on the Judiciary and Foreign Affairs and the Senate Committees on the Judiciary and Foreign Relations "of the identity of the [noncitizen] and the reasons for the determination." *Id.* § 1182(a)(3)(C)(iv).

## Factual Background

### *The Work Targeted Under the Censorship Policy*

Much of today's public and political discourse takes place on social media and other internet platforms owned and operated by private companies. *See Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). These companies make independent judgments about the content and communities they wish to host on their platforms. While all platforms must comply with legal requirements, their content moderation policies vary. For example, Instagram bars "hate speech and the targeting of private individuals" and most nudity. DeCell Decl., Ex. 1. YouTube prohibits "[e]xplicit content" as well as "hate speech" that targets people on the basis of age, caste, immigration status, or certain other factors. *Id.* Ex. 2. In contrast, X (formerly Twitter) allows "graphic media" and appears to allow hate speech even as it prohibits users from "affiliat[ing] with or promot[ing] the activities of violent and hateful entities." *Id.* Ex. 3. Truth Social says it "encourages your unencumbered free expression," *id.* Ex. 4, but it also "prevent[s] illegal and other prohibited content," prohibiting "[s]exual content or language" and "[s]exually suggestive (explicit or vague) statements," *id.* Ex. 5. As the Supreme Court recently recognized, the platforms' content moderation policies reflect expressive and associational decisions protected by the First Amendment. *Moody v. NetChoice, LLC*, 603 U.S. 707, 731–32 (2024).

The Censorship Policy targets individuals who work in areas related to the platforms' expressive and associational judgments about the content and communities they want to host. The

3

Policy targets the platforms' trust and safety workers who effectuate these judgments and ensure compliance with applicable laws. The Policy also targets fact-checkers who empower the public to assess the accuracy of information published on the platforms. And, most relevant here, it targets independent researchers whose work underpins all of the above, informing public understanding of how the platforms operate and how they impact society. *See* DeCell Decl. Exs. 6, 7.

Independent research is critical to the public's understanding of the ways in which internet platforms observe our online interactions and shape our society. CITR's members—including researchers, research institutions, and journalists—conduct rigorous, independent research to identify ways to ensure user safety and promote free expression and positive social impact on the platforms. Geurkink Decl. ¶ 6; Matias Decl. ¶ 5. CITR's members hold a broad range of perspectives on what platform policies are preferable from a societal standpoint: some members support tighter moderation of content on social media platforms, for example, while others support looser moderation. *See, e.g.*, Matias Decl. ¶ 5. Regardless of their views, by operating independently from the technology industry, CITR members provide the public with the information it needs to hold platforms accountable for their policies and practices.

### *The Censorship Policy*

Since his first administration, President Trump and his political allies have characterized the expressive activities of the private actors described above as a form of "censorship," contending that these activities have the intent or effect of suppressing conservative speech on internet platforms. Through private lawsuits, *see, e.g.*, *Trump v. Twitter Inc.*, 602 F. Supp. 3d 1213 (N.D. Cal. 2022); congressional investigations and reports, *see, e.g.*, Staff of H. Comm. on the Judiciary, 119th Cong., *The Foreign Censorship Threat: How the European Union's Digital Services Act Compels Global Censorship and Infringes on American Free Speech* (Interim Staff Rep. 2025), https://perma.cc/W5Y6-BV32; and administrative actions, *see, e.g.*, Press Release,

4

Fed. Trade Comm'n, *Federal Trade Commission Launches Inquiry on Tech Censorship* (Feb. 20, 2025), https://perma.cc/M7QS-9XDA, President Trump and his allies have targeted internet researchers and advocates as well as internet platforms themselves in waging a broad campaign against what they call the "censorship-industrial complex."

The Censorship Policy is the latest charge in this campaign. Announced in May 2025 and expanded in December 2025, the Policy subjects noncitizen researchers and advocates, fact-checkers, and trust and safety workers whose work the Trump administration and its political allies have characterized as "censorship" to visa denials, visa revocations, and even detention and deportation. The policy is aimed at deterring speech that advocates content moderation policies at odds with the policies favored by President Trump and his political coalition.

Recent reporting reveals that the Trump administration started to develop the Censorship Policy in early 2025, when aides to Vice President Vance ordered an office within the State Department to document what they described as censorship of online speech by European regulators. State Department staffers then conducted a weeks-long investigation focused on the European Union's Digital Services Act ("DSA"), in the course of which they asked social media companies for examples of times they were ordered to take action against content or accounts because of the DSA. Though X offered a handful of examples mostly related to law enforcement requests, staffers reportedly concluded: "There is no evidence that Member States of the European Union are overreaching the DSA to censor and criminalize online content." DeCell Decl. Ex. 8.

Defendant Rubio announced the Censorship Policy on May 28, 2025. Despite the lack of evidence adduced during the State Department's reported investigation into censorship under the DSA, he claimed in a post on X that, "[f]or too long, Americans have been fined, harassed, and even charged by foreign authorities for exercising their free speech rights," and he announced "a

5

new visa restriction policy that will apply to foreign officials and persons who are complicit in censoring Americans." DeCell Decl. Ex. 9. Defendants subsequently enforced the Policy against a Brazilian Supreme Court justice who had ordered X to shut down Brazilian operations after the platform failed to remove accounts accused of undermining Brazilian democracy. *Id.* Exs. 10–11.

Defendant Rubio and the State Department expanded the Censorship Policy in December 2025. On December 2, Defendant Rubio reportedly sent a cable to U.S. embassies regarding the enforcement of the Policy (the "Cable"). The Cable, which has been widely reported though not publicly disclosed, instructs consular officers to scrutinize online information to determine whether visa applicants have engaged in activities including "combatting misinformation, disinformation or false narratives, fact-checking, content moderation, compliance, and trust and safety," and to pursue a finding of ineligibility if they determine that an applicant was "responsible for, or complicit in, censorship or attempted censorship of protected expression in the United States." DeCell Decl. Ex. 6; *see id.* Ex. 7. The Cable reportedly subjects H-1B visa applicants to heightened review under the Policy because "many [H-1B applicants] work in or have worked in the tech sector, including in social media or financial services companies involved in the suppression of protected expression." *Id.* Ex. 6. In response to news reports, a State Department spokesperson commented: "We do not support aliens coming to the United States to work as censors muzzling Americans," adding, "[i]n the past, the President himself was the victim of this kind of abuse when social media companies locked his accounts. . . . Allowing foreigners to lead this type of censorship would both insult and injure the American people." *Id.*

Later in December 2025, Defendants expanded the Censorship Policy beyond visa applicants to visa-waiver travelers, visa holders, and even lawful permanent residents in the United States. On December 5, the European Commission imposed a $140 million fine on X for failing

6

to provide data access to researchers and for misleading users with its "blue check" identity verification system, in violation of the DSA. *See* DeCell Decl. Ex. 12. Although the fine was not for publishing or failing to remove any Americans' (or other) content on the platform, Defendant Rubio called it "an attack on . . . the American people" and claimed, "[t]he days of censoring Americans online is over." *Id.* Ex. 13. Soon thereafter, Defendants enforced the Policy against five individuals, including U.S. lawful permanent residents and visa-waiver travelers.

On December 16, 2025, Under Secretary of State for Public Diplomacy and Public Affairs Sarah B. Rogers sent an "Action Memo" to Defendant Rubio titled, "Response Options to the European Commission's Fine of X Corp. Under the Digital Services Act (DSA)." DeCell Decl. Ex. 14, at 2. "Consistent with those foreign policy objectives articulated in the May 2025 3C policy," Under Secretary Rogers recommended that Defendant Rubio respond to the fine imposed on X by exercising his authority under the foreign policy provisions to render deportable two U.S. lawful permanent residents, including Imran Ahmed, the leader of CITR member organization the Center for Countering Digital Hate ("CCDH"). *Id.* at 6–7. Under Secretary Rogers cited Mr. Ahmed's expressive activities as the basis for her deportability recommendation, including his advocacy "for foreign regulatory action," his leadership of "efforts to lobby Google to remove ads" from two websites, his reporting on vaccine-related disinformation online, and his endorsement of a "petition calling on the European Commission to take action to ensure access of platform data to researchers under the DSA." *Id.* at 7. She also noted that, if Defendant Rubio determined that Mr. Ahmed was deportable as recommended, "DHS/ICE may elect to pursue removal proceedings, including possibly detaining . . . Ahmed in the process." *Id.*

On December 19, 2025, Defendant Rubio sent a memo to Defendant Noem titled, "Determination of Deportability under Section 237(a)(4)(C) of the INA" (the "Rubio–Noem

7

Memo"). DeCell Decl. Ex. 14, at 8. Defendant Rubio shared his determination that Mr. Ahmed was deportable under the foreign policy provisions, cited the expressive activities set forth in the Action Memo, and shared his understanding that "DHS may now initiate removal charges against [Mr. Ahmed]." *Id.* He further explained that his determination regarding Mr. Ahmed was "based on the same foreign policy objectives articulated in [his] May announcement of a policy to restrict visa issuance under INA section 212(a)(3)(C)" (the inadmissibility provision). *Id.*

On December 23, 2025, Defendant Rubio issued a press release announcing the enforcement of the Censorship Policy against Mr. Ahmed and four other individuals whom he characterized as having "led organized efforts to coerce American platforms to censor, demonetize, and suppress American viewpoints they oppose." DeCell Decl. Ex. 15. The press release stated that Defendant Rubio had determined under the foreign policy provisions that the individuals' "entry, presence, or activities in the United States have potentially serious adverse foreign policy consequences for the United States"; it announced "visa restrictions" on all five individuals, so that they are "generally barred from entering the United States"; and it stated that, based on Defendant Rubio's determinations, DHS "can initiate removal proceedings against certain individuals." *Id.* Defendant Rubio underscored the announcement in a post on X, writing that the State Department was taking steps "to bar leading figures of the global censorship-industrial complex from entering the United States" and threatening: "We stand ready and willing to expand this list if others do not reverse course." *Id.* Ex. 16.

