**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| COALITION FOR INDEPENDENT TECHNOLOGY RESEARCH, <br><br> Plaintiff, <br><br> v. <br><br> MARCO RUBIO, in his official capacity as Secretary of State; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; and PAMELA BONDI, in her official capacity as Attorney General of the United States, <br><br> Defendants. | Civil Action No. 1:26-cv-00815 |

**DECLARATION OF BRANDI GEURKINK**

I, Brandi Geurkink, declare and state as follows:

1.      I am the Executive Director of the Coalition for Independent Technology Research ("CITR"), the plaintiff in the above-captioned case. I have held this position since January 2024. I was part of the initial organizing group for CITR beginning in January 2022, and I became a founding board member when the organization was launched in October 2022. I am also a member of CITR.

2.      In my capacity as Executive Director, I regularly communicate with CITR members and respond to their interests and concerns. I have therefore closely followed the Trump administration's new U.S. immigration policy targeting individuals working in fields including misinformation and disinformation, fact-checking, content moderation, trust and safety, or compliance (the "Censorship Policy" or "Policy"). Over the past several months, I have spoken to

and heard reports from many CITR members who either have been directly and seriously harmed by the Censorship Policy, or who fear they will be targeted under the Policy in the future.

3.     I am over the age of eighteen and a U.S. citizen. I have personal knowledge of the facts stated in this declaration, and, if called to testify, I could and would competently do so under oath.

**CITR**

4.     CITR is a U.S.-based non-profit, non-partisan membership organization whose mission is to advance, sustain, and defend the right to ethically study the impact of technology on society. As part of this mission, CITR works to protect technology research from efforts at obstruction, interference, and cooption by both the government and the technology companies themselves. Since 2022, the organization has served as a mutual aid network that defends the right of independent researchers to carry out their work without fear of reprisal; an advocate for public-interest research to educate the public about the impacts of technology on society; and a community hub for independent researchers to develop their careers, learn new skills, sharpen their analyses, and build the field of industry-independent researchers.

5.     Today, CITR has nearly 500 individual and institutional members, including academics, journalists, civil society researchers, community scientists, and research institutions working across forty-seven countries. These members include both U.S. citizens and noncitizens. Roughly half of CITR's members are located in the United States, and roughly half are located outside the United States. Approximately 30 to 40 of the members who reside in the United States are noncitizens. Some of these members are lawful permanent residents, while others hold H-1B visas, other visas, or lawful status and will need to renew their visas or status in the near future. One of these noncitizen members who resides in the United States is the member identified in the Complaint and in a declaration in support of the present motion as CITR Member A, with whom

2

I have spoken about their experience. CITR Member A works for a research group, which is itself an organizational member of CITR.

6.     Many of CITR's noncitizen members in the United States research and write about topics identified as grounds for targeting under the Policy. For example, these members research and write about misinformation and disinformation on social media platforms; how online scams, child sexual abuse material, and other harmful content spread across the internet; how large technology companies treat individual privacy online; and how to improve user literacy and mitigate user harms through platform policies. Their work informs the decisions of users, advertisers, policymakers, and the platforms themselves.

7.     CITR members participate in the organization's two core programmatic pillars, each designed to support independent researchers in their work to inform public understanding of technology's impacts on society.

8.     The first pillar is "Community": CITR works to create a trusted, neutral space for members to build professional networks and develop skills. In support of this pillar, CITR creates opportunities for members to connect, collaborate, and share best practices. For example, CITR regularly hosts events for its members to discuss urgent issues facing independent technology researchers. One such event is its annual Independent Technology Researchers' Summit, last held in Berlin, Germany in September 2025. CITR also hosts regular member meet-ups, as well as virtual and in-person workshops on different topics. CITR typically holds one or two events each month. CITR members are the primary audience for these events, though independent researchers, journalists, and lawyers who are not CITR members often join these events as well.

9.     The second pillar is "Advocacy": Together with its members, CITR engages in public education efforts to strengthen rights for independent, public-interest technology

researchers and to support their exercise of those rights through, for example, sufficient funding, access to data and information, and legal protections. CITR also engages in public awareness campaigns to draw attention to the important role that independent researchers play in informing the public about technology's impacts on society, and to build support for their work among key stakeholders. These efforts rely on engagement by CITR members for their success.

