**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| COALITION FOR INDEPENDENT TECHNOLOGY RESEARCH,<br><br>  Plaintiff,<br><br>  v.<br><br>MARCO RUBIO, in his official capacity as Secretary of State; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; and PAMELA BONDI, in her official capacity as Attorney General of the United States,<br><br>  Defendants. | Civil Action No. 1:26-cv-00815 |

**DECLARATION OF J. NATHAN MATIAS**

I, J. Nathan Matias, declare and state as follows:

1. I am a member of the Coalition for Independent Technology Research ("CITR"), a plaintiff in the above-captioned case. I am also a member of its Executive Committee, a position I have held since its founding.

2. I am over the age of eighteen and a U.S. citizen. I have personal knowledge of the facts stated in this declaration, and, if called to testify, I could and would competently do so under oath.

3. I am a computer scientist and behavioral scientist who currently serves as an assistant professor in the Cornell University Department of Communication and a field member in Information Science. I am currently being considered for a promotion to a tenured appointment with the university.

4.      At Cornell, I founded the Citizens and Technology Lab ("CAT Lab"), which works with communities to study the effects of technology on society and test ideas for changing digital spaces to better serve the public interest. CAT Lab is an organizational member of CITR.

5.      My research focuses on, among other things, freedom of expression, content moderation, and online safety. The through line of my work has been a search for ways to expand and protect freedom of expression while improving online safety. Over the years, I have audited technology platforms for their use of content moderation, studied ways that the public can manage conflicts and safety independently of the technology industry, studied the effect of content removal on freedom of expression, and tested alternatives to content removal.

6.      Over the past several months, I have closely followed the Trump administration's new U.S. immigration policy targeting individuals working in fields including misinformation and disinformation, fact-checking, content moderation, trust and safety, or compliance (the "Censorship Policy" or "Policy").

7.      As the founder of a large university-based lab and a professor who interacts with hundreds of undergraduate students, graduate students, staff members, and collaborators each year, it is my professional responsibility to take into account the capacity, safety, and well-being of my students and colleagues when structuring the work of my lab and other collaborations. One of my greatest joys is to support early-career researchers as they grow through a community of practice. Ensuring that they have a safe, supportive environment to do so is of paramount importance to me. As a result, I have had to seriously consider the risks to my noncitizen students and colleagues under the Censorship Policy when making staffing and programmatic decisions. I have also had to take into account the uncertainty caused by the Policy when making these decisions, including the

2

possibility that my noncitizen collaborators will be unable to remain in the United States or could be prevented from entering the United States in the future.

8.      My output as a professor depends on the work of my collaborators in my lab, many of whom are noncitizens, and some of whom are noncitizen CITR members. The work we publish together bears my name. In addition to contributing to science and society, these publications are incorporated into my job evaluation file for tenure consideration. The Censorship Policy has chilled my noncitizen collaborators and created considerable uncertainty for my work and the work of my lab. These chilling effects have directly impacted my work in the following ways, reducing my output, harming the operations of CAT Lab, and impairing my ability to earn tenure.

9.      First, the Censorship Policy has deprived me of significant opportunities to collaborate with noncitizen researchers from abroad.

10.     In one case, a rising star in my field and noncitizen who had received external research funding asked to join my lab to collaborate on projects related to youth mental health, artificial intelligence, and social media. Although this scholar would have contributed their talent and other valuable resources to the lab and I otherwise would have accepted them, I felt compelled to decline their request because of the fear that they would be targeted for visa denial or subsequent visa revocation, detention, and deportation under the Censorship Policy based on their work. The uncertainty created by the Policy would have made it difficult for me and the visiting scholar to make long-term plans and pursue research that depended upon their continued presence in the United States. I will feel compelled to deny similar future requests from noncitizen researchers abroad if the Policy remains in place, depriving me of significant opportunities to collaborate with noncitizen colleagues going forward.

11.    In another case, the Censorship Policy harmed my collaborations with researchers in the United Kingdom focused on child online safety. Before Defendants adopted the Policy, I was confidently able to hold meetings in the United States that brought internationally recognized experts in psychology, public health, and digital privacy together with U.S.-based survivors and their families. Due to the emotionally sensitive nature of conversations about child safety and the privacy needs that surround them, survivors have asked me to hold these meetings in person rather than over the telephone or in video calls. While the Policy remains in place, my uncertainty about the consequences for international collaborators has stopped me from inviting experts from abroad to come to the United States for these meetings, preventing me from organizing the best possible meetings about online child safety. Consequently, the Policy has substantially hindered my work to develop science that could reduce the number of children's hospitalizations and deaths that families attribute to the design of social media and AI products.

12.    Second, the Censorship Policy has deprived me of significant contributions from my noncitizen collaborators in the United States.

13.    As one example, some of the noncitizens in my lab have decided not to travel abroad, including to attend meetings with new community partners, because they fear that they will be denied reentry to the United States under the Censorship Policy. As a result, I have been unable to pursue collaborations with those international partners, who have important experiences related to online safety and freedom of expression to share and who would have added significant value to my research.

14.    As another example, at least one of my noncitizen collaborators felt compelled to make extensive contingency plans in connection with their international travel because of the fear that they would be targeted under the Censorship Policy, requiring more flexibility in their work

4

and less public visibility on their projects. These accommodations have significantly delayed progress on our joint projects.

15. Another noncitizen collaborator plans to engage in work on a joint project that requires international travel this summer; if the Censorship Policy remains in effect, I may need to search for another collaborator to take this individual's place.

16. Additionally, at least one of my U.S.-based noncitizen collaborators has decided not to speak to journalists or answer questions from policymakers on topics related to their work with my lab. They told me they made this decision because they fear that speaking publicly about their work will lead Defendants to target them for detention or deportation under the Censorship Policy based on their work and commentary. As a result, I have lost important opportunities to develop new research, obtain expert feedback on research, and bring visibility to my work and the work of my lab. This scholar, who was previously quoted as a scientific expert in hundreds of news stories before the Policy, has indicated to me that they would resume previous levels of speaking and writing publicly about their collaborations with my lab if the Policy were no longer in place.

17. Third, I have had to spend considerable time mitigating the risk and uncertainty the Censorship Policy has created for my projects. When I have been unable to mitigate the risk and uncertainty adequately, I have had to decline or forgo opportunities.

18. For example, in 2025 I redirected at least 100 hours toward making contingency plans on projects with noncitizen students and collaborators—hours that would have otherwise gone into conducting and publishing research during the year in which I am being considered for tenure. I have also publicized research findings less widely if they included work by noncitizens. I have decided not to hold workshops outside of the United States because of the fear that noncitizen participants may be denied reentry into the country under the Censorship Policy and

because of the uncertainty caused by the Policy. And I declined an invitation to moderate a high-profile, potentially transformative, cross-partisan dialogue focused on building common ground between Americans on the left and the right about online safety and content moderation. I declined out of concern that my noncitizen students and collaborators might face retaliation under the Policy as a result, and because I declined to participate, the event has not been held.

19.     If the Censorship Policy were no longer in place, my lab would regain its previous levels of output and impact because my noncitizen collaborators would no longer require reductions of responsibilities to avoid targeting under the Policy; they would no longer refrain from speaking to journalists and policymakers about their work; and they would resume traveling internationally to meetings with partners and other events. If the Policy were no longer in place, I would also welcome new talent from abroad to work in my lab, I would invite my UK collaborators to the United States to deepen our work together, I would publicize my work broadly, and I would hold workshops outside the United States.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: March 24, 2026

J. Nathan Matias

6