**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

COALITION FOR INDEPENDENT
TECHNOLOGY RESEARCH,

      Plaintiff,

  v.

MARCO RUBIO, in his official capacity as
Secretary of State; KRISTI NOEM, in her
official capacity as Secretary of Homeland
Security; and PAMELA BONDI, in her
official capacity as Attorney General of the
United States,

      Defendants.

Civil Action No. 1:26-cv-00815

**DECLARATION OF REBEKAH TROMBLE**

I, Rebekah Tromble, declare and state as follows:

1.      I am a member of the Coalition for Independent Technology Research ("CITR"), a plaintiff in the above-captioned case. I am also a co-founder of the organization, and I have served as a member of the Executive Committee of its Board of Directors since its founding.

2.      I am over the age of eighteen and a U.S. citizen. I have personal knowledge of the facts stated in this declaration, and, if called to testify, I could and would competently do so under oath.

3.      I am a political communication scholar and researcher currently serving as a professor in the Khoury College of Computer Sciences and the College of Social Sciences and Humanities at Northeastern University. At Northeastern, I co-lead the Institute for Information, the Internet and Democracy, which aims to advance public-interest research that examines how the internet and emerging information technologies impact democratic societies. I am also the co-

founder of Expert Voices Together and the Researcher Support Consortium, both of which support researchers and others facing coordinated campaigns of intimidation and harassment in response to their public-facing work.

4.      My research focuses on, among other things, how misinformation and disinformation spread in online spaces and how different communities understand what misinformation and disinformation are. My research also focuses on hate speech and forms of online harassment. I frequently work with undergraduate and graduate students, and I anticipate that a number of noncitizen students will join a new research lab that I am currently setting up at Northeastern University.

5.      Over the past several months, I have closely followed the Trump administration's new U.S. immigration policy targeting individuals working in fields including misinformation and disinformation, fact-checking, content moderation, trust and safety, or compliance (the "Censorship Policy" or "Policy"). This includes the cable that the State Department reportedly sent ordering U.S. consular officers to scrutinize visa applicants' resumes, LinkedIn profiles, and media appearances (the "Cable").

6.      As a professor and leader of a university research institute and research lab, it is my professional responsibility to take the well-being of my students and colleagues into account when structuring the work of the institute, lab, and other collaborations. I am obligated to ensure that my students have a safe, supportive environment in which to learn and grow. Therefore, I must take into account the very real risks my noncitizen students and colleagues face under the Censorship Policy when structuring and assigning work.

7.      My advocacy efforts focus on protecting and defending the rights of independent researchers to conduct their public interest work, including efforts to secure access to social media

2

platform data. I am acutely aware of how my research and advocacy efforts could expose the noncitizen students and collaborators with whom I work to the risks of visa denial, visa revocation, and detention and deportation under the Censorship Policy. I have met all five of the individuals whom Defendants announced on December 23, 2025 would be excluded or deported under the Policy. I am well-acquainted with four of those individuals, and I have worked closely with one of them as a member of the same advisory council.

8.      Because of the serious risk that my students and other collaborators will be targeted under the Censorship Policy if they engage in certain of my research and advocacy projects, and because I rely on student support to carry out those projects, I am no longer pursuing much of my work on the topics subject to scrutiny under the Policy. I have made the difficult decision to discontinue these projects even though they fall within my primary areas of expertise. Though I am still pursuing some of my projects on these topics, I have felt compelled not to assign noncitizens to projects related to researcher data access, online extremism, hate speech, and misinformation and disinformation so their work with me does not subject them to targeting under the Policy. As a result, I have had to take on more of that work myself, significantly reducing my research productivity.

9.      The Censorship Policy has also deterred me from speaking publicly about my research and engaging in public advocacy. Before Defendants adopted the Policy, I regularly spoke publicly about misinformation, disinformation, online harassment, and researchers' data access, and I still wish to do so. Since the adoption of the Policy, however, I fear that engaging in public speaking or advocacy related to these topics will expose my noncitizen students and collaborators to greater risk of being targeted under the Policy. Because of this fear, I have recently turned down at least half a dozen public speaking opportunities. If the Policy were no longer in place, I would

resume speaking freely and publicly about these topics, including by accepting speaking opportunities.

10.    The Censorship Policy has also caused me to spend significantly more time and energy than I otherwise would have in connection with Expert Voices Together and the Researcher Support Consortium. Since news outlets reported the contents of the Cable in early December 2025, I have consulted with several dozen individuals, including CITR members, about the threats posed by the Policy. These individuals include noncitizen researchers as well as U.S. citizen principal investigators and research leads who are concerned about the risks their noncitizen students and supervisees face under the Policy. Though noncitizen students and collaborators typically help me with my work with Expert Voices Together and the Researcher Support Consortium, I have felt compelled to exclude them from these efforts because of the risks they might face in connection with this work under the Policy. The Policy has thus significantly increased my workload and decreased student and collaborator support, thereby increasing the burden on me and decreasing the amount of work I can conduct on other projects.

11.    The Censorship Policy has also diminished the quality and quantity of research conducted by others in my field, on which I rely in my own work. Several noncitizen colleagues and collaborators have informed me that they have halted their research on certain topics of shared interest because they fear it will expose them to repercussions under the Policy. Additionally, several international scholars with whom I have previously co-authored research publications have told me that they are unwilling to travel to the United States while the Policy remains in place, decreasing opportunities for in-person discussion and collaboration. These chilling effects on noncitizen scholars harm the overall production of knowledge in the field, including my own.

4

12.     Finally, the Censorship Policy has made it more difficult to engage with noncitizen CITR members and colleagues. As a co-founder of CITR and a member of CITR's Executive Committee, I have been deeply engaged with the organization and its membership since its creation. Because of the Policy, I now have fewer opportunities to engage with CITR members at events in the United States. Several noncitizen CITR members who reside abroad have told me that because they fear they will be targeted under the Policy if they travel to the United States, they will no longer attend events here. I have thus lost meaningful opportunities to engage with noncitizen CITR members and other colleagues in person.

13.     If the Censorship Policy were no longer in place, I would resume certain research and advocacy projects, once again freely engage in public speaking and public advocacy about my work, and publicly associate with noncitizen CITR members and colleagues, including them in my research and advocacy activities and joining them in public speaking engagements, meetings, and other public activities. I would also invite noncitizen students to support my work with Expert Voices Together, the Researcher Support Consortium, and other research projects if the Policy were no longer in place.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on: March 24, 2026

Rebekah Tromble

5