**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COALITION FOR INDEPENDENT
TECHNOLOGY RESEARCH,

      *Plaintiff*,

    v.

MARCO RUBIO, et al,

      *Defendants*.

Civil Action No. 1:26-cv-00815 (JEB)

**BRIEF OF *AMICUS CURIAE* INTEGRITY INSTITUTE**

**INTEREST OF AMICI CURIAE**

Proposed Amicus Integrity Institute is a think tank and membership organization comprising individuals working on trust and safety for social media platforms. Amicus publishes research and analysis on issues relating to online content and problems relating to the social network, and works to support its members through discussion, research, and analysis.

No party's counsel authored this brief, or any part of it. No party's counsel contributed money to fund any part of the preparation or filing of this brief. Amicus files this brief with the consent of the parties.

**ARGUMENT**

Proposed Amicus writes to emphasize that the Censorship Policy enacted and enforced by Defendants targets workers whose expertise in online trust and safety further, rather than undermine, free speech values. Trust and safety professionals work to facilitate the speech of social media users and the effective functioning of social media platforms. By excluding and deporting noncitizens whose work centers on facilitating the effective and ideally equitable operation of speech platforms, Defendants have unconstitutionally created systemic weaknesses for those platforms. In particular, the Censorship Policy discourages individuals from working on trust and safety problems, which weakens the operations of speech platforms and makes it harder for individuals to express themselves on those platforms. Amicus therefore urges this court to grant Plaintiff's motion for a preliminary injunction against the Censorship Policy.

*1. Without the work of trust and safety professionals, social media users could not meaningfully communicate on platforms.* Trust and safety professionals work assiduously to facilitate the speech of the users of the platforms for which they work. Plaintiff describes in detail in its preliminary injunction briefing the operations of social media platforms and how trust and safety professionals serve an essential function in ensuring those platforms can operate from a

1

practical perspective. *See* Plaintiff's Motion for Preliminary Injunction 27–34. Without trust and safety policies and the staff to effectuate those policies, speech platforms could not exist.

Trust and safety policies and workers attempt to balance several interests, both those required by law and those established by best practices and policy decisions. For example, by law, platforms cannot host certain types of content (including some explicit depiction of minors); trust and safety professionals work to ensure that such content is removed from social media platforms. As a matter of content policy, trust and safety teams work to monitor, flag, and remove multiple types of legal but undesirable content. Spam requires constant attention from trust and safety professionals, to avoid the crowding out of speech that users actually want to read, critique, and share. Financial scams risk defrauding users and driving them off the platforms, lest they lose their savings; trust and safety professionals thus must monitor and remove content that may harm users financially.

These examples demonstrate just a few of the reasons that platforms, in their efforts to facilitate speech among users, must employ robust trust and safety teams to operate, and must develop detailed policies to comply with law and serve their users. A well-known recent case involving Pavel Durov, the CEO of Telegram, a messaging app, shows how the expertise of trust and safety professionals in local law is essential for platforms to function. Durov was detained by French authorities for failing to comply with investigations into criminal activity. *See* Bobby Allyn & A Martinez, *CEO of Messaging Service Telegram Detained in France, French Media Report*, NPR (Aug. 25, 2024), https://www.npr.org/2024/08/26/nx-s1-5089265/ceo-of-messaging-service-telegram-detained-in-france-french-media-report. Because trust and safety professionals must ensure the company's adherence to each country's domestic laws, their work serves as essential to the functioning of platforms and the facilitation of individual user speech.

This example is just one of many and shows how central trust and safety operations are to the viability of speech platforms, and why governments should support rather than hinder those teams' work. Defendants' Censorship Policy, rather than facilitating the speech of individuals, impedes the ability of platforms and trust and safety professionals to create online spaces that allow individuals to speak freely and thrive.

2. *Trust and safety professionals work to promote the First Amendment interests of speech platforms.* The Supreme Court has repeatedly emphasized the importance of speech platforms' First Amendment rights. In *Moody v. NetChoice, LLC*, the Court held "it is no job for government to decide what counts as the right balance of private expression—to 'un-bias' what it thinks biased, rather than to leave such judgments to speakers and their audiences. That principle works for social-media platforms as it does for others." *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024). In *TikTok v. Garland*, the Court recognized that a ban on TikTok's operations would implicate some of the company's First Amendment interests. *TikTok v. Garland*, 604 U.S. 56, 68–69 ("We have recognized a number of these asserted First Amendment interests [including content moderation].… an effective ban on a social media platform with 170 million U.S. users certainly burdens those users' expressive activity in a non-trivial way."). These cases show how the Court has contextualized the First Amendment interests of social media platforms and their users. The speech environments that private social media companies create, moderate, and facilitate operate under the protection of the First Amendment; as the Court has emphasized, social media "can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). Private platforms form the central space for such discussion.

Amicus does not contend that Defendants' Censorship Policy directly implicates the First Amendment rights of social media platforms or their users as set forth in these cases. Rather, proposed amicus merely seeks to highlight how the platforms and users have First Amendment interests, and that trust and safety programs work to promote and protect those interests. Far from operating as a zone of random censorship, social media companies must make choices regarding the specific ethos of the platform they operate and the users that they serve.

As the Supreme Court observed in *NetChoice, LLC*, "the major social-media platforms are in the business, when curating their feeds, of combining 'multifarious voices' to create a distinctive expressive offering." *NetChoice, LLC*, 603 U.S. at 738. Those distinct offerings take a variety of forms. Instagram does not permit nudity; trust and safety professionals must work to ensure that the content ecosystem operates according to the platform's content design. Grindr, specifically designed for LGBTQ+ users, would need to remove users who send homophobic messages to other users. Fundamentally, no individual or corporation would ever start a social media company if they could not moderate content or remove obstreperous users antithetical to their values or content guidelines. In doing so, social media companies and their trust and safety staff further the free expression goals that the First Amendment promotes.

Finally, foreign trust and safety workers perform an essential role for social media platforms and their users. Because most social media platforms aim to have a global reach, both for commercial reasons and to facilitate connections among individuals worldwide, those platforms must employ trust and safety professionals from many countries. Operating a platform in a particular country requires connections to that country's government, to civil society, to content creators within that country, and to local advertisers. Defendant's Censorship Policy disincentivizes the growth of trust and safety professionals in foreign countries by making it more

difficult for such individuals to travel to the United States. And by constraining the effective growth and functioning of trust and safety teams abroad, the Censorship Policy undermines the platforms themselves and makes it less likely that platforms will exist to facilitate the speech of Americans and individuals abroad.

## CONCLUSION

For the foregoing reasons, amicus respectfully urges this court to grant Plaintiff's motion for a preliminary injunction.

Dated: April 10, 2026                                        Respectfully submitted,

/s/ *Kathryn Ali*
Kathryn Ali (D.C. Bar No. 994633)
ALI & LOCKWOOD LLP
501 H Street NE, Suite 200
Washington, D.C. 20002
(202) 651-2475
katie.ali@alilockwood.com

G.S. Hans (*pro hac vice forthcoming*)
CORNELL LAW SCHOOL
Myron Taylor Hall
Ithaca, N.Y. 14853
(607) 254-5994
gshans@cornell.edu

*Counsel for Amicus Curiae*

5