**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| COALITION FOR INDEPENDENT TECHNOLOGY RESEARCH, <br><br> Plaintiff, <br><br> v. <br><br> MARCO RUBIO, in his official capacity as Secretary of State; KRISTI NOEM, in her official capacity as Secretary of Homeland Security, and PAMELA BONDI, in her official capacity as Attorney General of the United States, <br><br> Defendants. | Case No. 1:26-cv-00815-JEB |

**BRIEF OF *AMICUS CURIAE* ELECTRONIC FRONTIER FOUNDATION
IN SUPPORT OF PLAINTIFF'S MOTION FOR SECTION 705 STAY AND
PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ ii

INTEREST OF AMICUS CURIAE ...............................................................................1

INTRODUCTION .........................................................................................................2

ARGUMENT .................................................................................................................3

    I.    CONTENT MODERATION HAS BEEN INTEGRAL TO ONLINE
        FORUMS, AND CONTROVERSIAL, FOR DECADES ...............................3

        A.    Content Moderation Has Been a Common Practice for Decades ........................3

        B.    Interactive Online Services Have a Wide Range of Complicated and
            Often Bespoke Content Policies. ..........................................................5

        C.    Content Moderation Controversies are Widespread and Cross Many
            Ideologies ...............................................................................10

    II.    CIVIL SOCIETY EXPERTS PLAY AN IMPORTANT ROLE IN
         PROMOTING TRANSPARENCY AND INTEGRITY IN CONTENT
         MODERATION POLICIES AND PRACTICES ........................................14

    III.    GOVERNMENT HAS A SHARPLY MORE LIMITED ROLE IN THE
          PLATFORMS' CONTENT MODERATION POLICIES ...........................20

CONCLUSION...............................................................................................20

## TABLE OF AUTHORITIES

**Cases**

*Moody v. Netchoice*,
603 U.S. 707 (2024)..................................................................................................... 1, 5, 20

*National Rifle Association v. Vullo*,
602 U.S. 175 (2024)........................................................................................................... 20

*Netchoice v. Attorney General, Florida*,
34 F.4th 1196 (11th Cir. 2022) ........................................................................................ 1, 5

*Prager Univ. v Google*,
951 F.3d 991 (9th Cir. 2020) ............................................................................................... 1

**Other Authorities**

*2025 RDR Index: Big Tech Edition*, Ranking Digital Rights, (2025)........................................... 17

*About,* Gettr ................................................................................................................................. 8

Agustina Del Campo, *Moderate globally impact locally: Social media in Latin America,
caught between a rock and a hard place* (Sept. 18, 2020) ........................................... 15

Aisha Down, *Meta shuts down global accounts linked to abortion advice and queer
content*, The Guardian, (Dec. 11, 2025).................................................................... 12

Allison R. Donahue, *Facebook restores Planned Parenthood post about medication
abortion*, Michigan Advance, (Aug. 23, 2022)........................................................... 11

Allison R. Donahue, *Facebook takes down Planned Parenthood post about medication
Abortion*, Michigan Advance, (Aug. 22, 2022) .......................................................... 11

Ángel Díaz and Laura Hecht-Felella, *Double Standards in Social Media Content
Moderation*, brennancenter.org, (Aug. 4, 2021) ...................................................... 12

Associated Press, *Hate speech in Myanmar continues to thrive on Facebook*,
The Independent (Nov. 18, 2021) ............................................................................... 19

Beatriz Kira, *Regulatory intermediaries in content moderation*,
Internet Policy Review, 14(1) (2025) ........................................................................ 17

Brenda Dvoskin, *Human Rights Due Diligence of Meta's Impacts in Israel and Palestine*,
CETyS........................................................................................................................ 19

Carolina Are, *Flagging as a silencing tool: Exploring the relationship between
de-platforming of sex and online abuse on Instagram and TikTok*,
New Media & Society (2025), Vol. 27(6) .................................................................. 13

CELE, *Fake news on the internet: the strategy to battle misinformation* (Dec. 2017) ............... 15

*Code of Conduct*, The High Road .......................................................................................... 7

*Comment of Electronic Frontier Foundation to Oversight Board case 2022-007-IG-MR*,
    Electronic Frontier Foundation .......................................................................... 17

*Community Guidelines*, Peanut ........................................................................................... 6

*Community Guidelines*, Pinterest ....................................................................................... 6

*Content Creators FAQs*, Gettr .......................................................................................... 9

Content Moderation and Freedom of Expression: Bridging the Gap between Social
    Media and Local Civil Society, Article 19, (June 2022) ......................................... 14

Corynne McSherry & Jillian C. York, *Facebook's Policy Shift on Politicians Is a
    Welcome Step*, EFF Deeplinks, (June 7, 2021) ...................................................... 15

Danielle Blunt et al., *Posting Into The Void*, Hacking//Hustling, (Oct. 2020) ............................ 13

Digital Trust & Safety Partnership, dtspartnership.org ....................................................... 5

Elaine Veili, *In NYC Protest, Activists Tell Meta to Stop Deleting Art*, Hyperallergic,
    (June 16, 2023) ...................................................................................................... 15

Eric Goldman, *Content Moderation Remedies*, 28 Mich. Tech. L. Rev. 1 (2021) ...................... 11

*GodTube Community Guidelines* ......................................................................................... 7

Hibaq Farah, *Pro-Palestinian Instagram account locked by Meta for 'security reasons'*,
    The Guardian, (Oct. 26, 2023) ............................................................................... 13

*How Communities Are Safeguarded?*, HealthUnlocked .................................................... 8

*Human Rights Due Diligence of Meta's Impacts in Israel and Palestine*, BSR,
    (Sept. 22, 2022) ..................................................................................................... 19

Jennifer M. Urban, Joe Karaganis, and Brianna Schofield, *Notice and Takedown
    in Everyday Practice* (March 22, 2017), UC Berkeley Public Law Research
    Paper No. 2755628 ................................................................................................ 4

Jessica Anderson et al., *Online Censorship in Context: Insights from Crowdsourced
    Data on Social Media Censorship*, (2016) ............................................................. 16

Jillian C. York & David Greene, *Facebook's Latest Proposed Policy Change
    Exemplifies the Trouble With Moderating Speech at Scale*, EFF Deeplinks,
    (Feb. 4, 2021) ....................................................................................................... 16

Jillian C. York & David Greene, *Facebook's Secret "Dangerous Organizations and Individuals" List Creates Problems for the Company—and Its Users*, EFF Deeplinks (Dec. 1, 2021) ....................................................................... 16

