**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

COALITION FOR INDEPENDENT
TECHNOLOGY RESEARCH,

       Plaintiff,

v.

MARCO RUBIO, in his official capacity as
Secretary of State; KRISTI NOEM, in her
official capacity as Secretary of Homeland
Security; and PAMELA BONDI, in her
official capacity as Attorney General of the
United States,

       Defendants.

Case No.: 1:26-cv-00815 (JEB)

**<u>BRIEF OF AMICUS CURIAE THE POYNTER INSTITUTE FOR MEDIA STUDIES,
INC. IN SUPPORT OF PLAINTIFF'S MOTION FOR SECTION 705 STAY AND
PRELIMINARY INJUNCTION</u>**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 29(a)(4)(A), and Local Civil Rule 7(o) amicus curiae The Poynter Institute for Media Studies, Inc. ("Poynter") states that it has no parent corporation and issues no stock.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ................................................................. ii

TABLE OF CONTENTS ............................................................................................. iii

TABLE OF AUTHORITIES ....................................................................................... iv

INTEREST OF AMICUS CURIAE ............................................................................. 8

INTRODUCTION ...................................................................................................... 2

ARGUMENT ............................................................................................................. 6

    I.    THE CENSORSHIP POLICY VIOLATES THE FIRST AMENDMENT BY LIMITING THE PRESS' FACT-CHECKING ABILITIES AND CHILLING FACT-CHECKING JOURNALISTS' SPEECH. ..................................................... 6

        A.    Limitations on fact-checking journalism hinder a vital part of the .... journalistic process and run afoul of free press protections. ................................................. 8

        B.    The Policy is unconstitutional because it is retaliatory against protected speech…….......................................................................................... 12

CONCLUSION ......................................................................................................... 15

CERTIFICATE OF COMPLIANCE ........................................................................... 16

## TABLE OF AUTHORITIES

**Cases**                                                                       **Page(s)**

*Estes v. State of Tex.*, 381 U.S. 532 (1965) ................................................................... 12

*Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936) ............................................... 7, 12, 14

*Media Matters for Am. v. Paxton*, 138 F.4th 563 (D.C. Cir. 2025) ............................. 7, 12, 13, 14

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964) .................................................... 7, 13

*N.Y. Times Co., v. Dep't of Def*, No. 25-04218 (PLF),
   2026 WL 788689 (D.D.C. Mar. 20, 2026) ...................................................... 13, 14

*N.Y. Times Co., v. Dep't of Def*, No. 25-04218 (PLF),
   slip op. (D.D.C. Apr. 9, 2026) ...................................................................... 14, 15

*Nat'l Rifle Assoc. of Am. v. Vullo*, 602 U.S. 175 (2024) ......................................... 13, 14

*Roth v. U.S.*, 354 U.S. 476 (1957) .......................................................................... 7

*Snyder v. Phelps*, 562 U.S. 443 (2011) ................................................................... 7

**Other Authorities**

*#UkraineFacts: a worldwide collaborative database to fight disinformation*,
   MALDITA.ES (Feb. 26, 2022), https://maldita.es/nosotros/20220226/ukrainefacts-ukraine-
   database-disinformation/ .................................................................................... 11

*A look into Trump's recent rhetoric focusing on revenge and threats*, N.P.R.
   (Oct. 21, 2024), https://perma.cc/CC9M-GLHF ................................................... 1

*Agency Strategic Plan Fiscal Years 2026-2030*, Dep't of State (Jan. 16, 2026),
   https://www.state.gov/wp-content/uploads/2026/01/Agency-Strategic-Plan-for-Fiscal-Years-
   2026-2030.pdf .................................................................................................... 4

Amulya Hiremath, *How Fact-checking Works and Why It Matters: A Lesson in Disinformation
   Resilience*, PEN AMERICA (Aug. 23, 2024), https://pen.org/how-fact-checking-works-and-
   why-it-matters-a-lesson-in-disinformation-resilience/ ............................................. 7

Angie Drobnic Holan, "*How PolitiFact Started*," POLITIFACT (Feb. 12, 2018),
   https://www.politifact.com/article/2018/feb/12/principles-truth-o-meter-politifacts-
   methodology-i/#How%20PolitiFact%20Started ..................................................... 9

Ankush Khardori, *Trump Is Weaponizing the Government Against His Enemies.*

*It Doesn't Mean He'll Succeed.*, POLITICO (Aug. 28, 2025),

https://www.politico.com/news/magazine/2025/08/28/trump-revenge-tour-weaponize-

government-column-00529277 ..................................................................................... 1

Arthur MacMillan and W.G. Dunlop, *Trump claims US election was rigged*, AFP (Nov. 5, 2020),

https://factcheck.afp.com/trump-claims-us-election-was-rigged .............................................. 10

