## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| COALITION FOR INDEPENDENT TECHNOLOGY RESEARCH, <br><br> Plaintiff, <br><br> v. <br><br> MARCO RUBIO, in his official capacity as Secretary of State; KRISTI NOEM, in her official capacity as Secretary of Homeland Security, and PAMELA BONDI, in her official capacity as Attorney General of the United States, <br><br> Defendants. | Case No. 1:26-cv-00815-JEB |

**BRIEF OF *AMICUS CURIAE* ELECTRONIC FRONTIER FOUNDATION IN SUPPORT OF PLAINTIFF'S MOTION FOR SECTION 705 STAY AND PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... ii

INTEREST OF AMICUS CURIAE ...................................................................................1

INTRODUCTION ..............................................................................................................1

ARGUMENT......................................................................................................................2

I.    CONTENT MODERATION HAS BEEN INTEGRAL TO ONLINE
      FORUMS, AND CONTROVERSIAL, FOR DECADES ............................................2

      A.    Content Moderation Has Been a Common Practice for Decades ........................2

      B.    Interactive Online Services Have a Wide Range of Complicated and
            Often Bespoke Content Policies. ..........................................................................4

      C.    Content Moderation Controversies are Widespread and Cross Many
            Ideologies ..............................................................................................................9

II.   CIVIL SOCIETY EXPERTS PLAY AN IMPORTANT ROLE IN
      PROMOTING TRANSPARENCY AND INTEGRITY IN CONTENT
      MODERATION POLICIES AND PRACTICES ........................................................14

CONCLUSION.................................................................................................................20

i

# TABLE OF AUTHORITIES

**Cases**

*Moody v. Netchoice,*
603 U.S. 707 (2024)............................................................................................. 1, 4, 5

*Netchoice v. Attorney General, Florida,*
34 F.4th 1196 (11th Cir. 2022) ............................................................................. 1, 5

*Prager Univ. v Google,*
951 F.3d 991 (9th Cir. 2020) ................................................................................... 1

**Other Authorities**

*2025 RDR Index: Big Tech Edition*, Ranking Digital Rights, (2025).......................... 18

*About,* Gettr ..................................................................................................................... 8

Agustina Del Campo, *Moderate globally impact locally: Social media in Latin America,*
*caught between a rock and a hard place* (Sept. 18, 2020) ........................................ 15

Aisha Down, *Meta shuts down global accounts linked to abortion advice and queer*
*content*, The Guardian, (Dec. 11, 2025)...................................................................... 12

Allison R. Donahue, *Facebook restores Planned Parenthood post about medication*
*abortion*, Michigan Advance, (Aug. 23, 2022)............................................................ 11

Allison R. Donahue, *Facebook takes down Planned Parenthood post about medication*
*Abortion*, Michigan Advance, (Aug. 22, 2022) .......................................................... 11

Ángel Díaz and Laura Hecht-Felella*, Double Standards in Social Media Content*
*Moderation*, brennancenter.org, (Aug. 4, 2021) ........................................................ 12

Associated Press*, Hate speech in Myanmar continues to thrive on Facebook,*
The Independent (Nov. 18, 2021) ............................................................................... 20

Beatriz Kira, *Regulatory intermediaries in content moderation*,
Internet Policy Review, 14(1) (2025) ......................................................................... 18

Carolina Are, *Flagging as a silencing tool: Exploring the relationship between*
*de-platforming of sex and online abuse on Instagram and TikTok*,
New Media & Society (2025), Vol. 27(6) .................................................................. 13

CELE, *Fake news on the internet: the strategy to battle misinformation* (Dec. 2017) ................ 15

*Code of Conduct*, The High Road........................................................................................ 6

*Comment of Electronic Frontier Foundation to Oversight Board case 2022-007-IG-MR*, Electronic Frontier Foundation ........................................................................ 17

*Community Guidelines*, Peanut ........................................................................ 5, 6

*Community Guidelines*, Pinterest ........................................................................ 5

*Content Creators FAQs*, Gettr ........................................................................ 8

Content Moderation and Freedom of Expression: Bridging the Gap between Social Media and Local Civil Society, Article 19, (June 2022) ............................... 15

Corynne McSherry & Jillian C. York, *Facebook's Policy Shift on Politicians Is a Welcome Step*, EFF Deeplinks, (June 7, 2021) .......................................... 16

Danielle Blunt et al., *Posting Into The Void*, Hacking//Hustling, (Oct. 2020) ............ 13

Elaine Veili, *In NYC Protest, Activists Tell Meta to Stop Deleting Art*, Hyperallergic, (June 16, 2023) ...................................................................... 15

Eric Goldman, *Content Moderation Remedies*, 28 Mich. Tech. L. Rev. 1 (2021) ........ 10

*GodTube Community Guidelines* ........................................................................ 6

Hibaq Farah, *Pro-Palestinian Instagram account locked by Meta for 'security reasons'*, The Guardian, (Oct. 26, 2023) .............................................. 13

*How Communities Are Safeguarded?*, HealthUnlocked ......................................... 7

*Human Rights Due Diligence of Meta's Impacts in Israel and Palestine*, BSR, (Sept. 22, 2022) ...................................................................................... 20

Jennifer M. Urban, Joe Karaganis, and Brianna Schofield, *Notice and Takedown in Everyday Practice* (March 22, 2017), UC Berkeley Public Law Research Paper No. 2755628 .................................................................................... 3

Jessica Anderson et al., *Online Censorship in Context: Insights from Crowdsourced Data on Social Media Censorship*, (2016) ............................................... 16

Jillian C. York & David Greene, *Facebook's Latest Proposed Policy Change Exemplifies the Trouble With Moderating Speech at Scale*, EFF Deeplinks, (Feb. 4, 2021) .......................................................................................... 17

Jillian C. York & David Greene, *Facebook's Secret "Dangerous Organizations and Individuals" List Creates Problems for the Company—and Its Users*, EFF Deeplinks (Dec. 1, 2021) ...................................................................... 17

