UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| COALITION FOR INDEPENDENT TECHNOLOGY RESEARCH,<br><br>Plaintiff,<br><br>v.<br><br>MARCO RUBIO, *et al*.,<br><br>Defendants. | Civil Action No. 26-0815 (JEB) |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION SEEKING INTERIM**
**<u>RELIEF PURSUANT TO 5 U.S.C. § 705</u>**

## TABLE OF CONTENTS

Introduction.............................................................................................................. 1

Background ............................................................................................................... 2

    I.      Legal Landscape ..................................................................................... 2

    II.     The Policy Regarding Visa Restrictions ................................................. 3

    III.   Related Removal Actions For Noncitizens Engaging In Censorship .................... 4

    IV.   Related Immigration Actions To Date .................................................... 6

    V.     This Action............................................................................................. 7

Legal Standard ......................................................................................................... 7

Argument .................................................................................................................. 9

    I.      CITR Lacks Standing............................................................................... 9

         A.     CITR Lacks Associational Standing........................................... 10

              1.      Ms. Melford and GDI Lack Standing......................... 11

              2.      Mr. Ahmed's removal does not provide grounds for standing in this case. ................................................................ 13

              3.      CITR's Noncitizen Member Declarants Are Not Injured. ......... 13

              4.      CITR's U.S. Citizen Member Declarants Are Not Injured. ....... 15

         B.     CITR Lacks Organizational Standing Under the Diversion-of-Resources Theory. ............................................................................ 15

    II.     Plaintiff Is Not Likely To Succeed On The Merits............................... 18

         A.     Plaintiff's Constitutional Claims Are Not Likely to Succeed.................. 18

              1.      Plaintiff's First Amendment Claim is Unlikely to Succeed. ...... 18

                 *a.*    *Plaintiff's challenge ignores the Policy's legitimate scope.* ............................... 18

*b.    The Policy's legitimate purposes overcome noncitizen visa applicants and holders' reduced First Amendment protections.* .......................................................................... 21

*c.    Plaintiff's challenge to deportability does not alter the above.* ........................... 25

2.    Plaintiff's Fifth Amendment Claim is Unlikely to Succeed ....... 26

B.    Plaintiff's APA Claims Challenging The Policy Will Not Succeed. ........ 28

III.    For Deportability Determinations, The Court Lacks the Authority to Grant the Requested Relief For Current U.S.-Based Noncitizens. ....................................... 32

A.    Section 1252(g) ................................................................................ 33

B.    8 U.S.C. §§ 1201(i), 1252(b)(9) .................................................... 36

C.    8 U.S.C. § 1252(f)(1) ...................................................................... 38

IV.    Plaintiff Cannot Establish Irreparable Harm. ........................................................ 39

V.    The Balance of the Equities Favors Denying Interim Relief. .............................. 40

VI.    Any Granting of Interim Injunctive Relief Must be Narrowly Tailored. ............. 41

VII.    The Court Should Require Plaintiff to Post Bond ................................................ 42

Conclusion ............................................................................................................................. 42

# TABLE OF AUTHORITIES

Page(s)

Cases

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
   591 U.S. 430 (2020) .................................................................................................... 11

*Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec.*,
   510 F.3d 1 (1st Cir. 2007) .......................................................................................... 37

*Allen v. Wright*,
   468 U.S. 737 (1984) .................................................................................................... 14

*Already, LLC v. Nike, Inc.*,
   568 U.S. 85 (2013) ...................................................................................................... 16

*Alvarez v. U.S. Immigr. & Customs Enf't*,
   818 F.3d 1194 (11th Cir. 2016) .................................................................................. 34

*Americans for Prosperity Foundation v. Bonta*,
   594 U.S. 595 (2021) .................................................................................................... 18

*Arbaugh v. Y&H Corp.*,
   546 U.S. 500 (2006) ...................................................................................................... 9

*Arce v. United States*,
   899 F.3d 796 (9th Cir. 2018) ...................................................................................... 34

*Arcia v. Sec'y of Florida*,
   772 F.3d 1335 (11th Cir. 2014) .................................................................................. 10

*Ass'n of Am. Med. Colleges v. United States*,
   217 F.3d 770 (9th Cir. 2000) ...................................................................................... 29

*Ass'n v. Barr*,
   956 F.2d 1178 (D.C. Cir. 1992) .................................................................................. 14

*Baird v. Gotbaum*,
   792 F.3d 166 (D.C. Cir. 2015) .................................................................................... 13

*Beckles v. United States*,
   580 U.S. 256 (2017) .................................................................................................... 26

*Benisek v. Lamone*,
   585 U.S. 155 (2018) ...................................................................................................... 9

*Bennett v. Spear*,
   520 U.S. 154 (1997) .................................................................................................... 28

*Biden v. Texas*,
   597 U.S. 785 (2022) .................................................................................................... 39

*Biovail Corp. v. FDA*,
   448 F. Supp. 2d 154 (D.D.C. 2006) ........................................................................... 40

*Bluman v. FEC*,
   800 F. Supp. 2d 281 (D.D.C. 2011) ........................................................................... 22

*Cal. Cmtys. Against Toxics v. EPA*,
   934 F.3d 627 (D.C. Cir. 2019) .................................................................................... 29

*Camerena v. Director, Immigration and Customs Enforcement*,
   988 F.3d 1268 (11th Cir. 2021) .................................................................................. 34

*Carman v. Yellen,*
    112 F.4th 386 (6th Cir. 2024) ..................................................................................... 27
*Cato Inst. v. U.S. SEC*,
    438 F. Supp. 3d 44 (D.D.C. 2020) ............................................................................. 14
*Center for Law & Educ. v. Department of Educ.*,
    396 F.3d 1152 (D.C. Cir. 2005) ................................................................................. 17
*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ................................................................................ 8, 39
*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
    333 U.S. 103 (1948) ............................................................................................... 28, 29
*CityFed Fin. Corp. v. Office of Thrift Supervision*,
    58 F.3d 738 (D.C. Cir. 1995) ....................................................................................... 9
*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ............................................................................................... 13, 17
*Coal. for Humane Immigrant Rts. v. U.S. Dep't of Homeland Sec.,*
    780 F. Supp. 3d 79 (D.D.C. 2025) ............................................................................. 14
*Conservative Baptist Ass'n of Am., Inc. v. Shinseki,*
    42 F. Supp. 3d 125 (D.D.C. 2014) ............................................................................. 10
*Cronin v. USDA,*
    919 F.2d 439 (7th Cir. 1990) ...................................................................................... 39
*Cross v. EEOC,*
    Civ. A. No. 25-3702 (TNM), 2025 WL 3280764 (D.D.C. Nov. 25, 2025) ................................ 9
*Cuomo v. NRC,*
    772 F.2d 972 (D.C. Cir. 1985) ...................................................................................... 7
*Damus v. Nielsen*, Civ. A.,
    No. 18-0578 (JEB), 2018 WL 3232515 (D.D.C. July 2, 2018) .................................................. 8
*Davis v. Pension Ben. Guar. Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009) .................................................................................... 8
*Davis v. World Sav. Bank, FSB*,
    806 F. Supp. 2d 159 (D.D.C. 2011) .............................................................................. 7
*Delaware Valley Reg'l Ctr., LLC v. DHS*,
    106 F.4th 1195 (D.C. Cir. 2024) ............................................................................... 28, 29
*Demore v. Kim*,
    538 U.S. 510 (2003) ...................................................................................................... 21
*Dep't of State v. Munoz*,
    602 U.S. 899 (2024) ................................................................................. 12, 22, 23, 30
*DSE, Inc. v. United States*,
    169 F.3d 21 (D.C. Cir. 1999) ....................................................................................... 42
*E.F.L. v. Prim*,
    986 F.3d 959 (7th Cir. 2021) .......................................................................... 33, 34, 36
*E.O.H.C. v. Sec'y of Homeland Sec.*,
    950 F.3d 177 (3d Cir. 2020) ........................................................................................ 37
*Elgharib v. Napolitano*,
    600 F.3d 597 (6th Cir. 2010) ...................................................................................... 35
*EPA v. Brown*,
    431 U.S. 99 (1977) ....................................................................................................... 29

*F.C.C. v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)........................................................................................ 26, 27

*Farris v. Rice*,
    453 F. Supp. 2d 76 (D.D.C. 2006) ............................................................................ 8

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021)........................................................................................... 30

*FDA v. All. For Hippocratic Med.*,
    602 U.S. 367 (2024)........................................................................................... 17

*Flyers Rights Educ. Fund, Inc. v. United States DOT*,
    957 F.3d 1359 (D.C. Cir. 2020)............................................................................ 11

*Friends of the Earth v. Laidlaw Environ. Servs.*,
    528 U.S. 167 (2000)........................................................................................... 11

*Fund for Animals v. Frizzell*,
    530 F.2d 982 (D.C. Cir. 1975).............................................................................. 40

*Garland v. Aleman Gonzalez,*
    596 U.S. 543 (2022)........................................................................................... 38

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)........................................................................................... 27

*Guerrero-Lasprilla v. Barr*,
    589 U.S. 221 (2020)........................................................................................... 30

*Hamama v. Homan*,
    912 F.3d 869 (6th Cir. 2018) ............................................................................... 34

*Harisiades v. Shaughnessy*,
    342 U.S. 580 (1952)..................................................................................... passim

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)........................................................................................... 16

*Hines Immgr. Law, PLLC v. EOIR*, Civ. A. No. 26-1018 (CJN),
    2026 WL 969020 (D.D.C. Apr. 10, 2026)......................................................... 38, 41

*Humphries v. Various Fed. USINS Emps.*,
    164 F.3d 936 (5th Cir. 1999) ............................................................................... 34

*Hunt v. Washington State Apple Adver. Comm'n*,
    432 U.S. 333 (1977)........................................................................................... 10

*J.E.F.M. v. Lynch*,
    837 F.3d 1026 (9th Cir. 2016) ............................................................................. 37

*Jennings v. Rodriguez*,
    583 U.S. 281 (2018)........................................................................................... 37

*Jimenez-Angeles v. Ashcroft*,
    291 F.3d 594 (9th Cir. 2002) .......................................................................... 33, 34

*Johnson v. Eisentrager*,
    339 U.S. 763 (1950)........................................................................................... 21

*Kerry v. Din*,
    576 U.S. 86 (2015)............................................................................................. 23

*Khalil v. President, United States*,
    164 F.4th 259 (3d Cir. 2025) .......................................................................... 19, 38

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972)...................................................................................... 12, 22

