**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

COALITION FOR INDEPENDENT
TECHNOLOGY RESEARCH,

       Plaintiff,

    v.

MARCO RUBIO, in his official capacity as
Secretary of State; MARKWAYNE
MULLIN, in his official capacity as Secretary
of Homeland Security; and TODD
BLANCHE, in his official capacity as
Attorney General of the United States,

       Defendants.

Civil Action No. 1:26-cv-00815 (JEB)

**REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR**
**SECTION 705 STAY AND PRELIMINARY INJUNCTION**

**Table of Contents**

Table of Authorities ................................................................................................... iii

Introduction ...................................................................................................................1

Argument .......................................................................................................................2

    I.      CITR challenges the Censorship Policy as expanded in December 2025. ....................2

    II.     CITR has standing...................................................................................................5

          A.      CITR has associational standing. ....................................................... 5

          B.      CITR has organizational standing........................................................ 7

    III.    CITR is likely to succeed on the merits of its claims. .......................................................9

          A.      The Censorship Policy violates the First Amendment...................................... 9

               1.      The Censorship Policy is subject to strict scrutiny. ............................ 9

               2.      The Censorship Policy is substantially overbroad. ............................ 12

          B.      The Censorship Policy violates the Fifth Amendment. .................................. 15

          C.      The Censorship Policy violates the APA........................................................ 16

                1.      The Censorship Policy is final agency action. ................................... 16

                2.      The Censorship Policy is arbitrary and capricious and in excess of statutory authority........................................................................ 18

    IV.    The remaining factors favor preliminary relief................................................................19

    V.     Neither the INA nor *Trump v. CASA* restricts review or relief....................................20

          A.      The INA does not bar jurisdiction or relief against the Censorship Policy. ................................................................................................... 20

               1.      Section 1252(g)............................................................................. 20

                2.      Section 1252(b)(9). ....................................................................... 21

                3.      Section 1201(i)............................................................................... 23

                4.      Section 1252(f)(1). ........................................................................ 23

           B.      *Trump v. CASA* does not restrict relief against the Censorship Policy. .......... 24

VI.    The Court should not require a bond. ...........................................................................25

Conclusion .................................................................................................................................25

**Table of Authorities**

**Cases**

*Abourezk v. Reagan*, 592 F. Supp. 880 (D.D.C. 1984) .................................................. 12

*Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1986) ............................................. 5, 12

*Act Now to Stop War & End Racism Coal. v. Dist. of Columbia*, 846 F.3d 391
    (D.C. Cir. 2017) ..................................................................................................... 15

*Action for Child.'s Television v. FCC*, 58 F.3d 654 (D.C. Cir. 1995) ......................... 19

*Aguilar v. ICE*, 510 F.3d 1 (1st Cir. 2007) ................................................................ 22

*Ahmed v. Noem*, No. 25-1351, 2025 WL 2299447 (D.D.C. Aug. 8, 2025) ............. 22, 23

*Am. Ass'n of Univ. Professors v. Rubio*, 780 F. Supp. 3d 350 (D. Mass. 2025) ........... 17

*\*Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120 (D. Mass. 2025) ..... 4, 11

*Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045 (9th Cir. 1995) ...... 10, 11

*\*Ams. For Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) ......................... 12, 13, 14

*Anthropic PBC v. U.S. Dep't of War*, No. 26-CV-01996, 2026 WL 836842 (N.D.
    Cal. Mar. 26, 2026) ................................................................................................. 4

*Beckles v. United States*, 580 U.S. 256 (2017) ........................................................... 15

*Bennett v. Spear*, 520 U.S. 154 (1997) ...................................................................... 16

*Biden v. Texas*, 597 U.S. 785 (2022) ................................................................... 17, 23

*Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281 (D.D.C. 2011) ................ 11, 19

*Bridges v. Wixon*, 326 U.S. 135 (1945) ...................................................................... 10

*Coal. for Humane Immigrant Rts. v. Noem*, 805 F. Supp. 3d 48 (D.D.C. 2025) .......... 24

*CREW v. DOJ*, 846 F.3d 1235 (D.C. Cir. 2017) .......................................................... 18

*Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152 (D.C. Cir. 2005) ..................... 8

*Damus v. Nielsen*, 313 F. Supp. 3d 317 (D.D.C. 2018) ............................................... 24

*Dennis v. United States*, 341 U.S. 494 (1951) ............................................................ 11

*Dep't of Com. v. New York*, 588 U.S. 752 (2019) ....................................................... 17

*Dep't of State v. Muñoz*, 602 U.S. 899 (2024) ................................................................. 9

*\*DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) .......................................... 20, 22

*E.Q. v. DHS*, No. 25-CV-791, 2026 WL 946181 (D.D.C. Apr. 8, 2026) ....................................... 8

*Escobar Molina v. DHS*, 811 F. Supp. 3d 1 (D.D.C. 2025) ....................................... 20, 23

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) ............................................ 18

*FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) .............................. 7, 8

*Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74 (D.D.C. 2025) .................................. 19

*\*First Choice Women's Res. Ctrs., Inc. v. Davenport*, No. 24-781, 2026 WL
   1153029 (U.S. Apr. 29, 2026) ........................................................................ 7

*Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022) ............................................. 23, 24

*Grayscale Invs., LLC v. SEC*, 82 F.4th 1239 (D.C. Cir. 2023) .................................. 18

*Greater Bos. Legal Servs. v. DHS*, No. 21-CV-10083, 2022 WL 138629 (D. Mass.
   Jan. 14, 2022) ........................................................................................ 18

*Harisiades v. Shaughnessy*, 342 U.S. 580 (1952) ............................................. 10, 11

*Hines Immigr. L., PLLC v. EOIR*, No. 1:26-CV-01018, 2026 WL 969020 (D.D.C.
   Apr. 10, 2026). ...................................................................................... 22

*Hisp. Affs. Project v. Acosta*, 901 F.3d 378 (D.C. Cir. 2018) ................................... 4

*INS v. St. Cyr*, 533 U.S. 289 (2001) ........................................................... 21

*Jafarzadeh v. Nielsen*, 321 F. Supp. 3d 19 (D.D.C. 2018) ..................................... 21

*Jennings v. Rodriguez*, 583 U.S. 281 (2018) ................................................... 22

*Johnson v. Eisentrager*, 339 U.S. 763 (1950) .................................................. 10

*Khalil v. President, United States*, 164 F.4th 259 (3d Cir. 2026) ............................... 23

*Kleindienst v. Mandel*, 408 U.S. 753 (1972) ............................................. 5, 9, 12

*Kwong Hai Chew v. Colding*, 344 U.S. 590 (1953) ............................................... 10

*Las Americas Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1 (D.D.C. 2020) ........................... 17

*League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp.
   3d 135 (D.D.C. 2025) ................................................................................ 25

*Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) ........................................................................................................... 24

*Make the Rd. N.Y. v. Noem*, No. 25-CV-190, 2025 WL 2576701 (D.D.C. Sept. 5, 2025) ........................................................................................................... 25

*Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1 (D.D.C. 2024) ........................................... 19

*Miller v. Christopher*, 96 F.3d 1467 (D.C. Cir. 1996). ..................................................... 10

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ............................................................ 2, 12, 14

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29 (1983) ........................................................................................................... 18

*N. Am.'s Bldg. Trades Unions v. DOD*, 783 F. Supp. 3d 290 (D.D.C. 2025) ............................... 25

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) ......................................................... 25

*Neguse v. ICE*, 813 F. Supp. 3d 45 (D.D.C. 2025) ......................................................... 24