That same day, Under Secretary Rogers identified the five targeted individuals in a series of posts on X. These individuals included Mr. Ahmed and Clare Melford, a UK citizen and the leader of another CITR member organization, the Global Disinformation Index ("GDI"). In each post purporting to justify "sanctions" against a given individual, Under Secretary Rogers cited

only their expressive activities: Regarding Thierry Breton, a French citizen and former European Commissioner, she cited a letter he wrote to Mr. Musk regarding DSA obligations before Mr. Musk hosted a live interview with then-candidate Donald Trump on X. *See* DeCell Decl. 17. Regarding Mr. Ahmed, she cited, among other expressive activities, a CCDH report titled the "Disinformation Dozen" and CCDH's support for the DSA. *See id.* Ex. 18.[1] Regarding Ms. Melford, she included a screenshot of a GDI report on hate speech and claimed that GDI had "joined the deleterious EU Code of Practice on Disinformation." *See id.* Ex. 19. And regarding Josephine Ballon and Anna-Lena von Hodenberg, two German citizens and the leaders of HateAid, a non-profit organization providing direct counseling and legal support services to individuals facing online abuse and violent threats, Under Secretary Rogers cited, among other expressive activities, an interview Ms. Ballon gave on the news program *60 Minutes* and HateAid's petition to expand data access for researchers under the DSA. *See id.* Exs. 20–21.

Defendants have since reaffirmed the Censorship Policy. In mid-January 2026, the State Department released its "Agency Strategic Plan" for fiscal years 2026–2030, in which it declared that it would "oppose efforts by foreign countries, international organizations and NGOs, and activist groups that seek to censor Americans in their own country" and "counter these efforts through all appropriate means including visa and financial sanctions." DeCell Decl. Ex. 22.

### *The Censorship Policy's Effects on CITR and Its Members*

CITR is a U.S.-based non-profit organization with a mission "to advance, sustain, and defend the right to ethically study the impact of technology on society." Geurkink Decl. ¶ 4. In

---

[1] On December 24, 2025, Mr. Ahmed filed a lawsuit challenging the determination. Complaint, *Ahmed v. Rubio*, No. 1:25-cv-10705 (S.D.N.Y. Dec. 24, 2025), ECF No. 1. On December 25, a district court granted Mr. Ahmed a temporary restraining order, ECF No. 14, which remains in place pending further litigation, *see* ECF No. 40.

support of its mission, CITR has adopted two core "programmatic pillars": "Community" and "Advocacy." *Id.* ¶¶ 7–9. Under CITR's "Community" pillar, CITR works to "create a trusted, neutral space for members to build professional networks and develop skills" by hosting events where its members can "connect, collaborate, and share best practices," as well as "discuss urgent issues facing independent technology researchers." *Id.* ¶ 8. Under its "Advocacy" pillar, CITR "engages in public education efforts to strengthen rights for independent, public-interest technology researchers." *Id.* ¶ 9. Under both pillars, CITR hosts events, carries out public education campaigns, and engages in other activities to "protect technology research from efforts at obstruction, interference, and cooption" by the government or technology companies. *Id.* ¶ 4.

CITR has nearly 500 individual and organizational members across the globe, approximately 30 to 40 of which are noncitizens based in the United States. *Id.* ¶ 5. Many of these members "research and write about topics identified as grounds for targeting under the [Censorship] Policy," including "misinformation and disinformation on social media platforms; how online scams, child sexual abuse material, and other harmful content spread across the internet; how large technology companies treat individual privacy online; and how to improve user literacy and mitigate user harms through platform policies." *Id.* ¶ 6. Their research "informs the decisions of users, advertisers, policymakers, and the platforms themselves." *Id.*

The Censorship Policy has directly and significantly harmed CITR's U.S.-based organizational members. The leaders of two such member organizations have already been publicly targeted under the Policy, including Clare Melford, Chief Executive Officer of CITR Member GDI. Melford Decl. ¶¶ 4–14; *see also supra* pp. 7–9 (describing targeting of Mr. Ahmed). Pursuant to the Policy, Defendants have barred Ms. Melford from entering the United States, impairing GDI's ability to hear from and engage with its CEO, to raise funds for its work, and to

10

engage with researchers and other partners in the United States. Rogers Decl. ¶¶ 12–17. If the Policy were no longer in place, Ms. Melford would plan to travel to the United States to continue her work here. Melford Decl. ¶ 15.

The Censorship Policy has also harmed CITR's noncitizen members. One such member is identified in the Complaint and their declaration in support of this motion as "CITR Member A." Member A is a lawful permanent resident who lives in the United States and serves as a research director at a university in the Northeast. CITR Member A Decl. ¶¶ 3–4. Through their scholarly work, they have "advocated for the adoption of alternative approaches to content moderation to better address harm on social media platforms." *Id.* ¶ 5. Since the Trump administration adopted the Policy, however, Member A has "shifted the focus of [their] research" to more "politically neutral" topics. *Id.* ¶ 7. Because they fear that they will be targeted under the Policy for their work and related activities, they now refrain from attending and presenting their research at international conferences they would have otherwise attended, and they no longer publish op-eds or engage in public advocacy with other CITR members related to their work on online safety. *Id.* ¶¶ 9–10. If the Policy were no longer in place, they would be "substantially more likely" to resume these activities. *Id.* ¶ 11.

The Censorship Policy has similarly harmed another noncitizen CITR member, Dr. Emma Briant. Dr. Briant is a visa holder currently serving as a Visiting Associate Professor at the University of Notre Dame. Briant Decl. ¶¶ 3, 5. Her scholarly work focuses on "contemporary information warfare and propaganda, including disinformation." *Id.* ¶ 4. Because she fears that she will be targeted under the Policy based on her work, she now hesitates to travel to international conferences she would have otherwise attended and feels compelled to self-censor in her writing and speaking, including when posting about her work on social media and when speaking with

11

reporters. *Id.* ¶¶ 8–9. If the Policy were no longer in place, she "would no longer feel compelled to self-censor when speaking publicly about [her] work." *Id.* ¶ 10.

Though not the direct targets of the Censorship Policy, CITR's U.S. citizen members have suffered harms stemming from the Policy's chilling effects on their noncitizen colleagues and students. One such member, Dr. J. Nathan Matias, is an expert on content moderation and online safety and a professor at Cornell University, where he founded the Citizens and Technology Lab, an organizational member of CITR. Matias Decl. ¶¶ 1, 3–5. Dr. Matias has many noncitizen students and collaborators, and because of the Policy, some of them will no longer travel abroad or speak publicly in connection with their work. *Id.* ¶¶ 13, 16. He has spent over a hundred hours contingency planning; he "has lost important opportunities to develop new research" and "bring visibility to [his] work"; and he has been "deprived . . . of significant contributions from [his] noncitizen collaborators in the United States." *Id.* ¶¶ 8–18. Progress on joint projects had been delayed, his output has decreased, and his ability to earn tenure has been impaired. *Id.* ¶ 8, 14.

Another citizen member, Dr. Rebekah Tromble, is an expert on misinformation and disinformation and professor at Northeastern University. Tromble Decl. ¶¶ 1, 3–4. She is the co-founder of the Researcher Support Consortium and Expert Voices Together, groups that support researchers facing intimidation and harassment. *Id.* ¶ 3. As a result of the Policy, and at the expense of her work on other projects, her workload with these groups has significantly increased. *Id.* ¶ 10. Additionally, many of Dr. Tromble's colleagues and collaborators have halted research on topics of shared interest and decided not to travel to the United States for in-person collaboration, which has diminished the quality and quantity of research in her field, upon which she relies. *Id.* ¶ 11.

In addition to harming CITR's members, the Censorship Policy has harmed CITR as an organization. Fearing that they will be targeted under the Policy, some of CITR's noncitizen

members have stopped attending CITR events, limited their participation in CITR public education efforts, or even stopped publicly associating with the organization at all, making it more difficult for the organization to carry out its activities and achieve its mission. CITR has expended significant time and money to address the harms caused by the Policy, and it expects to spend much more in the coming months. Geurkink Decl. ¶¶ 15–33.

### Argument

The Censorship Policy violates the First and Fifth Amendments as well as the APA, and CITR respectfully asks the Court to stay it under the APA and preliminarily enjoin Defendants from enforcing it. At the outset, CITR has standing to sue on behalf of itself and its members. And preliminary relief is justified because CITR is likely to succeed on the merits of its claims; it is currently suffering and is likely to continue suffering irreparable harm in the absence of preliminary relief; and the balance of equities and public interest weigh in its favor. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (stating preliminary injunction factors); *Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that balance of equities and public interest factors "merge when the Government is the opposing party"); *see also District of Columbia v. Trump*, 810 F. Supp. 3d 19, 35 (D.D.C. 2025) ("The same factors governing the issuance of a preliminary injunction govern the issuance of relief under section 705.").