10.     In my role as CITR's Executive Director, I provide overall leadership and management of CITR's organizational strategy, operations, and external engagement. My role includes overseeing staffing, internal systems, and day-to-day operations to ensure the organization runs effectively and sustainably. I work with the Board, staff, and CITR members to set strategic priorities and translate them into clear, achievable programs, then oversee their implementation by staff and member-led working groups to ensure alignment with our mission.

11.     A core part of my role is maintaining close, regular contact with CITR members: listening to the challenges and opportunities they encounter in the field to advance our collective mission, and ensuring their perspectives inform programming, public education, and strategic direction. I also lead our fundraising efforts, cultivating relationships with philanthropic partners to secure resources for our work. Finally, I represent CITR publicly, acting as a spokesperson and building relationships with stakeholders across media, philanthropy, and the public and private sectors to advance our mission.

### The Censorship Policy's Harms to CITR

12.     Since May 2025, I have closely followed the adoption, expansion, and enforcement of Defendants' Censorship Policy. In my role as the Executive Director of CITR, I have observed firsthand several ways in which the Policy has impeded and continues to impede CITR from advancing its programmatic pillars and carrying out its mission.

13.    The Censorship Policy has harmed CITR's ability to advance its first programmatic pillar, "Community," by hampering its ability to host effective, inclusive in-person events.

14.    In-person events provide unparalleled opportunities for CITR members to develop deep connections across borders, identify opportunities for collaboration, and collectively address the threats facing the independent technology researcher community by sharing their different experiences and perspectives. CITR previously held events open to its entire membership in both the United States and Europe. Before Defendants adopted the Censorship Policy, CITR held multiple events in the United States.

15.    Beginning in the spring of 2025, I and other members of CITR leadership heard from several noncitizen members residing abroad that they feared they would be denied entry or otherwise targeted under the Censorship Policy if they attempted to travel to the United States, and because of that fear, they either would not, or likely would not, travel to the United States for CITR events. Members also shared similar concerns through a survey of researchers that CITR conducted in response to a request by stakeholders in the European policy community. They asked us to conduct the survey to help it understand the impacts of the Policy and other public and private measures affecting the technology researcher community. Multiple survey respondents, all CITR members, noted their concerns about being targeted for visa revocation, visa denial, and/or deportation if they traveled to the United States because of their research and reporting on issues like disinformation. At least one respondent noted that they no longer wanted to travel to the United States at all because of the risk that they might be targeted because of their scientific conclusions and publications. Like CITR members, I felt deeply concerned about the safety risks noncitizen members would face under the Policy if they did choose to travel to the United States for a CITR event.

16.    Because we expected that fewer noncitizen members would attend U.S.-based events, and because those who did attend would risk being targeted under the Censorship Policy, CITR decided in the summer of 2025 to stop hosting U.S.-based events for the time being. CITR holds events that have a global reach and that bring together members working in different countries and contexts, and I do not believe it is possible to hold such an event in the United States while the Policy is in place.

17.    Moreover, because of the Censorship Policy, hosting events in the United States would cost significantly more time and money than they previously did. For example, CITR has hired a service provider to help its members with visa support, flights, and other travel arrangements. The service provider charges based on their estimation of the number of hours they will need to spend to provide that support. Because the Policy has increased the complexity of providing visa support and making travel arrangements for noncitizens seeking to come to the United States, we understand that the cost to provide this support would be significantly more expensive than it had been in the past and significantly more expensive than it would be to provide the same services for travelers to Europe.

18.    The higher costs, safety concerns, and inability to plan events that advance our goals have thus led CITR to temporarily stop hosting U.S.-based events. Because roughly half of CITR members are based in the United States, the decision not to host events here has decreased CITR's ability to engage with its membership. If the Policy were no longer in place, CITR would resume regularly hosting events in the United States.

19.    Though CITR has continued to hold in-person events in Europe, the Censorship Policy has deterred U.S.-based, noncitizen CITR members from participating in those events. For example, in September 2025, CITR hosted its annual Independent Technology Researchers'

6

Summit in Berlin, Germany. The purpose of the event was to empower independent technology researchers from around the world to develop collaborations, discuss common obstacles they face in their work, and chart new paths to advance the field of independent technology research. Several U.S.-based, noncitizen members told me that they would have attended the Summit but, because of the fear that they would be denied reentry to the United States or otherwise targeted under the Policy as a result, they decided not to attend. Because of the Policy, the Summit suffered from decreased participation from CITR's U.S.-based members, which hampered CITR's ability to coordinate work across its membership on key topics. It is my understanding that, if the Policy were no longer in place, these members would attend future CITR events outside the United States.