Jillian C. York & David Greene, *How to Put COVID-19 Content Moderation Into Context*, Brookings' TechStream (May 21, 2020) .................................. 3, 4

Jillian C. York et al, *Twitter Has a New Owner. Here's What He Should Do*, EFF Deeplinks, (Apr. 25, 2022) ............................................................... 15

Jillian C. York, *Blunt Policies and Secretive Enforcement Mechanisms: LGBTQ+ and Sexual Health on the Corporate Web*, EFF Deeplinks, (Oct. 24, 2018) ........................... 13

Jillian C. York, *Companies Must Provide Accurate and Transparent Information to Users When Posts are Removed*, EFF Deeplinks, (Sept. 19, 2025) ........................... 16

Jillian C. York, *EFF and ECNL's Comment to the Meta Oversight Board on the Term 'Shaheed'*, EFF Deeplinks, (Apr. 24, 2023) ....................................... 17

Jillian C. York, *EFF's Comment to the Meta Oversight Board on United States Posts Discussing Abortion*, EFF Deeplinks, (July 10, 2023) ........................... 17

Jillian C. York, *Meta Oversight Board's Latest Policy Opinion a Step in the Right Direction*, EFF Deeplinks (March 26, 2024) ............................................. 18

Jillian C. York, *Silicon Values: The Future of Free Speech Under Surveillance Capitalism* (Verso 2021) ......................................................... 3, 10, 11

Jillian C. York, *The Global Suppression of Online LGBTQ+ Speech Continues*, EFF Deeplinks, (June 27, 2024) .......................................................... 15

Joan Barata, *The Decisions of the Oversight Board from the Perspective of International Human Rights Law*, (Oct. 2022) ......................................... 18

Karen Gullo & Jillian C. York, *Platforms Must Stop Unjustified Takedowns of Posts By and About Palestinians*, EFF Deeplinks, (Nov. 8, 2023) ...................... 13, 16

Kate Klonick, The New Governors: The People, Rules, and Processes Governing Online Speech, 131 Harv. L. Rev. 1598 (2018) ........................................ 4

Konstantinos Komaitis & David Greene, *Fact-Checking, COVID-19 Misinformation, and the British Medical Journal*, EFF Deeplinks, (Jan. 19, 2022) ................... 16

Megan Farokhmanesh, *YouTube Is Still Restricting and Demonetizing LGBT Videos—and Adding Anti-LGBT Ads to Some*, The Verge, (June 4, 2018) .............. 13

Megan McCluskey, *These TikTok Creators Say They're Still Being Suppressed for Posting Black Lives Matter Content*, Time, (July 22, 2020) ...................... 12

Mike Masnick, *Masnick's Impossibility Theorem: Content Moderation At Scale Is Impossible To Do Well*, Techdirt, (Nov. 20, 2019)..................................................... 10

*Moderator Code of Conduct*, Reddit ........................................................................ 10

Mukund Rathi, *Amidst Invasion of Ukraine, Platforms Continue to Erase Critical War Crimes Documentation*, EFF Deeplinks, (Apr. 27, 2022) ................................. 15

Nicola Palladino, Dennis Redeker, Edoardo Celeste, *The platform governance triangle: Conceptualising the informal regulation of online content,* Internet Policy Review 8 (June 2019).......................................................................................... 14

Olivia-Anne Cleary, *Facebook Has Banned Awareness Posts That Include the Words 'Period,' 'Vulva' and 'Clitoris' for Being Too Sexual*, Glamour, (June 9, 2023).............................................................................................................. 12

Paige Collings, *EFF's Comment to the Meta Oversight Board on Polish Anti-Trans Facebook Post*, EFF Deeplinks (Sept. 27, 2023)...................................................... 17

*Platform Policies*, Quora ........................................................................................... 8

*Protecting Media Freedom Online: Old Challenges, New Solutions*, Global Forum for Media Development (Feb. 10. 2025) .................................................................. 18

Ravelry, Ravelry.com .................................................................................................. 5

*Reach Over 400 Million Monthly Unique Visitors on Quora*, Quora for Business........................ 8

*Reddiquette*, Reddit.................................................................................................... 10

Robert Gorwa, *The platform governance triangle: Conceptualising the informal regulation of online content*. Internet Policy Review 8, 2 (June 2019) ................... 14

Robyn Caplan, *Networked platform governance: The construction of the democratic platform*, International Journal of Communication (2023)................... 17

*Role of Administrators and Moderators on Discord*, Discord..................................... 10

Santa Clara Principles, santaclaraprinciples.org ..................................................... 18

Sarah T. Roberts, Behind the Screen: Content Moderation in the Shadows of Social Media (Yale University Press 2019)................................................................ 4

*Social Media Councils*, Article 19 ............................................................................ 19

*Strava Community Standards*, Strava ........................................................................ 5

Taylor Wofford, *Twitter Was Flagging Tweets Including the Word "Queer" as Potentially "Offensive Content*, Mic, (June 22, 2017) ............................................ 13

*Terms and Conditions,* Shabbat.com ................................................................................ 7

*Terms of Use Agreement*, Petzbe ................................................................................... 7

*Terms of use*, Gettr .......................................................................................................... 9

*The Rules*, SmokingMeatForums.com ............................................................................. 5

TOSsed Out, Electronic Frontier Foundation .............................................................. 16

Trans Safety Network (@trans_safety), X .................................................................... 13

Trust & Safety Professional Association, https://www.tspa.org/ .................................... 5

*Truth Social Terms of Service*, Truth Social .................................................................. 9

Universidad de Chile, Informe revela alcance de las vulneraciones a la libertad
    de expresión durante el estallido social, (Jan. 21, 2020) ........................................... 15

Vanessa Pappas, *A Message to Our Black Community*, TikTok, (June 1, 2020) ......................... 12

*Website Terms and Conditions of Use and Agency Agreement*, Rumble ....................................... 9

*What's Petzbe*, Petzbe ....................................................................................................... 7

*Who has Your Back: Censorship Edition*, Electronic Frontier Foundation,
    (June 12, 2019) ....................................................................................................... 17

*YouTube restores Amy Greenfield's videos*, National Coalition Against Censorship,
    (Feb. 22, 2010) ....................................................................................................... 18