Chris Young & Emily Vespa, *The FBI search of a Washington Post reporter's home: What we

know and why it matters*, REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS (Jan. 16, 2026),

https://www.rcfp.org/fbi-raid-washington-post-explainer/ ........................................................ 2

Ciara O'Rourke, *Fact-checkers face intimidation in Eastern Europe as USAID cuts embolden

authoritarian tactics*, POYNTER (Apr. 2, 2025), https://www.poynter.org/fact-

checking/2025/usaid-fact-checkers-serbia-europe-istinomer/ ...................................................11

*Code of Ethics*,\ SOCIETY OF PROFESSIONAL JOURNALISTS (Sept. 6, 2014),

https://www.spj.org/spj-code-of-ethics/. ................................................................................. 7

Erik Wemple, *Judge Rules Pentagon Restrictions on Press Are Unconstitutional*, NY TIMES

(Mar. 20, 2026), https://www.nytimes.com/2026/03/20/business/media/pentagon-press-

restrictions-new-york-times.html.............................................................................................. 2

*Fact Check: Contrary to social media posts, recounts of the 2020 U.S. presidential

election were not conducted 'in 46 states,'* REUTERS (Apr. 21, 2022),

https://www.reuters.com/article/fact-check/contrary-to-social-media-posts-recounts-

of-the-2020-us-presidential-election-idUSL2N2WJ1J9/.......................................................... 10

Faiz Siddiqui & Susan Svlruga, *N.C. Man Told Police He Went to D.C. Pizzeria with Gun to

Investigate Conspiracy Theory*, WASH. POST (Dec. 5, 2016),

https://www.washingtonpost.com/news/local/wp/2016............................................................ 8

*Fighting the Infodemic: The #CoronaVirusFacts Alliance*, POYNTER,

https://www.poynter.org/coronavirusfactsalliance/ (last visited Mar. 29, 2026) ........................ 9

George Chidi, *Journalist Mario Guevara deported to El Salvador after 100 days in Ice custody*,

THE GUARDIAN (Oct. 3, 2025, 10:33 EDT), https://www.theguardian.com/us-

news/2025/oct/03/journalist-mario-guevara-ice-deportation....................................................... 2

Hadas Gold and Liam Reilly, *Disinformation experts blast Trump's executive order on

government censorship as 'direct assault on reality'*, CNN (Jan, 23, 2025),

https://www.cnn.com/2025/01/22/media/trump-censorship-executive-order-disinformation/index.html................................................................................................3

Humeyra Pamuk, Exclusive: *Trump administration orders enhanced vetting for applicants of H-1B visa*, REUTERS (Dec. 4, 2025), https://www.reuters.com/world/us/trump-administration-orders-enhanced-vetting-applicants-h-1b-visa-2025-12-04/......................................................4

*International Fact-Checking Network*, POYNTER, https://www.poynter.org/ifcn/ (last visited Mar. 30, 2026) .................................................................................................................9

Journalist Mario Guevara to be deported from US in unprecedented case, COMM. TO PROTECT JOURNALISTS, (Oct. 2, 2025), https://perma.cc/7N7E-3RY6 ......................................................2

Leonard Downie Jr., *The Trump administration and the media*, COMM. TO PROTECT JOURNALISTS (Apr. 16, 2020), https://perma.cc/7NN4-VN5U ..........................................................1

Oscar Westlund, et al., "*What Is the Problem with Misinformation? Fact-checking as a Sociotechnical and Problem-Solving Practice*," 25 JOURNALISM STUD. 898, 898–99 (2024).................................................................................................................8

Philip Fernbach and Steven Sloman, "*Why We Believe Obvious Untruths*," N.Y. TIMES (Mar. 3, 2017), https://www.nytimes.com/2017/03/03/opinion/sunday/why-we-believe-obvious-untruths.html ...........................................................................................................9

Press Release, Dep't of Homeland Sec., *Trump Administration Proposes New Rule to End Foreign Student Visa Abuse* (Aug. 28, 2025), https://www.dhs.gov/news/2025/08/27/trump-administration-proposes-new-rule-end-foreign-student-visa-abuse?mc_cid=81ed961eb1&mc_eid=UNIQID..................................................................2

Press Release, Dep't of State, *Announcement of Actions to Combat the Global Censorship-Industrial Complex* (Dec. 23, 2025), https://www.state.gov/releases/office-of-the-spokesperson/2025/12/announcement-of-actions-to-combat-the-global-censorship-industrial-complex..................................................................................................................4