Jillian C. York & David Greene, *How to Put COVID-19 Content Moderation Into Context*, Brookings' TechStream (May 21, 2020) ...................................... 3

Jillian C. York et al, *Twitter Has a New Owner. Here's What He Should Do*,
   EFF Deeplinks, (Apr. 25, 2022)...................................................................... 16

Jillian C. York, *Blunt Policies and Secretive Enforcement Mechanisms: LGBTQ+
   and Sexual Health on the Corporate Web*, EFF Deeplinks, (Oct. 24, 2018)........................... 12

Jillian C. York, *Companies Must Provide Accurate and Transparent Information to
   Users When Posts are Removed*, EFF Deeplinks, (Sept. 19, 2025)........................................ 16

Jillian C. York, *EFF and ECNL's Comment to the Meta Oversight Board on the
   Term 'Shaheed'*, EFF Deeplinks, (Apr. 24, 2023)...................................................... 17

Jillian C. York, *EFF's Comment to the Meta Oversight Board on United States
   Posts Discussing Abortion*, EFF Deeplinks, (July 10, 2023)............................................. 17

Jillian C. York, *Meta Oversight Board's Latest Policy Opinion a Step in the Right
   Direction*, EFF Deeplinks (March 26, 2024) ............................................................ 19

Jillian C. York, *Silicon Values: The Future of Free Speech Under Surveillance
   Capitalism* (Verso 2021)........................................................................ 3, 10, 11

Jillian C. York, *The Global Suppression of Online LGBTQ+ Speech Continues*,
   EFF Deeplinks, (June 27, 2024) ..................................................................... 16

Joan Barata, *The Decisions of the Oversight Board from the Perspective of
   International Human Rights Law*, (Oct. 2022) ......................................................... 19

Karen Gullo & Jillian C. York, *Platforms Must Stop Unjustified Takedowns of Posts
   By and About Palestinians*, EFF Deeplinks, (Nov. 8, 2023) ........................................ 13, 16

Kate Klonick, The New Governors: The People, Rules, and Processes
   Governing Online Speech, 131 Harv. L. Rev. 1598 (2018) ............................................... 4

Konstantinos Komaitis & David Greene, *Fact-Checking, COVID-19 Misinformation,
   and the British Medical Journal*, EFF Deeplinks, (Jan. 19, 2022) ..................................... 17

Megan Farokhmanesh, *YouTube Is Still Restricting and Demonetizing LGBT
   Videos—and Adding Anti-LGBT Ads to Some*, The Verge, (June 4, 2018) ............................... 13

Megan McCluskey, *These TikTok Creators Say They're Still Being Suppressed for
   Posting Black Lives Matter Content*, Time, (July 22, 2020) ........................................... 12

Mike Masnick, *Masnick's Impossibility Theorem: Content Moderation At Scale Is
   Impossible To Do Well*, Techdirt, (Nov. 20, 2019)..................................................... 10

*Moderator Code of Conduct*, Reddit ..................................................................... 9

Mukund Rathi, *Amidst Invasion of Ukraine, Platforms Continue to Erase Critical
   War Crimes Documentation*, EFF Deeplinks, (Apr. 27, 2022) ........................................... 16

Nicola Palladino, Dennis Redeker, Edoardo Celeste, *The platform governance triangle: Conceptualising the informal regulation of online content,* Internet Policy Review 8 (June 2019)........................................................................................................ 14

Olivia-Anne Cleary, *Facebook Has Banned Awareness Posts That Include the Words 'Period,' 'Vulva' and 'Clitoris' for Being Too Sexual*, Glamour, (June 9, 2023)......................................................................................................... 11

Paige Collings, *EFF's Comment to the Meta Oversight Board on Polish Anti-Trans Facebook Post*, EFF Deeplinks (Sept. 27, 2023) ....................................................... 17

*Platform Policies*, Quora ...................................................................................................... 8

*Protecting Media Freedom Online: Old Challenges, New Solutions*, Global Forum for Media Development (Feb. 10. 2025) .................................................................. 18

Ravelry, Ravelry.com ........................................................................................................... 5

*Reach Over 400 Million Monthly Unique Visitors on Quora*, Quora for Business........................ 7

*Reddiquette*, Reddit........................................................................................................... 9

Robert Gorwa, *The platform governance triangle: Conceptualising the informal regulation of online content*. Internet Policy Review 8, 2 (June 2019) .................................. 14

Robyn Caplan, *Networked platform governance: The construction of the democratic platform*, International Journal of Communication (2023)................................. 18

*Role of Administrators and Moderators on Discord*, Discord........................................ 9

Santa Clara Principles, santaclaraprinciples.org ........................................................ 19

Sarah T. Roberts, Behind the Screen: Content Moderation in the Shadows of Social Media (Yale University Press 2019)............................................................... 4

*Social Media Councils*, Article 19 .................................................................................... 20

*Strava Community Standards*, Strava .............................................................................. 4

Taylor Wofford, *Twitter Was Flagging Tweets Including the Word "Queer" as Potentially "Offensive Content*, Mic, (June 22, 2017) ........................................................... 13

*Terms and Conditions,* Shabbat.com ................................................................................ 6

*Terms of Use Agreement*, Petzbe ...................................................................................... 6

*Terms of use*, Gettr............................................................................................................ 8

*The Rules*, SmokingMeatForums.com.............................................................................. 5

TOSsed Out, Electronic Frontier Foundation ................................................................ 16

Trans Safety Network (@trans_safety), X ................................................................... 12

*Truth Social Terms of Service*, Truth Social ................................................................. 9

Universidad de Chile, Informe revela alcance de las vulneraciones a la libertad
de expresión durante el estallido social, (Jan. 21, 2020) ........................................ 15

Vanessa Pappas, *A Message to Our Black Community*, TikTok, (June 1, 2020) ......... 12

*Website Terms and Conditions of Use and Agency Agreement*, Rumble ...................... 8

*What's Petzbe*, Petzbe ................................................................................................... 6

*Who has Your Back: Censorship Edition*, Electronic Frontier Foundation,
(June 12, 2019) ..................................................................................................... 18