*Kolender v. Lawson,*
    461 U.S. 352 (1983)...................................................................................................... 27
*Kwong Hai Chew,*
    344 U.S. 590 (1953)...................................................................................................... 21
*League of Women Voters v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016)............................................................................................ 9
*Lujan v. Def. of Wildlife,*
    504 U.S. 555 (1992)....................................................................................... 10, 15, 16
*Lujan v. National Wildlife Federation,*
    497 U.S. 871 (1990)...................................................................................................... 28
*Make the Rd. N.Y. v. Noem,*
    No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025)...................................... 41
*Maynard v. Cartwright,*
    486 U.S. 356 (1988)...................................................................................................... 27
*McCreary Cnty., Ky. v. Am. C.L. Union of Ky.,*
    545 U.S. 844 (2005)...................................................................................................... 24
*Miller v. Christopher,*
    96 F.3d 1467 (D.C. Cir. 1996)...................................................................................... 23
*Miller v. Pacific Shore Funding,*
    224 F. Supp. 2d 977 (D. Md. 2002) ............................................................................... 7
*Monumental Task Comm., Inc. v. Foxx,*
    157 F. Supp. 3d 573 (E.D. La. 2016)........................................................................... 39
*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024)................................................................................ 18, 19, 20, 25
*Mylan Pharms., Inc. v. Shalala,*
    81 F. Supp. 2d 30 (D.D.C. 2000) ................................................................................. 40
*Nat'l Treasury Emps. Union v. Trump ("NTEU"),* No. 25-5157,
    2025 WL 1441563 (D.C. Cir. May 16, 2025)............................................................. 42
*N.S. v. Dixon,*
    141 F.4th 279 (D.C. Cir. 2025)..................................................................................... 38
*National Taxpayers Union, Inc. v. United States,*
    68 F.3d 1428 (D.C. Cir. 1995)...................................................................................... 18
*Nat'l Ass'n of Home Builders v. Norton,*
    415 F.3d 8 (D.C. Cir. 2005).......................................................................................... 29
*Nat'l Treasury Emps. Union v. Yeutter,*
    918 F.2d 968 (D.C. Cir. 1990)...................................................................................... 41
*Nat'l Urb. League v. Trump,*
    783 F. Supp. 3d 61 (D.D.C. 2025) ............................................................................... 28
*Neguse v. U.S. Immigr. & Customs Enf't,* Civ. A.,
    No. 25- 2463 (JMC), 2025 WL 3653597 (D.D.C. Dec. 17, 2025) ........................... 41
*Negusie v. Holder,*
    555 U.S. 511 (2009)...................................................................................................... 24
*Nken v. Holder,* 556 U.S. 418 (2009) ................................................................................ 40
*Open Top Sightseeing USA v. Mr. Sightseeing,*
    *LCC,* 48 F. Supp. 3d 87 (D.D.C. 2014) ....................................................................... 40

*Palestine Info. Off. v. Shultz*,
  853 F.2d 932 (D.C. Cir. 1988) ........................................................................ 27
*Palmer v. Thompson*,
  403 U.S. 217 (1971) ...................................................................................... 24
*Pantoja v. Martinez*,
  No. 21-7118, 2022 WL 893017 (D.C. Cir. 2022) ............................................. 8
*Wash. State Grange v. Wash. State Repub. Party*,
  552 U.S. 442 (2008) .......................................................................... 18, 19, 20
*Polyzopoulos v. Garland*, Civ. A.,
  No. 20-0804 (CKK), 2021 WL 1405883 (D.D.C. Apr. 14, 2021) ..................... 11
*Project of Nat'l Laws. Guild v. Exec. Off. of Immigr. Rev.*, 456 F. Supp. 3d 16 (D.D.C. 2020).. 37
*Project*,
  510 U.S. ......................................................................................................... 41
*Public Citizen, Inc. v. National Highway Traffic Safety Admin.*,
  489 F.3d 1279 (D.C. Cir. 2007) ...................................................................... 16
*Rahman v. Blinken*,
  Civ. A. No. 23-3235 (JDB), 2024 WL 4332603 (D.D.C. Sept. 27, 2024) .......... 12
*Rauda v. Jennings*,
  55 F.4th 773 (9th Cir. 2022) ........................................................................... 33
*Reno v. Am.-Arab Anti-Discrimination Comm.*,
  525 U.S. 471 (1999) .......................................................................... 19, 33, 35
*Saadulloev v. Garland*,
  No. 3:23-CV-00106, 2024 WL 1076106 (W.D. Pa. Mar. 12, 2024) ............ 34, 36
*Sampson v. Murray*,
  415 U.S. 61 (1974) .......................................................................................... 7
*Schindler Elevator Corp. v. Wash. Metro Area Transit Auth.*,
  514 F. Supp. 3d 197 (D.D.C. 2020) ................................................................. 9
*Scottsdale Capital Advisors Corp. v. Fin. Indus. Regul. Auth., Inc.*, 678 F. Supp. 3d 88 (D.D.C.
  2023) .............................................................................................................. 8
*Sierra Club v. EPA*,
  955 F.3d 56 (D.C. Cir. 2020) .......................................................................... 29
*Sierra Club v. Jackson*,
  833 F. Supp. 2d 11 (D.D.C. 2012) .................................................................. 39
*Sierra Club v. Morton*,
  405 U.S. 727 (1972) ....................................................................................... 17
*Sissoko v. Rocha*,
  509 F.3d 947 (9th Cir. 2007) .......................................................................... 34
*Starbucks Corp. v. McKinney*,
  602 U.S. 339 (2024) ................................................................................... 8, 37
*Students for Fair Admissions, Inc., v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023) ....................................................................................... 10
*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ....................................................................................... 16
*Taal v. Trump*,
  No. 3:25-CV-335 (ECC/ML), 2025 WL 926207 (N.D.N.Y. Mar. 27, 2025) ....... 36

*Tazu v. Att'y Gen. United States*,
  975 F.3d 292 (3d Cir. 2020)........................................................................... 33, 35, 36
*Texas v. EPA*,
  829 F.3d 405 (5th Cir. 2016) ................................................................................... 39
*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025)........................................................................................... 41, 42
*Trump v. Hawaii*,
  585 U.S. 667 (2018)........................................................................................... 23, 24
*Turlock Irrigation Dist. v. FERC*,
  786 F.3d 18 (D.C. Cir. 2015) ................................................................................... 17
*Turner v. Williams*,
  194 U.S. 279 (1904) ................................................................................................. 25
*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  578 U.S. 590 (2016) ................................................................................................. 29
*United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*,
  517 U.S. 544 (1996)................................................................................................. 11
*United States Ass'n of Reptile Keepers, Inc. v. Zinke*,
  852 F.3d 1131 (D.C. Cir. 2017).................................................................................. 9
*United States ex rel. Knauff v. Shaughnessy*,
  338 U.S. 537 (1950)................................................................................................. 23
*United States v. Curtiss-Wright Exp. Corp.*,
  299 U.S. 304 (1936)........................................................................................... 23, 27
*United States v. Martinez-Fuerte*,
  428 U.S. 543 (1976)................................................................................................. 40
*United States v. Matchett*,
  837 F.3d 1118 (11th Cir. 2016) ............................................................................... 26
*Uranga v. U.S. Citizenship & Immigr. Servs.*,
  527 F. Supp. 3d 10 (D.D.C. 2020) ........................................................................... 30
*W. Watersheds Project v. Bernhardt*,
  468 F. Supp. 3d 29 (D.D.C. 2020)........................................................................... 41
*Warth v. Seldin*,
  422 U.S. 490 (1975)........................................................................................... 10, 11
*Wilborn v. Mansukhani,*
  795 F. App'x 157 (4th Cir. 2019).............................................................................. 26
*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)................................................................................................. 8, 17
*Women's Emergency Network v. Bush*,
  323 F.3d 937 (11th Cir. 2003) ................................................................................. 16
*Zemel v. Rusk*,
  381 U.S. 1 (1965)........................................................................................... 27, 30, 31
*Zerilli v. Evening News Ass'n*,
  628 F.2d 217 (D.C. Cir. 1980)................................................................................. 13

Statutes

5 U.S.C. § 704................................................................................................................ 28
5 U.S.C. § 705......................................................................................................... passim

8 U.S.C. 1227(a)(1)(B) ................................................................................. 6, 25, 32

8 U.S.C. § 1182 ................................................................................................ 2, 3, 26

8 U.S.C. § 1227 ................................................................................................ passim

8 U.S.C. § 1229a ............................................................................................ 5, 38, 39

8 U.S.C. § 1252 ................................................................................................ passim

8 U.S.C. § 1201 ...................................................................................... ii, 5, 30, 36

Rules

Fed. R. Civ. P. 65(c) ...................................................................................... 42

Other Authorities

90 Fed. Reg. .................................................................................................... 3, 4

**INTRODUCTION**

This suit concerns a State Department policy aimed at protecting Americans' freedom of speech by deterring foreign actors from censoring protected expression within the United States. Concerned about efforts by foreign officials and entities to suppress Americans' speech, Secretary of State Marco Rubio instituted a policy that restricts visa issuance for foreign actors responsible for, or complicit in, such censorship (the "Policy"). This Policy derives from the Secretary's broad authority to make foreign-policy-based determinations that may render a noncitizen ineligible for a visa and inadmissible to the United States. Plaintiff, an organization of academics studying technology, wrongly recasts the policy far more broadly, asserting that it is meant to target researchers who study content moderation. It does not. As is clear from the plain text, the Policy targets foreign censorship of American speech, not the study of content moderation.

Plaintiff's claims fail under any fair reading of the Policy. First, Plaintiff lacks Article III injury: the organization itself is not subject to the Policy, and the U.S.-based members that Plaintiff seeks standing on behalf of have not asserted that they are engaged in conduct *actually* covered by the Policy. Second, Plaintiff's First Amendment claim, which seeks to facially invalidate the entire Policy, fails because the Policy's broad sweep is targeted toward deterring foreign censorship of American speech and the Secretary has a facially legitimate reason for denying visas to those that seek to suppress Americans' constitutional rights. That determination has particular force given the Secretary's broad discretion in the realm of foreign policy. Third, Plaintiff's Fifth Amendment claim fares no better. The Policy is not vague, and in any event, it is an internal directive that does not implicate the void-for-vagueness doctrine. Fourth, nor are Plaintiff's Administrative Procedure Act ("APA") claims likely to succeed. Among other defects, the APA claims will fail because the Policy is internal guidance that does not constitute a "final agency action" and, on the merits, it falls squarely within the Secretary's statutory authority to impose visa restrictions to advance the

United States' foreign policy interests under 8 U.S.C. § 1182(a)(3)(C). Finally, the Policy does not cover deportability determinations. Because deportability determinations are made on an individualized basis by the Secretary, they should be raised as an as-applied challenge to 8 U.S.C. § 1227(a) in immigration proceedings, and not as part of a facial challenge to the Policy. Thus, none of Plaintiff's claims are likely to succeed.

Further, Plaintiff cannot satisfy the demanding standard for extraordinary relief. It has not shown a likelihood of success on the merits, let alone irreparable harm. Indeed, Plaintiff's unexcused nine-month delay in seeking judicial intervention is fatal to its claim for immediate relief. And the balance of equities and the public interest strongly favor allowing the Executive to enforce the Nation's immigration laws and conduct foreign policy without judicial interference.

Thus, the Court should deny Plaintiff's request for preliminary relief.

## BACKGROUND

### I.    Legal Landscape

The legal framework governing foreign-policy-based visa denials and deportation determinations are 8 U.S.C. § 1182(a)(3)(C) and 8 U.S.C. § 1227(a), respectively.

Under 8 U.S.C. § 1182(a)(3)(C)(i), a noncitizen is inadmissible when the Secretary of State has "reasonable ground to believe" the noncitizen's entry or proposed activities in the United States "would have potentially serious adverse foreign policy consequences for the United States." That inadmissibility ground is subject to limited exceptions, including that individuals are generally not excludable based on their "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States." 8 U.S.C. § 1182(a)(3)(C)(iii). Congress created an exception to that exception, providing the Secretary of State the ability to override that consideration if he "personally determines that the alien's admission would compromise a compelling United States foreign policy interest." *Id.*

- 2 -

Noncitizens "in and admitted to the United States" are removable from the United States if they fall within certain specified classes. *See* 8 U.S.C. § 1227(a). The relevant prong of that statute similarly states that "[a]n alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." 8 U.S.C. § 1227(a)(4)(C)(i). That deportability ground is subject to the same limited exceptions in 8 U.S.C. § 1182(a)(3)(C). *See* 8 U.S.C. § 1227(a)(4)(C)(ii).