*New York v. Trump*, 133 F.4th 51 (1st Cir. 2025) ........................................................... 3

*NWDC Resistance v. ICE*, 493 F. Supp. 3d 1003 (W.D. Wash. 2020) ........................................ 20

*O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019) ...................................................... 22

*Öztürk v. Hyde*, 136 F.4th 382 (2d. Cir. 2025) ...................................................... 17, 21

*PETA v. U.S. Dep't of Agric.*, 797 F.3d 1087 (D.C. Cir. 2015) ........................................... 8

*Pullman Arms Inc. v. Healey*, 301 F. Supp. 3d 227 (D. Mass. 2018) ......................................... 15

*Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500 (D.C. Cir. 2016) ........................................... 20

*R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) ........................................................... 4, 24

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*, No. 25-5243, 2026 WL 1110616 (D.C. Cir. Apr. 24, 2026) ........................................................... 24

*Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999) ............................... 20, 21

*RFK Hum. Rts. v. Dep't of State*, No. 25-1774, 2026 WL 820811 (D.D.C. Mar. 25, 2026) ........................................................................................................... 9

*Rhea Lana, Inc. v. Dep't of Lab.*, 824 F.3d 1023 (D.C. Cir. 2016) ........................................... 17

*S. Poverty L. Ctr. v. DHS*, No. CV 18-760, 2020 WL 3265533 (D.D.C. June 17, 2020) ........................................................................................................... 22

*Sandvig v. Barr*, 451 F. Supp. 3d 73 (D.D.C 2020)........................................................................ 7

*Sierra Club v. EPA*, 955 F.3d 56 (D.C. Cir. 2020) ........................................................ 16

*\*Trump v. CASA, Inc.*, 606 U.S. 831 (2025)................................................................ 2, 24, 25

*Trump v. Hawaii*, 585 U.S. 667 (2018) ........................................................................ 9

*Turlock Irrigation Dist. v. F.E.R.C.*, 786 F.3d 18 (D.C. Cir. 2015) ............................... 8

*Turner v. Williams*, 194 U.S. 279 (1904)..................................................................... 10

*United States v. Williams*, 553 U.S. 285 (2008) ........................................................... 16

*Wagner v. Fed. Election Comm'n*, 793 F.3d 1 (D.C. Cir. 2015) ................................... 11

*Webster v. Doe*, 486 U.S. 592 (1988) ........................................................................... 21

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp.
3d 1 (D.D.C. 2020) ................................................................................................... 8

*\*Woodhull Freedom Found. v. United States*, 948 F.3d 363 (D.C. Cir. 2020) ............. 7

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ...................................................................... 10

**Statutes**

5 U.S.C. § 551.................................................................................................................. 4

5 U.S.C. § 704.................................................................................................................. 17

5 U.S.C. § 705.................................................................................................................. 2

8 U.S.C. § 1182................................................................................................................ 19

8 U.S.C. § 1201................................................................................................................ 23

8 U.S.C. § 1252................................................................................................... 2, 20, 21, 22

**Other Authorities**

Adam B. Cox, *The Invention of Immigration Exceptionalism*, 134 Yale L.J. 329
(2024)......................................................................................................................... 11

H.R. Rep. 101-955 .......................................................................................................... 19

**Introduction**

Defendants attempt to justify the Censorship Policy by pretending that most of it does not exist. Disclosing a May 23, 2025 "Action Memo" (the "May Memo") for the first time with their opposition brief, Defendants claim that the Policy consists only of that Memo and Defendant Rubio's accompanying May 28, 2025 announcement. But as Plaintiff, the Coalition for Independent Technology Research ("CITR"), has explained, Defendants significantly expanded the Policy in December 2025. As it exists now, and as CITR has challenged it, the Policy encompasses a cable reportedly sent to consular officers in early December 2025 (the "Cable"), as well as enforcement actions taken in late December 2025. Defendants fail even to mention the former, and they fail to explain how their cramped characterization of the Policy can be reconciled with the latter, or with their characterization of the Policy before other audiences.

In view of the actual scope of the Censorship Policy, Defendants' defenses fall flat. First, their argument that CITR lacks standing to bring this challenge overlooks the fact that two CITR member organizations have already been targeted under the Policy based on their research and reporting, and Defendants' public warning that the State Department "stand[s] ready and willing to expand" the target list "if others do not reverse course." ECF No. 11-25. Against that background, the reluctance of CITR's noncitizen members to engage in similar research and reporting cannot reasonably be described as "subjective." Nor can the steps that CITR has taken to respond to the Policy reasonably be described as "voluntary."

Second, Defendants' arguments that CITR's First Amendment claims are unlikely to succeed on the merits given the Censorship Policy's purportedly "legitimate sweep," and its application to noncitizens, also fail. Because the Policy imposes content- and viewpoint-based burdens on the speech and association of noncitizens who live and work *in* the United States, it is

1

subject to strict scrutiny. And the Policy fails strict scrutiny because the government interest it purportedly serves—combatting foreign censorship of speech in the United States—is speculative at best, and because the Policy is poorly tailored to address it. The Policy would fail any level of scrutiny, however, because it is motivated by Defendants' interest in "rejigger[ing] the expressive realm," which is categorically illegitimate. *Moody v. NetChoice, LLC*, 603 U.S. 707, 733 (2024). For similar reasons, CITR is also likely to prevail on its claims under the Fifth Amendment and Administrative Procedure Act ("APA"), 5 U.S.C. § 705.

Finally, Defendants' invocation of 8 U.S.C. § 1252 fails because CITR is challenging the Censorship Policy itself—not any removal proceeding, order, or decision, or any visa revocation. Nor does *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), bar the requested preliminary relief.

## Argument

### I.    CITR challenges the Censorship Policy as expanded in December 2025.

The Censorship Policy was first announced in May 2025, but Defendants expanded it in December 2025. *See* Pl.'s Br. 4–9, ECF No. 11-1. The full scope of the Policy is evident from: (1) the May Memo and Defendant Rubio's May 28, 2025 announcement of "a new visa restriction policy that will apply to foreign officials and persons who are complicit in censoring Americans," ECF No. 11-18; (2) the Cable, which reportedly was sent on December 2, 2025, references the May 2025 policy, and instructs consular officers to identify visa applicants who have engaged in activities including "combatting misinformation, disinformation or false narratives, fact-checking, content moderation, compliance, and trust and safety"—and to pursue findings of visa ineligibility if they determine those applicants were "responsible for, or complicit in, censorship or attempted censorship of protected expression in the United States ECF No. 11-15; *see also* Suppl. DeCell Decl. Ex. 1 (announcing social media disclosure requirement to facilitate that review); and (3)

2

enforcement actions announced on December 23, 2025—including actions against four independent researchers or advocates—along with the supporting action memoranda and accompanying public explanations of those actions, *see* ECF Nos. 11-23–30.

Defendants contend that the full scope of the Policy is described in the May Memo authored by Darren Beattie. *See* Defs.' Br. 3–4, ECF No. 45; ECF No. 45-2. That Memo indicates approval of a policy under 8 U.S.C. § 1182(a)(3)(C) (denoted "3C"), *see* ECF No. 45-2, at 1, which was announced on May 28, 2025, ECF No. 11-18. The Memo asserts that "the previous administration trampled free speech rights" by pressuring social media platforms "to moderate, deplatform, or otherwise suppress speech," purportedly "[u]nder the guise of combatting 'misinformation,' 'disinformation,' and 'malinformation.'" ECF No. 45-2, at 1–2. It then provides a non-exhaustive list of examples of "censorship or attempted censorship," all requiring government authority. *Id.* at 2. It concludes by proposing "a public announcement" that "would encourage foreign nationals to take steps to ensure they are not censoring free speech in the United States." *Id.* at 4.