**I.      CITR has standing.**

**A.      CITR has associational standing.**

CITR has associational standing to sue on behalf of its members because "(i) at least one member has standing to sue in her own right, (ii) the interests the association seeks to protect are germane to its purposes, and (iii) neither the asserted claim nor requested relief requires the participation of individual members." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,

13

146 F.4th 1144, 1157 (D.C. Cir. 2025). CITR's U.S. organizational, noncitizen, and U.S. citizen members have standing to sue "in their own right" because they have suffered injuries-in-fact that are fairly traceable to the Policy and would likely be redressed by the relief requested here. *See id.* at 1156. The Policy has injured CITR members in two ways, supporting standing under the First Amendment, Fifth Amendment, and APA. First, it has already been enforced against Ms. Melford and thus directly harmed the expressive and associational interests of U.S.-based organizational member GDI. Second, given the credible threat of enforcement against other noncitizens who engage in similar research and reporting, it has chilled those activities and thus harmed the expressive, associational, and professional interests of other CITR members.

### 1. CITR member GDI has standing.

CITR member GDI has standing to challenge the Censorship Policy because it has directly harmed GDI's expressive and associational interests. As explained above, Defendants have enforced the Policy against GDI's CEO, Ms. Melford, and have barred her from entering the United States. Melford Decl. ¶¶ 1, 12–13; *see* DeCell Decl. Ex. 19. The Policy has thus prevented Ms. Melford from speaking on behalf of GDI and associating with GDI colleagues as well as potential funders, students, researchers, research organizations, and other partners in the United States. Rogers Decl. ¶¶ 12–17. The Policy has thus substantially impaired GDI's ability to speak as an organization, to hear from and engage with its CEO, to raise funds for its work in the United States, and to engage with researchers, research organizations, and other partners here. *Id.*; *see Kleindienst v. Mandel*, 408 U.S. 753, 764–65 (1972) (recognizing U.S. organization's First Amendment interest in "hav[ing] [a noncitizen enter and to hear him explain and seek to defend his views" (citation omitted)); *cf. Kahbasi v. Blinken*, No. CV 23-1667, 2024 WL 3202222, at *3 (D.D.C. June 27, 2024) (finding injury-in-fact based on "risks [of] a loss of funding," being forced

14

"to cancel . . . travel arrangements," and being "prevented . . . from attending professional events, causing professional setbacks"). GDI's injuries are the direct result of Defendants' exclusion of Ms. Melford under the Policy. Rogers Decl. ¶¶ 12–17. And these injuries are likely to be redressed by a favorable decision. *See* Melford Decl. ¶ 15; *Pietersen v. U.S. Dep't of State*, 138 F.4th 552, 559 (D.C. Cir. 2025) (holding that injury "traceable to the challenged State Department [visa] guidance" is "likely redressable through a declaration that the guidance is unlawful").

### 2.    Individual CITR members have standing.

CITR's individual members also have standing to challenge the Censorship Policy. They have suffered injuries-in-fact because the Policy chills the exercise of their expressive and associational rights in ways that are "concrete and particularized" and "actual or imminent." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Standing to bring a pre-enforcement challenge requires an "'intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [government policy]." *U.S. Telecom Ass'n v. Fed. Commc'ns Comm'n*, 825 F.3d 674, 740 (D.C. Cir. 2016) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)). "[An individual's] inability to follow through on that intention constitutes an injury in fact." *Id*. In a First Amendment challenge, a plaintiff may establish a "credible threat" of enforcement or a "sufficiently imminent" injury, *Susan B. Anthony List*, 573 U.S. at 159, by "a credible statement by the plaintiff of intent to commit violative acts and a conventional background expectation that the government will enforce [its policies]," *U.S. Telecom Ass'n*, 825 F.3d at 739 (quoting *Act Now to Stop War & End Racism Coalition v. District of Columbia*, 589 F.3d 433, 435 (D.C. Cir. 2009)); *see also Sandvig v. Sessions*, 315 F. Supp. 3d 1, 15 (D.D.C. 2018). The D.C. Circuit has repeatedly emphasized courts' "special solicitude to pre-enforcement challenges brought under the First Amendment . . . to avoid the chilling effects that come from unnecessarily

15

expansive proscriptions on speech." *N.Y. Republican State Comm. v. S.E.C.*, 799 F.3d 1126, 1135–36 (D.C. Cir. 2015); *see also Atlas Brew Works, LLC v. Barr*, 820 F. App'x 4, 7 (D.C. Cir. 2020) (recognizing availability of "pre-enforcement First Amendment challenge to a government policy").

CITR's noncitizen members and other noncitizen researchers face a credible threat of enforcement under the Censorship Policy. As noted above, Defendants have already enforced the Policy against Ms. Melford, barring her from entering the country. They have also enforced the Policy against Mr. Ahmed, the leader of another CITR member organization, Mr. Ahmed, exposing him to detention and deportation. In both cases, Defendants justified the enforcement of the Policy based on work similar to that of many of CITR's noncitizen members and noncitizen collaborators. *See supra* pp. 7–9. And Defendants have declared that they are "ready and willing" to expand their list of targeted individuals "if others do not reverse course." *See* DeCell Decl. Exs. 16, 23.

As a result, the Censorship Policy has chilled CITR's noncitizen members' exercise of their expressive and associational rights, as they have shifted the focus of their research and writing, avoided speaking publicly about their work, and reduced their engagement in advocacy efforts related to their work. The Policy's chilling effect on noncitizens has, in turn, burdened the expressive, associational, and professional interests of CITR's U.S. citizen members. The relief CITR requests here would redress its members' injuries.

### a. CITR's noncitizen members have standing.

As part of their work as independent technology researchers, CITR's U.S.-based noncitizen members engage in writing, speaking, and research on topics targeted under the Censorship Policy. Despite their intent to continue engaging in these expressive activities, the Policy has deterred

16

them from doing so. CITR Member A Decl. ¶¶ 7–10; Briant Decl. ¶¶ 8–9. For example, CITR Member A has shifted the focus of their research and writing away from their primary areas of expertise, which include content moderation, to topics they believe may be considered more politically neutral. CITR Member A Decl. ¶ 7.[2] They now refrain from attending and presenting their research at international conferences they would have otherwise attended, depriving them of important opportunities to build relationships with colleagues, including other CITR members; to collaboratively generate new research ideas; and to share their work with others. *Id*. ¶ 9. Similarly, CITR member Dr. Briant hesitates to travel to international conferences she would otherwise attend because of the fear that she might be denied reentry to the United States under the Policy. Briant Decl. ¶¶ 5–6, 9. The Policy has also deterred these noncitizen members from engaging in public speaking about their research. CITR Member A previously published op-eds relating to their work and publicly engaged with other CITR members on advocacy campaigns relating to online safety, but, because of the Policy, they no longer do so. CITR Member A Decl. ¶¶ 8, 10. Similarly, Dr. Briant feels compelled to self-censor in her writing and speaking because of the fear that she might be targeted under the Policy as a result. Briant Decl. ¶ 9.

These chilling effects on CITR's U.S.-based noncitizen members satisfy the injury-in-fact, traceability, and redressability requirements for standing. "[T]he injury to [plaintiff's] constitutional right to express itself without fear of government reprisal itself confers standing." *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 105 (D.D.C. 2025), appeal

---

[2] CITR Member A's anonymity does not undermine their sworn declaration's support for CITR's associational standing. *See Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 594–95 (D.C. Cir. 2022) (noting that "anonymity is no barrier to standing"); *Hotel & Rest. Emps. Union, Loc. 25 v. Smith*, 846 F.2d 1499, 1506 (D.C. Cir. 1988) (en banc) (Mikva, J., separate opinion) (similar); *cf. NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 86 (D.C. Cir. 2012).

docketed, No. 25-5265 (D.C. Cir. July 22, 2025); *see also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988); *Am. Ass'n of Univ. Professors v. Rubio* ("*AAUP*"), 802 F. Supp. 3d 120, 179 (D. Mass. 2025) (finding injury-in-fact where noncitizen members refrained from expressive activities that they "previously engaged [in] and credibly testify that they would engage in again were it not for the challenged policy" of "targeting noncitizens based on their viewpoints"); *Stanford Daily Publ'g Corp. v. Rubio*, No. 25-CV-06618-NW, 2026 WL 125241, at *9 (N.D. Cal. Jan. 16, 2026) (finding injury-in-fact based on noncitizen members' "well-founded fears of immigration consequences for engaging in pro-Palestine expression"). The harms to CITR Member A and Dr. Briant are "fairly traceable" to the Censorship Policy; indeed, they have explicitly identified the Policy as the direct cause of their harm. *Ctr. for Biological Diversity v. Env't Prot. Agency*, 861 F.3d 174, 182 (D.C. Cir. 2017); *see* CITR Member A Decl. ¶¶ 7–10; Briant Decl. ¶¶ 8–9. And these harms are likely to be redressed by a favorable decision. *See supra* p. 11; CITR Member A Decl. ¶ 11; Briant Decl. ¶ 10; *see Pietersen*, 138 F.4th at 559; *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017) ("Causation and redressability typically 'overlap as two sides of a causation coin,'" because "[a]fter all, if a government action causes an injury, enjoining the action usually will redress that injury." (citation omitted)).