20.    Because the Censorship Policy has made some U.S.-based, noncitizen CITR members unwilling to travel internationally, and it has made other noncitizen members based abroad unwilling or unable to travel to the United States, CITR has been unable to host inclusive, cohesive events. CITR plans to expend a significant amount of time and money in an effort to mitigate this harm. CITR is in the process of planning its annual Summit for 2026 and, because of the Policy, intends to hold two separate events: the Summit outside of the United States, and a separate corresponding convening inside the United States. CITR has thus had to include two separate cost structures for its annual Summit in its 2026 budget, and CITR estimates that it will cost the organization tens of thousands of dollars more to host two events than it would have cost to host one, as well as significant additional staff time and resources. If CITR did not feel compelled to spend this money on a second event, the organization would have put the money toward funding another staff position, which, as of present, CITR cannot yet support financially. If the Policy were no longer in place, CITR would redirect time and resources toward planning only one in-person Summit for all of its members in 2026.

21.    Even with this effort, I expect that the Censorship Policy will decrease member participation in CITR events and meetings going forward. In the past, CITR members would share what they learned during meetings with their teams and broader organizations, with the aim of widening connections and collaborations. CITR viewed this continued collaboration as a powerful element of sustaining and strengthening the independent researcher community, one of CITR's core goals. Since the targeting of specific researchers and advocates under the Policy in December 2025, however, the Policy's chilling effects have changed how members engage with the organization and with each other. CITR leadership has observed that members are now reluctant to share resources and lessons learned during online and in-person meetings beyond the participants in the room. Many members no longer sign into meetings and are no longer willing to document their efforts as a group. The Policy is thus directly undermining CITR's ability to achieve its goal of building community, decreasing CITR's ability to be transparent, eroding trust and credibility within the membership and with the public, and stunting open dialogue. These impacts will damage CITR's long-term learning and growth as a coalition, as well as its ability to mobilize members around pressing issues facing the community.

22.    I have had several individual conversations with CITR members about the ways in which the Censorship Policy is chilling their engagement with CITR. For example, CITR Member B had planned to present their work at a future CITR "member session." CITR organizes member sessions to create opportunities for members to bring attention to their work and for other members to learn about developments and possible areas for collaboration, which serves CITR's goals of fostering community and advancing independent technology research. Member B was initially looking forward to this opportunity, but now is reluctant to participate, and will only do so if the event is private with a limited group of attendees—requirements that undermine CITR's

community-building goals. Additionally, Member B told me that they used to regularly promote CITR's work on social media, but they now do so less often. They informed me that they now feel compelled to self-censor because of the fear that they will be targeted for detention and deportation under the Policy based on their work and association with CITR. They told me that if the Policy were no longer in place, they would be substantially more likely to participate in public CITR events and post on social media without feeling compelled to self-censor.

23.    CITR Member A told me that they now refrain from traveling internationally, including to CITR's conferences and other conferences they otherwise would have attended, because they fear that they will be denied reentry under the Policy based on their work. They would be substantially more likely to resume attending those events if the Policy were no longer in place.

24.    Moreover, multiple noncitizen CITR members, including the member identified as Member C in the Complaint, have told me that they no longer want to be publicly associated with CITR or other CITR members because doing so has not felt safe since the Trump administration specifically targeted leaders of CITR member organizations under the Censorship Policy. Before Defendants adopted the Policy, CITR Member C attended CITR events and meetings and they were enthusiastic about their engagement with CITR. They told me that, because of the fear that they will be targeted for detention and deportation under the Policy based on these activities, they will no longer attend CITR meetings and events. They have now halted *any* public association with CITR, including by asking me to remove their name from CITR's website. CITR Member C told me that, if the Policy were no longer in place, they would be substantially more likely to resume attending CITR events and meetings and otherwise associating with the organization.

25.    In these ways, the Censorship Policy has bifurcated CITR's international community and decreased CITR's ability to engage with its membership overall, harming its

effectiveness as an organization. The Policy has also hampered CITR's ability to achieve its mission of facilitating collaboration among independent technology researchers.