**INTEREST OF AMICUS CURIAE**[1]

The Electronic Frontier Foundation (EFF) is a member-supported, nonprofit civil liberties organization founded in 1990 to defend civil liberties in the digital world. Social media content moderation is one of the many issues in which EFF has developed expertise and it has applied that expertise both in the courtroom and in numerous U.S.-based and international civil society forums. EFF has frequently filed influential amicus briefs in the U.S. Supreme Court and in various federal and state appellate courts in cases arising from content moderation, dating back to its amicus brief filed in the Ninth Circuit in 2018 in *Prager Univ. v Google*, 951 F.3d 991 (9th Cir. 2020). The Eleventh Circuit used examples from EFF's amicus brief submitted in *Netchoice v. Attorney General, Florida*, 34 F.4th 1196, 1213 (11th Cir. 2022), *aff'd in par, rev'd in part by Moody v. Netchoice*, 603 U.S. 707 (2024). EFF has also written extensively in non-legal forums about the human rights implications of content moderation. EFF is among the co-authors of the Santa Clara Principles, www.santaclaraprinciples.org, and was among the organizations that surveyed internet users around the world about their experiences with content moderation. EFF also maintains the webpage Tracking Global Online Censorship, www.onlinecensorship.org, which tracks the impact of content moderation on freedom of expression worldwide, and an issue page on Corporate Speech Controls, www.eff.org/issues/corporate-speech-controls, in which it indexes its writings on the topic.

---

[1] No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than the *amicus curiae* or their counsel made a monetary contribution intended to fund the brief's preparation or submission. All parties consent to *amicus* filing of this brief.

1

**INTRODUCTION**

Content moderation, the process by which social media platforms and similar online forums edit and curate user-generated content, has been a common practice since these services were first established. It was by no means created by the European Union, or any of the plaintiffs to this action, or any of the individuals or organization the U.S. government seeks to punish. It is a global phenomenon and was not, contrary to the position of the current U.S. administration, created to suppress, or primarily focused on suppressing, the speech of conservative U.S. speakers.

Content moderation is also a fraught and highly imperfect process that often frustrates both those trying to publish and their intended audiences, as well as those audience members who are served speech they hadn't expected and did not want to receive or did not want others to receive. Content moderation at the scale practiced by even a small platform is impossible to do perfectly and nearly impossible to do well. High quality content moderation typically requires global cultural competence and wide-ranging subject matter expertise.

As a result, civil society, including academics, researchers, and advocacy organizations, and a platform's community of users all play a vital role in improving content moderation systems, in educating the public about its many shortcomings, and in advocating for change. Even governments may have a role, though a decidedly limited one.

This case is about preserving the right to offer this external expertise free from government retaliation.

This Court should grant the preliminary injunction to preserve the status quo where people exercise their rights to consult with and complain to platforms to assist their content moderation processes, and to inform the public.

2

**ARGUMENT**

**I.      Content Moderation Has Been Integral to Online Forums, and Controversial, for Decades**

      **A.      Content Moderation Has Been a Common Practice for Decades**

While unmoderated forums remain available on the Internet, most social media networks and online interactive forums always have curated their users' speech.

Content moderation is nearly as old as the internet itself. Users of early bulletin board systems and web forums developed and enforced rules governing acceptable speech, often through a combination of community norms and technical controls, such as flagging. Early content moderation relied solely on user reporting.[2] Moderation was primarily conducted by volunteers, typically participants in each community.

Online services, at least from their point of mass adoption, rarely allowed all legal speech published on their sites to remain there. For example, most platforms for user speech removed legal, non-obscene sexual content, speech that enjoys First Amendment protection.[3]

The passage of the Digital Millennium Copyright Act (DMCA) in 1998 accelerated and formalized emerging content moderation practices by introducing a notice-and-takedown regime for alleged copyright infringement. This regime gave legal significance to user notice and incentivized platforms to create a process to review and assess such notices (or otherwise to

---

[2] Jillian C. York, *Silicon Values: The Future of Free Speech Under Surveillance Capitalism*, 25-27 (Verso 2021).

[3] Jillian C. York & David Greene, *How to Put COVID-19 Content Moderation Into Context*, Brookings' TechStream (May 21, 2020), https://www.brookings.edu/articles/how-to-put-covid-19-content-moderation-into-context/.

simply respond to every notice by depublishing the speech).[4] This, along with the growth of commercial social media in the 2000s, forced many companies to institutionalize moderation workflows.

Large-scale, outsourced content moderation emerged in the early 2000s.[5] The rise of large-scale social media platforms and the growth of their user bases required companies to develop written community standards and build internal teams dedicated to applying those standards. These systems evolved incrementally, often in response to public controversy, media scrutiny, or advertiser concerns.[6]

Today, almost every service that allows for user-generated speech has community standards or content guidelines by which they limit the users' speech that may be posted to their sites, and a trust and safety team to administer the standards. Commercial content moderation now may involve large teams as well as automated technologies, and moderation may take place before content is published or after it has been uploaded.[7] The moderation process may be triggered as the result of automated detection, user flagging or reporting, or following a request from an external party, such as a government or copyright holder. There are now trust and safety professional trade associations and affinity groups for both companies and individual

---

[4]Jennifer M. Urban, Joe Karaganis, and Brianna Schofield, *Notice and Takedown in Everyday Practice* (March 22, 2017), UC Berkeley Public Law Research Paper No. 2755628, available at SSRN: https://ssrn.com/abstract=2755628 or http://dx.doi.org/10.2139/ssrn.2755628.

[5] York & Greene, *supra* n.3.

[6] Kate Klonick, *The New Governors: The People, Rules, and Processes Governing Online Speech*, 131 Harv. L. Rev. 1598, 1618 (2018).

[7] Sarah T. Roberts, Behind the Screen: Content Moderation in the Shadows of Social Media 26-27 (Yale University Press 2019).

professionals,[8] and copious academic research.[9]

### B.  Interactive Online Services Have a Wide Range of Complicated and Often Bespoke Content Policies.

It is now well established that social media platforms and similar online services have a First Amendment right to curate and edit the speech created and posted by users to their sites. *See Moody v. Netchoice, LLC*, 603 U.S. 707, 731-40 (2024). No platform can be required to publish, recommend, amplify, or highlight any specific post by any user.

But even before that decision, the internet was full of both general purpose and highly specialized online platforms. Indeed, the vast majority of social media sites, large and small, are not designed for all speech, topics, or users; most are specialized services with a particular subject matter focus or target-user demographic.