Press Statement, Dep't of State, *Announcement of a Visa Restriction Policy Targeting Foreign Nationals Who Censor Americans* (May 28, 2025), https://www.state.gov/announcement-of-a-visa-restriction-policy-targeting-foreign-nationals-who-censor-americans/. ...........................4

*USA: 8 ways Trump is shrinking the space for press freedom – literally*, REPORTERS WITHOUT BORDERS (Nov. 18, 2025), https://rsf.org/en/usa-8-ways-trump-shrinking-space-press-freedom-literally....................................................................................................1

*USA: Proposed journalist visa restrictions would have catastrophic consequences for press freedom*, REPORTERS WITHOUT BORDERS (Mar. 9, 2025), https://rsf.org/en/usa-proposed-journalist-visa-restrictions-would-have-catastrophic-consequences-press-freedom .................. 3

*What is fact-checking?*, BALLOTPEDIA, https://ballotpedia.org/What_is_fact-checking (last visited Mar. 30, 2026)........................................................................................ 7

**INTEREST OF AMICUS CURIAE**

Amicus curiae Poynter is a nonprofit organization that aims to strengthen democracy by improving the relevance, ethical practice, and value of journalism. As part of that mission, Poynter operates the International Fact-Checking Network at the Poynter Institute ("IFCN"). Founded in 2015, IFCN is a global leader in fact-checking that offers resources on fact-checking standards, provides certification and training for fact-checking researchers and journalists, monitors fact-checking trends to foster the public's media literacy and knowledge, and advances accountability in journalism.

Poynter submits this brief in support of Plaintiff to emphasize the effect the executive policies at issue in this litigation have on international journalists who engage in fact-checking journalism, *i.e.*, journalism intended to verify and analyze claims for truthfulness, which furthers the First Amendment goal of a robust marketplace of ideas.

No party or party's counsel authored this brief in whole or in part, or made a monetary contribution intended to fund its preparation or submission. No person other than Poynter made any monetary contribution to the preparation or submission of this brief.  Poynter files this brief with the consent of the parties.

## INTRODUCTION

At its core, the executive actions at issue in this lawsuit center on the Trump administration's desire to silence and punish speech critical of its actions. The administration has often retaliated against speakers who challenge or criticize its policies, motives, or conduct. *See, e.g.*, *A look into Trump's recent rhetoric focusing on revenge and threats*, NPR (Oct. 21, 2024), https://perma.cc/CC9M-GLHF. The Trump administration will attack commentary it believes cast its actions or statements in a negative light as "fake news," regardless of facts or context. *Id.* It is also no secret that President Trump has specifically villainized the press, repeatedly claiming that the "mainstream media" engages only in reporting aimed at making the administration "look bad" and calling legitimate journalistic entities "fake news." Leonard Downie Jr., *The Trump administration and the media*, COMM. TO PROTECT JOURNALISTS (Apr. 16, 2020), https://perma.cc/7NN4-VN5U.

Along with verbal attacks, the Trump administration has called for changes to libel laws to allow legal punishment for critics, threatened to prosecute former opponents or officers who speak out against the administration, and denied journalists access to the White House and other government facilities. *USA: 8 ways Trump is shrinking the space for press freedom – literally*, REPORTERS WITHOUT BORDERS (Nov. 18, 2025), https://rsf.org/en/usa-8-ways-trump-shrinking-space-press-freedom-literally; Ankush Khardori, *Trump Is Weaponizing the Government Against His Enemies. It Doesn't Mean He'll Succeed.*, POLITICO (Aug. 28, 2025), https://www.politico.com/news/magazine/2025/08/28/trump-revenge-tour-weaponize-government-column-00529277. In the past year alone, the administration escalated its retaliation tactics, allowing the searches of the homes of both a journalist and his former National Security advisor. Chris Young & Emily Vespa, *The FBI search of a Washington Post reporter's home: What we know and why it matters*, REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS (Jan. 16, 2026), https://www.rcfp.org/fbi-

2

raid-washington-post-explainer/. The Department of Defense unconstitutionally implemented a policy limiting press access to the Pentagon and revoked access to seven journalists whose reporting the administration disliked. Erik Wemple, *Judge Rules Pentagon Restrictions on Press Are Unconstitutional*, NY TIMES (Mar. 20, 2026), https://www.nytimes.com/2026/03/20/business/media/pentagon-press-restrictions-new-york-times.html.