*YouTube restores Amy Greenfield's videos*, National Coalition Against Censorship,
(Feb. 22, 2010) ..................................................................................................... 18

**INTEREST OF AMICUS CURIAE**[1]

The Electronic Frontier Foundation (EFF) is a member-supported, nonprofit civil liberties organization founded in 1990 to defend civil liberties in the digital world. Social media content moderation is one of the many issues in which EFF has developed expertise and it has applied that expertise both in the courtroom and in numerous U.S.-based and international civil society forums. EFF has frequently filed influential amicus briefs in the U.S. Supreme Court and in various federal and state appellate courts in cases arising from content moderation, dating back to its amicus brief filed in the Ninth Circuit in 2018 in *Prager Univ. v Google*, 951 F.3d 991 (9th Cir. 2020). The Eleventh Circuit used examples from EFF's amicus brief submitted in *Netchoice v. Attorney General, Florida*, 34 F.4th 1196, 1213 (11th Cir. 2022), *aff'd in par, rev'd in part by Moody v. Netchoice*, 603 U.S. 707 (2024). EFF has also written extensively in non-legal forums about the human rights implications of content moderation. EFF is among the co-authors of the Santa Clara Principles, www.santaclaraprinciples.org, and was among the organizations that surveyed internet users around the world about their experiences with content moderation.

**INTRODUCTION**

Content moderation, the process by which social media platforms and similar online forums edit and curate user-generated content, has been a common practice since these services were first established. It was by no means created by the European Union, or any of the plaintiffs to this action, or any of the individuals or organization the U.S. government seeks to punish. It is a global phenomenon and was not, contrary to the position of the current U.S. administration,

---

[1] No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than the *amicus curiae* or their counsel made a monetary contribution intended to fund the brief's preparation or submission. All parties consent to *amicus* filing of this brief.

created to suppress, or primarily focused on suppressing, the speech of conservative U.S. speakers.

Content moderation is also a fraught and highly imperfect process that often frustrates both those trying to publish and their intended audiences, as well as those audience members who are served speech they hadn't expected and did not want to receive or did not want others to receive. High quality content moderation typically requires global cultural competence and wide-ranging subject matter expertise.

As a result, civil society, including academics, researchers, and advocacy organizations, and a platform's community of users all play a vital role in improving content moderation systems, in educating the public about its many shortcomings, and in advocating for change.

This case is about preserving the right to offer this external expertise free from government retaliation. This Court should grant the preliminary injunction to preserve the status quo where people exercise their rights to consult with and complain to platforms to assist their content moderation processes, and to inform the public.

## ARGUMENT

## I. Content Moderation Has Been Integral to Online Forums, and Controversial, for Decades

### A. Content Moderation Has Been a Common Practice for Decades

While unmoderated forums remain available on the Internet, most social media networks and online interactive forums always have curated their users' speech.

Content moderation is nearly as old as the internet itself. Users of early bulletin board systems and web forums developed and enforced rules governing acceptable speech, often through a combination of community norms and technical controls, such as flagging. Early

content moderation relied solely on user reporting.[2] Moderation was primarily conducted by volunteers, typically participants in each community.

Online services, at least from their point of mass adoption, rarely allowed all legal speech published on their sites to remain there. For example, most platforms for user speech removed legal, non-obscene sexual content, speech that enjoys First Amendment protection.[3]

The passage of the Digital Millennium Copyright Act (DMCA) in 1998 accelerated and formalized emerging content moderation practices by introducing a notice-and-takedown regime for alleged copyright infringement. This regime gave legal significance to user notice and incentivized platforms to create a process to review and assess such notices (or otherwise to simply respond to every notice by depublishing the speech), Jennifer M. Urban, Joe Karaganis, and Brianna Schofield, *Notice and Takedown in Everyday Practice* (March 22, 2017), UC Berkeley Public Law Research Paper No. 2755628, available at SSRN: https://ssrn.com/abstract=2755628 or http://dx.doi.org/10.2139/ssrn.2755628.  This, along with the growth of commercial social media in the 2000s, forced many companies to institutionalize moderation workflows.

Large-scale, outsourced content moderation emerged in the early 2000s.[4] The rise of large-scale social media platforms and the growth of their user bases required companies to develop written community standards and build internal teams dedicated to applying those standards. These systems evolved incrementally, often in response to public controversy, media

---

[2] Jillian C. York, *Silicon Values: The Future of Free Speech Under Surveillance Capitalism*, 25-27 (Verso 2021).

[3] Jillian C. York & David Greene, *How to Put COVID-19 Content Moderation Into Context*, Brookings' TechStream (May 21, 2020), https://www.brookings.edu/articles/how-to-put-covid-19-content-moderation-into-context/.

[4] York & Greene, *supra* n.3.

scrutiny, or advertiser concerns, Kate Klonick, *The New Governors: The People, Rules, and Processes Governing Online Speech*, 131 Harv. L. Rev. 1598, 1618 (2018).

Today, almost every service that allows for user-generated speech has community standards or content guidelines by which they limit the users' speech that may be posted to their sites, and a trust and safety team to administer the standards. Commercial content moderation now may involve large teams as well as automated technologies, and moderation may take place before content is published or after it has been uploaded, Sarah T. Roberts, Behind the Screen: Content Moderation in the Shadows of Social Media 26-27 (Yale University Press 2019). The moderation process may be triggered as the result of automated detection, user flagging or reporting, or following a request from an external party, such as a government or copyright holder.

**B.    Interactive Online Services Have a Wide Range of Complicated and Often Bespoke Content Policies.**

It is now well established that social media platforms and similar online services have a First Amendment right to curate and edit the speech created and posted by users to their sites. *See Moody v. Netchoice, LLC*, 603 U.S. 707, 731-40 (2024). No platform can be required to publish, recommend, amplify, or highlight any specific post by any user.

But even before that decision, the internet was full of both general purpose and highly specialized online platforms. Indeed, the vast majority of social media sites, large and small, are not designed for all speech, topics, or users; most are specialized services with a particular subject matter focus or target-user demographic.