## II.    The Policy Regarding Visa Restrictions

In May 2025, Secretary Rubio announced a new visa restriction policy aimed at protecting Americans' freedom of speech and deterring foreign persons' attempts to assert authority over protected expression in the United States. The policy restricts visa issuance for foreign nationals who are responsible for, or complicit in, censorship or attempted censorship of protected expression in the United States, and the immediate family members of such persons. *See* Exhibit A (the "Policy"). In his announcement, the Secretary stated that the Government would not tolerate encroachments upon American sovereignty that "undermine the exercise of [Americans'] fundamental right to free speech." Press Release, U.S. Dep't of State, Announcement of a Visa Restriction Policy Targeting Foreign Nationals Who Censor Americans (May 28, 2025), available at https://www.state.gov/announcement-of-a-visa-restriction-policy-targeting-foreign-nationals-who-censor-americans (last visited April 19, 2026). The announcement followed the President's issuance of Executive Order ("EO") 14149, "Restoring Freedom of Speech and Ending Federal Censorship," 90 Fed. Reg. 8,243 (Jan. 20, 2025), which states that it is the policy of the United States to secure the right of the American people to engage in constitutionally protected speech. *See* Exhibit A at PDF page 2.

The Policy identifies a class of individuals who are facilitating foreign censorship of American speech and authorizes the Department to restrict the issuance of visas to certain foreign nationals. *Id*. Individuals may fall within the Policy's target class if they "are responsible for, or complicit in, censorship or attempted censorship of protected expression in the United States." *Id*. at PDF Page 1-2. Such behavior can include, but is not limited to, (a) requiring American tech platforms to adopt content moderation policies that limit or chill protected expression by individuals in the United States; (b) fining American tech platforms for not complying with content moderation or censorship demands; and (c) requiring American tech platforms to provide access to private data on American citizens to satisfy content moderation oversight. *Id*. at PDF Page 2. Once a noncitizen is identified as falling within the target class, when he or she applies or reapplies for a visa, the Secretary (or his designee) would need to make the inadmissibility determination per the statute. *See* 8 U.S.C. § 1182(a)(3)(C)(i).

## III.    Related Removal Actions For Noncitizens Engaging In Censorship

In addition to—but separate from—the visa restrictions pursuant to the Policy, the Secretary has also rendered deportability decisions for specific individuals currently in the United States whose presence and activities in the United States he believes would pose potentially serious adverse foreign policy consequences for the United States because these individuals have engaged in censorship of Americans' speech.  Deportability determinations are not covered by the scope of the Policy. *See generally* Exhibit A. Instead, the procedure previously used for deportability determinations is illustrated in the Administrative Record for *Ahmed v. Rubio*, No. 1:25-cv-10705-LAP (S.D.N.Y. Feb. 6, 2026), which Plaintiff attached to its Motion as Exhibit 14. ECF No. 11-

23.[1] There, the Secretary did not cite to a policy for the basis for removal—just his discretionary authority under 8 U.S.C. § 1227(a)(4)(C). Ex. 14 at PDF Page 9-10. And the Secretary's deportability determination was based on an individualized assessment of whether Mr. Ahmed's "activities and presence in the United States have potentially serious adverse foreign policy consequences and compromise a compelling U.S. foreign policy interest," which was "based on the same foreign policy objectives articulated" in the Policy. *Id*. Further, the Secretary approved an individualized Action Memorandum detailing the reasons for Mr. Ahmed's deportability, and then the Secretary rendered a decision on whether to authorize a basis for deportability under 8 U.S.C. § 1227(a)(4)(C). *Id*. at PDF Pages 3-4.

Finally, the legal framework for visa revocations derives from 8 U.S.C. § 1201(i), which provides that "[a]fter the issuance of a visa . . . the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa . . . ." The revocation of a noncitizen's visa, or the Secretary of State's determination that a noncitizen is deportable, does not necessarily mean that the noncitizen will be removed from the United States. Those are merely grounds for removability that the Department of Homeland Security ("DHS") may assert in formal removal proceedings in immigration court. *See* ECF No. 11-23 at PDF Page 9 (determining Ahmed is deportable under 8 U.S.C. § 1227(a)(4)(C)). Noncitizens in removal proceedings are afforded procedural protections under 8 U.S.C. § 1229a. If a noncitizen whose nonimmigrant visa has been revoked effective immediately is placed into removal proceedings on the basis of the visa revocation, and there is no other valid basis for removal, an immigration judge, and later a federal court of appeals, may review the revocation as it relates to the final order of removal. *See* 8 U.S.C. § 1201(i) (providing

---

[1]    In referring to *Ahmed*'s administrative record, Defendants do not concede any jurisdictional argument raised in that proceeding or this one concerning the proper channel for challenges to removability. *See* 8 U.S.C. § 1252(b)(9), (g); *infra* 31–39.

"[t]here shall be no means of judicial review . . . of a revocation under this subsection, except in the context of a removal proceeding if such revocation provides the sole ground for removal under" 8 U.S.C. 1227(a)(1)(B)); *see also id.* § 1252(a)(5) (providing that the federal courts of appeals have exclusive jurisdiction over final orders of removal rendered in removal proceedings), (b)(9) (channeling all questions of law and fact arising out of proceedings or actions to remove a noncitizen into a challenge of a final order of removal). And courts of appeals retain jurisdiction to review "constitutional claims or questions of law" in removal proceedings. *Id*. § 1252(a)(2)(D).

## IV.    Related Immigration Actions To Date

On July 18, 2025, Secretary Rubio announced that the Department of State took steps to impose visa restrictions under the Policy, revoking the visas of Brazilian judicial officials involved in "a persecution and censorship complex so sweeping that it not only violates basic rights of Brazilians, but also extends beyond Brazil's shores to target Americans." Press Release, U.S. Dep't of State, Announcement of Visa Restrictions on Brazilian Judicial Officials and Their Immediate Family Members (July 18, 2025), available at https://www.state.gov/releases/office-of-the-spokesperson/2025/07/announcement-of-visa-restrictions-on-brazilian-judicial-officials-and-their-immediate-family-members (last visited April 19, 2026). And on December 23, 2025, Secretary Rubio announced additional actions under the Policy, this time addressing European individuals who "led organized efforts to coerce American platforms to censor, demonetize, and suppress American viewpoints they oppose." Press Release, U.S. Dep't of State, Announcement of Actions to Combat the Global Censorship-Industrial Complex (Dec. 23, 2025) available at https://www.state.gov/releases/office-of-the-spokesperson/2025/12/announcement-of-actions-to-combat-the-global-censorship-industrial-complex (last visited April 19, 2026). He also announced companion foreign policy determinations that rendered individuals deportable pursuant to 8 U.S.C. § 1227(a)(4)(C). *Id.*

## V.     This Action

Plaintiff Coalition for Independent Technology Research ("CITR" or "Plaintiff") claims to be a collection of academics and researchers who study how technology affects society. Compl. (ECF No. 1) ¶ 15. Plaintiff alleges that federal agencies have created a policy "excluding and deporting noncitizens whose work involves combatting misinformation and disinformation, fact-checking, content moderation, trust and safety, or compliance." *Id.* ¶ 1. This is based on its own perception of the Policy. It is not based on the Policy itself—which they do not claim to have read. *See generally* Compl.; *Davis v. World Sav. Bank, FSB,* 806 F. Supp. 2d 159, 172 (D.D.C. 2011) (Holding that "when the bare allegations of the complaint conflict with any exhibits or documents, whether attached or adopted by reference, the exhibits or documents prevail.") (quoting *Miller v. Pacific Shore Funding*, 224 F. Supp. 2d 977, 984 n. 1 (D. Md. 2002)).

Further, according to its own representations, none of Plaintiff's members have been subject to a removal action or threatened with removal due to the Policy. *See generally* ECF Nos 11-2 thru 11-8 (member declarations). A single declarant has been denied a travel authorization under the Policy, but that member is a noncitizen who was not in the United States at the time of her denial. *Id.* Plaintiff's U.S.-based members rely entirely on the alleged 'chilling effect' of their perception of the Policy to assert an injury. *Id.*

Plaintiff asserts the Policy violates the First and Fifth Amendments, and the APA. *Id.* ¶¶ 139-49. It now seeks expansive preliminary injunctive relief by asking the Court to enjoin Defendants from enforcing the Policy and to stay the Policy in general. Plaintiff's Motion for Preliminary Injunction, ECF No. 11 ("Pl. Mot.") at 1.

## LEGAL STANDARD

The standards of review for relief under 5 U.S.C. § 705 is the same as for preliminary injunctions. *See Sampson v. Murray*, 415 U.S. 61, 80 (1974); *Cuomo v. NRC*, 772 F.2d 972, 974

(D.C. Cir. 1985). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. The moving party bears the burden of persuasion and must demonstrate "by a clear showing" that the requested relief is warranted. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). A "court must be persuaded as to all four factors." *Scottsdale Capital Advisors Corp. v. Fin. Indus. Regul. Auth., Inc.,* 678 F. Supp. 3d 88, 100 (D.D.C. 2023).

Before the Supreme Court's decision in *Winter*, courts weighed these factors on a "sliding scale," allowing "an unusually strong showing on one of the factors" to overcome a weaker showing on another. *Damus v. Nielsen*, Civ. A. No. 18-0578 (JEB), 2018 WL 3232515, at *4 (D.D.C. July 2, 2018) (quoting *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009)). The Supreme Court subsequently reaffirmed its disagreement with the sliding scale approach, holding that "a plaintiff seeking a preliminary injunction must make a clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (quoting *Winter*, 555 U.S. at 20). And where a party "seeks a mandatory injunction—to change the status quo through action rather than merely to preserve the status quo—typically the moving party must meet a higher standard than in the ordinary case: the movant must show 'clearly' that [it] is entitled to relief or that extreme or very serious damage will result." *Farris v. Rice*, 453 F. Supp. 2d 76, 78 (D.D.C. 2006); *Pantoja v. Martinez*, No. 21-7118, 2022 WL 893017, at *1 (D.C. Cir. 2022) (per curiam)

(characterizing injunction that would reinstate the plaintiff in his prior leadership roles as a "mandatory preliminary injunction . . . requir[ing] a higher standard than an ordinary preliminary injunction"); *but see League of Women Voters v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016) (rejecting distinction between a mandatory and prohibitory injunction).

Regardless, if the Court concludes that a claim fails as a matter of law—on a point of jurisdiction or merits—then interim relief is inappropriate. *See United States Ass'n of Reptile Keepers, Inc. v. Zinke*, 852 F.3d 1131, 1135 (D.C. Cir. 2017). Because preliminary injunctions are not "awarded as of right," but "[a]s a matter of equitable discretion, a preliminary injunction does not [even] follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018). Even if the movant can show a strong likelihood of success on the merits but fails to make a sufficient showing of irreparable injury, the Court must deny the request for preliminary injunctive relief without considering the other factors. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).

If the Court "concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006); *see also Schindler Elevator Corp. v. Wash. Metro Area Transit Auth.*, 514 F. Supp. 3d 197, 212 (D.D.C. 2020) (dismissing case *sua sponte* after finding the plaintiff lacked standing); *Cross v. EEOC*, Civ. A. No. 25-3702 (TNM), 2025 WL 3280764, at *9 (D.D.C. Nov. 25, 2025) (same).

## ARGUMENT

### I.   CITR Lacks Standing.

As a party invoking federal jurisdiction, CITR bears the burden of establishing the three elements that constitute the "irreducible constitutional minimum of standing,"—namely that they have (1) suffered an "injury in fact"—an invasion of a legally protected interest which is "concrete and particularized," "actual or imminent" and not "conjectural" or "hypothetical" that is (2) "fairly

- 9 -

traceable" to the challenged conduct of Defendants, and will (3) "likely" be redressed by a favorable decision. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560-61 (1992).