Even if the May Memo accurately and exhaustively described the Censorship Policy as of May 2025, it is plain that the Policy was subsequently expanded, as evidenced by the December 2025 Cable and enforcement actions.[1] Strikingly, Defendants do not acknowledge the Cable at all. And Defendants' argument that certain enforcement actions should not be attributed to the Policy, *see* Defs.' Br. 4–6, 25, cannot be reconciled with the fact that State Department officials explicitly invoked the Policy in explaining those enforcement actions, including before Congress. ECF No. 11-23, at 7 (referring to the "May 2025 3C policy" in recommending deportability determination against Imran Ahmed); Suppl. DeCell Decl. ¶ 6 (describing Mr. Ahmed as "one of

---

[1] Defendants do not argue that these developments are each discrete final agency actions, but should the Court consider them as such, CITR challenges these "discrete final agency actions all at once." *New York v. Trump*, 133 F.4th 51, 68 (1st Cir. 2025).

the targets of our recent 3C sanctions policy" in testimony before Congress). Their argument that deportability determinations must be based on "individualized assessment[s]" does not distinguish them from inadmissibility determinations, which require the same personal determination by the Secretary of State, *see* Pl.'s Br. 2–3, and which Defendants concede fall under the Policy, *see* Defs.' Br. 6. Finally, Defendants' attempt to disavow social media statements explaining those actions, *see* Defs.' Br. 24, ignores the facts that those statements issued from official State Department accounts, *see, e.g.*, ECF Nos. 11-25–30, and that the May Memo itself called for such "public announcement[s]," *see supra* p. 3. These official statements are properly considered part of the Policy. *Cf. Anthropic PBC v. U.S. Dep't of War*, 2026 WL 836842, at *20 (N.D. Cal. Mar. 26, 2026) (ruling that post on X was itself agency action).

The Court should reject Defendants' effort to redefine the Censorship Policy in order to evade judicial review. CITR has made clear that it challenges the Policy *as reflected in the December Cable and enforcement actions*. *See* Pl.'s Br. 4–9. Accordingly, this is the Policy the Court should consider. *See Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 387 (D.C. Cir. 2018) (explaining that plaintiff "did not need to list a specific [agency] regulation in its complaint as long as it made clear what policy and practice it challenged"); *see also* 5 U.S.C. § 551(4), (13) (defining "rule" and "agency action"); *Am. Ass'n of Univ. Professors v. Rubio* ("*AAUP*"), 802 F. Supp. 3d 120, 173, 175 (D. Mass. 2025) (identifying "enforcement policy" based on similar facts and statutory authority); *cf. R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 176, 184 (D.D.C. 2015) ("Agency action . . . need not" even "be in writing to be final and judicially reviewable.").

4

## II.    CITR has standing.

### A.    CITR has associational standing.

Defendants' argument that CITR lacks associational standing because its members have "no concrete injury in fact," Defs.' Br. 11, is without merit. To begin, the Censorship Policy has directly injured CITR's U.S.-based organizational member the Global Disinformation Index ("GDI"). Pursuant to the Policy, Defendants publicly barred GDI's leader, Ms. Melford, from the country because of GDI's expressive activities. *See* ECF No. 11-28; Defs.' Br. 24 (citing GDI's expressive activities as grounds for Ms. Melford's exclusion). GDI is suffering significant, ongoing harms as a result.[2] *See* Pl.'s Br. 14–15. Those harms include the impairment of GDI's ability to speak as an organization, to raise funds, and to engage with other partners in the United States—harms which more than suffice for standing, and which Defendants do not counter. *See id.* Instead, Defendants contend that GDI cannot establish standing under *Kleindienst v. Mandel*, 408 U.S. 753 (1972), arguing that the case "did not directly address standing." Defs.' Br. 12. But "[p]resumably, had the Court harbored doubts concerning federal court subject matter jurisdiction in *Mandel*, it would have raised the issue on its own motion." *Abourezk v. Reagan*, 785 F.2d 1043, 1050 (D.C. Cir. 1986). Defendants also confuse standing with the merits of the case. Defs.' Br. 12. Regardless of its resolution of the merits, *Mandel* recognized a U.S. organization's First Amendment interest in having a noncitizen enter the country to hear his views—one of GDI's core interests injured by the Policy. *Mandel*, 408 U.S. at 764–65; *see* Pl.'s Br. 30.

---

[2] CITR does not assert standing on behalf of Ms. Melford or Mr. Ahmed, so Defendants' arguments as to their standing are not relevant here. *See* Defs.' Br. 11, 13. Nor has CITR asserted standing on behalf of Mr. Ahmed's organization, the Center for Countering Digital Hate, at this stage, though the record would support that assertion. *See, e.g.*, ECF Nos. 11-23, 11-27.

Defendants' announcement, expansion, and enforcement of the Censorship Policy have also significantly chilled the expressive and associational activities of CITR's noncitizen members. *See* ECF No. 11-5, at ¶¶ 8–9; ECF No. 11-6, at ¶¶ 7–10. This chill is not "subjective," as Defendants argue, Defs.' Br. 13–14—it is a reasonable, and even the intended, response. *See* ECF No. 45-2, at 4. Indeed, in announcing the Policy's enforcement against Ms. Melford, Mr. Ahmed, and others, Defendants warned that "the State Department stands ready and willing to expand" the target list "if other foreign actors do not reverse course." *See* ECF No. 11-24. Moreover, Member A and Emma Briant do precisely the kind of work that the Policy targets, putting them at substantial risk for detention and deportation. *Compare* ECF No. 11-5, at ¶¶ 5, 7 (describing work on content moderation); ECF No. 11-6, at ¶ 4 (describing work on disinformation) *with* ECF No. 11-16 (describing Cable's focus on visa applicants who have worked on disinformation and content moderation). For example, Defendants enforced the Policy against Anna-Lena von Hodenberg in part for circulating a petition urging greater "data access for 'researchers,'" ECF No. 11-30; similarly, CITR Member A has advocated for increased data access for researchers, including in an op-ed they co-authored, ECF No. 11-5, at ¶ 10. Likewise, Defendants barred Ms. Melford and Mr. Ahmed in part for their organizations' work on "disinformation," *see* ECF Nos. 11-27, 11-28; similarly, Dr. Briant has studied disinformation and participated in policy discussions about "the implications [of her work] for regulating technology industries, the handling of misinformation, and other aspects of trust and safety," ECF No. 11-6, at ¶ 4.[3]

---

[3] Even if the May Memo described the Censorship Policy's full scope (and it does not, as explained above), CITR Member A and Dr. Briant would still face a credible threat of enforcement because the Memo encompasses not just those "responsible for . . . censorship or attempted censorship," but also anyone deemed to be "complicit in" those efforts. ECF No. 45-2, at 2.