### b.    CITR's U.S. citizen members have standing.

CITR's U.S. citizen members also have standing to challenge the Censorship Policy because it burdens their expressive, associational, and professional interests in myriad ways. *See* Matias Decl. ¶¶ 8–18; Tromble Decl. ¶¶ 6–12. For example, Dr. Matias is harmed because multiple noncitizens in his lab—itself a CITR organizational member—will no longer travel abroad in connection with their work, depriving him of the ability to pursue important collaborations. Matias Decl. ¶¶ 4, 13. And because one of his collaborators has decided not to speak publicly about their

18

joint projects, Dr. Matias "has lost important opportunities to develop new research" and "bring visibility to [his] work." *Id.* ¶ 16. The Policy's chilling effects and the uncertainty it creates have also required him to spend at least a hundred hours contingency planning, reducing his scholarly output and harming his ability to earn tenure. *Id.* ¶¶ 8, 13. The Policy has also required Dr. Tromble to spend significantly more time than she otherwise would in connection with her work supporting researchers; since December, she has had dozens of consultation calls about the threats posed by the Policy at the expense of her work on other projects. Tromble Decl. ¶ 10. The Policy has also impeded Dr. Tromble's rights to receive information and to associate with others, as her noncitizen colleagues and collaborators have halted research on topics of shared interest and decided not to travel to the United States for in-person discussion and collaboration. *Id*. ¶ 11. This impact has diminished the quality and quantity of research in her field, on which she relies in her own work. *Id.*

These expressive, associational, and professional harms satisfy the injury-in-fact requirement. Dr. Matias and Dr. Tromble intend to continue engaging in writing, speaking, and research on topics targeted under the Censorship Policy, and the Policy has burdened their ability to do so. Matias Decl. ¶¶ 7–19; Tromble Decl. ¶¶ 6–13; *United States Telecom Ass'n*, 825 F.3d at 740. The First Amendment protects the right to hear and associate no less than the right to speak, including with noncitizens in the United States and abroad. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) ("[W]e have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others."); *Mandel*, 408 U.S. at 764–65; *Lamont v. Postmaster Gen.*, 381 U.S. 301, 302, 305–07 (1965) (recognizing First Amendment interest in receiving information from abroad).

19

These harms are also "fairly traceable" to the Censorship Policy: Dr. Matias and Dr. Tromble have identified the Policy as the direct or indirect cause of their harm. *See* Matias Decl. ¶¶ 8–18; Tromble Decl. ¶¶ 8–12. Though they are not themselves targeted by the Policy, they are harmed when noncitizens who face a credible threat of enforcement under the Policy are predictably chilled from collaborating, engaging, and developing new research with them. Matias Decl. ¶ 8–18; Tromble Decl. ¶ 11. Their standing "does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). Accordingly, there is a "causal connection" between the Policy and the concrete harms discussed above. *Lujan*, 504 U.S. at 560. The injuries suffered by CITR's citizen members are also "likely" to be redressed by a "favorable decision." *Ctr. for Biological Diversity*, 861 F.3d at 182. If the Policy were no longer in place, for example, Dr. Matias's collaborators would resume traveling internationally and speaking publicly about their work. Matias Decl. ¶¶ 15, 19. And Dr. Tromble would no longer need to devote her time to advising researchers about the Policy, allowing her to refocus her time on other projects. *See* Tromble Decl. ¶¶ 10, 13; *Carpenters*, 854 F.3d at 6 n.1.

### 3. The interests CITR seeks to protect are germane to its purpose, and this suit does not require participation of individual members.

The interests CITR seeks to protect through this case are germane to its purpose. This prong is "undemanding," requiring "mere pertinence between litigation subject and organizational purpose." *Nat'l Lime Ass'n v. E.P.A.*, 233 F.3d 625, 636 (D.C. Cir. 2000). CITR's mission includes "protect[ing] technology research from efforts at obstruction, interference, and cooption by" the government. Geurkink Decl. ¶ 4. CITR seeks to further that mission through this litigation to halt an unconstitutional government policy that chills and obstructs independent technology research. Those interests are sufficiently germane to CITR's purpose. *TOMAC v. Norton*, 193 F. Supp. 2d

20

182, 190–91 (D.D.C. 2002) (observing that litigation that "aims to enhance the [organization]'s success in its central missions is sufficiently germane") (citation omitted), *aff'd sub nom. TOMAC, Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852 (D.C. Cir. 2006).

Finally, neither this lawsuit's claims nor its requested relief require the participation of individual CITR members. *See Ctr. for Biological Diversity*, 146 F.4th at 1157. CITR seeks only declaratory, injunctive, and APA relief, which does not turn on the particularities of its individual members. *See id.* ("[T]he purely injunctive and declaratory relief sought . . . does not require the participation of individual members."); *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) ("'[I]ndividual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members."); *see also Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 983 F.3d 498, 508 (D.C. Cir. 2020) (concluding that individual member participation was not required where relief sought is "invalidation of agency action").

### B.    CITR has organizational standing.

CITR also has standing to sue on its own behalf because it has suffered "actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.* ("*PETA*"), 797 F.3d 1087, 1093 (D.C. Cir. 2015) (citation omitted). In determining whether an organization has established injury-in-fact, "the Court must ask first whether the agency's action or omission to act injured the [organization's] interest; then, if satisfied, it inquires whether the organization used its resources to counteract that harm." *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 19 (D.D.C. 2020) (quoting *PETA*, 797 F.3d at 1094) (cleaned up). CITR satisfies both prongs of this test.

*First*, the Censorship Policy has caused a "concrete and demonstrable injury to [CITR's] activities," *PETA*, 797 F.3d at 1093 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)), seriously hampering its ability to carry out its mission. CITR's mission is to "advance, sustain, and defend the right to ethically study the impact of technology on society." Geurkink Decl. ¶ 4. In pursuit of this mission, CITR has two core "programmatic pillars": "Community" and "Advocacy." *Id.* ¶¶ 7–9. As explained below, by deterring CITR's members from participating in its events and supporting its public advocacy and education efforts, the Policy has undermined both of these pillars, thus "inhibit[ing]" CITR's "daily operations," *PETA*, 797 F.3d at 1094, and "perceptibly impair[ing] the organization's ability to provide services," *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (citation omitted); *see also Stanford Daily*, 2026 WL 125241, at *10 (finding injury-in-fact where the speech of student members had been chilled by the threatened enforcement of an immigration policy against them).

The Censorship Policy has harmed CITR's "Community" efforts by deterring many CITR members from participating in its events, both in the United States and abroad. CITR hosts in-person events so that members can find ways to collaborate and to "collectively address the threats facing the independent technology researcher community." Geurkink Decl. ¶ 14. Since Defendants adopted the Policy, however, attendance at CITR's Europe-based events has suffered, including at its 2025 Independent Technology Researchers' Summit in Germany. *Id.* ¶ 19. Several U.S.-based noncitizen members informed CITR leaders that they would have attended the Summit but for their fear of being denied reentry under the Policy. *Id.* This loss of attendance "hampered CITR's ability to coordinate work across its membership on key topics." *Id.* Meanwhile, CITR decided to stop hosting U.S.-based events, at least for now, because of the risk that noncitizens traveling from abroad would be denied entry or detained at the border under the Policy; because of the resulting

22

expectation that fewer noncitizen members would attend from abroad; and because those who did attend would require greater visa support and more complex travel arrangements, costing more time and money for CITR. *Id.* ¶¶ 16–18. The Policy has thus "perceptibly impaired" CITR's ability to create opportunities for its members to engage in person over topics of shared concern. *Food & Water Watch*, 808 F.3d at 919–20; *see Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 521–22 (9th Cir. 1989) (finding organizational standing based on members "withdraw[ing] from active participation in the churches").

The Censorship Policy has also deterred some members from publicly associating with the organization. Multiple noncitizen CITR members, including the member identified as Member C in the Complaint, have told CITR leadership that "they no longer want to be publicly associated with the organization because doing so has not felt safe since the Trump administration specifically targeted leaders of CITR member organizations under the Policy." Geurkink Decl. ¶ 24.

By bifurcating CITR's community, decreasing CITR's ability to engage with its membership, and causing multiple members to avoid any public association with the organization, the Policy has "impeded" CITR's programming and frustrated its mission. *Citizens for Resp. & Ethics in Wash. v. U.S. Off. of Special Couns.* ("*CREW*"), 480 F. Supp. 3d 118, 127–128 (D.D.C. 2020). That is exactly the point: Defendant Rubio advised those engaged in precisely the work that brings CITR members together to "reverse course" to avoid being targeted under the Policy. DeCell Decl. Ex. 16. There is thus "a direct conflict between [Defendants'] conduct and the organization's mission." *Elec. Priv. Info. Ctr. v. Fed. Aviation Admin.*, 892 F.3d 1249, 1255 (D.C. Cir. 2018) (citation omitted) (emphasis omitted).