26. The Censorship Policy has also harmed CITR's ability to advance its second programmatic pillar, "Advocacy."

27. First, some noncitizen members have reduced their participation in CITR's public education efforts because of the fear that they will be targeted under the Censorship Policy as a result. For example, CITR Member A, who had previously worked with CITR on public advocacy campaigns relating to researchers' access to data, has limited their involvement with CITR and its public education efforts to a behind-the-scenes role, because of the fear that they will be targeted for detention and deportation under the Policy based on this activity. If the Policy were no longer in place, they would be substantially more likely to resume their public involvement in CITR's advocacy efforts.

28. Second, the Censorship Policy has made noncitizen members too afraid to share their names for CITR's own reporting. For example, when CITR was carrying out research for its 2025 State of Independent Tech Research report, some noncitizen members informed my colleagues that they were reluctant to share their names for the report because of the fear that they would be targeted for detention or deportation under the Policy based on their work and their association with CITR. Similarly, when journalists have approached CITR seeking comment from its members about the impacts of the Policy on their work and the field more broadly, I have had difficulty finding noncitizen members who are willing speak on the record. Several members told me that, because they feared being targeted under the Policy as a result of any public comments and their work in general, they were not willing to speak with press on the record about the Policy. Because the Policy has reduced noncitizen members' participation in CITR's research and public

education efforts, it is now more difficult for CITR to effectively carry out public education efforts on behalf of independent technology researchers.

29.    Beyond these impacts on CITR's two core programmatic pillars, the Censorship Policy has caused CITR to spend significant additional staff time to support its members, including by hosting events and consulting with members regarding the risks they face under the Policy.

30.    For example, CITR has planned three separate convenings of European researchers in large part to address member concerns regarding the Censorship Policy and its impact on the CITR community. We held the first event on June 26, 2025, in response to member concerns stemming from Defendant Rubio's May 28, 2025 announcement of the Policy. We held a second, follow-up event on July 30, 2025, to discuss the Policy in light of the House Judiciary Committee's July 25, 2025 publication of "The Foreign Censorship Threat" report, which identified several CITR members in its appendix. We held the third event on December 17, 2025, in response to member concerns stemming from the cable the State Department reportedly sent to consular officers in early December in connection with the Policy, as well as reporting regarding the European Commission's fine against X for violations under the Digital Services Act. CITR organized all three events to identify ways it could support its members as they evaluated their risks under the Policy.

31.    Separate from these events, CITR has also spent significant time counseling individual citizen and noncitizen members regarding the Censorship Policy's implications for their work and their involvement in CITR. CITR leadership has consulted with dozens of U.S. citizen and noncitizen members about the Policy since December 2025. I personally have spoken with many members since that time, spending many hours counseling them about their risks under the

11

Policy and assessing how the organization could best meet their needs during this time of great uncertainty.

32.    In addition, because of the risks to noncitizen members under the Censorship Policy, and noncitizen members' corresponding reduced willingness to engage in CITR public education efforts, CITR leaders have also felt compelled to take extra measures and create ad hoc processes to ensure the safety of CITR members before engaging in public education efforts, making these efforts more difficult and time-consuming.

33.    CITR's co-equal goals are to defend *and* to advance the right to ethically study the impact of technology on society. It now has to spend far more of its time and resources to defend independent technology research against the threats posed by the Censorship Policy—far beyond what CITR typically spends on this goal. The considerable time and resources CITR has spent planning events to address member concerns regarding the Policy, counseling members on the implications of the Policy for their work and their involvement in CITR, and otherwise addressing the threats the Policy poses to the independent technology researcher community have left the organization with less time and fewer resources to pursue other priorities, including planning activities that would *advance* the rights of independent technology research. For example, CITR had intended to organize capacity-building workshops for researchers focusing on data access over the past year, but we have not been able to launch that initiative because of the time and effort we have had to spend responding to the Policy. Additionally, though public-interest technology research has faced significant reductions in federal funding, CITR has not had time to pursue public education addressing that issue. If the Policy were no longer in place, CITR would redirect its resources to focus on these other pressing issues.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: March __24__, 2026

_Brandi M Geurkink_

Brandi Geurkink

13