People seeking out online services catering to their interests and communities can find a wide range of sites, from Strava, a social network for athletes,[10] to Ravelry, a social media site focused on knitting.[11] People can choose between Vegan Forum, s*ee NetChoice v. Attorney General, Florida,* 34 F.4th 1196, 1213 (11th Cir. 2022), *aff'd in par, rev'd in part by Moody*, 603 U.S. 707, and SmokingMeatsForums.com, a "community of barbecue and outdoor cooking enthusiasts dedicated to smoking meat."[12]

And each site has its own peculiar and intricate set of community standards that reflects

---

[8]*See, e.g.,* Digital Trust & Safety Partnership, https://dtspartnership.org/ (last visited April 8, 2026); Trust & Safety Professional Association, https://www.tspa.org/ (last visited April 8, 2026); Trust & Safety Foundation, https://www.trustandsafetyfoundation.org/ (last visited April 8, 2026).

[9]Just a small sample of which is cited throughout this brief.

[10] *Strava Community Standards*, Strava, https://www.strava.com/community-standards (last visited March 18, 2026).

[11] Ravelry, https://www.ravelry.com (last visited March 18, 2026).

[12] *The Rules*, SmokingMeatForums.com, https://www.smokingmeatforums.com/help/rules/ (last visited March 18, 2026).

its subject matter focus, targeted audience, or its societal or political values.

Pinterest, a site designed to visually inspire creative projects, has "community guidelines" that "outline what we do and don't allow on Pinterest."[13] Under these guidelines, Pinterest reserves the right to remove several categories of speech: "Adult content," "Exploitation," "Hateful activities," "Misinformation," "Harassment and criticism," "Private information," "Self-injury and harmful behavior," "Graphic violence and threats," "Violent actors," "Dangerous goods and activities," "Harmful or deceptive products and practices," and "Impersonation." Pinterest has special rules for comments users post on other users' "Pins," including a ban on "Irrelevant or non-purposeful material."[14]

Peanut, a social media site aiming to be a "safe, inclusive space for women" navigating fertility, pregnancy, and motherhood similarly prohibits its millions of users from posting any content that attacks, threatens or "otherwise dehumanizes an individual or group" based on race, ethnicity religion, age, socioeconomic status, or disability, among other categories.[15] Misinformation, including, specifically "misinformation about vaccines," "bullying," and "nudity, pornography, sexually explicit content or sexual solicitation" are also barred.[16]

Petzbe, which describes itself as "a social media app for pet parents and pet families of all ages," prohibits "any content that is offensive, abusive, libelous, defamatory, obscene, racist, sexually explicit, ethnically or culturally offensive, indecent, that promotes violence, terrorism, or illegal acts, incites hatred on grounds of race, gender, religion or sexual orientation, or is

---

[13] *Community Guidelines*, Pinterest, https://policy.pinterest.com/en/community-guidelines (last visited March 18, 2026).

[14] *Id.*

[15] *Community Guidelines*, Peanut, https://www.peanut-app.io/community-guidelines (last visited April 8, 2026).

[16] *Id.*

otherwise objectionable in Petzbe's sole and reasonable discretion."[17]

The High Road, a firearms discussion forum, requires that all posts be "related to firearms or 'Right to Keep and Bear Arms' (RKBA) issues" and explicitly prohibits users from engaging in "discussions relating to the preparation for possible societal breakdown" or "foreign invasion."[18]

These community standards may reflect a wide range of ideological and religious views. GodTube, a Christian video site, prohibits users from "promot[ing]" any "beliefs or teachings contrary to those of Christianity as articulated by the historic creeds…"[19]; while Shabbat.com, "the world's largest Jewish social network," prohibits users from posting any content that is "missionizing, Christian or otherwise."[20] As the Eleventh Circuit explained, "On the right, ProAmericaOnly promises 'No Censorship | No Shadow Bans | No BS | NO LIBERALS.' And on the left, The Democratic Hub says that its "online community is for liberals, progressives, moderates, independent[s] and anyone who has a favorable opinion of Democrats and/or liberal political views or is critical of Republican ideology." *See NetChoice*, 34 F.4th at 1214.

 Some social media sites have special concerns for ensuring that the information they publish is accurate. For example, HealthUnlocked, a social media site for health information, requires users to agree that their contributions to the site must not "promote false cures for illnesses, anti-vaccination advice, manipulate contents to mislead users by distorting the truth of

---

[17] *What's Petzbe*, Petzbe, https://petzbe.com/; *Terms of Use Agreement*, Petzbe, https://petzbe.com/terms-of-use (each last visited March 30, 2026).

[18] *Code of Conduct*, The High Road, https://www.thehighroad.org/index.php?pages/code-of-conduct/ (last visited March 18, 2026).

[19] *GodTube Community Guidelines*, GodTube, https://www.godtube.com/terms-of-use.html (last visited March 18, 2026).

[20] *Terms and Conditions,* Shabbat.com,  *https://www.shabbat.com/terms* (last visited March 18, 2026).

events, misinformation or post content that originates from disinformation campaigns" nor "post any inaccurate or misleading information, or opinions which you do not genuinely hold."[21] The site also bans posts that are "vulgar," "duplicitous," "bullying," "inflammatory," or anything "likely to harass, degrade, upset, shame, embarrass or alarm any other person."[22]

Even general purpose social networks, those covering a wide variety of subject matters and users, typically have editorial policies by which they will be required to make numerous editorial and curatorial decisions.

Quora sees itself as a site where any user can ask questions "and get answers from people who have been there and done that" and as a "refuge from misinformation and incendiary arguments." [23] Quora thus prohibits "posting irrelevant answers or comments"; "targeted insults or profanity directed at private individuals based on personal attributes, such as physical appearance"; "hate speech," including "content that dehumanizes or calls for violence, exclusion, or segregation of protected classes" and Holocaust and Armenian Genocide denial; and "encouraging, glorifying, or promoting" harmful activities such as "self-harm (including eating disorders) and animal cruelty."[24]

Gettr, a "a social media platform built on the foundation of freedom of opinion and expression,'"[25] also does not allow content that "disparages victims of violent tragedies, that depicts or threatens willful physical harm, or that wishes death or grievous injury on an

---

[21] *Terms of Use*, https://support.healthunlocked.com/article/147-terms. HealthUnlocked, (last visited April 8, 2026).

[22] *Id.*

[23] *Reach Over 400 Million Monthly Unique Visitors on Quora*, Quora for Business, https://business.quora.com/resources/reach-over-400-million-monthly-unique-visitors-on-quora/; (last visited March 18, 2026).

[24] *Platform Policies*, Quora, https://help.quora.com/hc/en-us/articles/360000470706-Platform-Policies (last updated June 2023).