The Trump administration has also targeted foreign speakers. In October 2025, the administration deported an El Salvadoran journalist following his arrest and five-month detainment by Immigration and Customs Enforcement ("ICE"). George Chidi, *Journalist Mario Guevara deported to El Salvador after 100 days in ICE custody*, THE GUARDIAN (Oct. 3, 2025), https://www.theguardian.com/us-news/2025/oct/03/journalist-mario-guevara-ice-deportation. Journalist Mario Guevara, who held a valid permit to work in the United States, was initially arrested for livestreaming a protest against the Trump administration's immigration policies and raids. *Id*. All charges were dropped, but the administration detained and deported Guevara on the grounds that his filming of law enforcement was a "risk to public safety." *Journalist Mario Guevara to be deported from US in unprecedented case*, COMM. TO PROTECT JOURNALISTS, (Oct. 2, 2025), https://perma.cc/7N7E-3RY6. Further, the Department of Homeland Security proposed new regulations on visas for foreign journalists, limiting foreign journalists' ability to enter, live, and work in the United States. Press Release, Dep't of Homeland Sec., *Trump Administration Proposes New Rule to End Foreign Student Visa Abuse* (Aug. 28, 2025),https://www.dhs.gov/news/2025/08/27/trump-administration-proposes-new-rule-end-foreign-student-visa-abuse?mc_cid=81ed961eb1&mc_eid=UNIQID. Although the new visa regulations have yet to go into effect, press advocates argue that the regulations unduly burden foreign journalists and create a system "with high potential for abuse, as the Trump administration punishes journalists

and news outlets that criticize its policies, and has repeatedly tried to deport non-US citizens for their political expression." *USA: Proposed journalist visa restrictions would have catastrophic consequences for press freedom*, REPORTERS WITHOUT BORDERS (Mar. 9, 2025), https://rsf.org/en/usa-proposed-journalist-visa-restrictions-would-have-catastrophic-consequences-press-freedom.

Against this backdrop, the Defendants adopted the policy at the center of this case. The Defendants' Censorship Policy ("Policy" or "Censorship Policy") "subjects noncitizen researchers and advocates, factcheckers, and trust and safety workers whose work the Trump administration and its political allies have characterized as 'censorship' to visa denials, visa revocations, and even detention and deportation" with an aim to deter speech about content moderation, a practice disfavored by Trump Administration. Plaintiff's Mot., ECF. 11-1 at 5. This Policy stems from numerous complaints and even an executive order from President Trump claiming that private speech aimed at assessing the accuracy of publicly available information, such as fact-checking or content moderation, is a form of "censorship." Hadas Gold and Liam Reilly, *Disinformation experts blast Trump's executive order on government censorship as 'direct assault on reality,'* CNN (Jan, 23, 2025), https://www.cnn.com/2025/01/22/media/trump-censorship-executive-order-disinformation/index.html. According to the administration, fact-checking and online content moderation suppress conservative speech by limiting certain forms of distasteful content on private platforms. Plaintiff's Mot., ECF. 11-1 at 3–4.

The Defendants implemented the Policy last year. In May, 2025, Defendant Marco Rubio announced visa restrictions for foreign nationals "responsible for censorship of protected expression in the United States" and foreign officials who "demand that American tech platforms adopt global content moderation policies." Press Statement, Dep't of State, *Announcement of a*

*Visa Restriction Policy Targeting Foreign Nationals Who Censor Americans* (May 28, 2025), https://www.state.gov/announcement-of-a-visa-restriction-policy-targeting-foreign-nationals-who-censor-americans/. Later, in December, 2025, a leaked memo revealed that the Defendants ordered "increased vetting" for H-1B visa applicants to "uncover evidence an applicant was responsible for, or complicit in, censorship or attempted censorship of protected expression in the United States" through activities like fact-checking, content moderation, or combatting misinformation. Humeyra Pamuk, Exclusive: *Trump administration orders enhanced vetting for applicants of H-1B visa*, REUTERS (Dec. 4, 2025), https://www.reuters.com/world/us/trump-administration-orders-enhanced-vetting-applicants-h-1b-visa-2025-12-04/.

Citing the Policy, Defendant Rubio announced the administration's campaign to end what it calls the "censorship-industrial complex" and barred five Europeans from the United States who he claimed, "led organized efforts to coerce American platforms to censor, demonetize, and suppress American viewpoints they oppose." Press Release, Dep't of State, *Announcement of Actions to Combat the Global Censorship-Industrial Complex* (Dec. 23, 2025), https://www.state.gov/releases/office-of-the-spokesperson/2025/12/announcement-of-actions-to-combat-the-global-censorship-industrial-complex. The five individuals targeted engaged in research on the effects of misinformation online. Mot., ECF 11-1 at 10–13. Since then, Defendants announced continued use of sanctions, visa denials, and deportations of foreign nationals who allegedly violate the Policy. *Agency Strategic Plan Fiscal Years 2026-2030*, Dep't of State (Jan. 16, 2026), https://www.state.gov/wp-content/uploads/2026/01/Agency-Strategic-Plan-for-Fiscal-Years-2026-2030.pdf.