People seeking out online services catering to their interests and communities can find a wide range of sites, from Strava, a social network for athletes, *Strava Community Standards*, Strava, https://www.strava.com/community-standards (last visited March 18, 2026), to Ravelry,

4

a social media site focused on knitting, Ravelry, https://www.ravelry.com (last visited March 18, 2026). People can choose between Vegan Forum, s*ee NetChoice v. Attorney General, Florida,* 34 F.4th 1196, 1213 (11th Cir. 2022), *aff'd in par, rev'd in part by Moody*, 603 U.S. 707, and SmokingMeatsForums.com, a "community of barbecue and outdoor cooking enthusiasts dedicated to smoking meat," *The Rules*, SmokingMeatForums.com, https://www.smokingmeatforums.com/help/rules/ (last visited March 18, 2026).

And each site has its own peculiar and intricate set of community standards that reflects its subject matter focus, targeted audience, or its societal or political values.

Pinterest, a site designed to visually inspire creative projects, has "community guidelines" that "outline what we do and don't allow on Pinterest," *Community Guidelines*, Pinterest, https://policy.pinterest.com/en/community-guidelines (last visited March 18, 2026). Under these guidelines, Pinterest reserves the right to remove several categories of speech: "Adult content," "Exploitation," "Hateful activities," "Misinformation," "Harassment and criticism," "Private information," "Self-injury and harmful behavior," "Graphic violence and threats," "Violent actors," "Dangerous goods and activities," "Harmful or deceptive products and practices," and "Impersonation." Pinterest has special rules for comments users post on other users' "Pins," including a ban on "Irrelevant or non-purposeful material," *Id*.

Peanut, a social media site aiming to be a "safe, inclusive space for women" navigating fertility, pregnancy, and motherhood similarly prohibits its millions of users from posting any content that attacks, threatens or "otherwise dehumanizes an individual or group" based on race, ethnicity religion, age, socioeconomic status, or disability, among other categories, *Community Guidelines*, Peanut, https://www.peanut-app.io/community-guidelines (last visited April 8, 2026). Misinformation, including, specifically "misinformation about vaccines," "bullying," and

5

"nudity, pornography, sexually explicit content or sexual solicitation" are also barred, *Id*.

Petzbe, which describes itself as "a social media app for pet parents and pet families of all ages," prohibits "any content that is offensive, abusive, libelous, defamatory, obscene, racist, sexually explicit, ethnically or culturally offensive, indecent, that promotes violence, terrorism, or illegal acts, incites hatred on grounds of race, gender, religion or sexual orientation, or is otherwise objectionable in Petzbe's sole and reasonable discretion," *What's Petzbe*, Petzbe, https://petzbe.com/; *Terms of Use Agreement*, Petzbe, https://petzbe.com/terms-of-use (each last visited March 30, 2026).

The High Road, a firearms discussion forum, requires that all posts be "related to firearms or 'Right to Keep and Bear Arms' (RKBA) issues" and explicitly prohibits users from engaging in "discussions relating to the preparation for possible societal breakdown" or "foreign invasion," *Code of Conduct*, The High Road, https://www.thehighroad.org/index.php?pages/code-of-conduct/ (last visited March 18, 2026).

These community standards may reflect a wide range of ideological and religious views. GodTube, a Christian video site, prohibits users from "promot[ing]" any "beliefs or teachings contrary to those of Christianity as articulated by the historic creeds…", *GodTube Community Guidelines*, GodTube, https://www.godtube.com/terms-of-use.html (last visited March 18, 2026); while Shabbat.com, "the world's largest Jewish social network," prohibits users from posting any content that is "missionizing, Christian or otherwise," *Terms and Conditions,* Shabbat.com, *https://www.shabbat.com/terms* (last visited March 18, 2026).As the Eleventh Circuit explained, "On the right, ProAmericaOnly promises 'No Censorship | No Shadow Bans | No BS | NO LIBERALS.' And on the left, The Democratic Hub says that its "online community is for liberals, progressives, moderates, independent[s] and anyone who has a favorable opinion

of Democrats and/or liberal political views or is critical of Republican ideology." *See NetChoice*, 34 F.4th at 1214.

Some social media sites have special concerns for ensuring that the information they publish is accurate. For example, HealthUnlocked, a social media site for health information, requires users to agree that their contributions to the site must not "promote false cures for illnesses, anti-vaccination advice, manipulate contents to mislead users by distorting the truth of events, misinformation or post content that originates from disinformation campaigns" nor "post any inaccurate or misleading information, or opinions which you do not genuinely hold," *Terms of Use*, https://support.healthunlocked.com/article/147-terms. HealthUnlocked, (last visited April 8, 2026. The site also bans posts that are "vulgar," "duplicitous," "bullying," "inflammatory," or anything "likely to harass, degrade, upset, shame, embarrass or alarm any other person." *Id.*

Even general purpose social networks, those covering a wide variety of subject matters and users, typically have editorial policies by which they will be required to make numerous editorial and curatorial decisions.

Quora sees itself as a site where any user can ask questions "and get answers from people who have been there and done that" and as a "refuge from misinformation and incendiary arguments." *Reach Over 400 Million Monthly Unique Visitors on Quora*, Quora for Business, https://business.quora.com/resources/reach-over-400-million-monthly-unique-visitors-on-quora/; (last visited March 18, 2026). Quora thus prohibits "posting irrelevant answers or comments"; "targeted insults or profanity directed at private individuals based on personal attributes, such as physical appearance"; "hate speech," including "content that dehumanizes or calls for violence, exclusion, or segregation of protected classes" and Holocaust and Armenian Genocide denial; and "encouraging, glorifying, or promoting" harmful activities such as "self-harm (including

eating disorders) and animal cruelty." *Platform Policies*, Quora, https://help.quora.com/hc/en-us/articles/360000470706-Platform-Policies (last updated June 2023).