As an organizational plaintiff, CITR may make the three-pronged showing under two alternative theories: (1) the "diversion-of-resources theory" in which the organizational plaintiff asserts standing on its own behalf by alleging facts showing that the defendants' allegedly "illegal acts impaired the organization's ability to engage in its own projects by forcing the organization to divert resources in response"; or (2) the "associational theory" in which the organizational plaintiff asserts standing in a representational capacity for its members where "the members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Arcia v. Sec'y of Florida*, 772 F.3d 1335, 1341-1342 (11th Cir. 2014); *Conservative Baptist Ass'n of Am., Inc. v. Shinseki*, 42 F. Supp. 3d 125, 129 (D.D.C. 2014). CITR attempts to rely on both a "diversion of resources" theory and "associational theory" to prove standing, but it fails to do so.

## A.    CITR Lacks Associational Standing

Associational-standing precedents hold that a membership organization can sometimes sue "as the representative of its members." *Students for Fair Admissions, Inc., v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (citation omitted). "The possibility of such representational standing, however, does not eliminate or attenuate the constitutional requirement of a case or controversy." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). An organization seeking to represent its members thus must show that those members "would otherwise have standing to sue in their own right." *Harvard*, 600 U.S. at 199 (quoting *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). Put differently, the organization must identify "at least one member with standing." *United Food & Commercial Workers Union Local 751 v. Brown Grp.,*

- 10 -

*Inc.*, 517 U.S. 544, 555 (1996). The Supreme Court has cautioned that it "would make a mockery" of Article III to find standing whenever, based on an "organization's self-description of the activities of its members, there is a statistical probability that some of those members are threatened with concrete injury." *Id*. at 497-98.

Organizations may only assert "associational standing" to enforce the rights of its members where "[1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Flyers Rights Educ. Fund, Inc. v. Dep't of Transportation*, 957 F.3d 1359, 1361 (D.C. Cir. 2020) (quoting *Friends of the Earth v. Laidlaw Environ. Servs.*, 528 U.S. 167, 181 (2000)). Here, CITR fails on the first prong. CITR's declarant members do not have standing to sue because they have no concrete injury in fact.

1.      Ms. Melford and GDI Lack Standing.

Start with Ms. Claire Melford, a British citizen who was denied a travel authorization under the Policy. Pl. Mot at 14–15. Ms. Melford is a non-US citizen, living outside the United States and as such does not have constitutional rights: "it is long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 433 (2020). Consistent with this broad rule, courts routinely hold that individuals like Ms. Melford—who remain offshore or outside the U.S.— do not have standing to bring a claim concerning their entry into the United States. *See Polyzopoulos v. Garland*, Civ. A. No. 20-0804 (CKK), 2021 WL 1405883, at *7 (D.D.C. Apr. 14, 2021) ("With respect to standing, there is a long line of cases explaining that non-resident aliens lack standing to challenge the determinations associated with their visa applications, which belong to the political and not judicial branches of government." (citation

omitted)); *Rahman v. Blinken*, Civ. A. No. 23-3235 (JDB), 2024 WL 4332603, at *4 (D.D.C. Sept. 27, 2024) (collecting cases).

Plaintiff attempts to avoid this problem by asserting injuries on behalf of Ms. Melford's U.S.-based organization, Global Disinformation Index ("GDI").[2] That claim fails as well. Plaintiff cites *Kleindienst v. Mandel* for the proposition that a U.S. organization may sue when its First Amendment rights are allegedly infringed by the visa denial of a foreign speaker. Pl. Mot. 14. But while *Mandel* addressed claims by U.S. citizens that they were deprived of hearing a foreign national speaker, the Court resolved the case on exceedingly narrow grounds. It held only that courts will not look behind the "facially legitimate and bona fide reason" the government provides for a visa denial. *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972). *Mandel* did not directly address standing, nor did it consider whether an organization has a constitutional right to have its CEO enter the United States. *Id.* And more recently, the Supreme Court has cautioned against reading *Mandel* broadly: "*Mandel* does not hold that a citizen's independent constitutional right (say, a free speech claim) gives that citizen a procedural due process right to a 'facially legitimate and bona fide reason' for why someone else's visa was denied." *Dep't of State v. Munoz,* 602 U.S. 899, 919 (2024). And it's unclear whether the "facially legitimate" and "bona fide" exception even survives after the Supreme Court's decision in *Muñoz*. *Id.* at 919 (noting that test was just "the justification for avoiding a difficult question of statutory interpretation"). Thus, *Muñoz* cautions against expansive readings of *Mandel* that would permit third-party challenges.

---

[2]    CITR's website states that organizational members do not include the individuals of those organizations: "Organizational members are representatives of their organizations, not as individuals." Coalition for Independent Technology Research, *Join Us*, https://independenttechresearch.org/join-us/ (last visited April 16, 2026).

Simply put, Plaintiff's reliance on *Mandel* to establish standing for GDI is misplaced. Plaintiff cites nothing to suggest a company has a First Amendment interest in their CEO entering the country or that such an interest permits standing to mount a facial constitutional challenge to the policy. Such a claim would necessarily require disclosure of the rationale of Ms. Melford's ESTA denial, which *Muñoz* foreclosed. Thus, Plaintiff fails to establish an injury through GDI.

2.     Mr. Ahmed's removal does not provide grounds for standing in this case.

Plaintiff also appears to assert an injury on behalf of Imran Ahmed, a lawful permanent resident identified for removal under the Policy. Pl. Mot. 16. But, as Plaintiff concedes, Mr. Ahmed's deportability determination is already being litigated: *Ahmed v. Rubio*, No. 1:25-cv-10705-LAP (S.D.N.Y. Feb. 6, 2025). Pl. Mot. 9, n.1. "A plaintiff has no right to maintain two separate actions involving the same subject matter at the same time in the same court and against the same defendant." *Baird v. Gotbaum*, 792 F.3d 166, 171 (D.C. Cir. 2015) (quoting *Zerilli v. Evening News Ass'n*, 628 F.2d 217, 222 (D.C. Cir. 1980)). Further, nowhere does Plaintiff state that Mr. Ahmed is a CITR member or that it is seeking standing based on Mr. Ahmed's organization, the Center for Countering Digital Hate. *See generally* Pl. Mot. 13–20. Thus, Plaintiff cannot rely on Mr. Ahmed to establish standing.

3.     CITR's Noncitizen Member Declarants Are Not Injured.

Next turn to CITR's two noncitizen member declarants. These declarants do not allege impending enforcement, but simply that the threat of possible enforcement has chilled their speech. The mere allegation of a "chilling effect," however, does not confer standing without a credible threat of enforcement. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417-18 (2013) (explaining that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of a specific present objective harm or a threat of specific future harm" in the standing inquiry). "Allegations of *possible* future injury are not sufficient." *Id*. (cleaned up) (emphasis in original). The declarants'

standing to challenge the policy's provisions "depends on how likely it is that the government will attempt to use these provisions against them—that is, on the threat of enforcement—and not on how much the prospect of enforcement worries them." *See Am. Libr. Ass'n v. Barr,* 956 F.2d 1178, 1193 (D.C. Cir. 1992); *see also Cato Inst. v. U.S. SEC*, 438 F. Supp. 3d 44, 52 (D.D.C. 2020) (quoting *Presbyterian Church* and holding that "[plaintiff's] attempt to premise a constitutional violation that it has standing to vindicate on a chilling effect theory fails in the absence of an allegation that it has suffered, or is facing the threat of, actual concrete harm"); *Coal. for Humane Immigrant Rts. v. U.S. Dep't of Homeland Sec.,* 780 F. Supp. 3d 79, 90 (D.D.C. 2025) ("Article III requires more than maybes—it demands that harms be 'actual or imminent.'").

Yet, Plaintiffs' fear of enforcement turns purely on "[s]ubjective 'chill,'" which "is not enough to constitute injury in fact." *Am. Libr. Ass'n*, 956 F.2d at 1193. The declarants do not even claim to be working to implement foreign censorship laws in the United States—which is what the Policy is geared toward targeting. Instead, the declarants vaguely refer to themselves as researchers that study "content moderation" and "information warfare." CITR "Member A" Decl. ¶ 5, ECF No. 11-5 (referring to their work as researching "content moderation"); Emma Briant Decl. ¶ 4, ECF No. 11-6 (referring to her work as a "researcher on contemporary information warfare and propaganda"). This is not enough to establish an imminent threat of harm. This is all the more so since the policy is not self-executing; rather, it requires levels of review, including that the Secretary (or his designee) must determine that a person is inadmissible. *See supra* 3–4. That alone shows that the "links in the chain of causation between the challenged Government conduct and the asserted injury are far too weak for the chain as a whole to sustain [plaintiff's] standing." *Allen v. Wright*, 468 U.S. 737, 759 (1984) *abrogated on other grounds by Lexmark Int'l, Inc. v. Static*

- 14 -

*Control Components, Inc.*, 572 U.S. 118 (2014). Thus, even if the jurisdictional bar does not apply, these U.S.-based noncitizens still lack standing to sue.

4.  CITR's U.S. Citizen Member Declarants Are Not Injured.

Finally, the U.S. citizen declarants–who are not themselves subject to the challenged immigration policy–face a higher burden to establish standing and have not shown how a policy that does not concern them inflicts a concrete injury. As the Supreme Court has held, "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." *Lujan*, 504 U.S. at 562 (internal quotation marks omitted). CITR identifies two U.S.-citizen researchers, J. Nathan Matias and Rebekah Tromble, who claim they are injured by the policy because they believe noncitizen rights have been chilled and that this has impacted their own research. Nathan Matias Decl., ECF No. 11-7 ¶¶ 10–17; Rebekah Tromble Decl., ECF No. 11-8 ¶¶ 8–12. Neither claims that they have been threatened with enforcement under the Policy or that they work closely with people that have. *See* Tromble Decl.; Matias Decl. At best, Tromble alleges she knows people targeted by the Policy. Tromble Decl. ¶ 7. But simply knowing others affected is too speculative to confer standing. And neither declarant even states that his or her work involves implementing foreign censorship laws, and so they haven't established that anyone they work with would even likely be impacted by the Policy. Thus, the U.S. citizens fall far short of alleging an Article III injury.

For these reasons, CITR has failed to show associational standing.

**B.      CITR Lacks Organizational Standing Under the Diversion-of-Resources Theory.**

Plaintiff has failed to establish organizational standing under a diversion-of-resources theory. Plaintiff does not claim that Defendants are regulating it directly; or that the Policy, whatever its precise contours, reaches them directly. Instead, Plaintiff complains about

- 15 -

downstream harms from others' actions—*e.g.*, it is less likely to attract members or attendees for its events. Pl. Mot. at 21–27. These downstream harms are insufficient to confer standing where, as here, Plaintiff has neither suffered any direct interference with its core activities nor shown its members are directly targeted.

To establish standing, an organization, like an individual, must show an actual or imminent injury in fact that is fairly traceable to the challenged action and likely to be redressed by a favorable decision. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982). Because the organization is not directly subject to the challenged rule, their "standing is 'substantially more difficult to establish[.]'" *Public Citizen, Inc. v. National Highway Traffic Safety Admin.*, 489 F.3d 1279, 1289 (D.C. Cir. 2007) (quoting *Lujan,* 504 U.S. at 562); *see, e.g., Summers v. Earth Island Inst.*, 555 U.S. 488, 493-94 (2009) (organization lacked standing to challenge regulations that "neither require nor forbid any action on the[ir] part"); *Women's Emergency Network v. Bush*, 323 F.3d 937, 948 (11th Cir. 2003) (organization "ineligible" for grant program lacked standing to challenge it).

CITR offers only vague responses to what resources, if any, the challenged policy "caused" CITR to divert. For instance, it asserts that the Policy is "deterring CITR's members from participating in its events and supporting its public advocacy and education efforts," including a Summit in Germany that it claims members did not travel abroad to because they feared being denied reentry. Pl. Mot. at 22. But obviously nothing in the Policy bars members from attending CITR events, either in the United States or abroad. Nowhere does Plaintiff attempt to explain with any detail why joining CITR, or attending one of its events, will result in imminent immigration enforcement—and of course, Plaintiff does not recount any example of this happening in the real

- 16 -

world. Pl. Mot. at 9–13. This is precisely the sort of *ipse dixit* anxiety that does not give rise to an Article III injury. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 97 (2013).