CITR Member A and Dr. Briant thus both face a credible threat of enforcement under the Censorship Policy. *See Woodhull Freedom Found. v. United States*, 948 F.3d 363, 373 (D.C. Cir. 2020) (finding standing where the plaintiff had "alleged 'some desired conduct . . . that might trigger an enforcement action'" (citation omitted)); *see also Sandvig v. Barr*, 451 F. Supp. 3d 73, 84 (D.D.C 2020) (finding standing to bring pre-enforcement challenge to ambiguous statute). Though Defendants argue that the Policy is "not self-executing," Defs.' Br. 14, "the value of a sword of Damocles is that it hangs—not that it drops." *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 2026 WL 1153029, at *9 (U.S. Apr. 29, 2026) (citation and alteration omitted) (rejecting argument that plaintiff had not suffered injury because subpoena was not self-executing). The Policy's chilling effects on CITR Member A and Dr. Briant, stemming from a credible threat of the Policy's enforcement, thus satisfy the injury-in-fact requirement.

Finally, the Censorship Policy's chilling effects on noncitizens have in turn burdened the expressive, associational, and professional interests of CITR U.S.-citizen members Nathan Matias and Rebekah Tromble, who work with noncitizens on issues that fall squarely within the scope of the Policy. *See* ECF No. 11-7, at ¶¶ 5, 7; ECF No. 11-8, at ¶¶ 4, 7. These burdens independently establish injury-in-fact sufficient for standing. *See* Pl.'s Br. 18–20.

**B.      CITR has organizational standing.**

CITR has also established organizational standing, *see* Pl.'s Br. 21–27, and Defendants' arguments to the contrary are unavailing. First, Defendants' argument that *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394 (2024), precludes a finding of organizational injury-in-fact is misguided. In that case, the Supreme Court foreclosed advocacy organizations that were otherwise unharmed from manufacturing standing by devoting resources to advocating against the challenged conduct. *Id.* Here, CITR *has* been harmed, even putting aside any of its advocacy

concerning the Censorship Policy itself: The Policy has deterred CITR members from traveling to attend its events, participating in its public education efforts, and in some cases, from associating with CITR at all—directly interfering with its "core . . . activities." *Id.* at 395; *see* Pl.'s Br. 22–24; ECF No. 11-2, at ¶¶ 7–9, 12–33. The other cases Defendants cite are similarly unavailing, because they denied standing where the challenged actions simply made the plaintiff's issue advocacy more resource-intensive. *See Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005); *Turlock Irrigation Dist. v. F.E.R.C.*, 786 F.3d 18, 24 (D.C. Cir. 2015). Here, in contrast, the Policy has "inhibit[ed]" CITR's "daily operations." *PETA v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (citation omitted); *see* Pl.'s Br. 23–24.

Moreover, CITR has counseled dozens of members and planned events to "counteract" those harms, *PETA*, 797 F.3d at 1094, not to "advocate against the defendant[s'] action," *FDA*, 602 U.S. at 394. Such expenditures, even if voluntary, are not "self-inflicted." Defs.' Br. 17; *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 19 (D.D.C. 2020) (citations omitted); *see also E.Q. v. DHS*, 2026 WL 946181, at *13 (D.D.C. Apr. 8, 2026) (finding standing based on "need to make new 'programmatic expenditures' to alleviate the Rules' direct interference with" plaintiff's client services). And CITR's injuries are not "inconsistent." *See* Defs.' Br. 17. CITR's plan to host two parallel events, one inside and one outside the United States, is a direct response to the concerns that led it to temporarily halt U.S.-based events: it will obviate the need for anyone to travel internationally. Pl.'s Br. 22–25; ECF No. 11-2, at ¶ 20.

Second, CITR has shown that its injuries are fairly traceable to the Censorship Policy. *See* Pl.'s Br. 26. Defendants' arguments to the contrary ignore that the Policy's chilling effects on those who work on disinformation, content moderation, and related issues—including many of CITR's noncitizen members—are by design. *See, e.g.*, ECF No. 11-25; ECF No. 45-2, at 4. *Cf. RFK Hum.*

8

*Rts. v. Dep't of State*, 2026 WL 820811, at \*13 (D.D.C. Mar. 25, 2026) ("The Court need not speculate about whether third parties would react to the Agreement in predictable ways when the participants' own public statements alleviate any doubt."). And the Policy need not "have bound any party to act"; "[i]t is enough" if it "set[s] in motion a foreseeable cascade of events." *Id.* at \*12. That CITR's noncitizen members have limited their participation in CITR's activities is thus not "*ipse dixit* anxiety," Defs.' Br. 17, but a "direct consequence" of the Policy's "successful implementation." *RFK Hum Rts.*, 2026 WL 820811, at \*7.

## III.    CITR is likely to succeed on the merits of its claims.

### A.    The Censorship Policy violates the First Amendment.

Defendants argue that CITR is unlikely to prevail on its First Amendment claims because (1) the Censorship Policy must be reviewed under the more lenient standard of review applicable in cases involving noncitizens residing outside the United States; and (2) the Policy is not "substantially overbroad" for purposes of a facial challenge. Both arguments fail.

### 1.    The Censorship Policy is subject to strict scrutiny.

The Censorship Policy is subject to strict scrutiny because it imposes a content- and viewpoint-based burden on lawful permanent residents ("LPRs") as well as nonimmigrant visa holders ("NIVs") who live in the United States. Defendants do not acknowledge that the Policy implicates the First Amendment rights of LPRs, and they argue that NIVs have only "reduced First Amendment rights," such that their claims are subject to the "facially legitimate and bona fide" standard set forth in *Kleindienst v. Mandel*, 408 U.S. 753, 769–70 (1972), or to rational basis review under *Trump v. Hawaii*, 585 U.S. 667, 704 (2018). *See* Defs.' Br. 22–24. But *Mandel* and *Hawaii* addressed challenges to denials of entry to noncitizens residing abroad, *see Dep't of State v. Muñoz*, 602 U.S. 899, 903, 908 (2024), and Defendant cite no cases applying *Mandel* or *Hawaii*

in challenges to actions against noncitizens residing lawfully in the United States.[4] Nor do they provide any justification for applying a lower level of scrutiny to a burden on speech simply because that burden falls on noncitizen residents instead of citizens in this country.

Defendants properly concede that the First Amendment "applies" to noncitizens in the United States. Defs.' Br. 21. Once a noncitizen "lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders. . . . None of these provisions acknowledges any distinction between citizens and resident [noncitizens]." *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953);[5] *see Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). Accordingly, lower courts have repeatedly concluded that noncitizens residing in the United States "are entitled to the *full panoply* of First Amendment rights." *Am.-Arab Anti-Discrimination Comm. v. Reno* ("*AADC*"), 70 F.3d 1045, 1063–66 (9th Cir. 1995) (emphasis added); *see also* cases cited at Pl.'s Br. 29.

Defendants incorrectly argue, however, that the First Amendment provides "lesser protections" to noncitizens in this country, such that a more lenient level of scrutiny applies to their claims. Defs.' Br. 21. Defendants rely on *Harisiades v. Shaughnessy*, 342 U.S. 580 (1952), and *Turner v. Williams*, 194 U.S. 279 (1904), but neither of these cases ultimately drew a distinction between the First Amendment protections afforded U.S. citizens and those afforded noncitizen residents. In upholding the deportation of Communist Party members in *Harisiades*, the Court applied the same free speech principles that would have applied to U.S. citizens at the

---

[4] Defendants cite *Miller v. Christopher*, but that case addressed the denial of a citizenship application submitted by a noncitizen residing abroad, on a record that did "not reveal whether she ha[d] ever been to the United States." 96 F.3d 1467, 1468 (D.C. Cir. 1996).

[5] Defendants quote language from *Kwong Hai Chew*, *see* Defs.' Br. 21, which describes *Johnson v. Eisentrager*, 339 U.S. 763 (1950), before distinguishing it on the ground that it "related to nonresident enemy [noncitizens] who had never been in the United States, rather than to a lawful permanent resident in the position of petitioner." *Kwong Hai Chew*, 344 U.S. at 596 n.5.