The Censorship Policy has also hampered CITR's "Advocacy" efforts, which rely on member engagement for their success. Geurkink Decl. ¶ 9. The Policy's chilling effect on

noncitizen members has reduced member engagement and made it more difficult for CITR to pursue its public education goals in three ways. First, some noncitizen members have limited their involvement with CITR's public education efforts. Geurkink Decl. ¶ 27. Second, some noncitizen members have been deterred from sharing their names for CITR's own reporting. Geurkink Decl. ¶ 28. And third, some noncitizen members have declined to speak on the record to journalists seeking comment from CITR members about the impacts of the Policy. *Id.* This reduced engagement in CITR's public education efforts has hampered the organization's ability to get its message out and to achieve its public education goals, "inhibit[ing] CITR's "daily operations." *PETA*, 797 F.3d at 1094 (citation omitted). This injury is no mere "setback to the organization's abstract social interests," and the organization is not "assert[ing] standing simply because [it] object[s] to [Defendants'] actions." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024). Instead, the Censorship Policy has interfered with CITR's public education work more broadly—one of its "core . . . activities," *id.* at 395—by deterring its members from engaging in its public education activities. *See also CREW*, 480 F. Supp. 3d at 128 (distinguishing between "'organizations that allege that their *activities* have been impeded'—which suffices for standing purposes—[and] 'those that merely allege that their *mission* has been compromised'—which does not" (citation omitted)).

*Second*, CITR has "used its resources to counteract" the harm caused by the Censorship Policy. *See PETA*, 797 F.3d at 1093–94 (citations omitted). It has expended, and plans to expend, considerable resources to mitigate effects of the Policy. For example, to counteract the decreased willingness of its U.S.-based noncitizen members to travel to events abroad because of the Policy, as evidenced by the decreased attendance at its 2025 Summit, CITR is planning two separate events for 2026: one Summit outside the United States and a separate corresponding convening inside the

24

United States. Geurkink Decl. ¶ 20. CITR included two separate cost structures for these events in its 2026 budget, and it estimates that hosting two events instead of one will cost the organization tens of thousands of dollars that otherwise would have gone toward funding another staff position, which it cannot yet support financially. *Id.* The Policy's chilling effects on CITR's members have thus caused economic harm to the organization. *See, e.g.*, *Carpenters*, 854 F.3d at 5 ("Economic harm . . . clearly constitutes an injury-in-fact.").

The Censorship Policy has drained CITR's resources in other ways, too. For example, CITR has spent significant staff time in holding three separate convenings of European researchers "to identify ways it could support its members as they evaluated their risks under the Policy." Geurkink Decl. ¶ 29–30. CITR has also spent significant time counseling dozens of members on the Policy's implications for their work since December 2025. *Id.* ¶ 31. And, because of noncitizen members' risks under the Policy and their reduced willingness to engage in CITR's public education efforts, CITR has "felt compelled to take extra measures and create ad hoc processes to ensure the safety of CITR members before engaging in public education efforts, making these efforts more difficult and time-consuming." Geurkink Decl. ¶ 32. These activities were "not part of [CITR's] normal annual expenditures," and they have resulted in a "consequent drain on the organization's resources." *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 619 (D.C. Cir. 2020) (citation omitted); *see* Geurkink Decl. ¶ 33 (explaining how CITR has had "to spend far more of its time and resources" to defend independent technology research than usual).

The considerable resources CITR has spent and likely will spend to counteract the effects of the Censorship Policy have come at a significant cost to the organization's ability to pursue its long-term goals. For example, CITR had intended to organize capacity-building workshops on

25

data access over the past year. *Id.* ¶ 33. But because of the time and effort CITR spent responding to the harms inflicted by the Policy, it was unable to launch that initiative. *Id.*

The harms described above are "fairly traceable" to the Censorship Policy and "likely to be redressed by a favorable court decision." *PETA*, 797 F.3d at 1093. Though CITR's harms stem from the actions of its members, there is "substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation." *Ams. for Safe Access v. Drug Enf't Admin.*, 706 F.3d 438, 446 (D.C. Cir. 2013) (citation omitted). There is no need to speculate about why CITR's noncitizen members have stopped traveling to CITR events and reduced their engagement in CITR's public education efforts: several have explicitly stated that their fear of visa denial, visa revocation, or detention or deportation under the Policy is the cause. *See* Geurkink Decl. ¶¶ 19, 22–24, 28; CITR Member A Decl. ¶¶ 9–10. Moreover, CITR's members have engaged in "voluntary but reasonably predictable" conduct to reduce their individual risks under the Policy, on the basis of which the D.C. Circuit has "routinely found causation." *Whitman-Walker Clinic*, 485 F. Supp. 3d at 24 (quoting *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 384 (D.C. Cir. 2020)). Under the Policy, Defendants may exclude and deport noncitizens whose work involves some of the very same issues that have brought CITR's members to the organization. *See* Geurkink Decl. ¶ 6. Because the point of the Policy is to deter noncitizens from working on those issues, and because Defendants have already targeted the leaders of two CITR member organizations under the Policy, *see supra* pp. 7–9, it is entirely predictable that noncitizens would be deterred from associating with an organization of researchers working on those issues, and from crossing borders to attend its meetings.

Finally, CITR's injuries will "likely" be redressed by a favorable court decision. *See Lujan*, 504 U.S. at 561 (citation omitted). "After all, if a government action causes an injury, enjoining

the action usually will redress that injury." *Carpenters*, 854 F.3d at 6 n.1. Here, it is "reasonably predictable," *Competitive Enter. Inst.*, 970 F.3d at 384, that CITR's noncitizen members will resume participating in CITR activities if they no longer fear being targeted for exclusion or detention and deportation under the Censorship Policy based on those activities. Indeed, several noncitizen members have said that they would be substantially more likely to resume these activities if the Policy were no longer in place. *See* Geurkink Decl. ¶¶ 22–24; CITR Member A Decl. ¶ 11. CITR's injury would thus be redressed by a court decision in its favor.

## II.     CITR is likely to succeed on the merits.

### A.     The Censorship Policy violates the First Amendment.

The Censorship Policy violates the First Amendment because it punishes protected expression and association based on viewpoint; it does not serve a legitimate, much less compelling, government interest; and it is not sufficiently tailored to any conceivably valid government interest. It also violates the First Amendment for the independent reason that Defendants are using the "threat of invoking legal sanctions and other means of coercion" to indirectly "achieve the suppression" of protected speech that they could not achieve directly—a practice that the Supreme Court has held is unconstitutional. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963); *see Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024).

#### 1.     The Censorship Policy burdens expressive and associational activities protected by the First Amendment.

To begin, the Censorship Policy burdens expressive and associational activities that are protected by the First Amendment. This is evident both from the Policy itself and from Defendants' public explanations of its enforcement. The Policy reportedly targets for exclusion those who work in the areas of "combatting misinformation, disinformation or false narratives, fact-checking, content moderation, compliance, and trust and safety." DeCell Decl. Ex. 6. These areas, which

relate to whether and how to address harms arising from speech on social media and other internet internet platforms, are the subject of vigorous public debate. Individuals who work in these areas contribute to this debate through their research, publications, and public speaking. These are all quintessential expressive and associational activities that are fully protected by the First Amendment. Indeed, as the D.C. Circuit recently held, "reporting on . . . alleged political extremism on a popular social media platform" is a "quintessential First Amendment activit[y]." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025); *see also Snyder v. Phelps*, 562 U.S. 443, 452 (2011) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." (citation omitted)); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) ("The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions."); *Roth v. United States*, 354 U.S. 476, 484 (1957) ("The protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.").

Defendants' public explanations of the Policy's enforcement confirm that the Policy is aimed at protected expression and association. For example, in announcing the enforcement of the Policy against Mr. Ahmed, Defendants explained that it was a response to CCDH's viewpoints about social media platforms, as expressed in several written reports. DeCell Decl. Exs. 14, 18. Likewise, Defendants explained that they were targeting Ms. Melford based on written statements in which she and GDI expressed their views about hate speech. *Id.* Ex. 19. And in announcing the decision to target Ms. Ballon under the Policy, Defendants specifically cited statements that she made in an interview with the broadcast news program *60 Minutes*. *Id.* Ex. 20.

28

That the speakers directly targeted here are noncitizens does not change the analysis. It is well-settled that noncitizens living in the United States "are entitled to the full panoply of First Amendment rights." *Am.-Arab Anti-Discrimination Comm. v. Reno* ("*AADC*"), 70 F.3d 1045, 1063–66 (9th Cir. 1995); *see Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and of press is accorded [noncitizens] residing in this country."); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (the First and Fifth Amendments do not "acknowledge[] any distinction between citizens and resident [noncitizens]"); *Parcham v. INS*, 769 F.2d 1001, 1004 (4th Cir. 1985) ("It has long been held that [noncitizens] residing in this country enjoy the protection of the First Amendment."); *Ragbir v. Homan*, 923 F.3d 53, 73 (2d Cir. 2019) (holding that the First Amendment protects noncitizens who are threatened with deportation as a result of their protected speech); *AAUP*, 802 F. Supp. 3d at 182 (concluding that, "[b]roadly speaking," First Amendment rights of noncitizen residents are coextensive with those of citizens); *Mohammed H. v. Trump*, 786 F. Supp. 3d 1149, 1155 (D. Minn. 2025) (the First Amendment "applies equally to citizens and noncitizens"); *Ercelik v. Hyde*, No. 25-CV-11007, 2025 WL 1361543, at *10 (D. Mass. May 8, 2025) (stating that the First Amendment's protections have "long extended to noncitizens residing within the country"); *Mahdawi v. Trump*, 781 F. Supp. 3d 214, 229 (D. Vt. Apr. 30, 2025) ("Noncitizen residents . . . enjoy First Amendment rights in this country to the same extent as United States citizens."); *Öztürk v. Trump*, 779 F. Supp. 3d 462, 490 (D. Vt. 2025), amended sub nom. *Öztürk v. Hyde*, 136 F.4th 382 (2d Cir. 2025) (observing that "First Amendment protections have long extended to noncitizens residing within the country").[3]

---

[3] Some lower courts have recognized narrow exceptions to this rule—for example, noncitizens who are not lawful permanent residents cannot contribute to election campaigns—but these exceptions are not relevant here. *See Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281, 292 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012).