[25] *About,* Gettr, https://about.gettr.com/ (last visited March 30, 2026).

individual," "content that involves the use of racial or religious epithets" or "promotes segregation of, individuals or groups merely on the basis of race, color, ethnicity, national origin, ancestry, religion, gender or sexual orientation," "depicts torture, violent or graphic deaths or accidents, dismembered, mutilated, charred, or burned human remains, or gore in which an open wound or injury is the *core focus*," and, among others, "content depicting, promoting, normalizing, encouraging, or glorifying activities that promote suicide or self-harm." Gettr also asks its users to "not excessively promote gambling activity."[26]

Rumble, a video sharing platform, prohibits both videos and comments on a number of criteria, including a bar on content that is "hateful, anti-semitic, racist or threatening" or "Promotes, supports or incites individuals and/or groups which engage in violence or unlawful acts, including but not limited to Antifa groups and persons affiliated with Antifa, the KKK and white supremacist groups and or persons affiliated with these groups."[27]

Truth Social, President Trump's social media platform, requires those posting speech to the site to warrant that "your Contributions are not false, inaccurate, or misleading" or "filthy" and bans "Sexually suggestive (explicit or vague) statements, texts or phrases." [28]

Finally, many sites leave many of the moderation decisions up to the users themselves, a practice known as "community moderation," with Reddit and Discord among its most popular adopters. Reddit users manage and create thousands of communities, called subreddits. Although Reddit has an overriding content policy, a moderator makes the decisions within each

---

[26]*Community Guidelines*, Gettr, https://support.gettr.com/en/articles/9937971-gettr-community-guidelines; *Terms of use*, Gettr, https://gettr.com/terms (each last visited March 18, 2026).

[27] *Website Terms and Conditions of Use and Agency Agreement*, Rumble, https://rumble.com/s/terms (last visited March 30, 2026).

[28] *Truth Social Terms of Service*, Truth Social, https://help.truthsocial.com/legal/terms-of-service/ (visited March 25, 2026).

community as guided by Reddit's "Moderator Code of Conduct."[29] Discord employs a similar model.[30] Each site thereby empowers some users to remove and down-rank other users' speech if that speech is against that community's rules.[31]

### C.    Content Moderation Controversies are Widespread and Cross Many Ideologies

For most sites, content moderation is accomplished by a complex, hybrid system of moderation that combines reactive and proactive measures, human judgment and automated filtering, along with both internal and external sources of authority. This system places private platforms in a central role of determining the boundaries of online expression, raising ongoing questions about transparency, accountability, and the protection of fundamental rights in digital spaces.[32]

Given the various and often complex rules and procedures, content moderation decisions are often controversial. As is often said, content moderation at scale is impossible to do perfectly, and nearly impossible to do well.[33] Even when using a set of precise rules or carefully articulated community standards, moderated platforms often struggle to distinguish between speech that is and is not permitted. Every online forum for user speech, not just the dominant social media

---

[29] *Moderator Code of Conduct*, Reddit, https://www.redditinc.com/policies/moderator-code-of-conduct (effective Sep. 25, 2023).

[30] *Role of Administrators and Moderators on Discord*, Discord, https://discord.com/safety/360044103531-role-of-administrators-and-moderators-on-discord (last visited March 18, 2026).

[31] *See, e.g., Reddiquette*, Reddit, https://reddit.zendesk.com/hc/en-us/articles/205926439-Reddiquette (last visited March 18, 2026).

[32] York, Silicon Values, supra note 2.

[33] *See, e.g.*, Mike Masnick*, Masnick's Impossibility Theorem: Content Moderation At Scale Is Impossible To Do Well*, Techdirt, (Nov. 20, 2019), https://www.techdirt.com/articles/20191111/23032743367/masnicks-impossibility-theorem-content-moderation-scale-is-impossible-to-do-well.shtml.

platforms, grapples with this problem.  Some user speech is rejected, hidden, labeled, demonetized, or otherwise negatively moderated; other speech is promoted or recommended.[34] This may occur because the user's speech clearly strayed from the site's rules. Or it may have been a close editorial call about which reasonable minds could differ. Or it may just be a mistake.

This aspect of content moderation is often frustrating, angering, or perplexing to the people who use these services. People may believe that a platform is not adequately recommending their posts to other users or otherwise spotlighting their posts or their account as the user thinks appropriate.

As a result, controversies about content moderation decisions abound worldwide. This is not a new problem; content moderation controversies date back to at least 2007, spanning the globe and the political spectrum. [35]

For example, in 2022, Facebook restricted a post from Planned Parenthood of Michigan that shared an article regarding the legal availability of abortion pills online so that it was visible to only the administrators of the group to which it was posted. Facebook claimed this was a mistake, and restored the post, and affirmed that discussions about the affordability and availability of pharmaceuticals were permitted, though "content that attempts to buy, sell, trade, gift, request or donate pharmaceuticals is not allowed."[36] Facebook also recently faced renewed

---

[34] Eric Goldman, *Content Moderation Remedies*, 28 Mich. Tech. L. Rev. 1 (2021).

[35] York, Silicon Values, *supra* note 2, at 25-27.

[36] Allison R. Donahue, *Facebook takes down Planned Parenthood post about medication abortion*, Michigan Advance, (Aug. 22, 2022), https://michiganadvance.com/blog/facebook-takes-down-planned-parenthood-post-about-medication-abortion/; Allison R. Donahue, *Facebook restores Planned Parenthood post about medication abortion*, Michigan Advance, (Aug. 23, 2022), https://michiganadvance.com/briefs/facebook-restores-planned-parenthood-post-about-abortion-medication/.

criticism over the negative moderation of posts containing words pertinent to feminine hygiene, including "vulva" and "endometriosis."[37]

Marginalized communities are particularly vulnerable to overzealous content moderation. Black creators have documented how their Black Lives Matter content was suppressed on TikTok; TikTok apologized and blamed it on a bug, but incidents persisted.[38] A 2021 report documented that the viewpoints of communities of color, women, LGBTQ+ persons, and religious minorities are subject to over-enforcement of social media community standards, with their posts subject more frequently to mass takedowns as compared to more subtle forms of content moderation, such as warning labels and temporary demonetization, more commonly applied to the viewpoints of dominant communities.[39] In 2025, accounts belonging to more than 50 abortion access providers, queer groups, and reproductive health organizations were removed across Meta platforms.[40] EFF has documented instances where sexual health content aimed at

---

[37] Olivia-Anne Cleary, *Facebook Has Banned Awareness Posts That Include the Words 'Period,' 'Vulva' and 'Clitoris' for Being Too Sexual*, Glamour, (June 9, 2023), https://www.glamourmagazine.co.uk/article/facebook-bans-bodyform-posts-with-words-period-vulva-clitoris.