The Policy at issue continues this assault and has grave potential impact on international journalists engaged in fact-checking journalism. Although the Defendants claim the Policy

*prevents* censorship of "conservative voices," including the President, it actually works to censor speakers from around the globe. Under the guise of free speech, the Policy enables the Defendants to strategically retaliate against foreign speakers who engage in speech the Trump administration disfavors. As a result, journalists and researchers who engage in fact-checking risk retaliation for doing their work. The risk of retaliation infringes the rights of the free press and freedom of speech. Such viewpoint discrimination violates the First Amendment.

Plaintiff provides the Court with the legal basis for enjoining the Defendants' Policy. Amicus Poynter writes to offer the perspective of the press, namely, journalists engaged in fact-checking journalism, and how the Policy is actually an attempt to suppress fact-checking and accountability journalism. Poynter supports multiple initiatives that promote independent fact-checking in global media, and its IFCN members understand the threats the Policy poses.

Thus, Poynter first argues that fact-checking is an integral part of newsgathering and is therefore protected activity under the First Amendment. Second, Poynter asserts that the Defendants' use the Policy as a means of retaliation, and fear of that retaliation, casts a chilling effect of foreign journalists' fact-checking. Therefore, Poynter ultimately contends that the Defendants' Policy violates the First Amendment. For the reasons set forth herein, Poynter urges the Court to grant Plaintiff's motion and enjoin the Defendants from further application of the Censorship Policy.

## ARGUMENT

## I.    THE CENSORSHIP POLICY VIOLATES THE FIRST AMENDMENT BY LIMITING THE PRESS' FACT-CHECKING ABILITIES AND CHILLING FACT-CHECKING JOURNALISTS' SPEECH.

Journalists engage in constitutionally protected conduct when reporting the news. *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025). Because "an untrammeled press [is] a vital source of public information," courts historically strike down government-based

6

restraints on the press' ability to accurately and adequately engage in newsgathering. *Grosjean v. Am. Press Co.*, 297 U.S. 233, 249–50 (1936).  As the Supreme Court explained, "[t]he protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. U.S.*, 354 U.S. 476, 484 (1957).  A journalist's ability to engage in investigative newsgathering and reporting is integral to that "unfettered interchange," as members of the press "have shed and continue to shed, more light on [public affairs] than any other instrumentality of publicity; and since informed public opinion is the most potent of all restraints upon misgovernment, the suppression or abridgement of [the] free press cannot be regarded otherwise than with grave concern." *Grosjean*, 297 U.S. at 250.

Reporting on public issues is thus considered a "quintessential" First Amendment activity. *Id.; see also Snyder v. Phelps*, 562 U.S. 443, 452 (2011) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." (citation omitted)); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) ("The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions."). More so than ever, fact-checking journalism is a critical component of the marketplace of ideas. The ability to verify and explain the accuracy of information in the public sphere is a principal function of the press. Any limitations on the ability to freely report on matters of public concern or engage in fact-checking infringe upon the First Amendment's protections for the press' "quintessential" activity.

Here, the Defendants' Censorship Policy unduly chills international journalists' ability to engage in fact-checking. It targets noncitizens whose work combats misinformation through fact-checking journalism, content moderation, and research with the threat of deportation or exclusion

7

from the country. Compl. at 2. In other words, the Policy punishes expressive activity based on viewpoints with which the Defendants disagree, thereby allowing them to retaliate against international journalists and fact-checkers, ironically, under the guise of "preventing censorship." Compl., Doc. 1 at 2.

**A.     Limitations on fact-checking journalism hinder a vital part of the journalistic process and run afoul of free press protections.**

Dedicated, fact-checking reporters and researchers broaden the proverbial marketplace of ideas by providing context and verification for the public's consumption of news media. Fact-checking has grown into a "modern, identifiable category of journalism" that provides "accurate, unbiased analysis of statements made in public in order to correct public misperceptions and increase knowledge of important issues." *What is fact-checking?*, BALLOTPEDIA, https://ballotpedia.org/What_is_fact-checking (last visited Mar. 30, 2026). Fact-checking journalism enhances the press' watchdog function by evaluating, in real time, the accuracy, context, and validity of newsworthy statements and information. Amulya Hiremath, *How Fact-checking Works and Why It Matters: A Lesson in Disinformation Resilience*, PEN AMERICA (Aug. 23, 2024), https://pen.org/how-fact-checking-works-and-why-it-matters-a-lesson-in-disinformation-resilience/.