Gettr, a "a social media platform built on the foundation of freedom of opinion and expression,'" *About,* Gettr, https://about.gettr.com/ (last visited March 30, 2026), also does not allow content that "disparages victims of violent tragedies, that depicts or threatens willful physical harm, or that wishes death or grievous injury on an individual," "content that involves the use of racial or religious epithets" or "promotes segregation of, individuals or groups merely on the basis of race, color, ethnicity, national origin, ancestry, religion, gender or sexual orientation," "depicts torture, violent or graphic deaths or accidents, dismembered, mutilated, charred, or burned human remains, or gore in which an open wound or injury is the *core focus*," and, among others, "content depicting, promoting, normalizing, encouraging, or glorifying activities that promote suicide or self-harm." Gettr also asks its users to "not excessively promote gambling activity." *Community Guidelines*, Gettr, https://support.gettr.com/en/articles/9937971-gettr-community-guidelines; *Terms of use*, Gettr, https://gettr.com/terms (each last visited March 18, 2026).

Rumble, a video sharing platform, prohibits both videos and comments on a number of criteria, including a bar on content that is "hateful, anti-semitic, racist or threatening" or "Promotes, supports or incites individuals and/or groups which engage in violence or unlawful acts, including but not limited to Antifa groups and persons affiliated with Antifa, the KKK and white supremacist groups and or persons affiliated with these groups." *Website Terms and Conditions of Use and Agency Agreement*, Rumble, https://rumble.com/s/terms (last visited March 30, 2026).

Truth Social, President Trump's social media platform, requires those posting speech to

8

the site to warrant that "your Contributions are not false, inaccurate, or misleading" or "filthy" and bans "Sexually suggestive (explicit or vague) statements, texts or phrases." *Truth Social Terms of Service*, Truth Social, https://help.truthsocial.com/legal/terms-of-service/ (visited March 25, 2026).

Finally, many sites leave many of the moderation decisions up to the users themselves, a practice known as "community moderation," with Reddit and Discord among its most popular adopters. Reddit users manage and create thousands of communities, called subreddits. Although Reddit has an overriding content policy, a moderator makes the decisions within each community as guided by Reddit's "Moderator Code of Conduct." *Moderator Code of Conduct*, Reddit, https://www.redditinc.com/policies/moderator-code-of-conduct (effective Sep. 25, 2023). Discord employs a similar model. *Role of Administrators and Moderators on Discord*, Discord, https://discord.com/safety/360044103531-role-of-administrators-and-moderators-on-discord (last visited March 18, 2026). Each site thereby empowers some users to remove and down-rank other users' speech if that speech is against that community's rules. [1] *See, e.g., Reddiquette*, Reddit, https://reddit.zendesk.com/hc/en-us/articles/205926439-Reddiquette (last visited March 18, 2026).

C.    **Content Moderation Controversies are Widespread and Cross Many Ideologies**

For most sites, content moderation is accomplished by a complex, hybrid system of moderation that combines reactive and proactive measures, human judgment and automated filtering, along with both internal and external sources of authority. This system places private platforms in a central role of determining the boundaries of online expression, raising ongoing questions about transparency, accountability, and the protection of fundamental rights in digital

spaces.[5]

Given the various and often complex rules and procedures, content moderation decisions are often controversial. As is often said, content moderation at scale is impossible to do perfectly, and nearly impossible to do well. *See, e.g.*, Mike Masnick*, Masnick's Impossibility Theorem: Content Moderation At Scale Is Impossible To Do Well*, Techdirt, (Nov. 20, 2019), https://www.techdirt.com/articles/20191111/23032743367/masnicks-impossibility-theorem-content-moderation-scale-is-impossible-to-do-well.shtml. Even when using a set of precise rules or carefully articulated community standards, moderated platforms often struggle to distinguish between speech that is and is not permitted. Every online forum for user speech, not just the dominant social media platforms, grapples with this problem.  Some user speech is rejected, hidden, labeled, demonetized, or otherwise negatively moderated; other speech is promoted or recommended. Eric Goldman, *Content Moderation Remedies*, 28 Mich. Tech. L. Rev. 1 (2021). This may occur because the user's speech clearly strayed from the site's rules. Or it may have been a close editorial call about which reasonable minds could differ. Or it may just be a mistake.

This aspect of content moderation is often frustrating, angering, or perplexing to the people who use these services. People may believe that a platform is not adequately recommending their posts to other users or otherwise spotlighting their posts or their account as the user thinks appropriate.

As a result, controversies about content moderation decisions abound worldwide. This is not a new problem; content moderation controversies date back to at least 2007, spanning the

---

[5] York, Silicon Values, *supra* note 2.

globe and the political spectrum. [6]

For example, in 2022, Facebook restricted a post from Planned Parenthood of Michigan that shared an article regarding the legal availability of abortion pills online so that it was visible to only the administrators of the group to which it was posted. Facebook claimed this was a mistake, and restored the post, and affirmed that discussions about the affordability and availability of pharmaceuticals were permitted, though "content that attempts to buy, sell, trade, gift, request or donate pharmaceuticals is not allowed." Allison R. Donahue, *Facebook takes down Planned Parenthood post about medication abortion*, Michigan Advance, (Aug. 22, 2022), https://michiganadvance.com/blog/facebook-takes-down-planned-parenthood-post-about-medication-abortion/; Allison R. Donahue, *Facebook restores Planned Parenthood post about medication abortion*, Michigan Advance, (Aug. 23, 2022), https://michiganadvance.com/briefs/facebook-restores-planned-parenthood-post-about-abortion-medication/. Facebook also recently faced renewed criticism over the negative moderation of posts containing words pertinent to feminine hygiene, including "vulva" and "endometriosis." Olivia-Anne Cleary, *Facebook Has Banned Awareness Posts That Include the Words 'Period,' 'Vulva' and 'Clitoris' for Being Too Sexual*, Glamour, (June 9, 2023), https://www.glamourmagazine.co.uk/article/facebook-bans-bodyform-posts-with-words-period-vulva-clitoris.

Marginalized communities are particularly vulnerable to overzealous content moderation. Black creators have documented how Black Lives Matter content was suppressed on TikTok; TikTok apologized and blamed it on a bug, but incidents persisted.[1] Megan McCluskey, *These TikTok Creators Say They're Still Being Suppressed for Posting Black Lives Matter Content*,

---

[6] York, Silicon Values, *supra* note 2, at 25-27.