Further, some of CITR's claimed injuries are facially inconsistent. CITR paradoxically both asserts that it has decided "to stop hosting U.S.-based events, at least for now" due to the Policy, Pl. Mot. at 22. and that it now has to employ additional resources, including hosting two summits in 2026: one "*inside the United States*" and one abroad. *Id.* at 24–25 (emphasis added). Obviously, both cannot be true. And such self-inflicted expenditures cannot manufacture organizational standing.

Moreover, Plaintiff claims that the alleged policy has caused them to divert resources to address noncitizen members' fears about the Policy. Pl. Mot. at 25. But that theory is expressly foreclosed by Supreme Court precedent. *FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 394 (2024). As the Court put it: "[A]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* That is this case: Where Plaintiff itself is not regulated but decides to reallocate its budget to respond to an event directly affecting others in the world, that sort of voluntary decision does not give rise to an Article III injury. *See Clapper*, 568 U.S. at 402, 415-16.

Further, Plaintiff cannot support standing with its advocacy efforts. Pl. Mot. 23–24. It is well established that injury to an organization's advocacy activities does not establish standing. *See, e.g., Center for Law & Educ. v. Department of Educ.*, 396 F.3d 1152, 1162 n.4 (D.C. Cir. 2005) (citing *Sierra Club v. Morton*, 405 U.S. 727, 739–740 (1972)). That is because "the expenditure of resources on advocacy is not a cognizable Article III injury." *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015). To hold otherwise "would eviscerate standing

doctrine's actual injury requirement" by permitting an interest group to generate its own standing merely by putting an issue in its lawyers' crosshairs. *Id.* (quoting *Center for Law & Educ.,* 396 F.3d at 1162 n.4); *see also National Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995).

At bottom, Plaintiff's diversion-of-resources injury fails because there is no evidence that the Policy targets the Plaintiff directly or its members for their involvement in CITR.

## II.    Plaintiff Is Not Likely To Succeed On The Merits.

Plaintiff's constitutional and APA claims are unlikely to succeed.

### A.    Plaintiff's Constitutional Claims Are Not Likely to Succeed.

#### 1.    Plaintiff's First Amendment Claim is Unlikely to Succeed.

##### a.    *Plaintiff's challenge ignores the Policy's legitimate scope.*

Plaintiff muddies the waters by bringing a facial challenge to the Policy "as applied." ECF No. 1, Compl. ¶ 141, Request for Relief (E); *see generally* Pl. Mot., ECF No. 10 (ignoring the test for "facial" challenges). But "as applied" to what? Plaintiff does not say—and the relief they seek is facial: striking down the entire Policy. Facial challenges and as-applied challenges are two separate things with two separate standards. *See, e.g., Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024); *Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 449-51 (2008). "As-applied" challenges concern a law's application to a particular set of facts, whereas facial challenges concern a law's validity in the abstract. *Id.* at 450.

For a facial challenge in the First Amendment context, "[t]he question is whether 'a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Moody*, 603 U.S. at 723 (quoting *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 615 (2021). Thus, "[t]he first step in the proper facial analysis is to assess the [challenged] laws' scope." *Id.* at 724. In a facial challenge, courts cannot ignore this

requirement merely because a plaintiff has focused on the laws' application to certain situations. *See id.* at 708 (explaining parties' and lower courts' error in "focus[ing] on how the laws applied to the content-moderation practices that giant social-media platforms use," rather than "address[ing] the full range of activities the laws cover, and measure the constitutional against the unconstitutional applications"). Instead, the proper method for challenging the application of a statute as-applied to specific situations is in individual adjudications brought by those subject to the provisions. Or, in immigration cases, in eventual petitions for review of removal decisions, where Congress has specifically preserved noncitizens' rights to raise constitutional challenges. *See e.g.*, 8 U.S.C. § 1252(a)(2)(D) (preserving courts of appeals' jurisdiction over constitutional claims in review of removal proceedings); *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 477 (1999) (holding challenges to removal, including First Amendment ones, must be brought in removal proceedings); *Khalil v. President, United States*, 164 F.4th 259, 279 (3d Cir. 2025) (recounting that the petition-for-review process permits review of First Amendment challenges).

Similarly here, Plaintiff cannot artificially limit its challenge to the Policy's application to "speech or conduct" of private actors. Compl. ¶ 6. Plaintiff "chose to litigate these [claims] as facial challenges, and that decision comes at a cost." *Moody*, 603 U.S. at 723. Indeed, Plaintiff's framing merely begs the question of what parameters there are to "speech or conduct" of private actors. And this framing still raises all of the problems the Supreme Court has repeatedly recognized regarding facial challenges more broadly: Plaintiff asks the Court to speculate based on a barebones factual record; it asks the Court to abandon the principle of judicial restraint and proactively announce a rule of constitutional law extending beyond the factual circumstances of

- 19 -

the parties before it; and the ruling it seeks threatens to prevent the government from implementing the laws consistent with the Constitution. *See Wash. State Grange*, 552 U.S. at 450-51.

Properly construed, the question the Court must decide is whether "a substantial number" of the challenged statutes' applications are unconstitutional in relation to their legitimate sweep. *Moody*, 603 U.S. at 723. The answer is plainly no. Indeed, Plaintiff makes no effort to quantify the relative scopes of what they view as permissible or impermissible enforcement. *See generally* Pl. Mot. Rather, they largely speculate about how the Policy might target their members in the future.

The actions taken pursuant to the Policy are expressly premised on a facially legitimate, bona fide purpose: protecting the First Amendment rights of American citizens from the enforcement of foreign censorship laws. The Policy targets foreign nationals who are responsible for censorship of protected expression in the United States. The Policy's target class includes foreign nationals who are responsible for, or complicit in, censorship or attempted censorship of protected expression in the United States. Exhibit A at PDF Page 2. Relevant behavior that could subject someone to the Policy's target class includes threatening arrest for activity on American tech platforms by individuals physically present in the United States, requiring American tech platforms to adopt content moderation policies that limit or chill protected expression by individuals in the United States, or requiring American tech platforms to provide access to private data on American citizens to satisfy content moderation oversight. *Id*. Notably absent from this list is any protected speech.

In short, the Policy has a "plainly legitimate" scope. Plaintiff has supplied no evidence or argument comparing that broad scope to what it claims would be the Policy's unconstitutional application. Plaintiff's facial challenge therefore fails. *See Wash. State Grange,* 552 U.S. at 457-58.

- 20 -

> b.    *The Policy's legitimate purposes overcome noncitizen visa applicants and holders' reduced First Amendment protections.*

Even under Plaintiff's framing, its First Amendment challenge fails as a matter of law because the challenged policy rests on a facially legitimate and bona fide justification–the only showing required in the exercise of the Government's broad immigration authority. The question is not whether the First Amendment applies; the question is what does the First Amendment require in these circumstances. Plaintiff argues for an all-or-nothing approach, such that temporary visitors to the United States receive the same protections as citizens. *See* Pl. Mot at 29. But that argument runs counter to the many authorities recognizing the lesser protections available to noncitizens. *See, e.g., Demore v. Kim,* 538 U.S. 510, 522 (2003) ("In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens.") And Plaintiff's attempts to distinguish those authorities falter.

Plaintiff cites a variety of cases for the unremarkable proposition that the First Amendment "applies" to lawfully present noncitizens, without addressing how it applies. Pl. Br at 27–30. For example, Plaintiff argues that the Supreme Court's recitation in a footnote in *Kwong Hai Chew* of its prior dicta in *Wixon* somehow means that the First Amendment applies with full force to noncitizens. *See id.* But the very same footnote also reaffirmed the principle that noncitizens' rights increase with their connections to society: "Mere lawful presence in the country creates an implied assurance of safe conduct and gives him certain rights; they become more extensive and secure when he makes preliminary declaration of intention to become a citizen, and they expand to those of full citizenship upon naturalization." *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (quoting *Johnson v. Eisentrager*, 339 U.S. 763, 770-71 (1950)).

Further, many authorities recognize the lesser protections available to noncitizens. For instance, Plaintiff ignores *Harisiades v. Shaughnessy*, 342 U.S. 580 (1952). There, the Supreme

Court reviewed a First Amendment challenge to removal. The petitioners were ordered deported because they associated with or were members of the Communist Party. *Harisiades*, 342 U.S. at 582-83. Specifically, each petitioner was found deportable because of membership in an organization which advocates overthrow of the Government by force and violence. *Id*. at 582-83. The petitioners all raised in part that their deportation abridged the freedom of speech and assembly protected by the First Amendment. *Id*. at 584. The Supreme Court ruled that the First Amendment did not "prevent the deportation of these aliens" just on membership alone. *Id*. at 582-83, 592. And indeed, then-Judge Kavanaugh cited *Harisiades* in 2011 for the proposition that the Supreme Court "has further indicated that aliens' First Amendment rights might be less robust than those of citizens in certain discrete areas." *Bluman v. FEC*, 800 F. Supp. 2d 281, 288 (D.D.C. 2011) (three judge panel) (Kavanaugh, J.), *aff'd*, 565 U.S. 1104 (2012).

Further, Plaintiff argues that *Bluman* is inapplicable because it concerns election spending, Pl. Mot. at 29, n.3, but in doing so concedes the key point: noncitizens have reduced First Amendment rights compared to citizens. *Bluman*, 800 F. Supp. 2d at 287 (holding these rights are "less robust than those of citizens in certain discrete areas.") (citing *Harisiades*, 342 U.S. at 591–92), *aff'd*, 565 U.S. 1104 (2012).

The practical effect of nonimmigrant visa holders' reduced First Amendment rights in this case is that the challenged policies are constitutional so long as the government has articulated a facially legitimate and bona fide justification for their use. *See Muñoz,* 602 U.S. at 908; *Mandel*, 408 U.S. at 769-70. In *Mandel*, the Supreme Court made clear that "[w]hen the Executive exercises" its authority to exclude noncitizens from the country "on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the" asserted constitutional rights of U.S. citizens.

*Id.* at 770. This rule reflects the Constitution's allocation of power over immigration matters, which is "to be exercised exclusively by the political branches of government[.]" *Id.* at 765. Control of the borders is "vitally and intricately interwoven with" matters at the heart of the President's inherent authority, including "the conduct of foreign relations" and "the war power." *Harisiades*, 342 U.S. at 588-89. Immigration matters therefore "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Id.* at 589; *see United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950). And the D.C. Circuit has since adopted the "facially legitimate and bona fide reason" standard when adjudicating noncitizen constitutional claims. *Miller v. Christopher*, 96 F.3d 1467, 1470-71 (D.C. Cir. 1996), *aff'd sub nom. Miller v. Albright*, 523 U.S. 420 (1998).

The "facially legitimate and bona fide reason" standard looks to the legal justification proffered by the agency and, if facially valid, "the inquiry is at an end." *Munoz*, 602 U.S. at 908. The Court has "has disclaimed the authority to 'look behind the exercise of that discretion,' much less to balance the reason given against the asserted constitutional right." *Id.* (quoting *Kerry v. Din*, 576 U.S. 86, 103–104 (2015)). As previously explained, the policy challenged here furthers the Government's legitimate foreign-policy interest in protecting American speech from foreign regulators. Because this justification falls squarely within the scope of 8 U.S.C. § 1182(a)(3)(C), the Court's inquiry need go no further.