10

time, under which they could be punished for association with the Communist Party. *See* 342 U.S. at 592 (citing *Dennis v. United States*, 341 U.S. 494 (1951)); *AADC*, 70 F.3d at 1064 (interpreting *Harisiades* this way); *AAUP*, 802 F. Supp. 3d at 182–84 (same). Similarly, the Court's decision in *Turner* was premised on a since-eroded distinction between rights and privileges, under which "Congress could exclude immigrants on the basis of their speech or beliefs without violating the First Amendment—not because those immigrants were outside the protection of the First Amendment, but because they sought a privilege." Adam B. Cox, *The Invention of Immigration Exceptionalism*, 134 Yale L.J. 329, 363 n.122 (2024).

Nor does *Bluman v. Federal Election Commission*, 800 F. Supp. 2d 281 (D.D.C. 2011), support Defendants' argument. There, the court applied strict scrutiny to regulations prohibiting campaign spending by NIVs, concluding that the regulations were narrowly tailored to the uniquely compelling government interest in the electoral context. *Id.* at 288; *see id.* at 292 (cabining ruling). *Bluman* thus stands for the proposition that the electoral context might justify regulations burdening specific categories of people, even under strict scrutiny—not a rule that regulations burdening noncitizens should always be reviewed under a lower level of scrutiny. *See Wagner v. Fed. Election Comm'n*, 793 F.3d 1, 21–22 (D.C. Cir. 2015) (explaining that campaign spending restrictions on judges and other categories of U.S. citizens are "not unique"). Thus, none of the cases Defendants cite suggests that claims brought by noncitizen residents should be subject to lower levels of scrutiny than would apply to claims brought by U.S. citizens. And Defendants make no argument at all as to LPRs. As far as undersigned counsel are aware, no court in this Circuit has ever applied a lower level of scrutiny to a burden on speech simply because that burden falls on noncitizens in this country instead of citizens. This court should not be the first.

11

Even if the Court were to review the Censorship Policy under *Mandel*'s "facially legitimate and bona fide" standard, however, the Policy would fail because it is a content-based and viewpoint-discriminatory burden on speech. *See infra* Pt. III.A.2; Pl.'s Br. 33–34 (citing, *inter alia*, *Abourezk v. Reagan*, 592 F. Supp. 880, 887 & n.23 (D.D.C. 1984) ("[A]lthough the government may deny entry to [noncitizens] altogether, or for any number of specific reasons, it may not, consistent with the First Amendment, deny entry solely on account of the content of speech."), *vacated and remanded on other grounds*, 785 F.2d 1043 (D.C. Cir. 1986)).

### 2.    The Censorship Policy is substantially overbroad.

The Censorship Policy violates the First Amendment because it targets noncitizens for exclusion or deportation on the basis of constitutionally protected activity. *See* Pl.'s Br. 27–34. Whether analyzed as a challenge to the Policy as applied to CITR members and other private actors, or as a challenge to the Policy on its face, CITR's challenge is likely to succeed. In a facial challenge, "[t]he question is whether 'a substantial number of the [Policy's] applications are unconstitutional, judged in relation to the [Policy's] plainly legitimate sweep.'" *NetChoice*, 603 U.S. at 723 (quoting *Ams. For Prosperity Found. v. Bonta* ("*AFPF*"), 594 U.S. 595, 615 (2021)). To answer this question, the Court first assesses the Policy's scope. *Id.* at 724. The Court then must "decide which of the [Policy's] applications violate the First Amendment, and . . . measure them against the rest." *Id.* at 725. The Policy is clearly unconstitutional on its face because it is substantially overbroad under the First Amendment.

First, the scope of the Censorship Policy is substantially broader than Defendants suggest. As explained above, the Policy encompasses not only the May Memo and announcement, but also the December 2025 expansion and enforcement. *See supra* Pt. I. Viewed as a whole, the Policy encompasses the deportation of LPRs, as well as the exclusion of visa applicants and holders, who

12

study misinformation and disinformation or work in fact-checking, content moderation, or trust and safety, and whom Defendants deem to have engaged or been "complicit" in "censorship" of Americans' speech on social media platforms. *See* Pl.'s Br. 6–7; *contra* Defs.' Br. 20.

Second, a substantial—if not overwhelming—number of the Censorship Policy's applications are unconstitutional. Because of its expansive scope, the Policy chills a significant amount of First Amendment–protected activities, especially of those whose work is described in the Cable. *See* Pl.'s Br. 27–30; *see generally* ECF Nos. 40, 41. Indeed, Defendants have publicly declared an intent to chill those activities. *See* ECF No. 45-2, at 4; ECF No. 11-25. The Policy also discriminates on the basis of viewpoint. In five of the six enforcement actions taken to date, Defendants acted explicitly and exclusively on the basis of expressive and associational activities. *See* Pl.'s Br. 8–9; *contra* Defs.' Br. 24. These enforcement actions confirm what the Cable conveys—that the Policy targets for exclusion and deportation private actors whose research, advocacy, trust and safety work, or other work supports greater moderation of content on the social media platforms. *See* Pl.'s Br. 6, 31; ECF No. 11-15 (State Department spokesperson commenting on reporting about the Cable); ECF Nos. 11-24–30 (commenting on enforcement actions). These Policy applications viewpoint-based and presumptively unconstitutional. *See* Pl.'s Br. 30–32.

On the other side, Defendants offer no cogent articulation of the Censorship Policy's "plainly legitimate sweep." *AFPF*, 594 U.S. at 615. They claim the Policy serves their interest in "protecting the First Amendment rights of American citizens from the enforcement of foreign censorship laws," Defs.' Br. 20, but they never identify actual instances of foreign "censorship" of speech *in* the United States. Indeed, despite reportedly having conducted an investigation specifically to identify such instances, they found none. *See* Pl.'s Br. 38; ECF No. 11-17; Suppl. DeCell Decl. Ex. 2, at 8. *Cf. AFPF*, 594 U.S. at 614 (concluding that state's witnesses "failed to

13

substantiate" its asserted interests). Even if Defendants could substantiate their asserted interest, the Policy would be poorly tailored to achieve that interest, given its broad application and broader chilling effects. That interest fails to justify five of the six enforcement actions under the Policy to date—actions against private actors who have no power to engage in the "censorship" Defendants describe. Thus, there is "a dramatic mismatch . . . between the interest" that Defendants purportedly seek "to promote" and the Policy they have "implemented in service of that end." *Id.* at 612; *see id.* at 609 ("Narrow tailoring is crucial where First Amendment activity is chilled." (cleaned up)); *id.* at 615 (explaining why "a facial challenge is appropriate" in overbreadth cases).

The only other explanation for the December enforcement actions is that Defendants' interest really lies in punishing private actors who advocate for one set of content moderation policies over another, or who develop and implement those policies on behalf of the platforms. *See, e.g.*, ECF No. 11-15 (commenting that "the President himself was the victim of this kind of abuse when social media companies locked his accounts. . . . Allowing foreigners to lead this type of censorship would both insult and injure the American people"); ECF No. 11-31, at 9 (describing efforts to oppose "NGOs which seek to restrict the right of free speech in the name of combatting 'hate speech,' promoting 'trust and safety,' or countering 'disinformation[,]'"); Suppl. DeCell Decl. Ex. 3, at 2 (reporting on Mr. Beattie's request for records "with or about a host of individuals and organizations that track or write about foreign disinformation"). That interest is facially illegitimate. *See NetChoice*, 603 U.S. at 741–42. Therefore, CITR is likely to prevail on its facial challenge to the Policy. But even if the Court believes that Defendants have a legitimate interest in excluding or deporting foreign state officials under the Policy, the Policy would still be unconstitutional as applied to private actors with no power to exercise government authority.