In any event, CITR also asserts its own First Amendment rights, and those of its U.S. citizen members. As explained above, the Censorship Policy burdens those rights in multiple ways. First, the Policy burdens CITR's U.S. organizational members and U.S. citizen members' rights to speak. *See supra* pp. 11–12. Second, the Policy burdens CITR's and its U.S. organizational and citizen members' right to hear—a right that the First Amendment protects alongside the right to speak. *See supra* pp. 11–13; *see, e.g.*, *Mandel*, 408 U.S. at 762–65; *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *Lamont*, 381 U.S. at 307–08. The Policy does so by deterring noncitizen researchers from sharing information and insights with CITR and its U.S. citizen members. *See supra* pp. 10–12. Third, the Policy also burdens the right of CITR and of CITR's U.S. organizational and citizen members to associate with CITR's noncitizen members. *See supra* pp. 12–13; *U.S. Jaycees*, 468 U.S. at 622.

> **2.  The Censorship Policy imposes a viewpoint-based burden on speech and association that fails First Amendment scrutiny.**
>
> **a.  The Censorship Policy discriminates on the basis of viewpoint and is therefore presumptively unconstitutional.**

The Censorship Policy punishes expressive activity on the basis of viewpoint. The Policy targets noncitizens who Defendants deem to have been "responsible for, or complicit in, censorship or attempted censorship of protected expression in the United States." DeCell Decl. Ex. 6. Although Defendants have not offered a definition of what they consider to be "censorship," Defendants' public statements and the context surrounding the Policy reveal that they are singling out for disfavor certain views about the content that social media companies allow to be published on their platforms. Through the Policy, Defendants explicitly seek to sanction and silence one set of participants in the public debate concerning platform content moderation: those whose research, advocacy, trust and safety work, or other work supports greater moderation of content on the

platforms. Thus, for example, Defendants have stated that they will continue to impose "sanctions" on individuals who are deemed to be "combatting 'hate speech,' promoting 'trust and safety,' or countering 'disinformation.'" DeCell Decl. Ex. 22. And in announcing the enforcement of the Policy against five individuals in December 2025, Defendant Rubio stated that the State Department was "taking decisive action against five individuals who have led organized efforts to coerce American platforms to censor, demonetize, and suppress American viewpoints they oppose." DeCell Decl. Ex. 15.

Defendants have been especially focused on one subset of researchers whose views Defendants disfavor—namely, those who criticize the content moderation policies of the social media platform X. Indeed, the evidence suggests that the Policy was motivated largely by a desire to protect X's content moderation decisions from criticism. Defendants took action under the Censorship Policy in direct response to the DSA fine against X, *see* DeCell Decl. Ex. 14, and they have targeted individuals who have issued statements or reports critical of X.

This is paradigmatic viewpoint discrimination, and it is presumptively unconstitutional. *See, e.g.*, *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994) (stating that viewpoint discrimination is presumptively unconstitutional because it "pose[s] the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas" or to "manipulate the public debate"); *Frederick Douglass Found., Inc. v. Dist. of Columbia.*, 82 F.4th 1122, 1141 (D.C. Cir. 2023) ("It is antithetical to a free society for the

31

government to give 'one side of a debatable public question an advantage in expressing its views to the people.'" (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 785 (1978))).[4]

        **b.**        **The Censorship Policy furthers no legitimate government interest that would justify its burdens on speech.**

As a viewpoint-based burden on speech, the Censorship Policy must survive strict scrutiny, but it cannot; indeed, it fails any applicable level of scrutiny because the Policy does not serve any valid, much less compelling, interest. In public statements explaining the Policy, Defendants have claimed that it is necessary to prevent the "censorship" of Americans. But as the Supreme Court made clear just two years ago, the government has no legitimate interest in dictating the editorial decisions of private actors, including decisions about what types of speech social media platforms should publish. As the Court wrote: "On the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *NetChoice*, 603 U.S. at 741–42; *see also Am. Freedom Def. Initiative v. Lynch*, 217 F. Supp. 3d 100, 106 (D.D.C. 2016), *aff'd sub nom. Am. Freedom Def. Initiative v. Sessions*, 697 F. App'x 7 (D.C. Cir. 2017) ("Indeed . . . the private social-media companies could argue that they cannot be compelled to publish a particular message."). It follows that the government has no legitimate interest in punishing private actors who develop and implement those policies on behalf of the platforms. Nor does the government have any legitimate interest in punishing private actors who advocate for one set of content moderation policies or another, *see Snyder*, 562 U.S. at 452, or those who study the platforms' content moderation policies and practices.

---

[4] Although the Censorship Policy is blatantly viewpoint-based, even if it were considered merely content-based, it would still need to satisfy the same level of scrutiny as viewpoint-based burdens. *See Rosenberger*, 515 U.S. at 829.

The invocation of foreign policy concerns cannot save the Censorship Policy from unconstitutionality. Courts have repeatedly recognized that the government's foreign policy powers are subject to First Amendment constraints. *See, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) ("[C]oncerns of national security and foreign relations do not warrant abdication of the judicial role. We do not defer to the Government's reading of the First Amendment, even when such interests are at stake."); *AADC*, 70 F.3d at 1056 (foreign policy concerns do not deprive the courts of their "essential function in ensuring that [noncitizens] are not targeted by the INS in retaliation for exercising their acknowledged constitutional rights").

Indeed, multiple courts have made clear that the First Amendment limits the government's power to discriminate on the basis of viewpoint even when it seeks to exclude a foreign citizen who has not yet been admitted to the country—a context in which the only First Amendment rights at issue are the listener interests of U.S. citizens. *Mandel*, 408 U.S. at 762, 769. Courts have repeatedly emphasized in this context that, "although the government may deny entry to [non-citizens] altogether, or for any number of specific reasons, it may not, consistent with the First Amendment, deny entry solely on account of the content of speech." *Abourezk v. Reagan*, 592 F. Supp. 880, 887 & n.23 (D.D.C. 1984), *vacated and remanded on other grounds*, 785 F.2d 1043 (D.C. Cir. 1986); *see AAUP*, 802 F. Supp. 3d at 183 ("In any case, political speech is not, on its own, a facially legitimate reason for expelling persons from this country."); *Allende v. Shultz*, 605 F. Supp. 1220, 1225 (D. Mass. 1985) (quoting relevant language from *Abourezk*, 592 F. Supp. at 887, approvingly), *aff'd*, 845 F.2d 1111 (1st Cir. 1988); *Harvard Law Sch. Forum v. Shultz*, 633 F. Supp. 525, 531 (D. Mass. 1986) ("[T]he Secretary's reason . . . is not facially legitimate [because it] is directly related to the suppression of a political debate with American citizens."), *vacated without opinion*, 852 F.2d 563 (1st Cir. 1986); *see also Am. Acad. of Religion v. Chertoff*, 463 F.

33

Supp. 2d 400, 415–16, 419 (S.D.N.Y. 2006), *aff'd sub. nom. Am. Acad. of Religion v. Napolitano*, 573 F.3d 115 (2d Cir. 2009). CITR is thus likely to prevail on its claim that the Censorship Policy violates the First Amendment.

### 3.    Defendants' coercive threats independently violate the First Amendment.

Defendants' numerous threats to exclude or deport noncitizens for engaging in protected speech and association independently violate the First Amendment rights of CITR and its members. The government's "threat of invoking legal sanctions and other means of coercion" to indirectly "achieve the suppression" of protected speech violates the First Amendment. *Bantam Books*, 372 U.S. at 67 . Threats of this kind violate the First Amendment because they amount to a "system of prior restraints," imposed without the procedural protections that the Constitution requires. *Id.* at 70. The critical question in analyzing a claim under *Bantam Books* is whether the government engaged in "permissible attempts to persuade" or, instead, "impermissible attempts to coerce." *Vullo*, 602 U.S. 175, 188 (2024).

Defendants' numerous statements threatening to exclude or deport noncitizens based on their protected expressive activities amounts to an unlawful campaign of coercion to censor speech that the government could not directly restrict. *See, e.g.*, DeCell Decl. Ex. 9 (Defendant Rubio declaring that noncitizens seen by the government as "complicit in censoring Americans" will not be allowed to travel to the United States); *id.* Ex. 23 (Under Secretary Rogers declaring that the list of five individuals "sanctioned" under the Policy was "illustrative[,] not exhaustive," and that she and Defendant Rubio stood "'ready and willing to expand' it"); *id*. Ex. 22 (agency strategic plan stating that State Department will impose "visa and financial sanctions" on "NGOs" and "activist groups" who "seek to restrict the right of free speech in the name of combatting 'hate speech,' promoting 'trust and safety,' or countering 'disinformation.'"). Threatening

34

noncitizens—and their family members—who reside in the United States with possible detention and deportation is plainly coercive and can hardly be characterized as merely an "attempt[] to persuade." *Vullo*, 602 U.S. at 188. And the government has largely "succeeded in its aim," *Bantam Books*, 372 U.S. at 67, by causing noncitizen members of CITR to withdraw from public discourse and advocacy because of the fear that they will be targeted under the Policy as a result. CITR is thus likely to prevail on its claim that the Policy is unconstitutionally coercive.