[38] Megan McCluskey, *These TikTok Creators Say They're Still Being Suppressed for Posting Black Lives Matter Content*, Time, (July 22, 2020), https://time.com/5863350/tiktok-black-creators/; Vanessa Pappas, *A Message to Our Black Community*, TikTok, (June 1, 2020), https://newsroom.tiktok.com/en-us/a-message-to-our-black-community.

[39] Ángel Díaz and Laura Hecht-Felella*, Double Standards in Social Media Content Moderation*, (Aug. 4, 2021), https://www.brennancenter.org/our-work/research-reports/double-standards-social-media-content-moderation.

[40] Aisha Down, *Meta shuts down global accounts linked to abortion advice and queer content*, The Guardian, (Dec. 11, 2025), https://www.theguardian.com/global-development/2025/dec/11/meta-shuts-down-global-accounts-linked-to-abortion-advice-and-queer-content.

LGBTQ+ audiences is treated differently from that directed at heterosexual audiences.[41] In 2023, the Trans Safety Network reported finding that the words "trans," "queer," "lesbian" and "bisexual" were downranked on X and not shown in direct message previews.[42] This finding recalls previous incidents when users discovered that Twitter had marked tweets containing the word "queer" as offensive[43] and YouTube was accused of restricting and demonetizing LGBTQ+ content.[44] Sex worker advocates are routinely shadow banned and flagged by malicious actors across a variety of social media platforms.[45]

Palestinian rights advocates have complained of unfair and biased content moderation against their views before and during the current Israel-Gaza conflict, including the removal of the Palestinian flag emoji and the Let's Talk Palestine and eye.on.palestine accounts from Instagram.[46]

---

[41] Jillian C. York, *Blunt Policies and Secretive Enforcement Mechanisms: LGBTQ+ and Sexual Health on the Corporate Web*, EFF Deeplinks, (Oct. 24, 2018), https://www.eff.org/deeplinks/2018/10/blunt-policies-and-secretive-enforcement-mechanisms-lgbtq-and-sexual-health.

[42] Trans Safety Network (@trans_safety), X (Apr. 1, 2023, 4:11 AM), https://twitter.com/trans_safety/status/1642122617594212353.

[43] Taylor Wofford, *Twitter Was Flagging Tweets Including the Word "Queer" as Potentially "Offensive Content*, Mic, (June 22, 2017), https://www.mic.com/articles/180601/twitter-was-flagging-tweets-including-the-word-queer-as-potentially-offensive-content.

[44] Megan Farokhmanesh, *YouTube Is Still Restricting and Demonetizing LGBT Videos—and Adding Anti-LGBT Ads to Some*, The Verge, (June 4, 2018), https://www.theverge.com/2018/6/4/17424472/youtube-lgbt-domentization-ads-alogrithm.

[45] *See* Danielle Blunt et al., *Posting Into The Void*, Hacking//Hustling, (Oct. 2020), https://hackinghustling.org/wp-content/uploads/2020/09/Posting-Into-the-Void.pdf; Carolina Are, *Flagging as a silencing tool: Exploring the relationship between de-platforming of sex and online abuse on Instagram and TikTok*, New Media & Society (2025), Vol. 27(6) 3577–3595.

[46] Hibaq Farah, *Pro-Palestinian Instagram account locked by Meta for 'security reasons'*, The Guardian, (Oct. 26, 2023), https://www.theguardian.com/technology/2023/oct/26/pro-palestinian-instagram-account-locked-by-meta-for-security-reasons; Karen Gullo & Jillian C. York, *Platforms Must Stop Unjustified Takedowns of Posts By and About Palestinians*, EFF Deeplinks, (Nov. 8, 2023), https://www.eff.org/deeplinks/2023/11/platforms-must-stop-unjustified-takedowns-posts-and-about-palestinians.

II.    **Civil Society Experts Play an Important Role in Promoting Transparency and Integrity in Content Moderation Policies and Practices**

Against this backdrop, civil society experts—NGOs, academics, and technical experts—can play an important role as content moderation watchdogs, publicly monitoring the platforms' compliance with their own rules, criticizing or praising the platforms as appropriate, and advocating for the people who use the platforms to publish and/or receive information. Their work helps hold the platforms accountable and informs the public so the people using these services can better understand a platform's content moderation practices and advocate for themselves. Their work often offers "actionable recommendations and granular norms for platforms to uphold human rights standards while balancing competing interests such as freedom of expression and protection from harm."[47] Indeed, as researcher describes it, civil society has become one of the pillars of platform governance: "Digital civil society groups, academics, and journalists have come to play a vital corporate accountability and watchdog function through their advocacy, research, and investigations into platform practices."[48]

For example, civil society organizations in countries as diverse as Bosnia and Herzegovina, Indonesia, and Kenya have helped bring to light the problem of inconsistent interpretation of content moderation rules in those countries.[49] And in 2020, three Chilean nongovernmental organizations carried out a study investigating social media content moderation

---

[47]Nicola Palladino, Dennis Redeker, Edoardo Celeste, *The platform governance triangle: Conceptualising the informal regulation of online content,* Internet Policy Review 8, 2 (June 2019) https://policyreview.info/articles/analysis/constitutionalising-global-content-governance.

[48]Robert Gorwa, *The platform governance triangle: Conceptualising the informal regulation of online content.* Internet Policy Review 8, 2 (June 2019), https://policyreview.info/articles/analysis/platform-governance-triangle-conceptualising-informal-regulation-online-content.