*The recent evolution of fact-checking journalism*

Fair and accurate reporting is a foundational principle of professional journalism. *Code of Ethics*, SOCIETY OF PROFESSIONAL JOURNALISTS (Sept. 6, 2014), https://www.spj.org/spj-code-of-ethics/. Journalists bear a professional and ethical duty to verify the accuracy of their work, provide the necessary context for their reporting, and remain transparent about corrections, ethical concerns, and accountability. *Id*. Thus, "fact-checking," the process of verifying the

accuracy of information before or after publication, is an integral part of the newsgathering process and a foundational practice in newsrooms across the globe.

However, in recent years, the need for fact-checking reporters and researchers has increased exponentially and moved beyond the need to verify the accuracy of one's own work. Social media has pushed beyond the proverbial "24-hour news cycle" of cable news, allowing the free-flow of more information than ever before. Breaking newsworthy items such as statements from public officials, now travel the globe almost instantly. Unfortunately, this "information superhighway" can carry both facts and falsehoods. Social media platforms allow speakers, including public officials, to reach large audiences, often with relatively minimal constraints or content moderation. In addition, social media users can create pages and personas that mimic actual news organizations to spread misinformation online.  And agenda-driven speech, disguised as journalism, has proliferated in this space. The permeation of such misinformation undermines trust in our institutions (including the press), influences elections, endangers public welfare, and has even led to violence. *See* Oscar Westlund, *et al.*, *What Is the Problem with Misinformation? Fact-checking as a Sociotechnical and Problem-Solving Practice*, 25 JOURNALISM STUD. 898, 898–99 (2024); Faiz Siddiqui & Susan Svlruga, *N.C. Man Told Police He Went to D.C. Pizzeria with Gun to Investigate Conspiracy Theory*, WASH. POST (Dec. 5, 2016), https://www.washingtonpost.com/news/local/wp/2016 /12/04/d-c-police-respond-to-report-of-a-man-with-a-gun-at-comet-ping-pong-restaurant/.

Whether misinformation is espoused by a public official or an anonymous poster, "fake news" has transformed how we engage in political, scientific, and economic discourse. Philip Fernbach and Steven Sloman, *Why We Believe Obvious Untruths*, N.Y. TIMES (Mar. 3, 2017), https://www.nytimes.com/2017/03/03/opinion/sunday/why-we-believe-obvious-untruths.html.

As a result, independent and professional fact-checking outlets have emerged in part to counter the spread of false information.

***Examples of fact-checking journalism***

Real-world examples of fact-checking journalism abound and, in recent years, have covered topics such as the global COVID-19 response, armed conflict, elections, foreign policy, and more. Poynter itself launched the fact-checking website PolitiFact in 2007 to verify the accuracy of political campaign statements. *See* Angie Drobnic Holan, *How PolitiFact Started*, POLITIFACT (Feb. 12, 2018), https://www.politifact.com/article/2018/feb/12/principles-truth-o-meter-politifacts-methodology-i/#How%20PolitiFact%20Started. Poynter later established the International Fact-Checking Network ("IFCN") in 2015 to advocate for global "information integrity and [support for] fact-checking journalists through networking, capacity building and collaboration." *International Fact-Checking Network*, POYNTER, https://www.poynter.org/ifcn/ (last visited Mar. 30, 2026).

IFCN's work alone provides myriad examples of the importance of fact-checking journalism. For example, in 2020, IFCN developed a collaborative journalism initiative, the "CoronaVirusFacts Alliance," to provide the public with verified, reliable information on claims about the COVID-19 vaccine's safety and efficacy. *Fighting the Infodemic: The #CoronaVirusFacts Alliance*, POYNTER, https://www.poynter.org/coronavirusfactsalliance/ (last visited Mar. 29, 2026). The CoronaVirusFacts Alliance provided over 17,000 fact-checks to over 110 countries to identify successive waves of misinformation worldwide. *Id*. This international alliance directly assessed statements made by figures who now hold senior positions in the Trump administration including Secretary of Health and Human Services Robert F. Kennedy Jr. The initiative garnered past praise from the State Department itself during a 2022 briefing for journalists covering the COVID-19 pandemic. Foreign Press Centers Briefing, "*COVID-19 Fact*

10

*Checking: What Journalists Need to Know*," U.S. STATE DEP'T (Jan. 21, 2022), *available at* https://2021-2025.state.gov/briefings-foreign-press-centers/covid-19-fact-checking-what-journalists-need-to-know.