Time, (July 22, 2020), https://time.com/5863350/tiktok-black-creators/; Vanessa Pappas, *A Message to Our Black Community*, TikTok, (June 1, 2020), https://newsroom.tiktok.com/en-us/a-message-to-our-black-community. A 2021 report documented that the viewpoints of communities of color, women, LGBTQ+ persons, and religious minorities are subject to over-enforcement of social media community standards, with their posts subject more frequently to mass takedowns as compared to more subtle forms of content moderation, such as warning labels and temporary demonetization, more commonly applied to the viewpoints of dominant communities. Ángel Díaz and Laura Hecht-Felella*, Double Standards in Social Media Content Moderation*, (Aug. 4, 2021), https://www.brennancenter.org/our-work/research-reports/double-standards-social-media-content-moderation. In 2025, accounts belonging to more than 50 abortion access providers, queer groups, and reproductive health organizations were removed across Meta platforms. Aisha Down, *Meta shuts down global accounts linked to abortion advice and queer content*, The Guardian, (Dec. 11, 2025), https://www.theguardian.com/global-development/2025/dec/11/meta-shuts-down-global-accounts-linked-to-abortion-advice-and-queer-content. EFF has documented instances where sexual health content aimed at LGBTQ+ audiences is treated differently from that directed at heterosexual audiences. Jillian C. York, *Blunt Policies and Secretive Enforcement Mechanisms: LGBTQ+ and Sexual Health on the Corporate Web*, EFF Deeplinks, (Oct. 24, 2018), https://www.eff.org/deeplinks/2018/10/blunt-policies-and-secretive-enforcement-mechanisms-lgbtq-and-sexual-health. In 2023, the Trans Safety Network reported finding that the words "trans," "queer," "lesbian" and "bisexual" were downranked on X and not shown in direct message previews. Trans Safety Network (@trans_safety), X (Apr. 1, 2023, 4:11 AM), https://twitter.com/trans_safety/status/1642122617594212353.  This finding recalls previous

12

incidents when users discovered that Twitter had marked tweets containing the word "queer" as offensive, Taylor Wofford, *Twitter Was Flagging Tweets Including the Word "Queer" as Potentially "Offensive Content*, Mic, (June 22, 2017), https://www.mic.com/articles/180601/twitter-was-flagging-tweets-including-the-word-queer-as-potentially-offensive-content,  and YouTube was accused of restricting and demonetizing LGBTQ+ content. Megan Farokhmanesh, *YouTube Is Still Restricting and Demonetizing LGBT Videos—and Adding Anti-LGBT Ads to Some*, The Verge, (June 4, 2018), https://www.theverge.com/2018/6/4/17424472/youtube-lgbt-domentization-ads-alogrithm. Sex worker advocates are routinely shadow banned and flagged by malicious actors across a variety of social media platforms. *See* Danielle Blunt et al., *Posting Into The Void*, Hacking//Hustling, (Oct. 2020), https://hackinghustling.org/wp-content/uploads/2020/09/Posting-Into-the-Void.pdf; Carolina Are, *Flagging as a silencing tool: Exploring the relationship between de-platforming of sex and online abuse on Instagram and TikTok*, New Media & Society (2025), Vol. 27(6) 3577–3595.

Palestinian rights advocates have complained of unfair content moderation against their views before and during the current Israel-Gaza conflict, including the removal of the Palestinian flag emoji and the Let's Talk Palestine and eye.on.palestine accounts from Instagram. Hibaq Farah, *Pro-Palestinian Instagram account locked by Meta for 'security reasons'*, The Guardian, (Oct. 26, 2023), https://www.theguardian.com/technology/2023/oct/26/pro-palestinian-instagram-account-locked-by-meta-for-security-reasons; Karen Gullo & Jillian C. York, *Platforms Must Stop Unjustified Takedowns of Posts By and About Palestinians*, EFF Deeplinks, (Nov. 8, 2023), https://www.eff.org/deeplinks/2023/11/platforms-must-stop-unjustified-takedowns-posts-and-about-palestinians.

13

**II.      Civil Society Experts Play an Important Role in Promoting Transparency and Integrity in Content Moderation Policies and Practices**

Against this backdrop, civil society experts—NGOs, academics, and technical experts—can play an important role as content moderation watchdogs, publicly monitoring the platforms' compliance with their own rules, criticizing or praising the platforms as appropriate, and advocating for the people who use the platforms to publish and/or receive information. Their work helps hold the platforms accountable and informs the public so the people using these services can better understand a platform's content moderation practices and advocate for themselves. Their work often offers "actionable recommendations and granular norms for platforms to uphold human rights standards while balancing competing interests such as freedom of expression and protection from harm." Nicola Palladino, Dennis Redeker, Edoardo Celeste, *The platform governance triangle: Conceptualising the informal regulation of online content,* Internet Policy Review 8, 2 (June 2019) https://policyreview.info/articles/analysis/constitutionalising-global-content-governance. Indeed, as researcher describes it, civil society has become one of the pillars of platform governance: "Digital civil society groups, academics, and journalists have come to play a vital corporate accountability and watchdog function through their advocacy, research, and investigations into platform practices." Robert Gorwa, *The platform governance triangle: Conceptualising the informal regulation of online content*. Internet Policy Review 8, 2 (June 2019), https://policyreview.info/articles/analysis/platform-governance-triangle-conceptualising-informal-regulation-online-content.