Further, the Policy would satisfy rational basis review—the only other standard of review that is arguably appropriate. *See Trump v. Hawaii*, 585 U.S. 667, 704 (2018) (only "assuming" reviewability to undertake rational-basis review). That standard considers whether the entry policy is plausibly related to the Government's stated objective. *Id.* The Supreme Court "hardly ever

strikes down a policy as illegitimate under rational basis scrutiny." *Hawaii*, 585 U.S. at 705. The only exceptions involve laws that "lack any purpose other than a 'bare . . . desire to harm a politically unpopular group.'" *Id*. (citations omitted). The Policy "does not fit th[at] pattern." *Id*. at 706. It expressly targets noncitizens that are "responsible for, or complicit in, censorship or attempted censorship of protected expression in the United States." Exhibit A at PDF Page 2. Thus, the Policy is plausibly related to the Government's anti-censorship objectives.[3]

Finally, Plaintiff improperly relies on tweets to suggest the Policy stretches further. First, courts evaluate whether official action is constitutional by looking at "the 'text, legislative history, and implementation of the statute,' or comparable official act," not through "judicial psychoanalysis of a drafter's heart of hearts." *McCreary Cnty., Ky. v. Am. C.L. Union of Ky*., 545 U.S. 844, 862 (2005). Divining purpose outside the operative terms of governmental action and official pronouncements is "extremely difficult," posing practical "pitfalls" and "hazards." *Palmer v. Thompson*, 403 U.S. 217, 224 (1971). But even if such statements could be considered, they do not comport to be what Plaintiff claims. Pl. Mot. at 28. For instance, Under Secretary Sarah Rogers's social media post regarding Ms. Melford lists reasons beyond Ms. Melford's individual views, including the Under Secretary's claim that Ms. Melford's "NGO used @StateDept taxpayer money to exhort censorship and blacklisting of American speech and press" and "joined the deleterious EU Code of Practice on Disinformation." Pl. Mot, Ex. 19, ECF No. 11-28. Similarly, the Under Secretary states Mr. Ahmed sought to expand EU censorship laws into the United States.

---

[3] Even under intermediate or strict scrutiny, the Policy would survive. This is because regulating who enters and lives or resides in the United States is, itself, a compelling Government interest. *See Harisiades*, 342 U.S. at 588-589; *see also Negusie v. Holder*, 555 U.S. 511, 526-527 (2009) ("in the context of immigration law, 'culpability' as a relevant factor in determining admissibility is only one facet of a more general consideration: desirability").

Pl. Mot. Ex. 18, ECF No. 11-27. In short, Plaintiff's attempt to construct official policy from cherry-picked social media posts fails both as a matter of law and as a matter of fact.

The Court should not second guess the Secretary's "facially legitimate and bona fide reason" in wanting to protect American First Amendment rights from foreign censorship and finding a compelling foreign policy interest in restricting visas to those that curtail Americans' free speech rights. Thus, Plaintiff's First Amendment claim is unlikely to succeed.

### c. *Plaintiff's challenge to deportability does not alter the above.*

Plaintiff's First Amendment challenge to State's deportability decisions also will fail. Deportability decisions have been made on an individualized basis pursuant to 8 U.S.C. § 1227(a). *Supra* 4–6. Thus, Plaintiff's actions concerning deportability decisions will fail for at least three reasons. First, it falls outside the scope of the actual Policy that Plaintiff seeks to challenge. Second, any challenge to deportability decisions should be made as-applied because those determinations have been made on an individualized basis. *Id*. Third, Plaintiff does not attempt to challenge the underlying statutes' constitutionality nor could they do so. Those statutes possess a "plainly legitimate sweep," and so any facial constitutional challenge to them fails. *Moody*, 603 U.S. at 744. As discussed above, a facial challenge–which seeks to strike down a law in full rather than merely "as-applied" to a specific circumstance–requires a plaintiff to demonstrate that the law lacks any "plainly legitimate sweep." *Id*. And courts have already established that the Secretary has authority to authorize foreign-policy-based removals. *Harisiades*, 342 U.S. at 591-92; *Turner v. Williams*, 194 U.S. 279, 293 (1904) (Holding there was no First Amendment impediment to the Government deporting a noncitizen because of his anarchist beliefs and advocacy).  Thus, any facial challenge to the authority underlying individualized deportability decisions fails.

2.      Plaintiff's Fifth Amendment Claim is Unlikely to Succeed.

The Policy cannot be void for vagueness. Rather than cite to the Policy, Plaintiff pieces together its own description of the Policy from press releases and communal speculation, and then declares that construct vague. But that is not how the void-for-vagueness doctrine works. Moreover, the doctrine does not apply to internal policy directives. The Policy at issue is an internal directive guiding the Secretary's exercise of discretion; it is not directed at the public and does not alter the substantive law governing noncitizens. Thus, it is not subject to the void-for-vagueness doctrine. Further, the Policy identifies the conduct it targets—foreign censorship aimed at suppressing American free speech—and therefore cannot be considered facially vague. Plaintiff's Fifth Amendment claim thus will fail.[4]

Internal directives do not implicate the void-for-vagueness doctrine. Courts decline to apply that doctrine to rules and guidance not directed at the public. *Beckles v. United States,* 580 U.S. 256, 263 (2017) (refusing to apply the void for vagueness doctrine to advisory sentencing guidelines); *Wilborn v. Mansukhani,* 795 F. App'x 157, 164 (4th Cir. 2019) (rejecting vagueness argument for a prison policy since "internal guidance is not subject to the void-for-vagueness doctrine"). This is because the vagueness doctrine applies to legal rules that regulate private conduct and bind private parties. *See United States v. Matchett*, 837 F.3d 1118, 1122 (11th Cir. 2016) (citing Supreme Court cases). Directives to other government officials cannot "notify [Plaintiff]" of what their conduct should be or should have been. *Id*. Rather, they operate analogously to sentencing guidelines, which informs government officials on how to conduct its

---

[4]      Plaintiff does not challenge the underlying statutes as facially vague, 8 U.S.C. § 1182(a)(3)(C) and 8 U.S.C. § 1227(a), only the Policy. Pl. Mot. 35–36.

enforcement actions. And if such a policy is unclear, that is a matter for internal administration; no different than if the instructions came orally at a cabinet meeting.

Plaintiff's reliance on *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) ("*Fox*") is misplaced. Pl. Mot. 35–36. In *Fox*, the Court was reviewing the FCC's indecency policy, which directly regulated public conduct. 567 U.S. at 243. But the Policy at issue here directs not the public, but agency personnel on how to implement the Secretary's discretion in enforcing immigration laws. Thus, *Fox* is inapplicable here.

And, even if the void-for-vagueness doctrine had a place here, the doctrine is meant to avoid "arbitrary and discriminatory enforcement" by providing "fair warning[s]" that are "clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). But "[t]he Supreme Court has long recognized that the special exigencies of foreign policy require Congress to draft statutes that 'provide a standard far more general than that which has always been considered requisite with regard to domestic affairs.'" *Palestine Info. Off. v. Shultz*, 853 F.2d 932, 944 (D.C. Cir. 1988) (quoting *United States v. Curtiss– Wright Export Corp.*, 299 U.S. 304, 324 (1936)). As the Supreme Court instructed, "because of the leeway necessary to represent adequately this nation's interests in foreign affairs, Congress 'must of necessity paint with a brush broader than that it customarily wields in domestic areas.'" *Id*. (quoting *Zemel v. Rusk*, 381 U.S. 1, 17 (1965)). If statutes can pass this muster, then the Policy at issue does, as well.

Finally, even putting aside the inapplicability of the Due Process Clause to internal directives to subordinates, Plaintiff's challenge suffers from yet another threshold flaw: it is facial in nature. The appropriate posture for Due Process vagueness challenges is as-applied. That is because "[o]bjections to vagueness under the Due Process Clause rest on the lack of notice, and

hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright,* 486 U.S. 356, 361 (1988); *see also Carman v. Yellen,* 112 F.4th 386, 402 (6th Cir. 2024) (noting that plaintiffs were unable to identify "a case when a pre-enforcement-facial-vagueness challenge was ripe, presumably because such cases benefit from factual development and applications of statutory provisions to particular scenarios"); *Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 88–89, n.8 (D.D.C. 2025). Because Plaintiff has not met the rigorous standard for asserting facial challenges to an internal policy, its Fifth Amendment claim fails at the outset.

**B.       Plaintiff's APA Claims Challenging The Policy Will Not Succeed.**

Plaintiff's APA claim has no likelihood of success. To be subject to APA review, Plaintiff must challenge an "agency action" that is "final," *see Lujan v. National Wildlife Federation*, 497 U.S. 871, 882 (1990), and "for which there is no other adequate remedy." *Bennett v. Spear*, 520 U.S. 154, 157 (1997). Not only does the Plaintiff fail to satisfy both prerequisites, but its claims also fail on the merits since the challenged policy is not arbitrary and capricious and does not exceed its statutory authorization.

Final Agency Action. There is no final agency action at issue here. Only a "final agency action" is reviewable. 5 U.S.C. § 704; *see Delaware Valley Reg'l Ctr., LLC v. DHS*, 106 F.4th 1195, 1203 (D.C. Cir. 2024) ("If there was no final agency action, there is no doubt that appellant would lack a cause of action under the APA." (citation omitted)). An agency action is final only if it (1) marks the "consummation" of the agency's decision-making process and (2) is one "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177-78. Plaintiff's claim fails under both prongs.

Under *Bennett*'s first prong, an agency's promulgation of a general guiding principle or framework marks the initiation, not the consummation, of the agency's decision-making process.

*Id.* It is the application of those general principles that is itself reviewable (as, for example, individual removal orders may be in the proper forum). "[They] may be a step, which if erroneous will mature into a prejudicial result[.]" *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 112 (1948). But that does not make those interim principles themselves the "consummation of the administrative process" reevaluating the agency's priorities. *Id*. at 113; *see EPA v. Brown*, 431 U.S. 99, 104 (1977) ("For [courts] to review [agency actions] not yet promulgated, the final form of which has only been hinted at, would be wholly novel.").

When evaluating agency action under *Bennett's* second prong, courts "must remain laser focused on whether the [challenged action] gives rise to `direct and appreciable legal consequences.'" *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 638 (D.C. Cir. 2019) (quoting *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016)); *see Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020) (stating that the second prong also requires courts to examine the "concrete consequences" of agency action). The Policy does nothing to replace the Secretary's duty to make individualized determinations when it comes to the inadmissibility findings. *See* 8 U.S.C. § 1182(a)(3)(C)(i). Nor does the Policy mandate visa denials. Rather, it provides notice to foreign nationals that certain conduct could result in the Department starting a review process under the Policy that might result in visa denial. *See Delaware Valley Reg'l Ctr., LLC,* 106 F.4th at 1201 n.3. (Holding statements in a USCIS policy manual, which the agency described as "contain[ing] the official policies of USICS" and "to be followed by all USCIS officers in the performance of their duties," did not constitute a final agency action). Further, even an investigation into unnamed individuals would not be a final agency action. *See Ass'n of Am. Med. Colleges v. United States*, 217 F.3d 770, 781 (9th Cir. 2000) ("An investigation, even one conducted with an eye to enforcement, is quintessentially non-final as a form of agency action."

- 29 -

(citation omitted)). Thus, the Policy does not "impose any obligation, deny any right, or fix any legal relationship[,]" *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005) (citation omitted), and so is not a final agency action.

This would apply equally to deportability determinations, which fall outside the Policy, but are by no means final agency actions. Critically, in addition to the Secretary determining whether a noncitizen is deportable, decisions to initiate removal proceedings are ultimately made by the Department of Homeland Security, not the Department of State. *Supra* 4–6.