14

### B.    The Censorship Policy violates the Fifth Amendment.

Defendants do not attempt to define the Censorship Policy's inherently indeterminate triggering terms—"censorship" and being "complicit" in such censorship—but instead argue that the vagueness doctrine does not apply here because it does not apply to facial challenges, and because the Policy consists only of internal guidance. Defs.' Br. 26–28. Both arguments fail.

First, the Censorship Policy is susceptible to a facial challenge on vagueness grounds. "At least in a pre-enforcement posture, such a claim is by its nature facial. Self-censorship is immune to an 'as applied' challenge, for it derives from the individual's own actions, not an abuse of government power." *Act Now to Stop War & End Racism Coal. v. Dist. of Columbia*, 846 F.3d 391, 410 (D.C. Cir. 2017) (cleaned up)).

Second, Defendants' contention that the Policy amounts only to an "internal directive" that is not susceptible to a vagueness challenge, Defs.' Br. 26–27, is also incorrect. As explained above, *supra* Pt. I, the Policy consists of more than just the May Memo—it consists also of the May announcement, the December Cable and enforcement actions, and Defendants' various public statements explaining those actions, including their use of the same indeterminate terms of "censorship" and "complicit." Regardless, the case on which Defendants primarily rely—*Beckles v. United States*, 580 U.S. 256, 264 (2017)—applies to "a system of purely discretionary sentencing" of federal criminal defendants, not, as here, to a Policy penalizing the constitutionally protected speech and association of private actors. *Cf. Pullman Arms Inc. v. Healey*, 301 F. Supp. 3d 227, 230 (D. Mass. 2018) (ruling that *Beckles* does not apply to vagueness challenge to enforcement notice informing public of possible prosecution for certain commercial transactions).

Here, the Censorship Policy's key triggering terms—"censorship" and "complicit"—are so indeterminate that they fail to provide fair notice and invite arbitrary or discriminatory

15

enforcement by Defendants. The May Memo illustrates "censorship" through a non-exhaustive list of examples, and it provides no definition of "complicit." *See* ECF No. 45-2, at 2. Moreover, statements made by Defendants in explaining the Policy's application to certain individuals suggest that the terms "censorship" and "complicit" are entirely subjective. These "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings" are unconstitutional. *United States v. Williams*, 553 U.S. 285, 306 (2008).

### C.    The Censorship Policy violates the APA.

#### 1.    The Censorship Policy is final agency action.

Defendants wrongly suggest that the Censorship Policy is not final agency action. First, contrary to Defendants' argument, *see* Defs.' Br. 28–29, there is no reasonable question that the December Cable and enforcement actions reflect the "consummation" of Defendants' decisionmaking process up to that point in time. *Bennett v. Spear*, 520 U.S. 154, 178 (1997); *see* ECF No. 11-15 (quoting Cable); Suppl. DeCell Decl. Ex. 1 (requiring that H-1B and certain other visa applicants, along with their dependents, set their social media accounts to "public" to facilitate Defendants' "online presence review" following Cable); ECF No. 11-23 (approved "Action Memo for the Secretary" with enforcement recommendations); ECF No. 11-24 (press release announcing enforcement actions). Moreover, there is nothing tentative about Defendants' repeated and definitive declarations of the Censorship Policy—whether in press releases, X posts, or congressional testimony—as it extends to the December Cable and enforcement actions. *See supra* Pt. I; *see, e.g.*, ECF Nos. 11-25–30; Suppl. DeCell Decl. ¶ 6.

Second, contrary to Defendants' argument, *see* Defs.' Br. 29–30, the Censorship Policy clearly determines legal rights and carries "concrete" legal "consequences." *Sierra Club v. EPA*, 955 F.3d 56, 62–63 (D.C. Cir. 2020) (citation omitted). It determines the right of noncitizens to

16

enter or remain in this country, subjecting noncitizens already in this country to detention and deportation. Defendants have already barred multiple individuals from the country under the Policy and have threatened to target more. *See* Pl.'s Br. 8–9; *Am. Ass'n of Univ. Professors v. Rubio*, 780 F. Supp. 3d 350, 385 (D. Mass. 2025) (finding final agency action where "'Defendants have repeatedly stated that there is a policy,'" and there are "several examples of high-level agency officials . . . 'saying that they were following a policy'" when targeting individuals for deportation); *see also Rhea Lana, Inc. v. Dep't of Lab.*, 824 F.3d 1023, 1027 (D.C. Cir. 2016). Additionally, parts of the Policy require immediate action by those implicated. *See* Suppl. DeCell Decl. Ex. 1 (requiring certain visa applicants to set social media accounts to "public"). The Policy therefore meets the APA's "pragmatic" finality test, especially given the APA's strong "presumption of judicial review." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019); *see Biden v. Texas*, 597 U.S. 785, 808–09 (2022).

Finally, CITR lacks any other adequate remedy for the severe chilling effects and other harms caused by the Censorship Policy. *See* 5 U.S.C. § 704. Defendants argue that CITR's U.S.-based noncitizen members might be placed in removal proceedings and, through those proceedings, afforded an opportunity for review, *see* Defs.' Br. 30, but CITR cannot obtain review of *its* claims through the petition for review ("PFR") process because it cannot join removal proceedings. And any review noncitizen members might obtain if put into such proceedings would not give CITR or its other members meaningful relief. Immigration judges have no authority to resolve constitutional challenges to the Policy, and a court of appeals reviewing a PFR "would not have a sufficient record to assess the government's conduct in cases such as this." *Öztürk v. Hyde*, 136 F.4th 382, 401 (2d. Cir. 2025); *cf. Las Americas Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 34 (D.D.C. 2020) (allowing APA claim supplemental to one under the INA); *Greater Bos. Legal*

17

*Servs. v. DHS*, 2022 WL 138629, at *5 (D. Mass. Jan. 14, 2022) (finding no adequate alternative remedy where plaintiff lawyers were "not parties to [individual removal proceedings]" and any review sought by noncitizens could "not address [plaintiffs'] broader injury"). Where "the very existence of an alternative remedy is doubtful or uncertain there is scant basis to displace APA review." *CREW v. DOJ*, 846 F.3d 1235, 1245 (D.C. Cir. 2017) (cleaned up).

### 2. The Censorship Policy is arbitrary and capricious and in excess of statutory authority.

Defendants' opposition brief confirms that the Censorship Policy is arbitrary and capricious. Defendants do not deny reports that they found no evidence of European censorship of speech in the United States; rather, they contend that the "assertion" of such censorship "is a policy judgment left to the Executive Branch." Defs.' Br. 31. That is not how the APA works. The APA demands that the agency "considered the relevant issues" and "adequately explained the decision," *Grayscale Invs., LLC v. SEC*, 82 F.4th 1239, 1245 (D.C. Cir. 2023) (cleaned up), drawing "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).