**B.      The Censorship Policy violates the Fifth Amendment.**

The Censorship Policy is also unconstitutionally vague. The Fifth Amendment requires that laws give "fair notice of conduct that is forbidden or required." *FCC. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). "[T]he void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.* (citation omitted). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253–54.

The Censorship Policy violates these core due process requirements. Defendants have articulated *no* standards by which speakers can determine whether their speech might subject them to exclusion or deportation from the country. The Policy targets those who work in "combatting misinformation, disinformation or false narratives, fact-checking, content moderation, compliance, and trust and safety," and within that group, calls for the exclusion of those deemed to be "censoring Americans," or "complicit" in such censorship. DeCell Decl. Ex. 6. But the Policy provides no guidance on what types of speech or activities Defendants equate with "censorship," or being "complicit" in censorship. Among other definitional uncertainties, "censorship" in the

35

First Amendment context means restrictions on speech *by the government*, not actions taken by private companies or individuals; the term "censorship" has no settled meaning when applied to private actors. Defendants' public statements suggest that they have targeted individuals who have advocated that social media companies remove "hate speech" or "disinformation" from their platforms, who have advocated for greater researchers access to platform data, or who have criticized the content moderation practices of X. *See id.* Exs. 18–21. But those nebulous parameters fall far short of providing the "fair notice" required by the Fifth Amendment. In short, Plaintiff is likely to prevail on its claim that the Policy is unconstitutionally vague.

### C.       The Censorship Policy violates the APA.

CITR is likely to succeed on the merits of its APA claims. As explained above, the Censorship Policy is contrary to constitutional right. *See supra* pp. 27–36; 5 U.S.C. § 706(2)(B). As explained below, it is also arbitrary and capricious and an abuse of discretion, *see id.* § 706(2)(A), and it exceeds Defendants' statutory authority, *id.* § 706(2)(C). The Policy should therefore be stayed pending review, *see id.* § 705, and ultimately declared unlawful and set aside.

### 1.       The Censorship Policy is subject to review under the APA.

CITR is entitled to APA review of the Censorship Policy because it is final agency action, *see* 5 U.S.C. § 704, because it is not committed to agency discretion by law, *id.* § 701(a)(2), and because CITR's claims fall within the relevant zone of interests, *see CSL Plasma Inc. v. CBP*, 33 F.4th 584, 593 (D.C. Cir. 2022).

The Censorship Policy is final agency action because it "mark[s] the consummation of the agency's decisionmaking process—it [is] not . . . of a merely tentative or interlocutory nature," and it is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up). Defendants

have definitively—not tentatively—declared their policy of excluding and deporting noncitizens who engage in the targeted work. *See supra* pp. 5–9. The Policy determines the right of noncitizens to enter or remain in this country, carrying clear legal consequences, as demonstrated in the cases of the five individuals Defendants have already targeted under the Policy. The Policy therefore meets the APA's "pragmatic" finality test. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598–99 (2016) (citation omitted); *see also Biden v. Texas*, 597 U.S. 785, 808–09 (2022).

The Censorship Policy does not fall in the "quite narrow" APA exception for actions committed to agency discretion by law under 5 U.S.C. § 701(a)(2). *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 17 (2020) (cleaned up). The exception is limited to "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (cleaned up); *see also Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018). Not only does the First Amendment supply a "meaningful standard" for judging Defendants' Policy, but so too do the foreign policy provisions of the INA. While these provisions commit certain determinations to the Secretary of State, the statute provides familiar standards under which the claimed abuse of his discretion may be judged—in particular, the prohibition on barring individuals based on lawful speech unless their presence "would compromise a compelling United States foreign policy interest." 8 U.S.C. § 1182(a)(3)(C)(iii).

CITR has prudential standing to challenge the Censorship Policy under § 706(2)(A) and (C) of the APA because its harms fall "arguably within the zone of interests to be protected or regulated by the statute," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (cleaned up)—here, the INA. The zone of interests test is "lenient," and "the benefit of any doubt goes to the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components,*

37

*Inc.*, 572 U.S. 118, 130 (2014) (cleaned up). CITR meets this test because its members are directly regulated under the Policy, and because its organizational injuries "bear[] a 'plausible relationship to the policies underlying'" the relevant statute. *CSL Plasma*, 33 F.4th at 593 (cleaned up). The INA includes visa classifications that enable foreign scholars and others to study and work in the United States, *e.g.*, 8 U.S.C. § 1101(a)(15)(F), (H), (J), (O), and Congress "presumably" intended those visa holders to "benefit the people" and organizations that work with them, including CITR and its U.S. citizen members. *CSL Plasma Inc.*, 33 F.4th at 590; *see Abourezk*, 785 F.2d at 1047, 1050–51 (holding that organizations that invited foreign nationals to attend meetings or address audiences in the United States were within the INA's zone of interests).

### 2. The Censorship Policy is arbitrary and capricious and an abuse of discretion.

Defendants' explanation of the Censorship Policy is incoherent and thus arbitrary and capricious. "To satisfy arbitrary-and-capricious review, an agency must at least reasonably explain its decision, and 'of course, it would be arbitrary and capricious for the agency's decision making to be internally inconsistent.'" *World Shipping Council v. Fed. Mar. Comm'n*, 152 F.4th 215, 221 (D.C. Cir. 2025) (citation omitted; cleaned up). In announcing and enforcing the Policy, Defendants have claimed—contrary to the available evidence—that "foreign officials and persons . . . are complicit in censoring Americans." DeCell Decl. Ex. 9. They have focused on the DSA and, in particular, its enforcement against X. *See supra* pp. 6–9; DeCell Decl. Ex. 13 (calling the fine "an attack on . . . the American people"). Yet their own investigation into censorship under the DSA reportedly yielded the following conclusion: "There is no evidence that Member States of the European Union are overreaching the DSA to censor and criminalize online content." DeCell Decl. Ex. 8. Nonetheless, Defendant Rubio has enforced the Policy against five individuals in direct response to the fine. *See supra* pp. 7–9; DeCell Decl. Ex. 14.

More broadly, the Censorship Policy is arbitrary and capricious because it unreasonably confuses speech with censorship. In announcing the Policy's enforcement against Mr. Ahmed, Ms. Melford, Ms. Ballon, and Ms. von Hodenberg, for example, Defendants claimed that they have "led organized efforts to coerce American platforms to censor, demonetize, and suppress American viewpoints they oppose" and "advanced censorship crackdowns by foreign states." DeCell Decl. Ex. 10. They decried various reports and public statements made by these individuals and their non-profit organizations. *See supra* pp. 7–9; DeCell Decl. Exs. 18–21. None of those individuals is an official of any government, however, so they are not in a position to censor speech themselves. *See Trump*, 602 F. Supp. 3d at 1218 ("[T]he First Amendment applies only to governmental abridgements of speech." (citation omitted)). Rather, Defendants' position appears to be that their research or advocacy in support of more robust content moderation policies is "censorship" because it may convince foreign regulators, or internet platforms themselves, to suppress "conservative" or other speech. But lawful advocacy to foreign (or domestic) regulators is expressive activity that is protected from censorship—it is not itself censorship. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* 570 U.S. 205, 218 (2013) (invalidating funding condition that "recipients adopt—as their own—the Government's view on an issue of public concern"). Moreover, the government has no valid interest in forcing private companies to moderate the content or communities they host on their platforms according to its preferences. *See NetChoice*, 603 U.S. at 741–42. The Policy is therefore neither "reasonable" nor "reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

For these reasons, even if the Censorship Policy fell within the scope of Defendant Rubio's authority under the foreign policy provision—and, as explained below, it does not—it would still fail arbitrary-and-capricious review. "Agency action may be consistent with the agency's

39

authorizing statute and yet arbitrary and capricious under the APA. The court's inquiry on the latter point depends not solely on the agency's legal authority, but instead on the agency's ability to demonstrate that it engaged in reasoned decisionmaking." *Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 619 (D.C. Cir. 2017) (citations omitted).

### 3.    The Censorship Policy exceeds Defendants' statutory authority.

CITR is also likely to succeed on the merits of its claim that the Censorship Policy exceeds Defendants' statutory authority. *See* 5 U.S.C. § 706(2)(C). As the Supreme Court has recently held, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024), using the "traditional tools of statutory construction," *id.* at 374. They interpret the statute first according to its text, followed by its history and purpose. *See, e.g.*, *Solar Energy Indus. Ass'n v. Fed. Energy Reg. Comm'n*, 154 F.4th 863, 868–71 (D.C. Cir. 2025). Then, "if one reading will raise 'serious constitutional doubts' and another 'plausible' reading will not, [they] will adopt the latter." *Paul v. FAA,* No. 24-1348, 2026 WL 547264, at *5 (D.C. Cir. Feb. 27, 2026) (citations omitted). Based on the publicly available record, Defendants relied on the foreign policy provisions in announcing the Policy in May 2025 and in expanding and enforcing the Policy in December 2025. *See* DeCell Decl. Ex. 14–15. Interpreted according to their plain terms and consistently with congressional intent and constitutional rights, the foreign policy provisions do not authorize the Policy.