[49]Content Moderation and Freedom of Expression: Bridging the Gap between Social Media and Local Civil Society, Article 19, (June 2022), https://www.article19.org/wp-content/uploads/2022/06/Summary-report-social-media-for-peace.pdf at 17, 23, 25-28, 33-35.

over a one-month period from the prior year so that they could understand and explain the rules to Chilean social media users.[50] This followed a 2017 study by an Argentina-based NGO into measures by Facebook, YouTube and Twitter to combat fake news and disinformation.[51] Don't Delete Art teaches artists how to post their images without having them flagged by platforms and also offers advice on how to appeal adverse content moderation decisions.[52]

EFF has spent many years research and highlighting content policies and decisions and educating users about them and the human rights implications of them.[53] In 2014, we launched a project, Onlinecensorship.org, that accepted submissions from platform users about their experiences with content takedowns. Our findings from eight months of submissions are

---

[50] Agustina Del Campo, *Moderate globally impact locally: Social media in Latin America, caught between a rock and a hard place* (Sept. 18, 2020), https://law.yale.edu/isp/initiatives/wikimedia-initiative-intermediaries-and-information/wiii-blog/moderate-globally-impact-locally-social-media-latin-america-caught-between-rock-and-hard-place; Universidad de Chile, Informe revela alcance de las vulneraciones a la libertad de expresión durante el estallido social, (Jan. 21, 2020), https://uchile.cl/noticias/161115/informe-revela-alcance-de-las-vulneraciones-a-la-libertad-de-expresion.

[51] CELE, *Fake news on the internet: the strategy to battle misinformation* (Dec. 2017), https://www.palermo.edu/Archivos_content/2019/cele/Mayo/Fake-news-strategy-to-battle-misinformation.pdf.

[52] Elaine Veili, *In NYC Protest, Activists Tell Meta to Stop Deleting Art*, Hyperallergic, (June 16, 2023), https://hyperallergic.com/in-nyc-protest-activists-tell-meta-to-stop-deleting-art/

[53] *See, e.g.,* Mukund Rathi, *Amidst Invasion of Ukraine, Platforms Continue to Erase Critical War Crimes Documentation*, EFF Deeplinks, (Apr. 27, 2022), https://www.eff.org/deeplinks/2022/04/amidst-invasion-ukraine-platforms-continue-erase-critical-war-crimes-documentation; Jillian C. York, *The Global Suppression of Online LGBTQ+ Speech Continues*, EFF Deeplinks, (June 27, 2024), https://www.eff.org/deeplinks/2024/06/global-suppression-online-lgbtq-speech-continues; Jillian C. York et al, *Twitter Has a New Owner. Here's What He Should Do*, EFF Deeplinks, (Apr. 25, 2022), https://www.eff.org/deeplinks/2022/04/twitter-has-new-owner-heres-what-he-should-do; Corynne McSherry & Jillian C. York, *Facebook's Policy Shift on Politicians Is a Welcome Step*, EFF Deeplinks, (June 7, 2021), https://www.eff.org/deeplinks/2021/06/facebooks-policy-shift-politicians-welcome-step.

15

encapsulated in a report.[54] Another project, TOSsed Out, highlighted examples of content

removals.[55] At times, we have advocated for changes to specific platform policies.[56]

Our work also includes explanations of policy changes, such as those that occurred

during the Covid-19 pandemic,[57] shifts in hate speech-related policies,[58] and problems users face

due to policies such as those aimed at curbing violent extremism.[59] We regularly submit

comment to the Meta Oversight Board on a range of subjects, including reproductive

---

[54]Jessica Anderson et al., *Online Censorship in Context: Insights from Crowdsourced Data on Social Media Censorship*, (2016), available at https://s3-us-west-1.amazonaws.com/onlinecensorship/posts/pdfs/000/000/088/original/Censorship_in_Context_November_2016.pdf.

[55] TOSsed Out, Electronic Frontier Foundation, https://www.eff.org/tossedout.

[56]Karen Gullo & Jillian C. York, *Platforms Must Stop Unjustified Takedowns of Posts By and About Palestinians*, EFF Deeplinks, (Nov. 8, 2023), https://www.eff.org/deeplinks/2023/11/platforms-must-stop-unjustified-takedowns-posts-and-about-palestinians; Jillian C. York, *Companies Must Provide Accurate and Transparent Information to Users When Posts are Removed*, EFF Deeplinks, (Sept. 19, 2025), https://www.eff.org/pages/companies-must-provide-accurate-and-transparent-information-users-when-posts-are-removed.

[57]Konstantinos Komaitis & David Greene, *Fact-Checking, COVID-19 Misinformation, and the British Medical Journal*, EFF Deeplinks, (Jan. 19, 2022), https://www.eff.org/deeplinks/2022/01/fact-checking-covid-19-misinformation-and-british-medical-journal.

[58]Jillian C. York & David Greene, *Facebook's Latest Proposed Policy Change Exemplifies the Trouble With Moderating Speech at Scale*, EFF Deeplinks, (Feb. 4, 2021), https://www.eff.org/deeplinks/2021/02/facebooks-latest-proposed-policy-change-exemplifies-trouble-moderating-speech-0.

[59]Jillian C. York & David Greene, *Facebook's Secret "Dangerous Organizations and Individuals" List Creates Problems for the Company—and Its Users*, EFF Deeplinks (Dec. 1, 2021),  https://www.eff.org/deeplinks/2021/12/facebooks-secret-dangerous-organizations-and-individuals-list-creates-problems.

healthcare,[60] LGBTQ issues,[61] government takedown demands,[62] and region-specific language.[63]

In some cases, platforms do modify their practices and policies in response to concerns raised by civil society. Platforms have long incorporated their users' feedback to identify posts that may violate the platform's community standards.[64] And some platforms have institutionalized outreach to civil society organizations, experts, government agencies, and other specific community members within the platform's operations.[65]

For example, efforts of multiple nongovernmental organizations, including amicus curiae, caused many of the largest platforms to begin publishing detailed transparency reports.[66]  In Ukraine, journalists rely on "escalation channels" such as Access Now's Digital Security Helpline and the Tech and Journalism Crisis and Emergency Mechanism to document and

---

[60]Jillian C. York, *EFF's Comment to the Meta Oversight Board on United States Posts Discussing Abortion*, EFF Deeplinks, (July 10, 2023), https://www.eff.org/deeplinks/2023/07/effs-comment-meta-oversight-board-united-states-posts-discussing-abortion.

[61]Paige Collings, *EFF's Comment to the Meta Oversight Board on Polish Anti-Trans Facebook Post*, EFF Deeplinks (Sept. 27, 2023), https://www.eff.org/deeplinks/2023/09/effs-comment-meta-oversight-board-polish-anti-trans-facebook-post.

[62]*Comment of Electronic Frontier Foundation to Oversight Board case 2022-007-IG-MR*, Electronic Frontier Foundation, https://www.eff.org/document/ob-comment-re-uk-drill-music

[63]Jillian C. York*, EFF and ECNL's Comment to the Meta Oversight Board on the Term 'Shaheed'*, EFF Deeplinks, (Apr. 24, 2023), https://www.eff.org/deeplinks/2023/04/eff-and-ecnls-comment-meta-oversight-board-term-shaheed.