Global fact-checking journalism similarly aided the American public in the wake of the 2020 Presidential election and continues to offer clarity on U.S.-sponsored activity worldwide. Fact-checking journalists in the United States and abroad systematically assessed and debunked false claims involving fraud and voting irregularities. IFCN-certified fact-checking journalists at Agence France-Presse (AFP) in France and Reuters in both Canada and the United Kingdom directly combatted misinformation spread about the 2020 election, countering many false claims made by President Trump himself. *Fact Check: Contrary to social media posts, recounts of the 2020 U.S. presidential election were not conducted 'in 46 states,'* REUTERS (Apr. 21, 2022), https://www.reuters.com/article/fact-check/contrary-to-social-media-posts-recounts-of-the-2020-us-presidential-election-idUSL2N2WJ1J9/; Arthur MacMillan and W.G. Dunlop, *Trump claims US election was rigged*, AFP (Nov. 5, 2020), https://factcheck.afp.com/trump-claims-us-election-was-rigged. Foreign fact-checking journalists have also verified claims related to U.S. military action and foreign policy, including claims about the war in Ukraine, U.S. arms transfers, civilian casualties, and the credibility of official U.S. government statements. *#UkraineFacts: a worldwide collaborative database to fight disinformation*, MALDITA.ES (Feb. 26, 2022), https://maldita.es/nosotros/20220226/ukrainefacts-ukraine-database-disinformation/. In fact, IFCN-certified fact checkers from the Balkans, Eastern Europe, and Latin America regularly collaborate with U.S.-based journalists and media organizations when misinformation intersects with U.S.-policies. *See* Ciara O'Rourke, *Fact-checkers face intimidation in Eastern Europe as*

11

*USAID cuts embolden authoritarian tactics*, POYNTER (Apr. 2, 2025),

https://www.poynter.org/fact-checking/2025/usaid-fact-checkers-serbia-europe-istinomer/.

As Justice Clark once explained, "[t]he free press has been a mighty catalyst in awakening public interest in governmental affairs, exposing corruption among public officers and employees and generally informing the citizenry of public events and occurrences[.]" *Estes v. State of Tex.*, 381 U.S. 532, 539 (1965). The public relies on accurate, timely information to make decisions about welfare, governance, and safety. But the implementation of the Policy poses a significant threat to those interests by chilling and threatening press freedom internationally. The Policy sends a clear message to dissuade foreign journalists from challenging, fact-checking, or even accurately reporting on the Trump administration for fear of retribution. Foreign journalists risk deportation, denial of entry into the United States (regardless of the purpose of their visit), and isolation from their journalistic trade in the United States. As a result, the press' role in our society is diminished, and its freedoms under the First Amendment are at risk.

**B.    The Policy is unconstitutional because it is retaliatory against protected speech.**

"The First Amendment generally 'prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech.'" *Media Matters for Am.*, 138 F.4th at 570 (D.C. Cir. 2025) (quoting *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022)). As the Plaintiff asserts in its motion, the defendants' Policy specifically targets speech protected by the First Amendment by burdening CITR members' rights to speak and to share information freely on matters of public concern. Mot., ECF 11-1 at 38. It does the same for international fact-checking journalists. Fear of retaliation silences would-be foreign

12

speakers, including journalists, by threatening deportation, barring legal entry into the United States, and imposing sanctions. *See* Compl., Doc. 1 at 3–4, 16–25.

The First Amendment proscribes Defendants from using the power of the state to punish or suppress speech they disfavor. *Nat'l Rifle Assoc. of Am. v. Vullo*, 602 U.S. 175, 188 (2024). As this Court recently explained, "the government may not impose speech restrictions that reflect an effort to suppress expression merely because public officials oppose the speaker's view." *N.Y. Times Co., v. Dep't of Def*, No. 25-04218 (PLF), 2026 WL 788689, at *13 (D.D.C. Mar. 20, 2026) (quoting *Minn. Voters All. v. Mansky*, 585 U.S. 1, 12 (2018)). Such government action aimed at silencing disfavored speech amounts to viewpoint discrimination, which is "uniquely harmful to a free and democratic society." *Nat'l Rifle Assoc. of Am.*, 602 U.S. at 187.

Beyond any overt restraint on speech, the Supreme Court has also held that "the First Amendment prohibits government officials from relying on the 'threat of invoking legal sanctions and other means of coercion . . .to achieve the suppression' of disfavored speech." *Id.* at 189 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). "[T]he First Amendment 'protect[s] [information-gathering] activities from official harassment' and that 'official harassment [of the press] places a special burden on information-gathering, for in such cases the ultimate, though tacit, design is to obstruct rather than to investigate, and the official action is proscriptive rather than observatory in character.'" *Media Matters for Am.*, 138 F.4th at 580 (quoting *Reporters Comm. For Freedom of the Press, et al.. v. Am. Tel. & Tel. Co.*, 593 F.2d 1030, 1064 (D.C. Cir. 1978)).