For example, civil society organizations in countries as diverse as Bosnia and Herzegovina, Indonesia, and Kenya have helped bring to light the problem of inconsistent interpretation of content moderation rules in those countries. Content Moderation and Freedom

14

of Expression: Bridging the Gap between Social Media and Local Civil Society, Article 19,

(June 2022), https://www.article19.org/wp-content/uploads/2022/06/Summary-report-social-

media-for-peace.pdf at 17, 23, 25-28, 33-35. And in 2020, three Chilean nongovernmental

organizations carried out a study investigating social media content moderation over a one-

month period from the prior year so that they could understand and explain the rules to Chilean

social media users. Agustina Del Campo, *Moderate globally impact locally: Social media in*

*Latin America, caught between a rock and a hard place* (Sept. 18, 2020),

https://law.yale.edu/isp/initiatives/wikimedia-initiative-intermediaries-and-information/wiii-

blog/moderate-globally-impact-locally-social-media-latin-america-caught-between-rock-and-

hard-place; Universidad de Chile, Informe revela alcance de las vulneraciones a la libertad de

expresión durante el estallido social, (Jan. 21, 2020), https://uchile.cl/noticias/161115/informe-

revela-alcance-de-las-vulneraciones-a-la-libertad-de-expresion. This followed a 2017 study by an

Argentina-based NGO into measures by Facebook, YouTube and Twitter to combat fake news

and disinformation. CELE, *Fake news on the internet: the strategy to battle misinformation*

(Dec. 2017), https://www.palermo.edu/Archivos_content/2019/cele/Mayo/Fake-news-strategy-

to-battle-misinformation.pdf. Don't Delete Art teaches artists how to post their images without

having them flagged by platforms and also offers advice on how to appeal adverse content

moderation decisions. Elaine Veili, *In NYC Protest, Activists Tell Meta to Stop Deleting Art*,

Hyperallergic, (June 16, 2023), https://hyperallergic.com/in-nyc-protest-activists-tell-meta-to-

stop-deleting-art/.

   EFF has spent many years research and highlighting content policies and decisions and

educating users about them and the human rights implications of them. *See, e.g.,* Mukund Rathi,

*Amidst Invasion of Ukraine, Platforms Continue to Erase Critical War Crimes Documentation*,

EFF Deeplinks, (Apr. 27, 2022), https://www.eff.org/deeplinks/2022/04/amidst-invasion-ukraine-platforms-continue-erase-critical-war-crimes-documentation; Jillian C. York, *The Global Suppression of Online LGBTQ+ Speech Continues*, EFF Deeplinks, (June 27, 2024), https://www.eff.org/deeplinks/2024/06/global-suppression-online-lgbtq-speech-continues; Jillian C. York et al, *Twitter Has a New Owner. Here's What He Should Do*, EFF Deeplinks, (Apr. 25, 2022), https://www.eff.org/deeplinks/2022/04/twitter-has-new-owner-heres-what-he-should-do; Corynne McSherry & Jillian C. York, *Facebook's Policy Shift on Politicians Is a Welcome Step*, EFF Deeplinks, (June 7, 2021), https://www.eff.org/deeplinks/2021/06/facebooks-policy-shift-politicians-welcome-step. In 2014, we launched a project, Onlinecensorship.org, that accepted submissions from platform users about their experiences with content takedowns. Our findings from eight months of submissions are encapsulated in a report. Jessica Anderson et al., *Online Censorship in Context: Insights from Crowdsourced Data on Social Media Censorship*, (2016), available at https://s3-us-west- Another project, TOSsed Out, highlighted examples of content removals. TOSsed Out, Electronic Frontier Foundation, https://www.eff.org/tossedout. At times, we have advocated for changes to specific platform policies. Karen Gullo & Jillian C. York, *Platforms Must Stop Unjustified Takedowns of Posts By and About Palestinians*, EFF Deeplinks, (Nov. 8, 2023), https://www.eff.org/deeplinks/2023/11/platforms-must-stop-unjustified-takedowns-posts-and-about-palestinians; Jillian C. York, *Companies Must Provide Accurate and Transparent Information to Users When Posts are Removed*, EFF Deeplinks, (Sept. 19, 2025), https://www.eff.org/pages/companies-must-provide-accurate-and-transparent-information-users-when-posts-are-removed.

Our work also includes explanations of policy changes, such as those that occurred during the Covid-19 pandemic, Konstantinos Komaitis & David Greene, *Fact-Checking,*

16

*COVID-19 Misinformation, and the British Medical Journal*, EFF Deeplinks, (Jan. 19, 2022), https://www.eff.org/deeplinks/2022/01/fact-checking-covid-19-misinformation-and-british-medical-journal, shifts in hate speech-related policies, Jillian C. York & David Greene, *Facebook's Latest Proposed Policy Change Exemplifies the Trouble With Moderating Speech at Scale*, EFF Deeplinks, (Feb. 4, 2021),  https://www.eff.org/deeplinks/2021/02/facebooks-latest-proposed-policy-change-exemplifies-trouble-moderating-speech-0, and problems users face due to policies such as those aimed at curbing violent extremism. Jillian C. York & David Greene, *Facebook's Secret "Dangerous Organizations and Individuals" List Creates Problems for the Company—and Its Users*, EFF Deeplinks (Dec. 1, 2021), https://www.eff.org/deeplinks/2021/12/facebooks-secret-dangerous-organizations-and-individuals-list-creates-problems. We regularly submit comment to the Meta Oversight Board on a range of subjects, including reproductive healthcare, Jillian C. York, *EFF's Comment to the Meta Oversight Board on United States Posts Discussing Abortion*, EFF Deeplinks, (July 10, 2023), https://www.eff.org/deeplinks/2023/07/effs-comment-meta-oversight-board-united-states-posts-discussing-abortion, LGBTQ issues, Paige Collings, *EFF's Comment to the Meta Oversight Board on Polish Anti-Trans Facebook Post*, EFF Deeplinks (Sept. 27, 2023), https://www.eff.org/deeplinks/2023/09/effs-comment-meta-oversight-board-polish-anti-trans-facebook-post. government takedown demands, *Comment of Electronic Frontier Foundation to Oversight Board case 2022-007-IG-MR*, Electronic Frontier Foundation, https://www.eff.org/document/ob-comment-re-uk-drill-music, and region-specific language. Jillian C. York*, EFF and ECNL's Comment to the Meta Oversight Board on the Term 'Shaheed'*, EFF Deeplinks, (Apr. 24, 2023), https://www.eff.org/deeplinks/2023/04/eff-and-ecnls-comment-meta-oversight-board-term-shaheed.