U.S.-Based Noncitizens Have An Adequate Remedy At Law. There exists an adequate remedy at law for U.S.-based noncitizens. Plaintiff's suit is in effect a challenge to certain removal decisions on the part of the Government. But those decisions are not reviewable under the APA, and instead must be channeled through the exclusive administrative scheme that Congress designed for immigration. *See* 8 U.S.C. §§ 1252(a)(5), (b)(9), (g); *see also* 8 U.S.C. § 1201(i). That process--where immigration courts reviews a removal in the first instance and are later reviewable by a court of appeals through a single petition for review--is the exclusive means for someone to challenge the legal and factual basis for his or her removal. *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 230 (2020); *see also Uranga v. U.S. Citizenship & Immigr. Servs.*, 527 F. Supp. 3d 10, 18 (D.D.C. 2020) ("Pursuant to 8 U.S.C. § 1252(a)(5), there is only one means to challenge an order of removal: a petition filed with the appropriate court of appeals."). Given that scheme, antecedent APA review is unavailable.

Merits of the Policy. Even excusing these threshold defects, Plaintiff's challenge to the Policy would also fail on the merits. Its constitutional challenges are baseless, as detailed above. And the substantive policy decisions captured are hardly arbitrary and capricious. *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) (Holding "agency action must be reasonable

and reasonably explained" and "a court may not substitute its own policy judgment for that of the agency"). In announcing the Policy, the Secretary made clear that he found that foreign actors were seeking to regulate and curtail free speech rights in the United States. *Supra* 3-4. Given these identified trespasses on American liberties, the Secretary acted reasonably in establishing a visa restriction policy targeting foreign actors trying to censor the American public. While Plaintiff claims that there was no evidence of foreign censorship, Pl. Mot. 38, that assertion is a policy judgment left to the Executive Branch. Moreover, whether foreign censorship occurs in the abstract is irrelevant since the Department makes individualized determinations about if each specific person engaged in foreign censorship conduct under the Policy. And similarly, Plaintiff's focus on specific denials or revocations is equally misplaced because these arguments challenge the application of the Policy to individuals, making them improper for a facial challenge. Pl. Mot. at 39. Thus, Plaintiff's arguments are merely an attack on the Policy (or related-immigration actions) as-applied and fail to show that a Policy targeting foreign censorship is arbitrary and capricious.

Statutory Authority. Finally, Plaintiff's claim that the Secretary exceeded his statutory authority in creating the Policy is equally deficient as a matter of law. Pl. Mot. at 40–44. As discussed above, the Policy does not violate the Constitution. And, under sections 1182(a)(3)(C) and 1227(a)(4)(C), the Executive Branch has significant discretion to determine that one's mere presence or activities would potentially have serious adverse foreign policy consequences and compromise compelling foreign policy interests. That Congress did not define what constitutes "potentially serious adverse foreign policy consequences" underscores that this should be read with deference to the Executive Branch. *See, e.g., Zemel v. Rusk,* 381 U.S. 1, 17 (1965) (reiterating that Congress must "paint with a brush broader" in this area "because of the changeable and explosive nature of contemporary international relations, and the fact that the Executive is

immediately privy to information which cannot be swiftly presented to, evaluated by, and acted upon by the legislature."); *supra* 22–23 (discussing cases). Based on this broad authority, the Secretary is well within his rights to restrict visas to those that attempt to censor or restrict Americans' free speech. Thus, Plaintiff's claim that the Policy exceeds the Department of State's statutory authority fails as a matter of law.

### III.    For Deportability Determinations, The Court Lacks the Authority to Grant the Requested Relief For Current U.S.-Based Noncitizens.

To the extent that Plaintiff seeks to enjoin or restrain individual removal proceedings by proxy in challenging the policy, Congress foreclosed such review and the granting of the requested relief. Specifically, 8 U.S.C. § 1252 precludes the Court from granting Plaintiff's request for injunctive relief for deportability determinations. Plaintiff challenges revocations and denials based on a government policy and seeks to enjoin that policy. Pl. Mot. 1. Although Plaintiff frames its claims for current U.S.-based noncitizens as against the State Department Policy that may provide ground for removal, the challenge in effect concerns the Government's choice of when and why to commence removal proceedings. *Id.*; *supra* 4–6. As discussed above, deportability determinations have not been made pursuant to a Policy and instead were made on an individualized basis and subject to the Secretary's discretionary authority under 8 U.S.C. § 1227(a). *Id.* And any decision to initiate removal proceedings is subject to DHS's discretion to commence that proceeding. *Id.* Thus, Plaintiff's challenge runs headfirst into section 1252(g)'s jurisdictional bar.

That is not to say that individual challenges to the policy cannot be raised. Noncitizens subject to removal proceedings under the Policy can raise those challenges through a petition for review. *See* 8 U.S.C. § 1252(a)(5), (b)(9).

A.        Section 1252(g)

Section 1252(g) specifically deprives courts of jurisdiction to review "any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to [1] commence proceedings, [2] adjudicate cases, or [3] execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g). Though this section "does not sweep broadly," *Tazu v. Att'y Gen. United States*, 975 F.3d 292, 296 (3d Cir. 2020), its "narrow sweep is firm," *E.F.L. v. Prim*, 986 F.3d 959, 964-65 (7th Cir. 2021). Courts "cannot entertain challenges to the enumerated executive branch decisions or actions" outside a petition for review. *E.F.L.*, 986 F.3d at 964.

Section 1252(g) was "'directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion,'" to protect "'no deferred action' decisions and similar discretionary decisions." *Tazu*, 975 F.3d at 297 (quoting *AADC*, 525 U.S. at 474, 485). This limitation exists for good reason: so "[a]t each stage the Executive has discretion to abandon the endeavor." *AADC*, 525 U.S. at 483–84. In addition, through § 1252(g) and other provisions of the INA, Congress "aimed to prevent removal proceedings from becoming 'fragment[ed], and hence prolong[ed].'" *Tazu*, 975 F.3d at 296 (alterations in original) (quoting *AADC*, 525 U.S. at 487); *see Rauda v. Jennings*, 55 F.4th 773, 777–78 (9th Cir. 2022) ("Limiting federal jurisdiction in this way is understandable because Congress wanted to streamline immigration proceedings by limiting judicial review to final orders, litigated in the context of petitions for review.").

Section 1252(g) prohibits district courts from hearing challenges to decisions and actions about *whether* and *when* to commence removal proceedings. *See Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 599 (9th Cir. 2002) ("We construe § 1252(g) . . . to include not only a decision in an individual case *whether* to commence, but also *when* to commence, a proceeding."). Several circuit courts have held § 1252(g) applies to the discretionary decision to execute a removal order. *See Tazu*, 975 F.3d at 297–99 ("The plain text of § 1252(g) covers decisions about *whether* and

- 33 -

*when* to execute a removal order."); *Rauda*, 55 F.4th at 777–78 ("No matter how [petitioner] frames it, his challenge is to the Attorney General's exercise of his discretion to execute [his] removal order, which we have no jurisdiction to review."); *E.F.L.*, 986 F.3d at 964–65 (holding that § 1252(g) barred review of the decision to execute a removal order while an individual sought administrative relief); *Camerena v. Director, Immigration and Customs Enforcement*, 988 F.3d 1268, 1272, 1274 (11th Cir. 2021) (holding that § 1252(g) bars review of challenges to the discretionary decision to execute a removal order); *Arce v. United State*s, 899 F.3d 796, 800 (9th Cir. 2018) (finding that § 1252(g) would bar claims asking the Attorney General to delay the execution of a removal order); *Hamama v. Homan*, 912 F.3d 869, 874 (6th Cir. 2018) ("Under a plain reading of the text of the statute, the Attorney General's enforcement of long-standing removal orders falls squarely under the Attorney General's decision to execute removal orders and is not subject to judicial review."). Under the plain text of § 1252(g), the provision must apply equally to decisions and actions to *commence* proceedings that ultimately may end in the execution of a final removal order. *See Jimenez-Angeles*, 291 F.3d at 599; *see also Sissoko v. Rocha*, 509 F.3d 947, 950–51 (9th Cir. 2007) (holding that § 1252(g) barred review of a Fourth Amendment false-arrest claim that "directly challenge[d] [the] decision to commence expedited removal proceedings"); *Humphries v. Various Fed. USINS Emps.*, 164 F.3d 936, 945 (5th Cir. 1999) (determining that § 1252(g) prohibited review of a noncitizen's First Amendment retaliation claim based on the Attorney General's decision to put him into exclusion proceedings).

The scope of § 1252(g) also bars district courts from hearing challenges to the *method* by which the Secretary of Homeland Security chooses to commence removal proceedings. *See Alvarez v. U.S. Immigr. & Customs Enf't*, 818 F.3d 1194, 1203 (11th Cir. 2016) ("By its plain terms, [§ 1252(g)] bars us from questioning ICE's discretionary decisions to commence removal—

and thus necessarily prevents us from considering whether the agency should have used a different statutory procedure to initiate the removal process."); *Saadulloev v. Garland*, No. 3:23-CV-00106, 2024 WL 1076106, at *3 (W.D. Pa. Mar. 12, 2024) ("The Government's decision to arrest Saadulloev on April 4, 2023, clearly is a decision to 'commence proceedings' that squarely falls within the jurisdictional bar of § 1252(g)."). A visa-revocation decision that leads to removal proceedings is an "action . . . to commence proceedings" that this Court lacks jurisdiction to review. *See Tazu*, 975 F.3d at 298–99 ("Tazu also challenges the Government's re-detaining him for prompt removal. . . . While this claim does not challenge the Attorney General's *decision* to execute his removal order, it does attack the *action* taken to execute that order. So, under § 1252(g) and (b)(9), the District Court lacked jurisdiction to review it.").

That Plaintiff raises First and Fifth Amendment claims does not change the analysis. *See Tazu*, 975 F.3d at 296–98 (holding that any constitutional claims must be brought in a petition for review, not a separate district court action); *Elgharib v. Napolitano*, 600 F.3d 597, 602–04 (6th Cir. 2010) (noting that "a natural reading of 'any other provision of law (statutory or nonstatutory)' includes the U.S. Constitution" and finding additional support for the court's interpretation from the remainder of the statute). Indeed, the Supreme Court held that a prior version of § 1252(g) barred claims similar to those brought here. *See AADC*, 525 U.S. at 487–92. In *AADC*, the respondents had alleged that the "INS was selectively enforcing immigration laws against them in violation of their First and Fifth Amendment rights." *Id.* at 473–74. The Supreme Court noted "an admission by the Government that the alleged First Amendment activity was the basis for selecting the individuals for adverse action." *Id.* at 488 n.10. The respondents argued to the Supreme Court that a lack of immediate review would have a "chilling effect" on their First Amendment rights.

- 35 -

*Id.* at 488. Nonetheless, the Supreme Court held that the "challenge to the Attorney General's decision to 'commence proceedings' against them falls squarely within § 1252(g)." *Id.* at 487.

That Plaintiff challenges a Secretary of State's foreign policy determination rather than the Attorney General's decision to initiate removal proceedings does not change the analysis either. The Third Circuit specifically cautioned against reading § 1252(g) to allow "a challenge to the *Executive's* general lack of authority to violate due process, equal protection, the Administrative Procedure Act, or some other federal law." *Tazu*, 975 F.3d at 298 (emphasis added). In this case, it would be the Secretary of State's determination that prompted the commencement of removal proceedings; in other words, but for the Secretary's determination, someone targeted by the Policy may not be in proceedings. This Court simply "cannot entertain challenges to the enumerated *executive* branch decisions or actions." *E.F.L.*, 986 F.3d at 964–65 (emphasis added). Doing so would improperly render § 1252(g) "a paper tiger" or "toothless." *Id*. at 965.