They have done nothing of the sort here. They may have "considered the relevant issues" in their internal investigation, *see* ECF No. 11-17, but the Policy they adopted bears no "rational connection" to the facts found in that investigation, *see* Pl.'s Br. 5, 38. Even putting aside the reported conclusions of their internal investigation, Defendants' stated concern about foreign-*government* censorship of speech in the United States bears no rational connection to a policy barring from the country private actors, not government officials, and their "immediate family members." ECF No. 45-2; *see* ECF Nos. 11-27–30 (targeting private actors under the Policy). Because it is neither "reasonable" nor "reasonably explained," the Policy is arbitrary and capricious. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

18

Defendants' opposition brief likewise confirms that the Censorship Policy exceeds the statutory authority on which it relies. Defendants make a pitch for broad deference to Defendant Rubio's determination of a "compelling United States foreign policy interest," *see* Defs.' Br. 2, 31, despite his failure to articulate one or notify Congress of that determination. *See* 8 U.S.C. § 1182(a)(3)(C)(iii). But whether an interest is "compelling" is a familiar arena for judicial scrutiny in the First Amendment context. *See, e.g.*, *Action for Child.'s Television v. FCC*, 58 F.3d 654 (D.C. Cir. 1995) (upholding obscenity regulation under strict scrutiny's compelling-interest requirement); *Bluman*, 800 F. Supp. 2d at 286. And it is clear that Congress expected this standard to set a high bar—"significantly higher" than the one set by the "potentially serious adverse . . . consequences" standard applicable to exclusion decisions unrelated to speech. H.R. Rep. 101-955 at 6794 (1990) (Conf. Rep.), *as reprinted in* 1990 U.S.C.C.A.N. 6784, 6794. *See generally* Pl.'s Br. 40–44 (discussing legislative history). Defendant Rubio failed to clear that bar. *See id.*

## IV.    The remaining factors favor preliminary relief.

Defendants refuse to reckon with precedent holding that "self-censor[ship]" resulting from government action qualifies as irreparable injury. *See, e.g.*, *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 29 (D.D.C. 2024), *aff'd*, 138 F.4th 563 (D.C. Cir. 2025). Defendants chastise CITR for waiting "nine months" to seek relief after the Censorship Policy's May announcement, Defs.' Br. 40, but that count ignores the fact that Defendants expanded the Policy—and enforced it against the leaders of two CITR member organizations, among others—in December, prompting CITR to act. *See Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 100 (D.D.C. 2025) (finding irreparable harm despite delay because the government's actions were "more acutely felt" at a later time).

Both the balance of the equities and the public interest also favor preliminary relief. *See* Pl.'s Br. 45. Defendants argue that CITR "misses" the public interest in the enforcement of U.S.

19

immigration laws. Defs.' Br. 40. But what that generic interest means in this specific context is an interest in expelling people from this country based on their constitutionally protected expression. *See* Pl.'s Br. 30–31. And that interest is clearly outweighed by the "strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).

## V.     Neither the INA nor *Trump v. CASA* restricts review or relief.

### A.     The INA does not bar jurisdiction or relief against the Censorship Policy.

No provision of the INA precludes the exercise of jurisdiction here or restricts the available relief. That is because CITR challenges the Censorship Policy, not any removal proceeding, removal order, removal decision, or visa revocation. Indeed, Defendants point to no noncitizen CITR member against whom they have already initiated removal proceedings.

#### 1.     Section 1252(g).

Defendants' argument that Section 1252(g) bars jurisdiction over CITR's claims is wrong. Section 1252(g) is "narrow[]," and it eliminates jurisdiction only over challenges that "aris[e] from" "three discrete actions": the Attorney General's "'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 482 (1999) (quoting 8 U.S.C. § 1252(g) (emphasis in original)). CITR does not seek to intervene in any removal proceeding or to reverse any removal decision; it seeks to enjoin the Censorship Policy. *Cf. DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 13–16 (2020) (holding that § 1252(g) did not bar policy-level challenge to DACA rescission); *Escobar Molina v. DHS*, 811 F. Supp. 3d 1, 42 (D.D.C. 2025) (same for policy-level challenge to immigration arrests); *NWDC Resistance v. ICE*, 493 F. Supp. 3d 1003, 1011 (W.D. Wash. 2020) (same for ICE policy of retaliating against immigrants for their speech).

Defendants' argument stretches § 1252(g) beyond its text in direct contravention of Supreme Court precedent. Defendants rely on *AADC*, Defs.' Br. 35–36, but the plaintiffs there were noncitizens who sued to reverse decisions to "'commence proceedings' against them." 525 U.S. at 487 (quoting 8 U.S.C. § 1252(g)). *AADC* recognized that there are many "decisions or actions that may be part of the deportation process—such as the decisions to open an investigation, to surveil the suspected violator, [and] to reschedule the deportation hearing." *Id.* at 482. Though closely connected to the exercise of prosecutorial discretion in many cases, these decisions do not "ari[se] from" the commencement of proceedings for the purposes of § 1252(g). *Id.*

A contrary reading of § 1252(g) would foreclose meaningful judicial review of CITR's claims, thus raising a "serious constitutional question" that courts have a duty to avoid. *Webster v. Doe*, 486 U.S. 592, 603 (1988); *see also Jafarzadeh v. Nielsen*, 321 F. Supp. 3d 19, 31 (D.D.C. 2018) (ruling that § 1252(g) did not apply to policy challenge for this reason). To suggest that § 1252(g) applies here, Defendants rely on inapt, out-of-circuit cases where noncitizen plaintiffs directly challenged the decision to commence proceedings or execute removal orders against them. *See* Defs.' Br. 33–35. Unlike in those cases, and as explained above, CITR cannot obtain judicial review of its claims through the petition for review process. *See supra* Pt. III.C.1.

### 2.    Section 1252(b)(9).

Defendants' reliance on § 1252(b)(9) is also misplaced. This provision applies only "[w]ith respect to review of an order of removal under subsection (a)(1)." 8 U.S.C. § 1252(b); *see also INS v. St. Cyr*, 533 U.S. 289, 313 (2001); *Öztürk*, 136 F.4th at 399. Likewise, § 1252(a)(5) is only implicated by challenges to "an order of removal." 8 U.S.C. § 1252(a)(5); *see Öztürk*, 136 F.4th at 401. Again, CITR challenges the Censorship Policy, not any order of removal.

21

In any event, § 1252(b)(9) does not apply because CITR's claims do not "aris[e] from any action taken or proceeding brought to remove [a noncitizen] from the United States." 8 U.S.C. § 1252(b)(9). This provision "is certainly not a bar where, as here, the parties are not challenging any removal proceedings." *Regents*, 591 U.S. at 19 (holding that § 1252(b)(9) did not apply to recission of DACA); *see Ahmed v. Noem*, 2025 WL 2299447, at *14 (D.D.C. Aug. 8, 2025); *O.A. v. Trump*, 404 F. Supp. 3d 109, 132–34 (D.D.C. 2019) ("[I]t is implausible to construe § 1252(b)(9)'s mention of an 'action taken' or a 'proceeding brought to remove [a noncitizen]' as shorthand for any agency action that might ultimately facilitate the removal of a class of [noncitizens]." (citation omitted)). Many of the cases Defendants cite concern access-to-counsel claims arising from removal proceedings, which this Court has already rejected as "sufficiently distinct" so as to "not carry over to [other] context[s]." *S. Poverty L. Ctr. v. DHS*, 2020 WL 3265533, at *17 (D.D.C. June 17, 2020) (collecting cases cited at Defs.' Br. 37–38). Defendants' reliance on *Hines Immigr. L., PLLC v. EOIR* is likewise unavailing, as plaintiffs there challenged "decision[s] to schedule removal proceedings more rapidly," which arose directly from such proceedings. 2026 WL 969020, at *10 (D.D.C. Apr. 10, 2026). In contrast, CITR is harmed regardless of whether Defendants ever commence removal proceedings against its members.