The text of the provisions makes clear that Defendants must meet the heightened "compelling . . . foreign policy interests" standard. The foreign policy provisions explicitly prohibit the exclusion and deportation of noncitizens based on their lawful "past, current, or expected beliefs, statements, or associations, . . . unless the Secretary of State personally determines that the [noncitizens'] admission would compromise a compelling United States

40

foreign policy interest." 8 U.S.C. § 1182(a)(3)(C)(iii). Because Defendants are seeking to exclude and deport individuals under the Policy based on their protected expressive and associational activities, Defendants must meet the higher "compelling foreign policy interest" standard. "[C]ompelling" means something "so great that irreparable harm or injustice would result if it is not met." Black's Law Dictionary (11th ed. 2019). In other words, to exclude or deport noncitizens based on their expressive or associational activities, Defendants must establish that irreparable harm or injustice would otherwise result.

The legislative history of the foreign policy provisions confirms Congress's intent that the "compelling foreign policy interest" standard imposes a much higher barrier to exclusion based on protected expression. As explained in a Senate Report, Congress enacted the foreign policy provisions in 1990, after repealing McCarthy era provisions of the Immigration and Nationality Act ("INA") "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States." S. Rep. No. 100-75 at 11 (1987), *as reprinted in* 1987 U.S.C.C.A.N. 2314, 2326. A House Conference report reaffirmed this point, stating that the provisions should be used "sparingly and not merely because there is a likelihood that [a noncitizen] will make critical remarks about the United States or its policies," and that the "'compelling foreign policy interest' standard [must] be interpreted as a significantly higher standard than the general 'potentially serious adverse foreign policy consequences standard.'" H.R. Rep. 101-955 at 6794 (1990) (Conf. Rep.), *as reprinted in* 1990 U.S.C.C.A.N. 6784, 6794. The "compelling foreign policy interest" standard might be met, for example, "when [a noncitizen's] mere entry into the United States could result in imminent harm to the lives or property of United States persons abroad or to property of the United States government abroad (as occurred with the former Shah of Iran), or when [a noncitizen's] entry

41

would violate a treaty or international agreement to which the United States is party." *Id.* at 6795; *see also Khalil v. Trump*, 784 F. Supp. 3d 705, 743 (D.N.J. 2025) (explaining reference to former Shah of Iran in connection with Iranian hostage crisis), *vacated and remanded sub nom. Khalil v. President, United States*, 164 F.4th 259 (3d Cir. 2026).

At no point in the development or enforcement of the Censorship Policy, however, have Defendants identified a coherent, let alone compelling, foreign policy interest that would justify excluding individuals based on their protected expressive activities.[5] Defendants have identified no imminent harm to the lives or property of U.S. persons or the U.S. government or any treaty violations threatened by the researchers and platform workers targeted under the Policy. Nor have Defendants identified any actual instances of foreign government censorship of protected speech in the United States. *See supra* pp. 5–9. And they misconstrue the internet platforms' own content moderation decisions, as well as independent researchers' reporting and advocacy regarding those decisions, as censorship. *See supra* p. 6. All that remains are Defendants' conclusory assertions of the existence of a "global censorship-industrial complex," which cannot carry the day. *Cf. Abourezk*, 785 F.2d at 1060 (accepting district court conclusion that "public documentation [w]as 'entirely conclusory' and inadequate" while cautioning court "to make certain that plaintiffs are accorded access to the decisive evidence to the fullest extent possible"); *Allende*, 605 F. Supp. at 1225 (rejecting as impermissibly conclusory a State Department affidavit stating that plaintiff's entry "would have been prejudicial to the conduct of the foreign affairs of the United States").

---

[5] Indeed, in the December 23, 2025 announcement itself, Defendant Rubio referenced the inapplicable, lower standard—stating only that the individuals' "entry, presence, or activities in the United States have potentially serious adverse foreign policy consequences for the United States." DeCell Decl. Ex. 15. He failed to provide "reasonable ground" even for that belief. Nor is there evidence that he provided any notice, let alone timely notice, of his determinations to members of Congress, as required. *See* 8 U.S.C. § 1182(a)(3)(C)(iv).

Because Defendants have failed to identify a non-chimerical "compelling foreign policy interest" in adopting and enforcing the Policy, it exceeds their statutory authority under the foreign policy provisions. *See Abourezk*, 785 F.2d at 1061–62.

Because the text and legislative history of the foreign policy provisions clearly prohibit the Censorship Policy, the Court need not address the provisions' constitutionality. To the extent the Court considers the provisions ambiguous, however, it should interpret them narrowly to avoid serious constitutional concerns.[6] "[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems," a court should "construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 173 (2001) (citation omitted); *see Loper Bright*, 603 U.S. at 395 (requiring courts to "independently interpret the statute and effectuate the will of Congress subject to constitutional limits"); *Paul*, 2026 WL 547264, at *5 ("[I]f one reading will raise "serious constitutional doubts" and another "plausible" reading will not, we will adopt the latter."); *Motion Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796, 805 (D.C. Cir. 2002).

Here, the Court should reject Defendants' apparent interpretation of the foreign policy provisions because it raises serious First Amendment concerns. Instead, the Court should construe the foreign policy provisions as prohibiting the exclusion of individuals based on their lawfully conveyed viewpoints, and based on the content of their lawful speech, beliefs, or associations except where the Secretary of State justifies their exclusion as a narrowly tailored means of achieving a compelling foreign policy interest, such that it would meet heightened scrutiny under the First Amendment. Here, it is Defendants' construction of the foreign policy provisions that is

---

[6] This case challenges Defendants' reliance on the foreign policy provisions in adopting and enforcing the Censorship Policy, not foreign policy provisions themselves. *Cf. Stanford Daily*, No. 25-cv-06618 (N.D. Cal. Jan. 16, 2026).

plainly contrary to the intent of Congress, as described above. The Court should therefore adopt a narrower construction that avoids the constitutional problems that Congress itself sought to avoid in enacting the foreign policy provisions.

The Supreme Court has narrowly interpreted other INA authority to prevent the statute from transgressing First Amendment and other constitutional limits, and this Court should do the same here. *See United States v. Witkovich*, 353 U.S. 194, 199, 201–02 (1957) (rejecting government interpretation of INA authority because it would allow for unlimited demands for information from noncitizens subject to deportation orders, thereby raising "issues touching liberties that the Constitution safeguards, even for [a noncitizen] 'person'"); *see also Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (the Court has "read significant limitations into other immigration statutes in order to avoid their constitutional invalidation"); *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1438 (D.C. Cir. 1996) (applying avoidance canon to State Department's Foreign Affairs Manual "in light of the constitutional difficulties entailed by reading" it more broadly). "The Executive has broad discretion over the admission and exclusion of aliens, but that discretion is not boundless. It extends only as far as the statutory authority conferred by Congress and may not transgress constitutional limitations. It is the duty of the courts, in cases properly before them, to say where those statutory and constitutional boundaries lie." *Abourezk*, 785 F.2d at 1061.

## III.    The other preliminary injunction factors support relief.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). CITR therefore satisfies the second preliminary injunction factor because it has demonstrated a likelihood of success on its First Amendment claim. *See Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016); *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 29 (D.D.C. 2024) (finding irreparable

44

injury where challenged action had "caused Plaintiffs to self-censor when making research and publication decisions . . . and restricted communications with sources and journalists"), *aff'd*, 138 F.4th 563 (D.C. Cir. 2025) (finding "no error" in irreparable harm conclusion).

The two remaining preliminary injunction factors—the balance of the equities and the public interest—also strongly favor relief. These two factors "merge when the Government is the opposing party," *Nken*, 556 U.S. at 435, because "the government's interest *is* the public interest," *Pursuing Am.'s Greatness*, 831 F.3d at 511. And "there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation." *Id.* at 511. There is also "a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citation omitted). Given CITR's likelihood of success on the merits of its constitutional and APA claims, the balance of the equities and the public interest weigh in favor of granting the preliminary injunction. Moreover, the public interest in the work of independent researchers and advocates who focus on the social media platforms is especially significant now, given the ongoing public debate over the role that social media platforms play in our political as well as personal lives.

## Conclusion

For the reasons stated above, CITR respectfully requests that the Court stay the Censorship Policy under the APA and preliminarily enjoin Defendants from enforcing it.

March 26, 2026                                    Respectfully submitted,


/s/ *Naomi Gilens*                               /s/ *Carrie DeCell*
Naomi Gilens (D.C. Bar No. 90037831)*            Carrie DeCell (D.C. Bar No. 1015491)
Nicole Schneidman**                              Raya Koreh*

45

Protect Democracy Project
2020 Pennsylvania Avenue NW, Suite 163
Washington, DC 20006
(202) 579-4582
naomi.gilens@protectdemocracy.org

Kiran Wattamwar**
Anna Diakun**
Katie Fallow**
Alex Abdo**
Jameel Jaffer (D.C. Bar No. MI0067)
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
carrie.decell@knightcolumbia.org

*Counsel for Plaintiff*

\* Application for admission to
D.D.C. pending.

\*\* Motion for admission *pro hac
vice* forthcoming.

46