[64] Robyn Caplan, *Networked platform governance: The construction of the democratic platform*, International Journal of Communication (2023), at 17, 22, available at https://ijoc.org/index.php/ijoc/article/view/20035.

[65] *Id.*; Beatriz Kira, *Regulatory intermediaries in content moderation*, Internet Policy Review, 14(1) (2025), available at https://doi.org/10.14763/2025.1.1824.

[66] *See, e.g., Who has Your Back: Censorship Edition*, Electronic Frontier Foundation, (June 12, 2019), https://www.eff.org/el/wp/who-has-your-back-2019; *2025 RDR Index: Big Tech Edition*, Ranking Digital Rights, (2025) https://www.eff.org/el/wp/who-has-your-back-2019.

challenge moderation decisions that affect their news outreach.[67] In the U.S., civil society

pressure caused YouTube to restore access to the videos of internationally recognized artist Amy

Greenfield.[68] Meta's Oversight Board, which reviews selected user appeals and offers policy

recommendations regarding Meta's content decisions across its platforms, actively solicits

comments from the public and civil society, and those recommendations commonly make their

way into the Board's decisions and recommendations.[69]

External expertise is particularly necessary for international platforms. Such platforms

must often make moderation decisions about speech that is in a foreign language, arises in a

specialized or unfamiliar context, or otherwise requires specialized cultural and subject matter

knowledge. The Santa Clara Principles, a widely accepted human rights framework for content

moderation, of which amicus was a co-author, identifies "cultural competence" as a foundational

principle:

> Companies should ensure that their rules and policies, and their enforcement, take
> into consideration the diversity of cultures and contexts in which their platforms
> and services are available and used, and should publish information as to how
> these considerations have been integrated in relation to all operational
> principles."[70]

Where companies lack such competence, civil society can help fill the gap and/or

---

[67] *Protecting Media Freedom Online: Old Challenges, New Solutions*, Global Forum for Media Development (Feb. 10. 2025), https://gfmd.info/briefings/protecting-media-freedom-online-old-challenges-new-solutions.

[68] *YouTube restores Amy Greenfield's videos*, National Coalition Against Censorship, (Feb. 22, 2010), https://ncac.org/incident/youtube-restores-amy-greenfields-videos-2.

[69] Joan Barata, *The Decisions of the Oversight Board from the Perspective of International Human Rights Law*, (Oct. 2022) available at https://globalfreedomofexpression.columbia.edu/wp-content/uploads/2022/10/The-Decisions-of-the-OSB-from-the-Perspective-of-Intl-Human-Rights-Law-Joan-Barata-.pdf; Jillian C. York, *Meta Oversight Board's Latest Policy Opinion a Step in the Right Direction*, EFF Deeplinks (March 26, 2024), https://www.eff.org/deeplinks/2024/03/meta-oversight-boards-latest-policy-opinion-step-right-direction.

[70] Santa Clara Principles, www.santaclaraprinciples.org.

pressure the companies to do so themselves. In Myanmar following severe criticism that Facebook played a role in the Rohingya genocide in Myanmar, Meta worked with local civil society to improve their moderation practices including recognizing local language differences and cultural expertise.[71]  And civil society criticism of Meta's policies in Israel and Palestine resulted in the company commissioning an external human rights impact assessment and policy changes.[72] In Paraguay and Peru, Facebook has actively sought and followed civil society advice in applying its hate speech policies to specific slurs or threats.[73] While these efforts may not have led to as much change as requested, they are at least moving the dial on Meta's practices.

Policymakers concerned with freedom of expression have recognized the crucial role civil society can play in supporting free expression and due process on social media platforms. For example, the U.N.'s special rapporteur for freedom of expression endorsed a proposal to create voluntary "Social Media Councils" that would bring together multiple stakeholders, including civil society experts, to review content moderations decisions under international human rights standards[74].

Moreover, even if a company does not adopt civil society's recommendations, civil society can foster broader advocacy for accountability and change simply by educating users. Many users find content moderation practices opaque at best; public interest organizations can

---

[71]Associated Press, *Hate speech in Myanmar continues to thrive on Facebook*, The Independent (Nov. 18, 2021), https://www.independent.co.uk/news/world/americas/us-politics/facebook-myanmar-indonesia-jakarta-mark-zuckerberg-b1959851.html.

[72] *Human Rights Due Diligence of Meta's Impacts in Israel and Palestine*, BSR, (Sept. 22, 2022), https://www.bsr.org/en/reports/meta-human-rights-israel-palestine.

[73]Brenda Dvoskin, *Human Rights Due Diligence of Meta's Impacts in Israel and Palestine*, CETyS, available at https://dspaceapi.live.udesa.edu.ar/server/api/core/bitstreams/d6a44646-1c96-4ec1-87f6-76128100b111/content, at 12.

[74]*Social Media Councils*, Article 19, https://www.article19.org/social-media-councils/.

19

offer explanatory guides and call attention to unfair moderation decisions.

## III. Government Has a Sharply More Limited Role in the Platforms' Content Moderation Policies

Governments, including the U.S. government may offer their own expertise and/or opinion about the application of a platform's community standards in an attempt to persuade the platform. *See National Rifle Association v. Vullo*, 602 U.S. 175, 188 (2024). But they cannot seek to coerce platforms to make editorial decisions they would not have otherwise made. *See id*. Nor may they require platforms by force of law to publish, prioritize or recommend speech they would not have otherwise treated in that manner. *Moody*, 603 U.S. at 740-43.

### CONCLUSION

Civil society has a long-standing and important role as a watchdog of social media content moderation, through research, educational efforts, and advocacy, helping the public to become aware of and understand how the policies affect them, advocating for human rights-compliant changes, and even achieving such changes. Those who participate in the process should not be punished for doing so, and when the U.S. government does so, it amounts to a serious infringement of First Amendment rights.

For the above-stated reasons, this Court should grant the preliminary injunction.

Dated: April 10, 2026                    Respectfully submitted,


                                        /s/ *Aaron Mackey*
                                        Aaron Mackey (DC Bar No. 1017004)
                                        Electronic Frontier Foundation
                                        815 Eddy Street
                                        San Francisco, CA 94109
                                        amackey@eff.org
                                        (415) 436-9333 phone
                                        (415) 436-9993 fax

                                        *Counsel for Amicus Curiae*
                                        *Electronic Frontier Foundation*

20