Retaliatory viewpoint discrimination aimed at the press is particularly nefarious. This Court has already struck down a government policy targeting journalism that the executive branch disfavors. *N.Y. Times Co.*, 2026 WL 788689, at *19–*20. In *N.Y. Times Co. v. Dep't of*

13

*Def.*, the Court held that the Trump administration violated the First Amendment by implementing a policy allowing its officials "unconstrained" discretion to deny, revoke, or suspend press passes at the Pentagon. *Id*. at \*12–\*17. The Court vacated portions of the Department's policy, finding that its purpose and practical effect was to "weed out" journalists whose reporting the administration deems critical of its activity. *Id*. at \*14. Incredibly, the Department violated that order days later by adopting a "new" policy that implemented the very same actions enjoined by the Court. *N.Y. Times Co., v. Dep't of Def*, No. 25-04218 (PLF), slip op. at 9 (D.D.C. Apr. 9, 2026). The Court issued a swift rebuke and explained that the Trump administration cannot "dictate the information received by the American people, to control the message so that the public hears and sees only what the [administration wants] them to hear and see." *Id*. at 19.

All told, the retaliation fact-checking journalists face for sharing information that the Defendants disfavor unconstitutionally discriminates against speech based on viewpoint. *Nat'l Rifle Assoc. of Am.*, 602 U.S. at 188–89; *N.Y. Times Co.*, 2026 WL 788689, at \*14. The Defendants, through the Policy, engage in the restrictions and harassment the First Amendment prohibits. *See id*.; *Media Matters for Am.*, 138 F.4th at 580. The Policy's chilling effects will inevitably cause IFCN's members to alter their behavior by self-censoring their reporting and research, refusing travel and conference opportunities, and declining to publish work. *See id.* at 581. The Policy is "neither abstract nor contingent" on any future action; the Policy in and of itself is a retaliatory action against foreign journalists and researchers in and outside of the United States that dissuades its targets from engaging in constitutionally protected newsgathering and reporting. *See id*.; *Grosjean*, 297 U.S. at 250.

14

Despite claims that the Defendants seek to combat censorship, the Policy ironically does the opposite. Rather, the Policy is simply the Trump administration's unconstitutional attempt to control the narrative the public receives by threatening fact-checking journalists abroad and in the United States. *See N.Y. Times Co.,* No. 25-04218 (PLF), slip op. at 9. Therefore, the Court should reject the Defendants' Policy.

## CONCLUSION

For the foregoing reasons, Poynter respectfully urges the Court to grant the Plaintiffs' motion and enjoin the Defendants from any further application of the Censorship Policy.

Dated: April 10, 2026

Respectfully submitted,

/s/  *Laura R. Handman*

Laura R. Handman (D.C. Bar No. 444386)
Meenakshi Krishnan (D.C. Bar No. 1617229)
DAVIS WRIGHT TREMAINE LLP
1301 K Street, Ste. 500 East
Washington, DC 20005
Telephone: (202) 973-4239

*-and-*

Mark R. Caramanica (FL. Bar. No. 110581)*
Rachael L. Jones (D.C. Bar No.  1616184)*
THOMAS & LOCICERO, PL
601 South Boulevard
Tampa, FL 33606
Telephone: (813) 984-3060
Facsimile: (813) 984-3070
mcaramanica@tlolawfirm.com
rjones@tlolawfirm.com

*Counsel for Amicus Curiae The Poynter Institute for Media Studies, Inc.*

*\*pro hac vice forthcoming*

15

## CERTIFICATE OF COMPLIANCE

This amicus curiae brief complies with the type-volume limit of LCvR 7(o)(4) because it is 25 or fewer pages.

This amici curiae brief complies with the typeface and type-style requirements of LCvR 5.1(d) because it has been prepared in a proportionally spaced typeface using Microsoft Word with Times New Roman font in size 12.

Dated:  April 10, 2026

Respectfully submitted,

/s/  *Laura R. Handman*
Laura R. Handman (D.C. Bar No. 444386)
Meenakshi Krishnan (D.C. Bar No. 1617229)
DAVIS WRIGHT TREMAINE LLP
1301 K Street, Ste. 500 East
Washington, DC 20005
Telephone: (202) 973-4239

*and*

Mark R. Caramanica (FL. Bar. No. 110581)*
Rachael L. Jones (D.C. Bar No.  1616184)*
THOMAS & LOCICERO, PL
601 South Boulevard
Tampa, FL 33606
Telephone: (813) 984-3060
Facsimile: (813) 984-3070
mcaramanica@tlolawfirm.com
rjones@tlolawfirm.com

*Counsel for Amicus Curiae The Poynter Institute for Media Studies, Inc.*

**pro hac vice forthcoming*

16