17

In some cases, platforms do modify their practices and policies in response to concerns raised by civil society. Platforms have long incorporated their users' feedback to identify posts that may violate the platform's community standards. Robyn Caplan, *Networked platform governance: The construction of the democratic platform*, International Journal of Communication (2023), at 17, 22, available at https://ijoc.org/index.php/ijoc/article/view/20035. And some platforms have institutionalized outreach to civil society organizations, experts, government agencies, and other specific community members within the platform's operations. *Id.*; Beatriz Kira, *Regulatory intermediaries in content moderation*, Internet Policy Review, 14(1) (2025), available at https://doi.org/10.14763/2025.1.1824.

For example, efforts of multiple nongovernmental organizations, including amicus curiae, caused many of the largest platforms to begin publishing detailed transparency reports.*See, e.g., Who has Your Back: Censorship Edition*, Electronic Frontier Foundation, (June 12, 2019), https://www.eff.org/el/wp/who-has-your-back-2019; *2025 RDR Index: Big Tech Edition*, Ranking Digital Rights, (2025) https://www.eff.org/el/wp/who-has-your-back-2019. In Ukraine, journalists rely on "escalation channels" such as Access Now's Digital Security Helpline and the Tech and Journalism Crisis and Emergency Mechanism to document and challenge moderation decisions that affect their news outreach. *Protecting Media Freedom Online: Old Challenges, New Solutions*, Global Forum for Media Development (Feb. 10. 2025), https://gfmd.info/briefings/protecting-media-freedom-online-old-challenges-new-solutions. In the U.S., civil society pressure caused YouTube to restore access to the videos of internationally recognized artist Amy Greenfield. *YouTube restores Amy Greenfield's videos*, National Coalition Against Censorship, (Feb. 22, 2010), https://ncac.org/incident/youtube-restores-amy-greenfields-videos-2. Meta's Oversight Board, which reviews selected user appeals and offers policy

recommendations regarding Meta's content decisions across its platforms, actively solicits comments from the public and civil society, and those recommendations commonly make their way into the Board's decisions and recommendations. Joan Barata, *The Decisions of the Oversight Board from the Perspective of International Human Rights Law*, (Oct. 2022) available at https://globalfreedomofexpression.columbia.edu/wp-content/uploads/2022/10/The-Decisions-of-the-OSB-from-the-Perspective-of-Intl-Human-Rights-Law-Joan-Barata-.pdf; Jillian C. York, *Meta Oversight Board's Latest Policy Opinion a Step in the Right Direction*, EFF Deeplinks (March 26, 2024), https://www.eff.org/deeplinks/2024/03/meta-oversight-boards-latest-policy-opinion-step-right-direction.

External expertise is particularly necessary for international platforms. Such platforms must often make moderation decisions about speech that is in a foreign language, arises in a specialized or unfamiliar context, or otherwise requires specialized cultural and subject matter knowledge. The Santa Clara Principles, a widely accepted human rights framework for content moderation, of which amicus was a co-author, identifies "cultural competence" as a foundational principle:

> Companies should ensure that their rules and policies, and their enforcement, take into consideration the diversity of cultures and contexts in which their platforms and services are available and used, and should publish information as to how these considerations have been integrated in relation to all operational principles."

Santa Clara Principles, www.santaclaraprinciples.org.

Where companies lack such competence, civil society can help fill the gap and/or pressure the companies to do so themselves. In Myanmar following severe criticism that Facebook played a role in the Rohingya genocide in Myanmar, Meta worked with local civil society to improve their moderation practices including recognizing local language differences and cultural expertise. Associated Press*, Hate speech in Myanmar continues to thrive on*

19

*Facebook*, The Independent (Nov. 18, 2021),

https://www.independent.co.uk/news/world/americas/us-politics/facebook-myanmar-indonesia-

jakarta-mark-zuckerberg-b1959851.html. And civil society criticism of Meta's policies in Israel

and Palestine resulted in the company commissioning an external human rights impact

assessment and policy changes. *Human Rights Due Diligence of Meta's Impacts in Israel and*

*Palestine*, BSR, (Sept. 22, 2022), https://www.bsr.org/en/reports/meta-human-rights-israel-

palestine. In Paraguay and Peru, Facebook has actively sought and followed civil society advice

in applying its hate speech policies to specific slurs or threats. *Human Rights Due Diligence of*

*Meta's Impacts in Israel and Palestine*, BSR, (Sept. 22, 2022),

https://www.bsr.org/en/reports/meta-human-rights-israel-palestine. While these efforts may not

have led to as much change as requested, they are at least moving the dial on Meta's practices.

Policymakers concerned with freedom of expression have recognized the crucial role

civil society can play in supporting free expression and due process on social media platforms.

For example, the U.N.'s special rapporteur for freedom of expression endorsed a proposal to

create voluntary "Social Media Councils" that would bring together multiple stakeholders,

including civil society experts, to review content moderations decisions under international

human rights standards *Social Media Councils*, Article 19, https://www.article19.org/social-

media-councils/.

Moreover, even if a company does not adopt civil society's recommendations, civil

society can foster broader advocacy for accountability and change simply by educating users.

Many users find content moderation practices opaque at best; public interest organizations can

offer explanatory guides and call attention to unfair moderation decisions.

## CONCLUSION

Civil society has a long-standing and important role as a watchdog of social media

20

content moderation, through research, educational efforts, and advocacy, helping the public to become aware of and understand how the policies affect them, advocating for human rights-compliant changes, and even achieving such changes. Those who participate in the process should not be punished for doing so, and when the U.S. government does so, it amounts to a serious infringement of First Amendment rights.

For the above-stated reasons, this Court should grant the preliminary injunction.

Dated: April 13, 2026                    Respectfully submitted,

/s/ *Aaron Mackey*
Aaron Mackey (DC Bar No. 1017004)
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
amackey@eff.org
(415) 436-9333 phone
(415) 436-9993 fax

*Counsel for Amicus Curiae*
*Electronic Frontier Foundation*

21