Notably, the Northern District of New York recently affirmed that § 1252(g) bars claims that closely mirror those brought by Plaintiff. *See Taal v. Trump*, No. 3:25-CV-335 (ECC/ML), 2025 WL 926207, at *2-3 (N.D.N.Y. Mar. 27, 2025). There, plaintiffs sought to enjoin two executive orders and attempted to prevent Taal's placement in removal proceedings and indeed conceded that Taal would have an opportunity to raise his constitutional challenges before immigration courts and the appropriate court of appeals. *Id*. at *2. So Taal was not foreclosed from obtaining judicial review, and the court recognized the importance of that notion. *Id*.

### B.    8 U.S.C. §§ 1201(i), 1252(b)(9)

Congress specifically contemplated and provided a path to challenge visa revocations. That is by way of a petition for review to the appropriate court of appeals. *See* 8 U.S.C. §§ 1201(i), 1252(b)(9). Therefore, Plaintiff cannot obtain a pre-enforcement injunction when individual

members would have an opportunity to seek review through the appropriate administrative channels.

Under 8 U.S.C. § 1252(b)(9), "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provision, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final [removal] order." And a petition for review filed in the appropriate court of appeals is the sole and exclusive means for judicial review of a final removal order. *See* 8 U.S.C. § 1252(a)(5). In other words, if a claim challenges a "decision to . . . seek removal," a district court lacks jurisdiction to consider that claim and the claim instead must be reviewed through the administrative process. *Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018). Collateral attacks on removal proceedings are part of the decision to remove a noncitizen and § 1252(b)(9) plainly precludes "all district court review of any issue raised in a removal proceeding." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1029, 1034 (9th Cir. 2016) ("We conclude that §§ 1252(a)(5) and 1252(b)(9) channel review of all claims, including policies-and-practices challenges, through the [petition for review] process whenever they 'arise from' removal proceedings."); *E.O.H.C. v. Sec'y of Homeland Sec.*, 950 F.3d 177, 188 (3d Cir. 2020) (upholding dismissal of noncitizen's deprivation of counsel claim because "the court of appeals can redress any deprivation of counsel in the removal proceedings before the alien is removed."); *Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec.*, 510 F.3d 1 (1st Cir. 2007) ("Challenges to removal orders premised on the government's putative violation of an alien's right to counsel are commonplace, and such claims are often featured in petitions for judicial review of removal orders."); *Nat'l Immigr. Project of Nat'l Laws. Guild v. Exec. Off. of Immigr. Rev.*, 456 F. Supp. 3d 16, 29 (D.D.C. 2020) (reading § 1252(b)(9) to reach "all claims—whether statutory or

constitutional—that 'aris[e] from' immigration removal proceedings can only be brought through the petition for review process in federal courts of appeals."). Indeed, policy challenges do not escape the reach of § 1252(b)(9). *See Hines Immgr. Law, PLLC v. EOIR*, Civ. A. No. 26-1018 (CJN), 2026 WL 969020, at *9-10 (D.D.C. Apr. 10, 2026); *see also Khalil*, 164 F.4th at 279 (recounting that the petition-for-review process for individual charged removable based on the foreign policy charge).

### C.    8 U.S.C. § 1252(f)(1)

To the extent that Plaintiff's motion seeks to enjoin or restrain the Government's ability to invoke the foreign policy removability charge, 8 U.S.C. § 1227(a)(4)(C), or to initiate removal proceedings, 8 U.S.C. § 1229a, this Court lacks jurisdiction to issue such an order, *see* 8 U.S.C. § 1252(f)(1). That is true regardless of whether the Court reviews Plaintiff's motion through the lens of a regular preliminary injunction or a stay under 5 U.S.C. § 705. By providing that "no court (other than the Supreme Court) shall" have the power to grant coercive programmatic relief against the covered statutes, Section 1252(f)(1) operates on the premise that the lower courts will sometimes err and inappropriately restrict the government's ability to effectuate the removal process. *See* H.R. Rep. No. 469, 104th Cong., 2d Sess. Pt. 1, at 161 (1996) ("[S]ingle district courts or courts of appeal do not have authority to enjoin procedures established by Congress to reform the process of removing illegal aliens from the U.S."). Any order would be unsound because it would require the Court to issue an order applicable to "an entire class of aliens" *Garland v. Aleman Gonzalez,* 596 U.S. 543, 550-51 (2022), rather than any "individual alien." 8 U.S.C. §1252(f)(1); *see also N.S. v. Dixon*, 141 F.4th 279, 289 (D.C. Cir. 2025).

A court order would "enjoin" or at the very least "restrain" the governmental actions with respect to §§ 1227 and 1229a. Congress divested district courts from entering orders directing "immigration officials to 'refrain from actions that … are allowed by' the statute[s]." *Hines*

*Immigr. Law*, 2026 WL 969020, at \*8. That Plaintiff has also sought relief under § 705 does not alter the analysis. Courts routinely note that the standard for a § 705 stay "is the same as the standard for issuance of a preliminary injunction." *Monumental Task Comm., Inc. v. Foxx*, 157 F. Supp. 3d 573, 586 (E.D. La. 2016), *aff'd sub nom. Monumental Task Comm., Inc. v. Chao*, 678 F. App'x 250 (5th Cir. 2017); *see, e.g., Texas v. EPA*, 829 F.3d 405, 424 (5th Cir. 2016); *Cronin v. USDA*, 919 F.2d 439, 446 (7th Cir. 1990); *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 19 (D.D.C. 2012). And here, an order under § 705 staying removal proceedings would "order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out" removal proceedings and determinations, even if such an order is labeled as a stay. *Biden v. Texas*, 597 U.S. 785, 797 (2022); *see also* Injunction, Black's Law Dictionary (12th ed. 2024) (defining injunction as "[a] court order commanding or preventing an action," and defining stay as "[t]he postponement or halting of a proceeding, judgment, or the like" or "[a]n order to suspend all or part of a judicial proceeding or a judgment resulting from that proceeding.").

Thus, the Court cannot grant equitable remedies that "enjoin[] or restrain[] the operation" of § 1227(a)(4)(C), the foreign policy removability charge, or § 1229a removal proceedings. Congress specifically foreclosed that relief.

## IV.    Plaintiff Cannot Establish Irreparable Harm.

Plaintiff does not attempt to independently show irreparable harm. Pl. Mot. 44–45. Instead, it relies solely on its claimed likelihood of success on the merits. *Id*. But failure to establish irreparable harm, standing alone, is sufficient to deny Plaintiff's motion for preliminary injunction. *McKinney*, 602 U.S. at 346. As explained above, there is no constitutional or APA violation here. But, even so, a preliminary injunction is an extraordinary remedy, where a plaintiff must show a "clear and present need for equitable relief" to guard against an "imminen[t]" injury. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. Accordingly, even if Plaintiff's speculative theory of

standing is enough for Article III, it is nonetheless insufficient for immediate injunctive relief. For irreparable harm, a plaintiff must demonstrate a concrete, identifiable, and imminent injury—attributable to a discrete governmental action that can be redressed by a court. Plaintiff has not done so here, resting instead on a mischaracterization of the Policy.

Further, Plaintiff's delay in filing this action and motion dooms its request for extraordinary relief. Plaintiff acknowledged they were aware the Policy was first released in May 2025, Compl. ¶ 40, and its Executive Director asserts she was concerned the Policy would target its members that summer. Guerkink Decl. ¶ 12. Yet it did not file the instant action and request for extraordinary relief until March 2026, more than nine months after the Policy was announced. "The D.C. Circuit has found that a delay of forty-four days before bringing action for injunctive relief was 'inexcusable,' and 'bolstered' the 'conclusion that an injunction should not issue,' particularly where the party seeking an injunction had knowledge of the pending nature of the alleged irreparable harm." *Open Top Sightseeing USA v. Mr. Sightseeing, LCC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) (quoting *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975)). Thus, Plaintiff's delay in filing suit dooms its irreparable harm arguments. *See Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (delay of two months in bringing action "militates against a finding of irreparable harm"); *Biovail Corp. v. FDA*, 448 F. Supp. 2d 154, 165 (D.D.C. 2006) ("The delay in filing this suit further undermines any showing of irreparable injury").

## V.     The Balance of the Equities Favors Denying Interim Relief.

Plaintiff focuses solely on the alleged First Amendment interests and relies on those to argue that the equities favor it and therefore warrant an injunction. Pl. Mot. 44–45. However, it misses a key component of the analysis. It is well settled that the public interest in the enforcement of the United States' immigration laws is significant. *See*, *e.g.*, *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-58 (1976); *Nken v. Holder*, 556 U.S. 418, 435 (2009). As are the public interests

in conducting foreign policy without judicial interference. *Harisiades*, 342 U.S. at 588-89. Moreover, any order would impact the Secretary's foreign policy determinations and would therefore be "an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *Legalization Assist. Project*, 510 U.S. at 1305-06. These interests outweigh Plaintiff's weaker First Amendment interests in this context.

**VI.    Any Granting of Interim Injunctive Relief Must be Narrowly Tailored.**

Any preliminary injunction "should be narrowly tailored to remedy the harm shown." *W. Watersheds Project v. Bernhardt*, 468 F. Supp. 3d 29, 46 (D.D.C. 2020) (quoting *Nat'l Treasury Emps. Union v. Yeutter*, 918 F.2d 968, 977 (D.C. Cir. 1990)). As the Supreme Court reiterated in *Trump v. CASA, Inc.,* 606 U.S. 831 (2025), injunctions must be no "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id*. at 861. Thus, to the extent that relief is granted, although Defendants maintain it should not be, the Court should tailor any relief narrowly and have it cover only Plaintiff's members and only to the extent it has established standing, a likelihood of success, and irreparable harm for that injury.

Further, to the extent the Court finds Plaintiff is likely to succeed on its APA claim, Plaintiff may not obtain universal relief by its request for a Section 705 stay. Some judges in this Circuit have recently held, notwithstanding the ordinary rule of equity that relief should be no broader than necessary to redress the plaintiff's injuries, that the presumptive operation of APA Section 705 is to accord universal relief by operating to stay the applicable agency action in toto. *See, e.g., Make the Rd. N.Y. v. Noem,* No. 25-5320, 2025 WL 3563313, at *34 (D.C. Cir. Nov. 22, 2025) (statement of Millett, J. and Childs, J.); *Neguse v. U.S. Immigr. & Customs Enf't,* Civ. A. No. 25-2463 (JMC), 2025 WL 3653597, at *32 (D.D.C. Dec. 17, 2025). But those decisions are not binding, and the government maintains that those cases are mistaken. *See Hines Immigr. Law*, 2026 WL 969020, at *8 (recognizing that § 705 motion could run headlong into § 1252(f)(1)).

- 41 -

Section 705 remedies are constrained by the same traditional equitable principles as the Judiciary Act of 1789. *See CASA, Inc.,* 606 U.S. at 846. And, as explained above, Plaintiff has not shown a likelihood of success on its APA claims.

### VII.       The Court Should Require Plaintiff to Post Bond

For the reasons stated above, the Court should deny Plaintiff's motion in its entirety. Nevertheless, should the Court issue any injunctive relief, the Court should also order Plaintiff to post security. Under Rule 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by the Government if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). In the event the Court issues an injunction here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any injunction. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (a district court has "broad discretion . . . to determine the appropriate amount of an injunction bond"); *Nat'l Treasury Emps. Union v. Trump ("NTEU"),* No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) ("clarify[ing] that injunction bonds are generally required.") (citing Fed. R. Civ. P. 65(c)).

### CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's request for extraordinary relief.

*      *      *

- 43 -

Dated: April 23, 2026

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: */s/ Zachariah Weston Lindsey*
    Zachariah (Zack) Weston Lindsey
    Assistant United States Attorney
    601 D Street, NW
    Washington, DC 20530
    202-252-6612

*Attorneys for the United States of America*