Finally, applying § 1252(b)(9) would deprive CITR "of any meaningful chance for judicial review." *Jennings v. Rodriguez*, 583 U.S. 281, 293 (2018) (plurality). As explained above, CITR cannot obtain judicial review of its claims through the PFR process. *See supra* Pt. III.C.1. Interpreting § 1252(b)(9) to bar CITR's claims would thus contravene "the express purpose" of the provision as well as "the presumption favoring judicial review of administrative actions." *Aguilar v. ICE*, 510 F.3d 1, 19 (1st Cir. 2007); *see Jennings*, 583 U.S. at 293–94 (§ 1252(b)(9) did not bar challenge to immigration detention that could not be brought on PFR); *Escobar Molina*,

811 F. Supp. 3d at 40 (§ 1252(b)(9) did not bar claim that would otherwise be "potentially" unreviewable); *Ahmed*, 2025 WL 2299447, at *14 (§ 1252(b)(9) does not bar claims that are "not clearly cognizable in the PFR process" (citation omitted)). Defendants' reliance on *Khalil v. President, United States*, 164 F.4th 259 (3d Cir. 2026), is unavailing because that case was brought by a noncitizen in removal proceedings. This case is brought by a U.S.-based organization that cannot intervene in removal proceedings, and Defendants point to no noncitizen members against whom it has already initiated such proceedings.

### 3. Section 1201(i).

Defendants also argue that 8 U.S.C. § 1201(i) bars district court review of the Policy, Defs.' Br. 36–37, but that provision is inapplicable here. Section 1201(i) provides that "[t]here shall be no means of judicial review [ . . . ] of a [visa] revocation *under this subsection*, except in the context of a removal proceeding[.]" 8 U.S.C. § 1201(i) (emphasis added). But CITR does not seek to intervene in any removal proceeding or to reverse any visa revocation decision under § 1201(i). Rather, CITR seeks to enjoin the Censorship Policy, and nowhere in the Policy itself, or in Defendants' explanation of the Policy or its enforcement, have Defendants invoked § 1201(i).

### 4. Section 1252(f)(1).

None of the relief CITR requests falls within the scope of § 1252(f)(1). The Supreme Court has emphasized "the narrowness of [§ 1252(f)(1)'s] scope," *Biden v. Texas*, 597 U.S. at 798, and has held that it prohibits only "injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out" covered provisions of the INA, *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022). The injunction sought here would prohibit Defendants from carrying out the Policy, not from carrying out any covered provision. And as this Court has held, § 1252(f)(1) is "not implicated" where a party "seeks to enjoin conduct that

23

allegedly is not even authorized." *Damus v. Nielsen*, 313 F. Supp. 3d 317, 328 (D.D.C. 2018) (quoting *R.I.L-R*, 80 F. Supp. 3d at 184). Even downstream effects on the covered provisions would be insufficient to bring the injunction within § 1252(f)(1)'s scope. *See Aleman Gonzalez*, 596 U.S. at 553 n.4 (explaining that "some collateral effect on the operation of a covered provision" is insufficient to implicate § 1252(f)(1)); *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin* ("*RAICES*"), 2026 WL 1110616, at *25 (D.C. Cir. Apr. 24, 2026) (holding that § 1252(f)(1) is not implicated merely because an injunction "could have the indirect effect of compelling . . . adhere[nce] to [covered provisions]").

Moreover, the D.C. Circuit has rejected Defendants' argument that § 1252(f)(1) applies to APA relief. That "prohibition is limited to enjoining the operation of certain statutory provisions," and thus does not affect vacatur under § 706. *RAICES*, 2026 WL 1110616, at *27. So are stays under § 705. *See Make the Rd. N.Y. v. Noem*, 2025 WL 3563313, at *15 (D.C. Cir. Nov. 22, 2025); *Coal. for Humane Immigrant Rts. v. Noem*, 805 F. Supp. 3d 48, 72–74 (D.D.C. 2025).

### B.    *Trump v. CASA* does not restrict relief against the Censorship Policy.

The requested relief is also consistent with *Trump v. CASA*, which held that the Judiciary Act of 1789 does not authorize federal courts to issue universal injunctions unless necessary to provide complete relief to the plaintiffs. 606 U.S. 831. *CASA* does not alter the availability of APA relief here. *See Make the Rd. N.Y. v. Noem*, 2025 WL 3563313, at *34 ("*CASA* does not control the scope of relief available under Section 705."); *Neguse v. ICE*, 813 F. Supp. 3d 45, 100 (D.D.C. 2025) (similar). The *CASA* majority explicitly distinguished injunctions from APA relief, emphasizing that it did not reach the latter. 606 U.S. at 847 n.10.

Nor does *CASA* restrict the requested injunctive relief here. Under *CASA*, district courts may still issue universal injunctions where they are necessary to provide complete relief to the

24

plaintiffs. 606 U.S. at 851. The requested injunction is necessary to provide CITR and its members complete relief for at least two reasons. First, an injunction limited to members would require CITR to disclose its membership list to Defendants, which would impermissibly burden CITR's and its members' associational rights, *see NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958), and put CITR's members "at risk of 'retaliation,'" *Make the Rd. N.Y. v. Noem*, 2025 WL 2576701, at *2 (D.D.C. Sept. 5, 2025). Second, relief limited to CITR's members would not effectively remedy the harms CITR's U.S. citizen members suffer under the Policy, which stem from its chilling effects on noncitizen colleagues and students, including non–CITR members. *See* Pl.'s Br. 12, 18–20; ECF No. 11-7, at ¶¶ 8–18; ECF No. 11-8, at ¶¶ 11–12.

## VI.     The Court should not require a bond.

The Court should reject Defendants' request for a bond, *see* Defs.' Br. 42, or require only a nominal one. Courts in this district have repeatedly "declin[ed] to require bonds in public interest litigation," where, as here, the "government is the enjoined party and no concrete economic injury is established," and "[w]here a bond would have a chilling effect on access to justice." *N. Am.'s Bldg. Trades Unions v. DOD*, 783 F. Supp. 3d 290, 315 (D.D.C. 2025); *see also League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 224–25 (D.D.C. 2025) (collecting cases declining to require bond as condition of injunction against government).

**Conclusion**

For the reasons stated above, CITR respectfully requests that the Court stay the Censorship Policy under the APA and preliminarily enjoin Defendants from enforcing it.

25

May 6, 2026                                    Respectfully submitted,


/s/ *Nicole Schneidman*                        /s/ *Carrie DeCell*

Nicole Schneidman*                             Carrie DeCell (D.C. Bar No. 1015491)
Protect Democracy Project                      Raya Koreh (D.D.C. Bar No. NY0712)
2020 Pennsylvania Avenue NW, Suite 163         Kiran Wattamwar*
Washington, DC 20006                           Anna Diakun*
(202) 579-4582                                 Katie Fallow*
nicole.schneidman@protectdemocracy.org         Alex Abdo*
                                               Jameel Jaffer (D.D.C. Bar No. MI0067)
                                               Knight First Amendment Institute
                                                 at Columbia University
                                               475 Riverside Drive, Suite 302
                                               New York, NY 10115
                                               (646) 745-8500
                                               carrie.decell@knightcolumbia.org

                                               *Counsel for Plaintiff*

                                               * Admitted *pro hac vice*.